ACCEPTED
04-14-00735-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
2/20/2015 1:49:45 PM
KEITH HOTTLE
CLERK

## CAUSE NO. **04-14-00735-CV**

_____

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

2/20/2015 1:49:45 PM

KEITH E. HOTTLE
Clerk

## IN THE COURT OF APPEALS
## FOR THE
## FOURTH JUDICIAL DISTRICT
## SAN ANTONIO, TEXAS

### Thomas Christopher and Catrina Christopher
### v.
### Brian C. Simcoe and Adria Simcoe

_____

### APPEAL FROM THE 45TH JUDICIAL DISTRICT COURT
### BEXAR COUNTY, TEXAS
### HONORABLE JUDGE BARBARA HANSON NELLERMOE, JUDGE PRESIDING

### BRIEF OF APPELLANT

**Jamie L. Graham, SBOT 24027335**
**Sarah Anne Lishman, SBOT 24086267**
**JAMIE GRAHAM & ASSOCIATES, PLLC**
310 S. St. Mary's St, Ste. 845
San Antonio, Texas 78205
Telephone: (210) 308-6448
Telecopier: (210) 308-5669
Email: sarahanne.jgrahamlaw@yahoo.com
Attorney for Appellant, Brian C. Simcoe

Oral Argument Not Requested

# Contents

IDENTITY OF PARTIES AND COUNSEL .......................................................4

INDEX OF AUTHORITIES..............................................................................5

STATEMENT OF THE CASE...........................................................................6

STATEMENT OF FACTS .................................................................................7

ISSUES PRESENTED.....................................................................................11

  I.    Whether the evidence is legally sufficient to support the trial court's finding that enforcement of the oral agreement was not barred by the statute of frauds. .11

  II.  Whether the evidence is legally sufficient to support the trial court's judgment solely against Appellant. ......................................................................11

SUMMARY OF THE ARGUMENTS ..............................................................12

ARGUMENTS AND AUTHORITIES .............................................................13

  I.    Whether the evidence is legally sufficient to support the trial court's finding that enforcement of the oral agreement was not barred by the statute of frauds. .13

    Standard of review ....................................................................................13

    The statute of frauds barred enforcement of the alleged oral contract as a matter of law. ......................................................................................................14

    In order to enforce the purported oral contract, the burden was on the Christophers to show some exception to the statute of frauds. ..........................15

    Calculation of the time for performance depends on the tenor of the agreement and the understanding of the parties at the time the agreement is made, excluding merely fortuitous events. ...............................................................15

    The parties disputed what type of performance was required of the Simcoes under the oral contract. ...................................................................................16

    The evidence is legally insufficient to show that Payment Performance could have been completed within one year of the making of the oral contract. ........17

    The evidence is legally insufficient to support the trial court's finding that Refinance Performance could conceivably have been completed within one year of the making of the oral agreement..........................................................19

    The trial court enforced the oral contract against Appellant, finding that Refinance Performance of the oral contract was to be completed within one year.  RR 85:15-21. .....................................................................................19

II.   Whether the evidence is legally sufficient to support the trial court's judgment solely against Appellant. ...........................................................20

The undisputed evidence showed that both Appellant and Adria Simcoe were liable under the alleged oral contract. ............................................................20

CONCLUSION ...............................................................................................22

PRAYER ........................................................................................................22

APPENDIX .....................................................................................................25

# IDENTITY OF PARTIES AND COUNSEL

Appellant:   Brian C. Simcoe- Defendant in the underlying case

Appellees:   Thomas Christopher- Plaintiff in the underlying case

Catrina Christopher- Plaintiff in the underlying case

Adria Simcoe- Third-party Defendant in the underlying case

Counsel for Appellant:  Jamie L. Graham and Sarah Anne Lishman, Jamie Graham & Associates, PLLC, 310 S. St. Mary's St., Suite 845, San Antonio, Texas 78205

Counsel for Appellees Thomas Christopher and Catrina Christopher:  James A. Rodriguez, 540 S. St. Mary's St., San Antonio, Texas 78205

Adria Simcoe: Pro se; 115 Osprey Haven, San Antonio, Texas 78253

# INDEX OF AUTHORITIES

CASES

Burbage v. Burbage, 447 S.W.3d 249 (Tex. 2014)………..…………………………13

Dynegy, Inc. v. Yates, 422 S.W.3d 638 (Tex. 2013)………………………………13

City of Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005)………………………14, 17

Ford Motor Co. v. Ridgway, 135 S.W.3d 598 (Tex. 2004)………………………..13

Young v. Ward, 917 S.W.2d 506 (Tex. App.—Waco, 10th Dist. 1996)…..15, 16, 17

Pitman v. Lightfoot, 937 S.W.2d 496 (Tex. App.—San Antonio 1996)…………...20

SBC Operations, Inc. v. Business Equation, Inc., 75 S.W.3d 462 (Tex. App.—San Antonio [4th Dist.] 2001)………………………………………………….16, 19

Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp., 418 S.W.3d 172 (Tex. App.—Dallas [5th Dist.] 2013)………………………………………13

STATUTES

TEX. BUS. & COM. CODE § 26.01…………………………………………………...14, 15

## STATEMENT OF THE CASE[1]

The underlying suit is a breach of oral contract action filed on September 20, 2012 by Appellees Thomas and Catrina Christopher (hereafter "the Christophers") against Appellant Brian Simcoe. CR 1-4. Appellant filed his Original Answer on October 5, 2012. CR 6-7. Appellant filed his First Amended Answer on October 24, 2012. CR 8-9. On June 5, 2013, Appellant filed his Second Amended Answer and Petition to Joinder Third Party, joining Appellee Adria Simcoe, his ex-wife, as a third-party defendant. CR 15-17. On August 16, 2013, Appellant filed his Second Amended Answer and First Amended Petition to Join Third Party Defendant. CR 19-21. On February 11, 2014, Appellant filed his Third Amended Answer and Second Amended Petition to Join Third Party Defendant. CR 23-25. The Christophers filed their Second Amended Petition for Breach of Oral Contract and For Promissory Estoppel on February 20, 2014. CR 26-30.

The final hearing of this matter was held on February 24, 2014, which included Appellant's motion to dismiss on the basis of the statute of frauds. CR 31. The judgment was signed on July 9, 2014. CR 36-37.

Appellant timely filed a Motion for New Trial on August 7, 2014, and a First Amended Motion for New Trial on September 9, 2014. CR 40-82; CR 83-129. The

---

[1] In this Brief, the Clerk's Record is cited as "CR," and the Reporter's Record from the hearing on February 24, 2014 is cited as "RR."

Motion for New Trial was denied after hearing on September 25, 2014. CR 130-131. Appellant filed his Notice of Appeal on October 21, 2014. CR 132-134.

## STATEMENT OF FACTS

In the summer of 2012, the Christophers' daughter, Adria Simcoe, was expecting her fourth child with her then-husband, Brian Simcoe. RR 43:13. Desiring to help the Simcoe family, it is undisputed that the Christophers purchased a 2010 Chrysler Town and Country (hereafter "the Van") and a Jeep, intending for these vehicles to be used by the growing Simcoe family. RR 37:11-15; 43:19-25. It is undisputed that at the time the Van was purchased by the Christophers, the Simcoes' credit score precluded them from acquiring financing for the Van in their own names. RR 12:23-25; 13:1-4. It is undisputed that the Christophers signed a five-year note for the Van. RR 21:9-13. It is undisputed while the Van was in the possession of the Simcoes, the Simcoes made the monthly payments for the Van. RR 14:24-25; 15:1-5.

On February 21, 2012, Adria Simcoe filed for divorce. RR 51:15-20. Shortly thereafter, Appellant returned the Van to the Christophers with a kind note explaining that, in light of the pending divorce, he was no longer able to afford the monthly payments. RR 16:6-13; 52:4-5. The Christophers had the Van repossessed about one month later. RR 17:21-24. The Van was sold at auction, leaving a

7

deficiency of $18,411.14, for which the Christophers were the named responsible parties. RR 19:7-15.

The Simcoes' Final Decree of Divorce was signed on November 5, 2013. RR 40:21-22. Nowhere in the decree is the Van mentioned as an asset or a liability of the marital estate. CR 113-114; RR 80:21-25; 81:1-5. The Jeep was awarded to Adria Simcoe. CR 113-114.

On September 20, 2012, the Christophers filed suit against Appellant, alleging that he breached an oral contract whereby the Christophers were to obtain the Van in their names and Appellant was to be responsible for all payments thereon. CR 1-4. The Christophers sought to hold Appellant responsible for the entire amount of the deficiency. *Id*. Appellant brought his ex-wife, Adria Simcoe, into the suit as a third-party defendant, maintaining that if he was liable, she shared joint and several liability with him as a responsible party to the alleged oral contract. CR 23-25.

At the final hearing on February 24, 2014, the Christophers alleged that the Simcoes were obligated to make the monthly payments for the Van, regardless of whether or not the Simcoes had possession of it. *Compare* RR 11:24-25; 12:1-2; RR 34:25; 35:1-4, *with* RR 60:18-22; RR 70:6-12. The Christophers further alleged that they agreed to acquire the Van in their names, but that the Simcoes were obligated to make all payments under the five year note or to refinance the vehicle into their names once their credit so permitted. RR 20:17-18; RR 24:13-19; RR 28:10-19.

8

Conversely, Appellant maintained that the Simcoes agreed only to make payments for the Van for so long as they had possession of it. RR 60:18-22; RR 70:6-12. In other words, according to Appellant, by returning the Van to the Christophers, the Simcoes' obligation to make payments ceased. RR 71:16-20. Appellant further argued that the time for performance, based upon the five-year note signed by the Christophers, was greater than one year. RR 67:22-25; 68:1-3. As such, the statute of frauds barred enforcement of the oral agreement because it was not in writing nor was it signed by the parties to be bound. RR 84:2-8.

At the conclusion of the hearing, the trial court found that the alleged oral contract was taken outside of the statute of frauds "by virtue of the fact that [the Van] could have been refinanced as the plan was to refinance as soon as Mr. Simcoe's credit improved." RR at 85:17-21. Judgment was rendered against Appellant for $18,411.14, and an additional $5,000.00 was awarded to the Christophers for their attorney's fees. RR 86:2-4: CR 36-37. No judgment was rendered against Appellee Adria Simcoe. RR 86:5-15; CR 36-37.

Appellant timely filed a Motion for New Trial, and a hearing on said Motion was held on September 11, 2014. CR 83-88. Appellant requested a new trial on the grounds that there was no evidence the alleged oral agreement could be performed or was intended to be performed within one year, and because Adria Simcoe

9

should've been held jointly and severally liable. *Id*. The trial court denied

Appellant's Motion for New Trial and this appeal followed. CR 131-134.

## ISSUES PRESENTED

I.   Whether the evidence is legally sufficient to support the trial court's finding that enforcement of the oral agreement was not barred by the statute of frauds.

II.   Whether the evidence is legally sufficient to support the trial court's judgment solely against Appellant.

# SUMMARY OF THE ARGUMENTS

To be enforceable, the statute of frauds requires that a contract to answer for the debt of another, like the one at issue in this case, be in writing and signed by the party to be bound. It is undisputed that there was not a written and signed contract between the Simcoes and the Christophers for the debt at issue. The statute of frauds therefore barred enforceability of the alleged oral contract as a matter of law.

Performance of the alleged oral contract, whether by payment in full or refinancing of the debt, was not to be completed within one year, according to the tenor of the agreement and the understanding of the parties at the time the agreement was allegedly made. Performance within one year could only have been possible upon the occurrence of some merely fortuitous event. The evidence was legally insufficient to support the trial court's finding that the oral contract was enforceable because of the One-Year Exception to the statute of frauds.

The undisputed evidence shows that both Appellant and Adria Simcoe were parties to the oral contract at issue as promisors. The terms of the oral contract did not differentiate or apportion liability between Appellant and Adria Simcoe. Accordingly, the only theory of liability supported by the undisputed evidence before the trial court was joint and several liability of both Appellant and Adria Simcoe. There was legally insufficient evidence to support the trial court's take-nothing judgment with respect to Appellee Adria Simcoe.

12

## ARGUMENTS AND AUTHORITIES

I.      Whether the evidence is legally sufficient to support the trial court's finding that enforcement of the oral agreement was not barred by the statute of frauds.

*Standard of review*

Whether a contract comes within the statute of frauds is a question of law, which is reviewed *de novo*. Dynegy, Inc. v. Yates, 422 S.W.3d 638, 642 (Tex. 2013). Whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact. Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp., 418 S.W.3d 172, 192 (Tex. App.—Dallas [5th Dist.] 2013).

For an issue where the opposing party bears the burden of proof, a legal-sufficiency challenge to an adverse finding will be sustained if the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. Burbage v. Burbage, 447 S.W.3d 249, 259 (Tex. 2014). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). Evidence that creates a mere surmise or suspicion of a vital fact is to be regarded as, in legal effect, no evidence. *Id*. The reviewing court should consider the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless

reasonable jurors could not." City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005). In conducting a legal sufficiency review, the Court cannot disregard undisputed evidence that allows of only one logical inference. *Id*. at 814.

*The statute of frauds barred enforcement of the alleged oral contract as a matter of law.*

The statute of frauds, as codified in Section 26.01 of the Texas Business and Commerce Code, applies to "a promise by one person to answer for the debt, default, or miscarriage of another person." TEX. BUS. & COM. CODE § 26.01(b)(2). Enforceability of such promises or agreements is barred as a matter of law unless they are "(1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." TEX. BUS. & COM. CODE § 26.01(a).

The oral contract at issue in the present case falls within the purview of the statute of frauds because the Simcoes allegedly agreed to answer for the debt of the Christophers. *See* RR 12:23-25; 13:1-4. Accordingly, in order to be enforceable, the statute of frauds required that this contract be in writing and signed by the Simcoes. It is undisputed that there was not a written and signed contract between the Simcoes and the Christophers for the debt at issue. RR 21:6-8; 52:6-9. The statute of frauds therefore barred enforceability of the oral contract as a matter of law.

14

*In order to enforce the purported oral contract, the burden was on the Christophers to show some exception to the statute of frauds.*

At trial, the Christophers argued that an exception to the statute of frauds applied in this case because performance of the oral contract could have been completed within one year's time (the "One-Year Exception"). RR 83:18-24. The basis for the One-Year Exception is found in Section 26.01(b)(6) of the Texas Business and Commerce Code, which states that the statute of frauds does not bar enforcement of "an agreement which is not to be performed within one year from the date of making the agreement." The question for the trial court was whether the alleged oral contract was to be performed within one year from the date the agreement was made.

*Calculation of the time for performance depends on the tenor of the agreement and the understanding of the parties at the time the agreement is made, excluding merely fortuitous events.*

To determine the time for performance, the court simply compares the date the oral agreement is made to the date when the performance under the oral agreement is to be completed, and if there is a year or more in between them, a writing is required to render the oral agreement enforceable. Young v. Ward, 917 S.W.2d 506, 508 (Tex. App.—Waco, 10th Dist. 1996). In the absence of a known date when performance will be completed, the statute of frauds does not apply if

performance could conceivably be completed within one year of the agreement's making. *Id.* at 509. Whether performance could conceivably be completed within one year depends on the tenor of the agreement and the understanding of the parties at the time the agreement is made. *Id.* If performance within one year is dependent upon some merely fortuitous event, a writing is required to enforce the oral agreement. *Id.* at 510–511. If a contract explicitly calls for performance over a period longer than one year, the mere theoretical possibility of termination of the contract within one year because of a fortuitous event does not take the contract out of the statute of frauds. SBC Operations, Inc. v. Business Equation, Inc., 75 S.W.3d 462, 466 (Tex. App.—San Antonio [4th Dist.] 2001).

*The parties disputed what type of performance was required of the Simcoes under the oral contract.*

In the instant case, the parties presented conflicting testimony as to what type of performance was required of the Simcoes under the oral agreement. Appellant testified that the Simcoes were only required to make payments for so long as they had possession of the Van. RR 70:6-12; 71:16-20. The Christophers maintained that performance would be completed when the Simcoes paid all monthly installment payments for the Van owing under the finance agreement signed by the Christophers, or, alternatively, when the Simcoes' credit improved and they

qualified to refinance the Van into their own names. RR 20:17-18; 24:13-19; 34:25; 35:1-4.

If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. City of Keller, 168 S.W.3d at 819. Accordingly, the reviewing court must presume that performance under the oral contract at issue was complete either upon payment of the debt in full by the Simcoes ("Payment Performance"), or refinance of the debt into the Simcoes' names ("Refinance Performance").

At trial the Christophers bore the burden of proving that either Payment Performance or Refinance Performance could have been completed within one year in order to enforce the oral contract under the One-Year Exception to the statute of frauds. The proper analysis for the trial court was whether the Christophers presented sufficient evidence to show that performance could conceivably be completed within one year of the agreement's making, based upon the tenor of the agreement and the understanding of the parties, and excluding the possibility of some merely fortuitous event. *See* Young, 917 S.W.2d at 510–511.

*The evidence is legally insufficient to show that Payment Performance could have been completed within one year of the making of the oral contract.*

The only evidence presented to the trial court reflecting the time for completion of Payment Performance was the note signed by the Christophers. RR

17

21:9-13; 36:1-5. By the express term of that note, there was indeed a known date when Payment Performance was to be completed. Payment Performance would be completed after five years of monthly installment payments. *Id.*

In conducting a legal sufficiency review, the Court cannot disregard undisputed evidence that allows of only one logical inference. City of Keller v. Wilson, 168 S.W.3d at 814. In the instant case, the only logical inference to be made from the undisputed evidence presented to the trial court was that Payment Performance was not to be completed within one year. While there may be some conceivable possibility that the Simcoes could have paid off the Van within one year, no evidence was presented at trial showing that was the tenor of the oral agreement or the understanding of the parties at the time the oral agreement was made. No evidence was presented to the trial court indicating the Christophers expected the Simcoes to pay off the Van within one year. To the contrary, the evidence presented to the trial court indicated that the Christophers knew that the Simcoes were struggling financially, and could not afford to pay off the Van within one year. RR 67:22-25; 68:1-3. Completion of Payment Performance within one year could only have been possible upon the occurrence of a merely fortuitous event that transformed the financial circumstances of the Simcoe family.

The evidence further demonstrated that the Simcoes actually made payments for the Van for over a year, with no complaint from the Christophers or request that

they pay the Van off in full.  RR 14:24-25; 15:1-5.  The fact that over a year lapsed without completion of performance demonstrates that the parties never intended for the Simcoes to pay off the Van in full within a year.

Because the written finance agreement was for a five year term and completion of Payment Performance within one year was only possible upon the occurrence of a merely fortuitous event, the One-Year Exception does not apply and the statute of frauds was a complete bar to enforcement of the oral agreement in this case. *See SBC Operations, Inc.*, 75 S.W.3d at 466.

*The evidence is legally insufficient to support the trial court's finding that Refinance Performance could conceivably have been completed within one year of the making of the oral agreement.*

The trial court enforced the oral contract against Appellant, finding that Refinance Performance of the oral contract was to be completed within one year.  RR 85:15-21.  Even considering the evidence in the light most favorable to the judgment, there is no evidence to support the trial court's finding "that [the Van] could have been refinanced" within a year of the agreement's making.  RR at 85:17-21.  No evidence was presented at trial to show whether the Simcoes qualified to refinance the Van into their names within a year after the alleged oral agreement was made.  Further, there was no evidence that it was the tenor of the agreement or the understanding of the parties at the time the agreement was made that the Simcoes

would refinance the Van within one year.  No evidence was presented that the Christophers asked the Simcoes to refinance within one year.  No evidence was presented that the Simcoes even attempted to refinance within one year.

Absent any evidence that Refinance Performance could have been or was to be completed within one year, the evidence is legally insufficient to support the trial court's finding that the One Year Exception applied to the alleged oral contract at issue.  Enforcement of the oral contract was barred by the statute of frauds as a matter of law.

II.     Whether the evidence is legally sufficient to support the trial court's judgment solely against Appellant.

Joint and several liability usually arises when two or more promisors in the same contract promise the same or different performances to the same promisee. Pitman v. Lightfoot, 937 S.W.2d 496, 528 (Tex. App.—San Antonio 1996). Obligations of multiple parties to a contract are usually joint and several. *Id.* *The undisputed evidence showed that both Appellant and Adria Simcoe were liable under the alleged oral contract.*

The undisputed evidence presented to the trial court showed that, under the terms of the alleged oral contract sued upon, both Appellant and his then-wife, Appellee Adria Simcoe, orally promised the Christophers to pay for the Van.  RR 34:25; 35:1-4; 35:11-16; 43:19-25; 50:16-21.  Evidence was presented that during

the divorce of Appellant and Adria Simcoe, the Jeep was awarded to Adria Simcoe and Appellant was asked to take the Van and assume all payments therefore. RR 45:7-16.35:11-16. The evidence further demonstrated that Appellant could not afford to assume the Van payments individually, prompting him to return the Van to the Christophers. RR 63:17-20.

The oral contract that the Christophers sued upon was allegedly made on that date when the Christophers acquired the Van. RR 14:24-25; 27:22. Regardless of whatever subsequent negotiation or agreement was allegedly made regarding the vehicles upon the divorce of Appellant and Adria Simcoe, the terms of the oral contract as they stood on June 30, 2010 are controlling.

It is undisputed that both Appellant and Adria Simcoe were parties to the oral contract as promisors. The terms of the oral contract did not differentiate or apportion liability between Appellant and Adria Simcoe. *See* RR 50:16-21. Accordingly, the only theory of liability supported by the undisputed evidence before the trial court was joint and several liability of both Appellant and Adria Simcoe. *See* Pitman, 937 S.W.2d at 528. There was legally insufficient evidence to support the trial court's take-nothing judgment with respect to Appellee Adria Simcoe. RR 86:5-14.

21

## CONCLUSION

The undisputed evidence before the trial court was that the contract the Christophers sued on was not in writing or signed by the Christophers. It was therefore unenforceable under the statute of frauds. There was no evidence presented to the trial court to show that the Simcoes were to refinance the Van within one year. The evidence is therefore factually insufficient evidence to support the trial court's finding that the oral contract was enforceable under the One Year Exception to the statute of frauds.

The undisputed evidence shows that both Appellant and Adria Simcoe were parties to the oral contract at issue as promisors. The terms of the oral contract did not differentiate or apportion liability between Appellant and Adria Simcoe. Accordingly, the only theory of liability supported by the undisputed evidence before the trial court was joint and several liability of both Appellant and Adria Simcoe. There was legally insufficient evidence to support the trial court's take-nothing judgment with respect to Appellee Adria Simcoe.

## PRAYER

Appellant Brian Simcoe respectfully prays this Court grant his appeal, and hold that enforcement of the oral contract is barred by the statue of frauds. Appellant further prays that this Court reverse the judgment of the trial court, and render judgment that Appellees, the Christophers, take nothing against him by way of their

22

claims. Appellant prays that, in the alternative, this Court reverse the judgment of the trial court, and render judgment holding Appellee Adria Simcoe jointly and severally liable for all damages and attorney's fees awarded to Appellees, the Christophers. Appellant further prays for all other and further relief to which he may be entitled.

Respectfully Submitted,

/s/ Sarah Anne Lishman
Sarah Anne Lishman
State Bar No. 24086267
Jamie L. Graham
State Bar No. 24027335
JAMIE GRAHAM & ASSOCIATES, PLLC
310 S. St. Mary's St., Suite 845
San Antonio, Texas 78205
Tel. (210) 308-6448
Fax (210) 308-5669

## Certificate of Compliance

I certify that the *Brief of Appellant* is in compliance with the Texas Rules of Appellate Procedure with respect to its word count, containing approximately 3,345 words.

/s/ Sarah Anne Lishman
Sarah Anne Lishman
State Bar No. 24086267
Attorney for Appellant, Brian Simcoe

## Certificate of Service

I certify that a true copy of this *Brief of Appellant* was served in accordance with rule 9.5 of the Texas Rules of Appellate Procedure on each party or that party's lead counsel on February 20, 2015 as follows:

Party:                          Thomas Christopher
Lead attorney:              James A. Rodriguez
Address of service:       540 S. St. Mary's St.
                                    San Antonio, Texas 78205
Method of service:       Via Facsimile: (210) 224-8214
Date of service:            February 20, 2015

Party:                          Catrina Christopher
Lead attorney:              James A. Rodriguez
Address of service:       540 S. St. Mary's St.
                                    San Antonio, Texas 78205
Method of service:       Via Facsimile: (210) 224-8214
Date of service:            February 20, 2015

Party:                          Adria Joy Simcoe
Address of service:       115 Osprey Haven, San Antonio, Texas 78253
Method of service:       Via First class mail and certified mail
Date of service:            February 20, 2015

/s/ Sarah Anne Lishman
Sarah Anne Lishman
State Bar No. 24086267
Attorney for Appellant, Brian C. Simcoe

# **APPENDIX**

APPENDIX A: Judgment

APPENDIX B: Statutes

APPENDIX C: Cases

# Appendix A:
# Judgment

Document
scanned as filed.



2012CI15519 -0166

NO. 2012-CI-15519

| | | |
|---|---|---|
| THOMAS CHRISTOPHER AND | § | IN THE DISTRICT COURT |
| CATRINA CHRISTOPHER | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 166TH JUDICIAL DISTRICT |
| | § | |
| BRIAN C. SIMCOE and | § | |
| ADRIA SIMCOE | § | |
| Defendants | § | OF BEXAR COUNTY, TEXAS |

## JUDGMENT

The Court considered this case on February 24, 2014. Plaintiffs, Thomas Christopher and Catrina Christopher, appeared through attorney of record James A. Rodriguez; Defendant, Brian C. Simcoe, appeared through attorneys of record Jamie Graham and Cody Graham; and Third-Party Defendant, Adria Simcoe, appeared *pro se*.

The Court has considered the pleadings and records on file in this cause and the evidence and arguments presented by counsel and is of the opinion that judgment should be rendered for Plaintiff.

It is accordingly ADJUDGED AND ORDERED that Thomas Christopher and Catrina Christopher, Plaintiffs, recover from Brian C. Simcoe, Defendant, judgment for-

1.    $18,411.14 as damages;

2.    $5,000.00 as attorney's fees;

It is ORDERED that Plaintiffs take nothing against Adria Simcoe, Third-Party Defendant.

It is ORDERED that Plaintiffs shall have all abstracts, writs of execution and other process necessary to enforce this judgment.

This judgment finally disposes of all parties and all claims and is appealable.

SIGNED on _July 9, 2014_.


_____
HON. BARBARA NELLERMOE
JUDGE PRESIDING

APPROVED AS TO FORM:

Law Office of James A. Rodriguez
540 S. St. Mary's St.
San Antonio, TX 78205
Tel: (210) 224-8200
Fax: (210) 224-8214

By: _____
James A. Rodriguez
SBN: 24057667
Attorney for Plaintiffs


Law Offices of Jamie L. Graham
310 S. St. Mary's St., Suite 845
San Antonio, TX 78205
Tel: (210) 308-6448
Fax: (210) 308-5669


By: _____
Jamie L. Graham
SBN: 24057667
Attorney for Defendant Brian C. Simcoe


By: _____
Adria Simcoe, Third-Party Defendant
_Pro Se_

37

# Appendix B:
# Statutes

## *Tex. Bus. & Com. Code § 26.01*

This document is current through the 2013 3rd Called Session

*Texas Statutes and Codes* > *BUSINESS AND COMMERCE CODE* > *TITLE 3. INSOLVENCY, FRAUDULENT TRANSFERS, AND FRAUD* > *CHAPTER 26. STATUTE OF FRAUDS*

### § 26.01. Promise or Agreement Must Be in Writing

**(a)** A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

   **(1)** in writing; and

   **(2)** signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

**(b)** Subsection (a) of this section applies to:

   **(1)** a promise by an executor or administrator to answer out of his own estate for any debt or damage due from his testator or intestate;

   **(2)** a promise by one person to answer for the debt, default, or miscarriage of another person;

   **(3)** an agreement made on consideration of marriage or on consideration of nonmarital conjugal cohabitation;

   **(4)** a contract for the sale of real estate;

   **(5)** a lease of real estate for a term longer than one year;

   **(6)** an agreement which is not to be performed within one year from the date of making the agreement;

   **(7)** a promise or agreement to pay a commission for the sale or purchase of:

   **(A)** an oil or gas mining lease;

   **(B)** an oil or gas royalty;

   **(C)** minerals; or

   **(D)** a mineral interest; and

   **(8)** an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in *Section 74.001, Civil Practice and Remedies Code*. This section shall not apply to pharmacists.

## History

Enacted by Acts 1967, 60th Leg., ch. 785 (H.B. 293), § 1, effective September 1, 1967; am. Acts 1977, 65th Leg., ch. 817 (H.B. 1048), § 21.01, effective August 29, 1977; am.

Jamie Graham

*Acts 1987, 70th Leg., ch. 551 (S.B. 281)*, § 1, effective August 31, 1987; am. *Acts 2005, 79th Leg., ch. 187 (H.B. 735)*, § 1, effective September 1, 2005.

LexisNexis ® Texas Annotated Statutes
Copyright © 2015 by Matthew Bender & Company, Inc. a member of the LexisNexis Group All rights reserved.

# Appendix C:
# Cases

# Burbage v. Burbage

Supreme Court of Texas

January 9, 2014, Argued; August 29, 2014, Opinion Delivered

NO. 12-0563

## Reporter

447 S.W.3d 249; 2014 Tex. LEXIS 753; 57 Tex. Sup. J. 1303; 2014 WL 4252274

ALLEN CHADWICK BURBAGE, PETITIONER AND CROSS-RESPONDENT, v. W. KIRK BURBAGE AND BURBAGE FUNERAL HOME, RESPONDENTS AND CROSS-PETITIONERS

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS.

_Burbage v. Burbage, 447 S.W.3d 291, 2011 Tex. App. LEXIS 10034 (Tex. App. Austin, Dec. 21, 2011)_

## Core Terms

damages, funeral home, trial court, qualified privilege, defamation, reputation, Questions, exemplary damages, court of appeals, injunction, cemetery, jury award, defamatory, preservation, broad-form, jury's, evidence supports, mental anguish, no evidence, privileged, estimate, funeral, invalid, compensatory damages, defamatory statement, specific objection, special damage, jury charge, compensate, cancelled

## Case Summary

### Overview

HOLDINGS: [1]-In a defamation case arising from statements defendant made alleging plaintiff committed elder abuse, family abuse, and fraud, defendant failed to preserve error in the jury charge and the reviewing court could not reach the issue of qualified privilege; [2]-There was no evidence to support the compensatory damage award, and the award of exemplary damages could not stand; [3]-Only speculative evidence supported the actual impact of the defamatory statements plaintiff's funeral home business; [4]-The trial court's permanent injunction making a broad prohibition on defendant's future speech about plaintiff's actions was an impermissible prior restraint on free speech in violation of _U.S. Const. amend. I_.

### Outcome

Affirmed in part; and reversed in part.

## LexisNexis® Headnotes

Governments > Courts > Common Law

Torts > ... > Defenses > Privileges > Qualified Privileges

Governments > Courts > Common Law

Torts > ... > Defenses > Privileges > Qualified Privileges

*HN1* The common law provides a qualified privilege against defamation liability when a communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication. Defamation actions necessarily inhibit free speech and, thus, the qualified privilege offers an additional safeguard, even in cases of private, non-political speech.

Torts > ... > Defenses > Privileges > Qualified Privileges

Evidence > Burdens of Proof > Burden Shifting

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defenses > Privileges > Qualified Privileges

Evidence > Burdens of Proof > Burden Shifting

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Torts > ... > Defamation > Public Figures > Actual Malice

*HN2* In a defamation action, the qualified privilege operates as an affirmative defense in the nature of confession and avoidance; the defendant bears the burden of proving

privileged publication unless the plaintiff's petition affirmatively demonstrates privilege. If a defendant establishes the privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice. Actual malice, in the defamation context, means the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.

Torts > ... > Defenses > Privileges > Qualified Privileges

Torts > ... > Defenses > Privileges > Qualified Privileges

*HN3* In a defamation action, qualified privilege presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

*HN4* Any complaint to a jury charge is waived unless specifically included in an objection.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

**HN5** It is fundamental to the system of justice that parties have the right to be judged by a jury properly instructed in the law.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > Appeals > Standards of Review > Reversible Errors

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > Appeals > Standards of Review > Reversible Errors

**HN6** A broad-form damages submission mixing valid and invalid elements of damages creates harmful error.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

**HN7** The Texas Rules of Civil Procedure establish the preservation requirements to raise a jury-charge complaint on appeal. The complaining party must object before

the trial court and must point out distinctly the objectionable matter and the grounds of the objection. *Tex. R. Civ. P. 274*; *Tex. R. App. P. 33.1*. Under *Tex. R. Civ. P. 274*, any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections. *Tex. R. Civ. P. 274*.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**HN8** Preservation requires (1) a timely objection stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and (2) a ruling. *Tex. R. App. P. 33.1*. The test ultimately asks whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

**HN9** Only by proper objection does a litigant afford the trial court sufficient opportunity to correct defects in the charge.

Civil Procedure > Appeals > General Overview

Governments > Courts > Rule Application & Interpretation

Civil Procedure > Appeals > General Overview

Governments > Courts > Rule Application & Interpretation

*HN10* The court construes procedural rules liberally so that the right to appeal is not lost unnecessarily.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN11* When an objection fails to explain the nature of the error, the appellate court cannot make assumptions.

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Burdens of Proof > Allocation

Evidence > Weight & Sufficiency

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Burdens of Proof > Allocation

Evidence > Weight & Sufficiency

*HN12* The legal sufficiency review standards are well established. On an issue where the opposing party bears the burden of proof, the appellate court sustains a legal sufficiency challenge to an adverse finding if a review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. The appellate court regards evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence. The appellate court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.

Evidence > Inferences & Presumptions > Presumptions

Torts > ... > Defamation > Remedies > Damages

Civil Procedure > Remedies > Damages > General Damages

Torts > Intentional Torts > Defamation > Defamation Per Se

Torts > ... > Damages > Types of Damages > Nominal Damages

Evidence > Inferences & Presumptions > Presumptions

Torts > ... > Defamation > Remedies > Damages

Civil Procedure > Remedies > Damages > General Damages

Torts > Intentional Torts > Defamation > Defamation Per Se

Torts > ... > Damages > Types of Damages > Nominal Damages

*HN13* Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages

such as loss of reputation and mental anguish. But this presumption yields only nominal damages. Beyond nominal damages, the appellate court reviews presumed damages for evidentiary support.

> Civil Procedure > Remedies > Damages > General Overview

> Civil Procedure > Trials > Jury Trials > General Overview

> Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

> Civil Procedure > Remedies > Damages > General Overview

> Civil Procedure > Trials > Jury Trials > General Overview

> Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN14* In addition to the legal sufficiency of evidence, the Supreme Court of Texas has recognized an imperative that appellate courts determine whether any evidence supports the amount of jury damages.

> Torts > ... > Defamation > Remedies > Damages

> Torts > ... > Types of Damages > Compensatory Damages > General Overview

> Torts > ... > Defamation > Remedies > Damages

> Torts > ... > Types of Damages > Compensatory Damages > General Overview

*HN15* The private defamation plaintiff who establishes liability under a less

demanding standard than knowledge of falsity or reckless disregard for the truth may recover only such damages as are sufficient to compensate him for actual injury.

> Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

> Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

> Civil Procedure > Remedies > Damages > General Damages

> Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

> Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

> Civil Procedure > Remedies > Damages > General Damages

*HN16* The jury charge sets the standard for reviewing whether the evidence is legally sufficient to support the damages awarded. It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.

> Evidence > Types of Evidence > Circumstantial Evidence

> Evidence > Inferences & Presumptions > Inferences

> Civil Procedure > Trials > Jury Trials > Province of Court & Jury

> Evidence > Types of Evidence > Circumstantial Evidence

> Evidence > Inferences & Presumptions > Inferences

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

**HN17** A jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Procedure > Remedies > Damages > Punitive Damages

**HN18** A party may not recover exemplary damages unless the plaintiff establishes actual damages.

Civil Procedure > Remedies > Injunctions > General Overview

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Prior Restraint

Civil Procedure > Remedies > Injunctions > General Overview

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Prior Restraint

**HN19** Prohibitive injunctions of future speech that is the same or similar to speech that has been adjudicated to be defamatory operate as impermissible prior restraints on free speech.

**Counsel:** For Electronic Frontier Foundation, Amicus Curiae: David Greene, Electronic Frontier Foundation, San Francisco, CA; Marc A. Fuller, Vinson & Elkins LLP, Dallas, TX.

For Burbage, Allen Chadwick, Petitioner: James J. Scheske, James J. Scheske, PLLC, Austin, TX; Jason P. Steed, Bell Nunnally & Martin LLP, Dallas, TX; Peter D. Kennedy, William Gerow Christian, Graves Dougherty Hearon & Moody PC, Austin, TX.

For Burbage, W. Kirk, Respondent: Gregory Scott Cagle, Savrick, Schumann, Johnson, McGarr Kaminski & Shirley, LLP, Austin, TX.

**Judges:** JUSTICE GREEN delivered the opinion of the Court.

**Opinion by:** Paul W. Green

## Opinion

[*252] In this defamation case, a jury assessed compensatory and exemplary damages against Allen Chadwick Burbage (Chad) for ten statements defaming his brother, W. Kirk Burbage (Kirk). The trial court also permanently enjoined Chad from making similar statements. We are presented with three issues: (1) whether any defamatory statements fell within a qualified privilege; (2) whether evidence supports the jury's damage awards; and (3) whether the trial court abused its discretion by issuing the permanent injunction. Because we hold that Chad failed to preserve error in the charge, we do not reach the issue of qualified privilege. We also hold that the permanent injunction operates as an impermissible prior restraint on freedom of speech. Accordingly, we affirm those parts of the court of appeals' judgment. But, on damages, we hold that

no evidence supports the compensatory damage award. We reverse that part of the court of appeals' judgment.

## I. Factual and Procedural Background

Kirk owns and operates the Burbage Funeral Home, a centuries-old family business, [**2] in Worcester County, Maryland. Chad is Kirk's older brother. Chad and Kirk's grandmother, Anna Burbage, managed the funeral home from her husband's death in the 1940s until her death in 1985. In her will, Anna left the funeral home and all of its assets to Kirk.

Anna bequeathed the land for the Burbage family cemetery to her children, Richard Burbage, Sr., Chad and Kirk's father, and Jean Burbage Prettyman. Although primarily a family cemetery, Anna and Richard gave permission for burial or entombment of several non-family members. Richard died in 1991; in his will, he left his 50% undivided interest in the family cemetery property to Chad and Kirk's mother, Virginia Burbage Markham, but the will was never probated. Virginia conveyed this interest to Kirk by quitclaim deed in 2003. Chad felt Kirk obtained the funeral home and the family cemetery interest through manipulation, first of Anna and later of Virginia.

Although the origin of the strife between Chad and Kirk remains unclear, the "Farm Property," a 23-acre tract that Virginia inherited from Richard in 1991, aggravated any existing discord. The potential sale of the property ultimately aligned Virginia's four children against [**3] each other:

Chad and Patrice Burbage Lehmann wanted to sell, while Kirk and his brother, Keith, demurred. Throughout 2006 and 2007, Chad exchanged heated emails with Kirk's attorney. In late 2007 and early 2008, Chad created a website, *www.annaburbage.org*, to air his grievances with Kirk. Chad placed several posters around town to publicize the website. The website contained the following allegations:

- "Anna Burbage ('Miss Anna') was a victim of Elder Abuse. The Abuser was her grandson, Kirk Burbage and others."

- [*253] • "Virginia Burbage Markham was the principal of Stephen Decatur High School serving northern Worcester County Maryland. At the present time, she is being abused by her son, Kirk Burbage, of the Burbage Funeral Home. She is currently a victim of ELDER as well as FAMILY ABUSE."

- "The methods [of abuse] include: lies, trespassing, grand larceny, will tampering/undue influence, gifts with the intent to control his mother, discrediting fellow siblings, deceptively misrepresenting the contents of legal documents requiring the signature of the ABUSED for personal gain and to cover up land fraud and involving the ABUSED ELDER in Cemetery Land Fraud implicating several families including [**4] Shirley and

Brice Phillips of the Phillips Crab House."

• "Kirk Burbage has also been known to abuse the dead, specifically his cousin, Anne Prettyman Jones."

Chad also sent letters to Shirley and Brice Phillips, family friends of the Burbages who had earlier obtained permission to place a mausoleum in the Burbage cemetery. The letters espoused a common interest in settling property rights to the cemetery but stated, "You currently have no title or right to be in the Burbage Family Cemetery." Chad made the following statements in the letters:

• "Kirk Burbage has committed numerous abuses to family members."

• "We are the victims of the selfish, greedy and unlawful actions of Kirk Burbage."

• "Kirk Burbage of the Burbage Funeral Home with the assistance of his attorney Robert McIntosh have fraudulently misrepresented rights which Kirk Burbage does not have . . . ."

• "Kirk Burbage fraudulently obtained a Quit Claim [deed] from our mother by what is believed to be elder abuse . . . ."

• "Kirk Burbage and the Burbage Funeral Home violated Maryland law by not having a license to operate a cemetery . . . ."

• "Kirk Burbage did commit fraud."

Kirk and the Burbage Funeral Home sued Chad for defamation [**5] in Bastrop County.[1] Chad appeared pro se. The trial court submitted ten questions—one for each of the statements reproduced above—asking the jury whether Chad had proven that the statements were substantially true. The jury answered "no" to all questions. The court also asked questions on compensatory and exemplary damages for Kirk and, separately, for the Burbage Funeral Home. The court instructed the jury that all statements were defamatory per se because each statement either leveled a criminal charge or tended to cause injury to the funeral home's business or to Kirk's profession. The jury awarded Kirk $6,552,000: $250,000 for past injury to reputation; $2,500,000 for future injury to reputation; $1,000 for past mental anguish; $1,000 for future mental anguish; and $3,800,000 in exemplary damages. The jury awarded the Burbage Funeral Home $3,050,000: $50,000 for past injury to reputation; $1,000,000 for future injury to reputation; and $2,000,000 in exemplary damages. The trial court also permanently enjoined Chad from future defamatory speech in a four-page list of prohibited topics (tied to the ten defamatory statements).

[*254] Chad appealed. The court of appeals reduced the exemplary damages to $750,000 under *Texas Civil Practice and Remedies Code section 41.008(b)*, upheld the other damage awards, and vacated the

---

[1] Chad was a resident of Bastrop County, Texas at the time [**6] the lawsuit was filed. *See* Tex. Civ. Prac. & Rem. Code § 15.017.

injunction. *447 S.W.3d 291, 303, 2011 Tex. App. LEXIS 10034, *25 (Tex. App.—Austin 2011, pet. granted)* (mem. op.). Each party petitioned for review; we granted both petitions. *57 Tex. Sup. Ct. J. 38 (Nov. 1, 2013)*.

## II. Qualified Privilege and Charge Error

We first address Chad's contention that qualified privilege barred Kirk's recovery based on Chad's defamatory statements to the Phillipses. If Chad's statements were privileged, the jury's answers on damages would rest upon invalidly submitted theories of liability. We hold that, even if the privilege applied, Chad failed to preserve jury charge error on this point.

## A. Chad's Qualified Privilege Claim

*HN1* The common law provides a qualified privilege against defamation liability when "communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication." *Cain v. Hearst Corp., 878 S.W.2d 577, 582 (Tex. 1994)*. We have recognized that defamation actions necessarily inhibit free speech and, thus, the qualified privilege offers an additional safeguard, even in cases of private, non-political speech. *See id*. *HN2* The privilege operates as an affirmative defense [**7] in the nature of confession and avoidance; the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege. *Denton Pub. Co. v. Boyd, 460 S.W.2d 881, 884 (Tex. 1970)*. If

a defendant establishes the privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice. *Dun & Bradstreet, Inc. v. O'Neil, 456 S.W.2d 896, 898 (Tex. 1970)*. Actual malice, in the defamation context, means "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Hagler v. Proctor & Gamble Mfg. Co., 884 S.W.2d 771, 772 (Tex. 1994)* (per curiam). *HN3* Qualified privilege presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed. *Fitzjarrald v. Panhandle Pub. Co., 149 Tex. 87, 228 S.W.2d 499, 505 (Tex. 1950)*.

Of the ten statements that the trial court found defamatory per se, Chad made six of those statements in letters to the Phillipses, while four appeared on the web site or posters. Chad argues that a qualified privilege protects his communication with the Phillipses because both he and they had an interest "sufficiently affected by the communication." The Phillipses obviously had an interest, Chad suggests, in whether Kirk had the right to sell them a mausoleum and whether any other Burbage family members objected to interring [**8] the Phillipses at the family cemetery. Chad contends that the court of appeals erred when it found the letter unprotected by the "common-interest privilege"; specifically, Chad objects to the court of appeals' suggestion that "antithetical" interests cannot form the basis for a qualified privilege. *2011 Tex. App. LEXIS 10034,*

*2011 WL 6756979, at \*9*. While the court of appeals seized on the "common-interest" language, which Chad sometimes used in briefing, our case law identifies the affirmative defense at issue here as qualified privilege.[2]

 [*255] The trial court submitted the ten statements—four unprivileged and six potentially privileged—for the jury to determine if each statement was substantially true at the time it was made. On damages, [**9] the trial court submitted broad-form questions that incorporated the jury's answers for all ten statements. If the qualified privilege applied to any statements, then, the broad-form damages questions incorporated both valid and invalid bases for liability. Such commingling may result in harmful error. *Cf. Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex. 2000)* (reversing for new trial due to erroneous commingling of valid and invalid liability theories in a single broad-form liability question). To obtain reversal due to such a charge error, Chad must have preserved the error at trial. *In re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003)* ("*HN4* [A]ny complaint to a jury charge is waived unless specifically included in an objection."). We now turn to this preservation question.

## B. Preservation of Charge Error

The court of appeals held that Chad waived any claim of error in the submission of potentially privileged statements because he "did not object in the trial court to the submission of broad-form damages questions." ___S.W. 3d at ___(citing *In re B.L.D., 113 S.W.3d at 349*). In *In re B.L.D.*, we held that the court of appeals erred by reviewing a jury charge complaint when the parties did not object at trial to the form of submission. *113 S.W.3d at 349, 355*. Chad suggests that this case differs because he raised an objection on qualified privilege, which preserved [**10] error in any derivative damages question. Kirk responds that Chad must specifically object to the damages question's form, not merely to the underlying liability issue. Kirk further argues that even Chad's qualified privilege objection failed to preserve error.

## 1. Charge Error Based on Valid and Invalid Liability Theories

*HN5* "It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law." *Casteel, 22 S.W.3d at 388*. Thus, in *Casteel*, we required a new trial when a timely and specific objection preserved the issue of erroneous commingling of valid and invalid theories of liability in a broad-form liability question, such that the appellate court could not determine whether the jury based its verdict on an improperly submitted theory. *Id.* (citing *Tex. R. App. P. 61.1*). Extending this principle in *Harris County v. Smith, 96 S.W.3d 230, 234 (Tex.*

---

[2]   *Compare Cain, 878 S.W.2d at 582* (privileging communication when made "in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication"), *with* Restatement (Second) of Torts § 596 (1977) (describing the common-interest privilege, which arises when "circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know").

*2002)*, we determined that **HN6** a broad-form damages submission mixing valid and invalid elements of damages created the same type of harmful error. And in *Romero v. KPH Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005)*, where evidence supported the jury's negligence finding but *not* its malicious credentialing finding, we held that the trial court committed harmful error by submitting an apportionment question which allowed the jury to consider malicious **[**11]** credentialing. We explained that "[e]ven if the jury *could* still have made the same apportionment of fault [without considering malicious credentialing], the error in the question is nevertheless reversible because it effectively prevents [the appellant] from complaining **[*256]** on appeal that they *would not* have done so." *Id. at 226*.

We continue to adhere to these principles. Yet in addition to the common animating principle of properly instructing the jury in the law, these cases share another link: *some* timely and specific objection. *Romero, 166 S.W.3d at 229*; *Harris Cnty., 96 S.W.3d at 232*; *Casteel, 22 S.W.3d at 387*. In other words, in situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability that forms the basis of a *Casteel*-type error. If we allowed litigants to raise a *Casteel* issue with no valid objection, either to liability or submission form, those litigants could use a post-trial motion to raise a lack of evidence on the liability question, thus

bypassing the crucial step of allowing the trial judge to correct any errors in the charge.

In *Romero*, we declined to address whether the appellant must object both to the lack of evidence to support submission **[**12]** of a jury question *and* the form of the submission, because in that case the appellant did both. *166 S.W.3d at 229* & n.55 (acknowledging the difficult question of whether an additional broad-form objection is required) (citing *Pan E. Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1124 (5th Cir. 1988))*. But whether or not an objection to *both* is required, *some* timely and specific objection must raise the issue in the trial court. *See Thota v. Young, 366 S.W.3d 678, 691 (Tex. 2012)* (requiring "some objection to the charge," whether to evidentiary support or to form, to preserve error for appellate review). Here, Chad objected based on qualified privilege, but he made no objection to the form of submission. If Chad's initial objection on qualified privilege did not preserve error, we need not address whether a further *Casteel*-type objection is required.

### 2. Specific Objections

**HN7** Our rules of procedure establish the preservation requirements to raise a jury-charge complaint on appeal. *Id. at 689*. The complaining party must object before the trial court and "must point out distinctly the objectionable matter and the grounds of the objection." *TEX. R. CIV. P. 274*; *see also TEX. R. APP. P. 33.1*. Under *Rule of Civil Procedure 274*, "[a]ny complaint as to a question, definition, or

instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.″ *TEX. R. CIV. P. 274*. As [**13] a general rule, *HN8* preservation requires (1) a timely objection ″stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context,″ and (2) a ruling. *See TEX. R. APP. P. 33.1*. Stated differently, the test ultimately asks ″whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.″ *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).

Importantly, the ″purpose of *Rule 274* is to afford trial courts an opportunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint.″ *Wilgus v. Bond, 730 S.W.2d 670, 672 (Tex. 1987)*; *see Payne*, 838 S.W.2d at 243 (Mauzy, J., dissenting) (″*HN9* Only by proper objection does a litigant afford the trial court sufficient opportunity to correct defects in the charge.″). We apply these rules to Chad's objection.

### 3. Chad's Objection

The following dialogue occurred at the formal charge conference:

[*257] Mr. Cagle:[3] I'm not sure if this is an objection. I apologize, Your Honor. But the matter of in the amended-- defendant's amended-- *first amendment* to the original response, defendant has requested that there be a qualified privilege relative to the letter, and [**14] the reason for the qualified privilege is it represents common interests, a continuation of a prior judicial proceeding in Maryland and a continuation of trying to resolve matters of mutual concern between the parties of the cemetery.

The Court: All right. Do you have a requested instruction that you're asking the Court to consider and to include in the charge?

Mr. A. Burbage: I have-- it seems as though it would-- it would require the-- a question in the line after-- after you find that the statement inflammatory, then there would be a question do you find the statement blah-blah-blah was false at the time it was made as it related to--

The Court: All right. Anything further on that? On that particular issue is there anything further?

Mr. A. Burbage: No. It was-- it's been mentioned in the testimony.

The Court: All right. The objection is overruled. The requested instruction is denied.

---

[3] The record states that Mr. Cagle, Kirk's attorney, initially made the objection. The reproduction in Kirk's brief on the merits instead attributes the objection to Chad. Indeed, it makes more sense in context that Chad made the initial objection. We decline to attach importance to this potential record error [**15] because we find either objection insufficient to preserve error.

Chad claims that the trial court erred in submitting liability questions on the potentially privileged statements. Therefore, Chad's objection needed to communicate to the trial court that it was improper to submit Questions 5 through 10 (on statements in the Phillips letters) to the jury. The objection does raise the subject of the qualified privilege. But, crucially, the objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem. *See Wilgus, 730 S.W.2d at 672*. When the trial court asked Chad whether he had a requested instruction, Chad responded only with a request for a question that appears to address the falsity of the statements themselves. As Chad has argued, a qualified privilege may still apply even when the statements are false. *See O'Neil, 456 S.W.2d at 898*. It is unclear what Chad hoped to accomplish by requesting an additional question if he wanted the court to withhold Question 5 through 10 from the jury.[4] And it is uncertain even to which questions Chad referred (presumably Questions 5 through 10, but the word "inflammatory," which Chad uses to describe the placement of his proposed question, **[**16]** appears nowhere in the charge). Quite simply, Chad has not provided a specific objection indicating the alleged error in the charge and allowing **[*258]** the trial court the opportunity to correct the error.

We note that when Chad wanted to object to a specific question at the charge conference, he did so. *Before* the objection on qualified privilege at issue here, Chad objected **[**17]** to Question 10 because it duplicated elements of Questions 7 and 8. The trial court initially sustained this objection (although it reversed that ruling at the end of the charge conference). Chad's objection to qualified privilege, in order to preserve error, needed to distinctly raise the issue of withdrawing Questions 5 through 10 from the jury. By its language, it does not do this. And it would make little sense for Chad to raise an objection to qualified privilege to eliminate Questions 5 through 10 when, only moments before, he eliminated Question 10 only because it was duplicative of Questions 7 and 8, *not* because the Questions 7 and 8 were improper to submit to the jury. With this in mind, we cannot conclude that Chad's intent to remove Questions 5 through 10 was "apparent from the context." *Tex. R. App. P. 31.4(a)(1)*. We hold that Chad's objection was insufficiently specific and did not preserve his claim of error in the submission of Questions 5 through 10.

Our procedural rules are technical, but not trivial. *HN10* We construe such rules liberally so that the right to appeal is not lost unnecessarily. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A,*

[4] We cannot safely engage in assumptions about what Chad might have meant. Whether the statements were false and Chad knew of their falsity—compared with the jury's actual finding that the statements were not substantially true—would have relevance to the question of whether Chad acted with actual malice. But the trial court gave the incorrect common law definition of malice, Chad did not object to the incorrect malice definition, and, as Chad argues, the burden on actual malice falls to Kirk, not Chad. Such a confusing objection, raised during the crucial charge conference, could not have apprised the trial judge that Chad objected to the submission of the offending questions. Chad explained his desire more coherently at a hearing on his request for findings of fact and conclusions of law, but at that point it was too late.

*Ltd., 249 S.W.3d 380, 388 (Tex. 2008)*. But *HN11* when an objection fails to explain the nature of the [**18] error, we cannot make assumptions. Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the opportunity to first consider and rule on error. *In re B.L.D., 113 S.W.3d at 350* (citing *In re C.O.S., 988 S.W.2d 760, 765 (Tex. 1999))*. Affording courts this opportunity conserves judicial resources and promotes fairness by ensuring that a party does not neglect a complaint at trial and raise it for the first time on appeal. *Id.* (citing *Pirtle v. Gregory, 629 S.W.2d 919, 920 (Tex. 1982)* (per curiam)). Nor may we stray from these rules because Chad represented himself at trial. *See Mansfield State Bank v. Cohn, 573 S.W.2d 181, 184-85 (Tex. 1978)*.

### 4. Application

Chad argues that the court impermissibly combined valid and invalid theories of liability when the broad-form damages question incorporated privileged statements. Chad did not make a *Casteel*-type objection to form; thus, to preserve error, Chad *must* have raised some specific objection to the submission of Questions 5 through 10. *See In re B.L.D., 113 S.W.3d at 349-50* (holding that a complaint to a jury charge was waived because it was not specifically included in an objection). He did not. Thus, we hold that Chad's failure to object waives his right to complain of the charge on appeal.

## III. Damages

We next consider the jury's compensatory and exemplary damage awards. The [**19] jury awarded Kirk and the Burbage Funeral Home $3,802,000 in compensatory damages and $5,800,000 in exemplary damages, but the court of appeals reduced exemplary damages to $750,000.[5] After reviewing the record, we hold that no evidence supports the amount of compensatory [*259] damages and, consequently, exemplary damages cannot stand.

### A. Compensatory Damages

Chad argues that the jury's $3.8 million award lacks evidentiary support and offends the *First Amendment*. Specifically, Chad contends that the $3.5 million awarded for *future* damages punishes Chad for his speech, rather than fairly compensates Kirk for his injury. Kirk responds that Texas law presumes damages for defamatory per se statements and ample evidence supports the jury's awards. Kirk suggests that trust-based businesses like funeral homes suffer greatly from the mere insinuation of unseemly acts. Further, Kirk argues that non-media defendants like Chad fail to present the same *First Amendment* concerns as media defendants.

*HN12* Our legal-sufficiency review standards are well established. On an issue where the opposing party bears the burden [**20] of proof, we sustain a legal-sufficiency challenge to an adverse

---

5  Chad does not specifically challenge the $2,000 awarded as mental anguish damages. Therefore, we do not address those damages.

finding if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Ltd., 434 S.W.3d 142, 156 (Tex. 2014)*. More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004)*. We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence. *Id*. We consider the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005)*.

**HN13** Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish. *Bentley v. Bunton, 94 S.W.3d 561, 604 (Tex. 2002)* (plurality opinion). But this presumption yields only nominal damages. *See Salinas v. Salinas, 365 S.W.3d 318, 320 (Tex. 2012)* (per curiam). Beyond nominal damages, we review presumed damages for evidentiary support. *See Hancock v. Variyam, 400 S.W.3d 59, 66 (Tex. 2013)*.

**HN14** In addition to the legal sufficiency of evidence, we have recognized an imperative that appellate courts determine whether any evidence supports the *amount* of jury damages. *See Bentley, 94 S.W.3d at 606*. In *Bentley*, a judge sued [**21] for

defamation after a call-in talk show host repeatedly made on-air imputations of corruption. *Id. at 566-67*. The jury assessed $7 million in damages for mental anguish and $150,000 in reputation and character damages. *Id. at 605*. We recognized that the inherent difficulty in quantifying such noneconomic damages necessarily allows the jury latitude. *Id*. Yet this latitude has limits; latitude does not "give [the jury] carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials." *Id*. Even in a case outside the realm of media defendants and public officials, judicial review of jury discretion remains important to protect free speech. *See id*. We must ensure that noneconomic damages compensate for *actual* injuries and are not simply "a disguised disapproval of the defendant." *Id*.; *see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)* ("**HN15** [T]he private defamation plaintiff who establishes liability under a less demanding standard than [knowledge of falsity or reckless disregard for the truth] may recover only such damages as are sufficient to compensate him for actual injury.").

[*260] Before turning to the evidence, we must delimit our review. **HN16** The jury charge sets the standard. *See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000)* ("[I]t is the court's charge, not [**22] some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). Questions 11 and 12 asked what sum of money "would fairly and reasonably

compensate″ for injuries sustained. The trial court instructed the jury that ″[y]ou must make a finding of at least nominal damages for injury to reputation in the past.″ In response, the jury awarded $300,000 to Kirk and the Burbage Funeral Home. But on *future* reputation damages, the court instructed the jury to determine the appropriate compensation for injury ″that, in reasonable probability, [Kirk] will sustain in the future″ (and did not require the jury to find at least nominal damages). The jury awarded a combined $3.5 million in response. We must conduct a meaningful appellate review of the jury's determination of an amount that ″would fairly and reasonably compensate″ for the loss.

With these principles in mind, we turn to the evidence. Chad and Kirk vigorously disagree about the defamation's effect on the Burbage Funeral Home's business. The court of appeals upheld the large compensatory damage award in part because the funeral home ″had a market value of at least $3 million [**23] and . . . this value would likely be lost because of Chad's statements.″ __S.W.3d at __. The court stated that Kirk was not required to substantiate the value with documentary evidence. *Id*.

Although we agree that the jury generally has broad latitude in determining damages, we find no evidence of actual injury in the record. To begin, we cannot credit the purported value of the funeral home business (leaving aside that this does not reflect actual damage to reputation). Kirk reluctantly offered a questionable estimate of the funeral home's value:

Q. If you sold the funeral home today, what would the value of that funeral home be-- of the business, as an ongoing business?

A. I never had any intention nor do I have any interest in selling the funeral home, so I never really-- if I had to throw something out there and just-- this is just from experience with hearing about other firms, but I don't-- I don't really know. I'd say a few million dollars.

This estimate is practically and linguistically troubling. Practically speaking, Kirk admits in the previous sentence that he does not know the value, and the phrase ″if I had to throw something out there″ qualifies his response. We require *some* concrete basis [**24] for an estimate. *Cf*. Nat. Gas Pipeline Co. of Am. v. Justiss, 397 S.W.3d 150, 159-61 (Tex. 2012) (concluding that speculative and conclusory testimony, lacking in demonstrable factual explanation, could not support an award of damages based on diminished market value of a home in a permanent nuisance claim). And Kirk's language adds ambiguity. How many is a few? The court of appeals interprets this as at least $3 million, but this is not clear: definitions of ″few″ vary. *See, e.g*., AMERICAN HERITAGE COLLEGE DICTIONARY 505 (3d. ed. 2000) (″[b]eing more than one but indefinitely small in number″); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 712 (2d. ed. 1987) (″not many but more than one″); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 843 (1961) (″not many persons or things″).

We recently addressed an analogous situation in *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Ltd., 434 S.W.3d 142 (Tex. 2014)*. In that case, the key evidence of injury to Texas [*261] Disposal Systems' reputation was its CEO's testimony estimating the value of its reputation at $10 million, and three exhibits purportedly supported that testimony. *Id. at 160*. The exhibits estimated lost profits and evidenced a decrease in "base business." *Id*. First, we held that damages such as lost profits "are not the sort of general damages that necessarily flow from such a defamatory publication." [**25] *Id*. Then, we stated that the "evidence must support the amount awarded by the jury; it must not be an 'indicator' that supports the estimates offered by the corporate executive." *Id*. Turning to this case, Kirk provided even less evidence than the "indicators" we found insufficient in *Waste Management*. Kirk's ballpark estimate of the Burbage Funeral Home's value does not equate to evidence of actual damages for injury to the business's reputation.[6]

The record contains only speculative evidence that the value, if established, "would likely be lost," as the court of appeals found. [**27] *See* __S.W.3d at __. Questioned whether the defamation could destroy the funeral home's reputation, Kirk said: "[P]otentially. In my opinion." Kirk said the value would be "zero" only when questioned on what would happen if the funeral home was "run out of business." Keith, Kirk's brother, testified that, in a small community, such allegations "can ruin that entire business." A theoretical possibility, however, is a far cry from a likely event.

Similarly speculative evidence supports the actual impact on the funeral home. Kirk testified that some customers, including customers with previous business at the funeral home, cancelled pre-paid contracts:

> Q. Since these allegations have been made, have you had people who have cancelled those?

---

[6] Furthermore, the purported evidence on the value of the business blurs the lines between the torts of business disparagement and business defamation. In *Waste Management*, we noted "the similarity between the two claims, but that one difference is that one claim seeks to protect reputation interests and the other seeks to protect economic interests against pecuniary loss." 434 S.W.3d at 155 (citing *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). The publication at issue in that case was defamatory of the *owner* of the business, and not the landfill-services business *itself*. *Id*. at 150-51 n.35. In other words, defamation injures the reputation of the owner, not the owner's business. *Id*. In a defamation per se claim, general damages are presumed, while special damages are not; special damages, on the other hand, are an essential [**26] element of a business disparagement claim. *Id*. at 155. We distinguish between "general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income)." *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013).

Turning back to this case, Kirk seems to seek damages to the business, rather than damages for loss of the business's reputation. This fine distinction matters. If Kirk desired damages to protect the economic interests of the Burbage Funeral Home, a business disparagement claim provides the correct vehicle. See *Forbes, 124 S.W.3d at 170*. And, whether under defamation or business disparagement, we require a plaintiff requesting special damages to prove those damages. See *Hancock, 400 S.W.3d at 66*. Here, the type of damages Kirk seeks, economic damages, are distinct from the noneconomic damages that are presumed in a defamation per se case. Kirk did not plead these special damages and certainly has not proven them. Kirk could have brought business disparagement or defamation claims (or both), but in any case his proof will not suffice for recovery of special damages.

A. Yes, I have.

Q. Even as recently as last week?

A. Yes, sir.

Q. Have you ever asked them why they're cancelling it?

[*262] A. Couldn't bring myself to.

Q. Are you afraid its because of these accusations?

A. Yes.

In *Hancock v. Variyam*, a doctor claimed that the submission of a defamatory letter to an accrediting body, which later denied the doctor accreditation, provided evidence of reputation damages. *400 S.W.3d at 70*. This Court held that **HN17** ″a jury may not reasonably infer an ultimate fact from 'meager circumstantial [**28] evidence which could give rise to any number of inferences, none more probable than another.'″ *Id. at 70-71* (quoting *Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex. 1997))*. Similarly, the jury cannot reasonably infer that defamation caused the cancellations when the cancellations could have occurred for any number of reasons. Indeed, Kirk admitted that he did not ask why the customers cancelled, only that he was ″afraid″ it was because of accusations.

Some evidence does suggest community awareness of and discussion of Chad's statements. And Chad, in earlier menacing letters, suggested that the statements would have ″significant repercussions.″ But in terms of *actual* impact of the defamation—the basis for which the

damage award compensates—Kirk offered only vague testimony:

Q. How would you say that these accusations have affected your reputation in the community? Do you still have one?

A. I'd like to think that I do. I'd like to think that there's those people that know me and-- that truly know me and that they're going to give it credence. Sure, they're going to listen up, because they'd be stupid not to, but I'd like to believe that-- you know, that it-- that it doesn't affect everybody. I'd like to believe that.

Q. But you don't know.

A. No, I don't [**29] know.

Kirk's mother, Virginia, when asked about the impact on the Burbage family name, said ″I'm sure it could hurt some, but I think most people would not believe it.″ Further, Kirk's testimony undermines the scope of the impact on him, personally:

Q. You don't advertise with your photo anywhere or your name anywhere?

A. No, sir.

Q. Have there been any newspaper articles about you in conjunction with the funeral home or community service?

A. Not that I can recall anyway.

Q. Are you the only funeral director there at the Burbage Funeral Home?

A. No. There are three others.

Q. Are you-- are you-- Anna Burbage was the face of the Burbage Funeral Home; is that right?

A. In her lifetime.

Q. Are you considered the face of the Burbage Funeral Home?

A. I don't know if I would be considered the face because I don't meet with a lot of the families any more unless it's a family that I know. That's what I have the other directors to do. I'm a lot more behind the scenes.

The court of appeals distinguished *Bentley* as a public-official case. __S.W.3d at __. While the concern for baseless jury awards has stronger resonance in public-official cases, such concerns are not absent here. The evidence does not show actual loss of [**30] reputation, that anyone believed the defamation, that the Burbage Funeral Home suffered an actual loss, or even the funeral home's actual value. On the record here, we hold [*263] that no evidence supports the jury's award of $3.8 million in actual damages. We reverse the judgment of the court of appeals in part.

## B. Exemplary Damages

*HN18* A party may not recover exemplary damages unless the plaintiff establishes actual damages. *Hancock, 400 S.W.3d at 71*. Because we hold that no evidence supports the jury's award of actual damages, exemplary damages are not available. *See id.*

## IV. Prohibitive Injunction

As part of its final judgment, the trial court permanently enjoined Chad from "publishing, disseminating or causing to be published or disseminated, . . . to third-parties by any means, . . . any statement or representation that states, implies or suggests in whole or part" any of four pages of forbidden topics. The injunction tracks the language of the ten defamatory statements, and for many statements the injunction lists numerous ways Chad may run afoul of the court's order. For instance, Chad may not assert that he or *any* third party suffered from *any* of Kirk's selfish, greedy, or unlawful actions. This extraordinarily broad [**31] prohibition on future speech need not detain us long. *HN19* Prohibitive injunctions of future speech that is the same or similar to speech that has been adjudicated to be defamatory operate as impermissible prior restraints on free speech.[7] *Kinney v. Barnes, 443 S.W.3d 87, 92-93, 2014 Tex. LEXIS 764, *4 (Tex. 2014)*. Under *Kinney*, the trial court's prohibitive injunction cannot stand. Therefore, we affirm that part of the court of appeals' judgment.

## V. Conclusion

---

[7] A mandatory injunction requiring the removal or deletion of posted speech that has been adjudicated defamatory is not a prior restraint on speech. *Kinney v. Barnes*, 443 S.W.3d 87, 89, 2014 Tex. LEXIS 764 , *4 (Tex. 2014). But here the injunction did not require Chad to remove or delete any previously-made defamatory statements. Although Chad published several defamatory statements to his website and on posters, the website was only operative for approximately four months and the posters had been removed by trial.

Chad failed to preserve for appeal his complaint of the jury charge; thus, we do not reach whether a qualified privilege protected any of Chad's statements. We therefore affirm in part the court of appeals' judgment. We do, however, hold that no evidence supports the jury's award of compensatory damages, and that exemplary damages cannot stand. We reverse that part of the **[**32]** court of appeals' judgment and render judgment that Kirk and the Burbage Funeral Home take nothing as compensatory and exemplary damages on their defamation claims. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P., 292 S.W.3d 660, 666 (Tex. 2009)* (recognizing that "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages" and instead rendering a take-nothing judgment). However, we do not reach mental anguish damages because Chad made no challenge in this Court. Finally, we hold that the prohibitive injunction impermissibly restrains speech; therefore, we affirm that part of the court of appeals' judgment.

Paul W. Green

Justice

OPINION DELIVERED: August 29, 2014

# *Dynegy, Inc. v. Yates*

Supreme Court of Texas

August 30, 2013, Opinion Delivered

NO. 11-0541

## Reporter

422 S.W.3d 638; 2013 Tex. LEXIS 679; 56 Tex. Sup. J. 1092; 2013 WL 4608711

DYNEGY, INC., PETITIONER, v. TERRY W. YATES, INDIVIDUALLY, AND TERRY W. YATES, P.C., RESPONDENTS

**Subsequent History:** Released for Publication March 21, 2014.
Rehearing denied by *Dynegy Inc. v. Yates, 2014 Tex. LEXIS 224 (Tex., Mar. 21, 2014)*

**Prior History:**   [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS.
*Dynegy, Inc. v. Yates, 345 S.W.3d 516, 2011 Tex. App. LEXIS 1272 (Tex. App. San Antonio, 2011)*

## Core Terms

statute of frauds, suretyship, main purpose doctrine, promise to pay, court of appeals, guarantor, surety, initial burden, fee agreement, third person, legal fees, applies, attorney's fees, oral promise, inducement, another's, billed

## Case Summary

## Overview

HOLDINGS: [1]-The company pleaded the statute of frauds under *Tex. Bus. & Com. Code Ann. § 26.01(a)*, *(b)(2)* as an affirmative defense and had the burden to establish that the alleged promise fell within the statute of frauds; [2]-The company's former officer hired the attorney to represent him in criminal proceedings, and the company orally promised to pay the fees associated with the defense that under the fee agreement were the officer's obligation, and thus the company established the statute of frauds' suretyship provision initially applied to bar the claims against the company; [3]-The burden was on the attorney to secure favorable findings on the main purpose doctrine, and his failure to do so constituted a waiver of the issue under *Tex. R. Civ. P. 279*;

[4]-Because the statute of frauds rendered the oral agreement unenforceable, the attorney could not recover on his claims.

## Outcome

Appellate court's judgment reversed and a take-nothing judgment rendered in favor of the company.

## LexisNexis® Headnotes

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

*HN1* The statute of frauds' suretyship provision provides that an oral promise by one person to answer for the debt, default, or miscarriage of another person is generally unenforceable. *Tex. Bus. & Com. Code Ann. § 26.01(a)*, *(b)(2)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Burdens of Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Statute of Frauds

Contracts Law > ... > Statute of Frauds > Exceptions > General Overview

*HN2* The statute of frauds generally renders a contract that falls within its purview unenforceable. *Tex. Bus. & Com. Code Ann. § 26.01(a)*. The party pleading the statute of frauds bears the initial burden of establishing its applicability. *Tex. R. Civ. P. 94*. Once that party meets its initial burden, the burden shifts to the opposing party to establish an exception that would take the verbal contract out of the statute of frauds. One recognized exception to the statute of frauds' suretyship provision is the main purpose doctrine. The party seeking to avoid the statute of frauds must plead, prove, and secure findings as to an exception or risk waiver under *Tex. R. Civ. P. 279*. A party who contends that an agreement falls within an exception to the statute of frauds must request and obtain a jury finding on the exception. Case law places the burden on the plaintiff to plead and prove an exception to the statute of frauds.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

*HN3* Whether a contract comes within the statute of frauds is a question of law, which the appellate court reviews de novo. The statute of frauds' suretyship provision applies to a promise by one person to answer for the debt, default, or miscarriage of another

person. *Tex. Bus. & Com. Code Ann. § 26.01(b)(2)*. The suretyship provision applies regardless of whether the debt was already incurred or to be incurred in the future.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Contracts Law > ... > Statute of Frauds > Exceptions > General Overview

*HN4* A plaintiff relying on a primary obligor theory under the main purpose doctrine must plead and establish facts to take a verbal contract out of the statute of frauds. *Tex. Bus. & Com. Code Ann. § 26.01(b)(2)* provides that a promise by one person to answer for the debt of another person falls within the statute of frauds.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Benefit of the Bargain

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

*HN5* The statute of frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the statute of frauds.

**Counsel:** For Dynegy, Inc., Petitioner: Bruce D. Oakley, Christopher Mohr Odell, Hogan Lovells L.L.P., Houston, TX; David J. Beck, David M. Gunn, Russell S. Post, Beck Redden LLP, Houston, TX.

For Terry W. Yates, Respondent: Elizabeth Holman Rivers, Kathleen S. Rose, Thomas C. Wright, Wanda McKee Fowler, Wright & Close LLP, Houston, TX; Lloyd E. Kelley, The Kelley Law Firm, Houston, TX.

**Judges:** JUSTICE GREEN delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE LEHRMANN, and JUSTICE BOYD joined. JUSTICE DEVINE filed a dissenting opinion. JUSTICE GUZMAN did not participate in the decision. JUSTICE DEVINE, dissenting.

**Opinion by:** Paul W. Green

## Opinion

[*639] *HN1* The statute of frauds' suretyship provision provides that an oral promise "by one [*640] person to answer for the debt, default, or miscarriage of another person" is generally unenforceable. *See Tex. Bus. & Com. Code § 26.01(a)*, *(b)(2)*. Dynegy, Inc. contends that this provision bars the current suit because both the fraudulent inducement and breach of contract claims against it are based on an oral promise to an attorney to

pay the attorney's fees incurred by one of Dynegy's former officers. We agree. Accordingly, we reverse the court of appeals' judgment and render a take-nothing judgment in favor of Dynegy.

## I. Background

A grand jury indicted James Olis, a former officer of Dynegy, on multiple counts of securities fraud, mail and wire fraud, and conspiracy arising out of work he performed while at Dynegy. [**2] Dynegy's board of directors passed a resolution authorizing the advancement of attorney's fees for Olis's defense provided that Olis acted in good faith, in Dynegy's best interests, and in compliance with applicable law. The resolution provided that it "may be modified or revoked by this Board at any time as a result of changes in circumstances or further analysis."

Olis hired Terry Yates, a criminal defense attorney, to defend him in the federal criminal investigation and an ongoing civil investigation conducted by the Securities and Exchange Commission. Olis told Yates and Mark Clark, Yates's associate, that Dynegy would be paying his legal fees. Clark called Cristin Cracraft, an attorney in Dynegy's legal department, who orally confirmed that Dynegy would pay Olis's legal fees. Clark testified that Cracraft stated, "The Board has passed a resolution, so, yes, we are paying Jamie Olis's fees," and instructed Clark that the bills should be submitted to her. Cracraft's trial testimony was similar to Clark's version of the conversation. Olis signed a written fee agreement with Yates under which Olis agreed that he was responsible for payment of his legal fees. The contract stated that [**3] "all fees are due when billed unless other specific arrangements have been made." Yates testified that, despite the written fee agreement, he had an oral agreement with Olis under which Yates would never look to Olis for payment of fees, but instead would look to Dynegy for payment. Yates testified that he spoke to Cracraft after faxing his fee agreement and hourly rate to Dynegy and that Cracraft told him Dynegy would pay Olis's legal fees through trial. Cracraft contradicted Yates's testimony about the phone call, however, stating that she had spoken only to Clark and never to Yates as of the date of the trial.

Dynegy then hand-delivered a letter notifying Yates that it would pay him directly for Olis's legal fees through August 17, 2003, but the remaining fees incurred were to be paid into escrow pursuant to a board resolution. Dynegy paid Yates's initial invoice for $15,000. Yates submitted his $105,176 July bill in August, but Dynegy did not pay it until after trial in November. Olis was ultimately convicted of securities fraud, mail and wire fraud, and conspiracy. *United States v. Olis, 429 F.3d 540, 549 (5th Cir. 2005)* (affirming the conviction but remanding to the trial court [**4] to reconsider the proper sentencing guidelines). Yates submitted a third and final invoice for $448,556, representing all work performed from August 2003 through April 2004, including the

November 2003 trial. Dynegy initially escrowed that amount pursuant to the board resolution, but later refused to release the escrowed funds after concluding that Olis did not meet the "good faith" standard for indemnification as required by the board's resolution.

Yates filed suit against Dynegy to recover the unpaid attorney's fees, alleging that Dynegy orally promised that it would pay Yates's fees *through* Olis's trial. Yates asserted claims for breach of contract and **[*641]** fraudulent inducement and sought benefit-of-the-bargain damages for both claims. After a three-week trial, the jury found for Yates on both claims. Yates ultimately elected to recover under his fraudulent inducement claim, and the trial court rendered judgment on that claim in favor of Yates. Dynegy filed a motion for judgment notwithstanding the verdict on its affirmative defense of statute of frauds, which the trial court denied. Dynegy appealed.

The court of appeals initially reversed and rendered judgment for Dynegy based on its **[**5]** affirmative defense of statute of frauds. *No. 04-10-00041-CV, 2010 Tex. App. LEXIS 3556, at *1 (Tex. App.—San Antonio May 12, 2010)*. Thereafter, the court of appeals denied Yates's motion for rehearing while also issuing a revised opinion. *No. 04-10-00041-CV, 2010 Tex. App. LEXIS 6915, at *1 (Tex. App.—San Antonio Aug. 25, 2010)*. Then the same panel, on its own motion, reconsidered and granted Yates's motion for rehearing. *345 S.W.3d 516, 519 (Tex. App.—San Antonio 2011)*. In its third opinion, the court of appeals reversed itself based on the main purpose doctrine, holding that Dynegy intended to bind itself to a primary obligation rather than a promise to pay the debt of another, and the statute of frauds was therefore inapplicable. *Id. at 520, 523-25*. The court of appeals also reversed the trial court's judgment based on the jury's fraud finding, holding that the evidence was legally insufficient. *Id. at 534*. The court of appeals then rendered judgment for Yates on his breach of contract claim. *Id. at 536*. Dynegy petitions this Court for review, arguing that the court of appeals erred by considering an element of the main purpose doctrine, which is an exception to the statute of **[**6]** frauds, as a part of Dynegy's initial burden on its statute of frauds affirmative defense. We agree.

## II. Analysis

*HN2* The statute of frauds generally renders a contract that falls within its purview unenforceable. *TEX. BUS. & COM. CODE § 26.01(a)*. The party pleading the statute of frauds bears the initial burden of establishing its applicability. *TEX. R. CIV. P. 94*; *cf. Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988)* (holding that the party pleading statute of limitations has the initial burden of proof). Once that party meets its initial burden, the burden shifts to the opposing party to establish an exception that would take the verbal contract out of the statute of frauds. *See Cobb v. Johnson, 101*

*Tex. 440, 108 S.W. 811, 812 (Tex. 1908)*. One recognized exception to the statute of frauds' suretyship provision is the main purpose doctrine. *See Cruz v. Andrews Restoration, Inc., 364 S.W.3d 817, 827-28 (Tex. 2012)*. The party seeking to avoid the statute of frauds must plead, prove, and secure findings as to an exception or risk waiver under *Rule 279 of the Texas Rules of Civil Procedure*. *See, e.g., Crown Ranch Dev., Ltd. v. Cromwell, No. 09-10-00458-CV, 2012 Tex. App. LEXIS 1345, at *14-15 (Tex. App.—Beaumont Feb. 23, 2012, pet. denied)* **[\*\*7]** (mem. op.) ("A party who contends that an agreement falls within an exception to the statute of frauds must request and obtain a jury finding on the exception."); *W.H. McCrory & Co. v. Contractors Equip. & Supply Co., 691 S.W.2d 717, 720-21 (Tex. App.—Austin 1985, writ ref'd n.r.e.)* (placing the burden on the plaintiff to plead and prove an exception to the statute of frauds); *cf. Woods, 769 S.W.2d at 517-18* (holding that the discovery rule, as a defense to the statute of limitations, is a plea in confession and avoidance that is waived if not pled).

## A. Dynegy Met its Initial Burden to Establish Applicability of the Statute of Frauds

 **[\*642]**  Here, Dynegy pled the statute of frauds as an affirmative defense and thus had the initial burden to establish that the alleged promise fell within the statute of frauds. *See TEX. BUS. & COM. CODE § 26.01(a)*, *(b)(2)*; *TEX. R. CIV. P. 94*. **HN3** Whether a contract comes within the statute of frauds is a question of law, which we review de novo. *See Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795, 796 (Tex. 1961)*. The statute of frauds' suretyship provision applies to "a promise by one person to answer for the debt, default, or miscarriage **[\*\*8]** of another person." *TEX. BUS. & COM. CODE § 26.01(b)(2)*. Yates argues that the suretyship provision does not apply to the oral agreement in this case because there is not a preexisting debt. On the contrary, the suretyship provision applies regardless of "whether [the debt was] already incurred or to be incurred in the future." *See RESTATEMENT (SECOND) OF CONTRACTS § 112 cmt. b* (1981).

The record indicates that Olis hired Yates to represent him in the criminal proceedings. Olis signed a fee agreement with Yates, in which Dynegy was not mentioned. Yates agreed to defend Olis, and Olis agreed in exchange that fees were due when billed unless other arrangements were made. Both Clark and Yates testified that Cracraft orally promised that Dynegy would be paying Olis's fees through trial, and it is undisputed that this agreement was never reduced to writing. These facts establish one conclusion: Dynegy orally promised to pay attorney's fees associated with Olis's defense that, under the fee agreement, were Olis's obligation (i.e., Olis's debt). The dissent, like the court of appeals, believes that Dynegy's promise to pay Olis's legal fees was a primary obligation and not a promise to pay **[\*\*9]** another's debts, and therefore the statute of frauds does not bar Yates's recovery on his breach of contract claim. But, as we have explained, **HN4** a plaintiff relying on a primary obligor theory under the main purpose doctrine must plead and establish facts to take a verbal contract out of the statute of

frauds. *See Cruz, 364 S.W.3d at 828*; *Gulf Liquid Fertilizer Co. v. Titus*, 163 Tex. 260, 354 S.W.2d 378, 382-83 (Tex. 1962); *Cobb, 108 S.W. at 812*. We hold that Dynegy established as a matter of law that the statute of frauds' suretyship provision initially applied to bar the claims against it. *See Tex. Bus. & Com. Code § 26.01(b)(2)* (providing that "a promise by one person to answer for the debt . . . of another person" falls within the statute of frauds). The court of appeals erred when it held otherwise.

## B. The Burden Shifted to Yates

At this point, the burden shifted to Yates to establish an exception that would take the verbal contract out of the statute of frauds—namely, the main purpose doctrine. *See Cobb, 108 S.W. at 812*. The main purpose doctrine required Yates to prove: (1) Dynegy intended to create primary responsibility in itself to pay the debt; (2) there was consideration for the promise; **[**10]** and (3) the consideration given for the promise was primarily for Dynegy's own use and benefit—that is, the benefit it received was Dynegy's main purpose for making the promise. *See Cruz, 364 S.W.3d at 828*. We have noted that the question of intent to be primarily responsible for the debt is a question for the finder of fact, taking into account all the facts and circumstances of the case. *See Haas Drilling Co. v. First Nat'l Bank, 456 S.W.2d 886, 889 (Tex. 1970)* (citing *Gulf Liquid Fertilizer Co*., 354 S.W.2d at 384). Thus, the burden was on Yates to secure favorable findings on the main purpose doctrine.[1] Yates's failure to do so constituted a waiver of the issue under *Rule 279 of the Texas Rules of Civil Procedure*. **[*643]** *See Tex. R. Civ. P. 279*; *W.H. McCrory & Co., 691 S.W.2d at 720-21*; *cf. Woods, 769 S.W.2d at 518* (holding the discovery rule waived when a party neither pled nor obtained findings on the issue in response to the opposing party's limitations defense). Therefore, the court of appeals erred by considering the intent element of the main purpose doctrine in conjunction with determining whether Dynegy met its initial burden to show applicability of the statute of frauds.[2]

## III. Conclusion

Based on the preceding analysis, we hold that the statute of frauds renders the oral agreement between Dynegy and Yates unenforceable. Consequently, Yates cannot recover under his breach of contract claim. In addition, Yates's claim for benefit-of-the-bargain damages pursuant to his alternative fraudulent inducement action is barred. *See Haase v. Glazner, 62 S.W.3d 795, 799 (Tex. 2001) HN5* ("[T]he Statute

---

[1] Dynegy **[**11]** even pointed out to the trial court and Yates the omission of any jury questions related to an exception to the statute of frauds in its written charge objections.

[2] The dissent also argues that the main purpose doctrine takes Dynegy's promise out of the statute of frauds based on Dynegy's self-serving reasons for promising to pay Olis's legal fees. But, as with the intent element, Yates failed to plead and prove the consideration elements of the main purpose exception.

of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds."). Accordingly, we grant Dynegy's petition for review and, without hearing oral argument, *Tex. R. App. P. 59.1*, **[**12]** we reverse the court of appeals' judgment and render judgment that Yates take nothing on his claims.

Paul W. Green

Justice

OPINION DELIVERED: August 30, 2013

**Dissent by:** John P. Devine

**Dissent**

JUSTICE DEVINE, dissenting.

The Statute of Frauds "is a two-edged sword. It . . . may be used to perpetrate frauds as well as to prevent them. Under it a person may obtain an oral promise to pay the debt of a third person and then resist payment on the ground that this promise is oral and therefore unenforceable under the Statute of Frauds. Because of this and other dangers, the courts of England and this country have sought to keep the Statute within its intended purpose."[1]

In this case, the Court applies the Statute of Frauds' suretyship provision to, what the jury found to be, an unconditional promise by a company to pay an attorney to defend one of its employees from a work-related prosecution. Because I do not believe the Statute was intended to apply to such promises, I respectfully dissent.

The Statute of Frauds' suretyship provision applies when a creditor seeks to recover from a guarantor because of a third person's failure to perform.[2] The provision **[**13]** discourages false allegations that a person promised to pay if the primary debtor could not.[3] The provision also protects **[*644]** those closely associated with the principal debtor from making rash or emotionally-driven oral promises before having "any real opportunity for awareness of the nature and magnitude of the risks

---

[1] *Gulf Liquid Fertilizer Co. v. Titus*, 163 Tex. 260, 354 S.W.2d 378, 382 (Tex. 1962).

[2] The essential elements of a surety relationship are (1) the third person and the surety are each bound to the same performance; and, (2) the third person, rather than the surety, should be the one to perform. RESTATEMENT (SECOND) OF CONTRACTS § 112 cmt. c.; *see also* 4 CAROLINE N. BROWN, CORBIN ON CONTRACTS § 15.14, at 290 (Joseph M. Perillo ed., rev. ed. 1997) ("To be within the suretyship clause of the statute, *the defendant's (S's) duty to pay must be conditional on nonpayment* by the third person (P) . . . .") (emphasis added).

[3] *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*, 436 S.W.2d 889, 895 (Tex. 1969).

undertaken."[4] The suretyship provision, however, is not intended to provide more certainty to the terms of an oral contract for the benefit of a third person.[5] Nor is it intended to discourage oral promises to assume the debt of a third person.[6]

The Court states that the facts here "establish one conclusion: Dynegy orally promised to pay attorney's fees associated with Olis' defense [that would have otherwise been Olis' obligation.]" __S.W.3d at __. I agree, but the inference I draw from that conclusion is that Dynegy assumed the role of primary obligor, not surety. As we explained in *Bank of Garvin v. Freeman*, the Statute of Frauds' suretyship provision does not bar an oral promise to assume primary responsibility for the debt of another:

> The meaning of that statute is to require a promise as surety for another's debt, or guarantor of another's debt, to be in writing. *It never was intended to prohibit one person from assuming the payment of another's debt, as his own debt, where there is a valid consideration moving between the parties to such contract.* In other words, one person for a valuable consideration may assume as his own debt the debt of another, and it need not be in writing, but he cannot [**15] contract with one person to become surety or guarantor for the debt of another person except it be in writing.[7]

Here, Dynegy does not claim that a surety relationship existed between Olis and itself. Dynegy argues instead that the suretyship provision applies merely because Olis and Yates entered into a written fee agreement, creating a debt. But if the creation of a debt was all that was necessary to invoke the Statute of Frauds, it would not be possible to assume another's debt by oral agreement, and the Court was wrong to say otherwise in *Bank of Garvin*.[8]

For its part, Dynegy does not claim to be the guarantor of Olis' debt. Dynegy instead concedes that it agreed to pay Yates for Olis' defense, but argues that a condition in the board resolution allowed it to stop paying Yates if Dynegy's board determined that Olis did not act in good faith. At that point, according to Dynegy, Olis became responsible for Yates' fee. But the board resolution did not make Dynegy the guarantor of Olis' debt, nor did it give the company the right to stop or suspend payment to the attorney [**16] for services already rendered. The board resolution merely stated that the

---

[4] 4 BROWN, *supra*, § 16.1, [**14] at 317.

[5] *See id.* § 15.7, at 268 ("[I]t is enough to take the defendant's promise out of the statute that the third person was not bound at all to the promisee.").

[6] *See Bank of Garvin v. Freeman, 107 Tex. 523, 181 S.W. 187, 190-91 (Tex. 1915)*.

[7] *Titus*, 354 S.W.2d at 383-84 (quoting *Bank of Garvin, 181 S.W. at 191* (emphasis added)).

[8] *Bank of Garvin, 181 S.W. at 191*.

employee was to repay the company if his actions were determined not to have been in good faith.

The dispute in this case is therefore not about whether Dynegy agreed to pay Yates; it clearly did. The dispute instead is about the extent of Dynegy's promise. Dynegy contends that its promise to Yates was conditioned by the terms of the board resolution. Yates contends that Dynegy's promise to pay for Olis' defense through trial was unconditional and, as to Yates, primarily the company's responsibility.

The dispute was submitted to a jury, which was asked to determine the extent of Dynegy's agreement with Yates. The **[*645]** charge instructed the jury that an essential term of the asserted agreement was whether Dynegy agreed to pay Yates for his legal services to Olis through trial.[9] In closing argument, Dynegy argued that the jury should not find it in breach of the agreement unless it believed Dynegy made an unconditional promise to pay Yates through trial. The jury found Dynegy in breach of its agreement to pay Yates and awarded damages, apparently reasoning that the conditional payment terms of the board resolution did **[**17]** not apply to the oral contract between Dynegy and Yates.

The Court concludes, however, that the written fee agreement between Yates and Olis conclusively establishes Olis as the primary obligor, making Dynegy merely the surety of that obligation. Because Dynegy never intended to act as a guarantor of Olis' debt, however, the Statute of Frauds' suretyship provision should not apply as a matter of law. I therefore disagree with the Court's conclusion, but even if I agreed with it, I would nevertheless hold that the main purpose exception takes Dynegy's promise to Yates out of the Statute.

The main purpose doctrine, or leading object rule, takes a promise out of the Statute where "the consideration given for the promise is primarily for the promisor's own use and benefit."[10] The test focuses on the purpose of the promise, rather than on who receives the benefit of the promise.[11] This test was devised by the courts to determine whether "the promise was manifestly induced by other than **[**18]** gratuitous or sentimental purposes."[12]

The circumstances surrounding the promise in this case began with an SEC investigation into Project Alpha. Dynegy originally billed Project Alpha as a complex transaction that

---

[9]   The charge instructions also stated that the terms of an agreement may be oral or written, or both, and that the parties must have the same understanding of the subject matter at the time of the agreement.

[10]   *Titus*, 354 S.W.2d at 383.

[11]   *Cruz v. Andrews Restoration, Inc.*, 364 S.W.2d 817, 828 (Tex. 2012).

[12]   4 BROWN, *supra*, § 16.1, at 317; *see also* Cooper, 436 S.W.2d at 895 ("[T]he basic reason for requiring that a promise to answer for the default of another be in writing is that the promisor has received no direct benefit from the transaction.").

would provide the company a significant long-term supply of physical natural gas, cash funding, and a permanent tax benefit. The SEC investigation resulted in a civil fine related to the company's tax classification of the assets involved. However, the Department of Justice's investigation was just beginning.

As media publicity and threats of indictment by the Department of Justice increased, Dynegy's board passed a resolution promising to advance attorney's fees to officers and employees of the company who were involved with Project Alpha. Dynegy's bylaws required the company to indemnify its directors and officers for any civil or criminal **[\*\*19]** proceedings arising out of their role as a Dynegy director or officer. Dynegy paid Olis' first attorney directly and, when Olis desired to hire Yates, the company told Yates to send the bills to the company and that it would pay him directly. The urgency in securing the services of Yates, a more experienced trial attorney, was heightened by Olis' recent indictment. Therefore, Dynegy had at least two self-serving reasons to promise to pay Yates to represent Olis: (1) to protect the company's interests; and (2) to comply with its bylaws. Yates should therefore be able to enforce Dynegy's oral contract to **[\*646]** pay him through trial because Dynegy was acting for its own purposes and not merely as a guarantor of its employee's obligation.[13]

In conclusion, Dynegy has not asserted or argued that it intended to act as a guarantor of Olis' debt. Moreover, the jury agreed that **[\*\*20]** Dynegy's promise to pay Yates through trial was not conditional, and thus its promise does not fall within the Statute of Frauds' suretyship provision. However, even were I to agree that the suretyship provision otherwise applies to this transaction, I would conclude that the main purpose exception takes Dynegy's promise out of the Statute. Because the Court holds the Statute of Frauds applies to bar Dynegy's oral contract with Yates, I respectfully dissent.

John P. Devine

Justice

Opinion Delivered: August 30, 2013

---

[13] *See Haas Drilling Co. v. First Nat'l Bank*, 456 S.W.2d 886, 890-91 (Tex. 1970) (holding that main purpose doctrine was satisfied "as a matter of law" where prospect of maintaining value of oil-producing property was sufficient benefit to enforce bank's promise to pay jetting gas company the past-due debt of the former owner).

## *City of Keller v. Wilson*

Supreme Court of Texas

October 19, 2004, Argued ; June 10, 2005, Delivered

NO. 02-1012

**Reporter**

168 S.W.3d 802; 2005 Tex. LEXIS 436; 48 Tex. Sup. J. 848

THE CITY OF KELLER, PETITIONER v. JOHN W. WILSON, GRACE S. WILSON, JOHNNY L. WILSON AND NANCY A. WILSON, RESPONDENTS

**Subsequent History:** [**1]
Rehearing denied by *City of Keller v. Wilson, 2005 Tex. LEXIS 688 (Tex., Sept. 2, 2005)*
On remand at *City of Keller v. Wilson, 2006 Tex. App. LEXIS 5361 (Tex. App. Fort Worth, June 22, 2006)*

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS.
*City of Keller v. Wilson, 86 S.W.3d 693, 2002 Tex. App. LEXIS 7837 (Tex. App. Fort Worth, 2002)*

**Disposition:** The court reversed the judgment of the court of appeals and remanded.

## Core Terms

jurors, reviewing court, City's, flooding, contrary evidence, no evidence, cases, conclusively, disregarded, inferences, per curiam, insurer, no-evidence, ***legal sufficiency***, parties, scope of review, damages, courts, reasonable juror, jury's, drainage, plans, evidence supports, court of appeals, appellate court, inclusive, vital fact, credibility, undisputed, engineers

## Case Summary

### Procedural Posture

Appellant city petitioned for review of a decision of the Court of Appeals for the Second District of Texas, which upheld the trial court's ruling that there was an intentional taking by the city under *Tex. Const. art. I, § 17* of appellee property owners' property that they claimed by flooded due to a drainage ditch.

## Overview

The owners contended that the city approved revised plans that it knew were certain to have the effect of flooding their land. The question was whether the court of appeals applied the correct standard in its *legal sufficiency* review by considering only the evidence and inferences that supported the finding. The court held that both the inclusive and exclusive standards for the scope of *legal-sufficiency* review, properly applied, must arrive at the same result, disregarding evidence contrary to the verdict unless reasonable jurors could not. The court reversed the judgment, holding that the court of appeals did not properly apply the scope of review in that the critical question was the city's state of mind because the owners had to prove the city knew that flooding was substantially certain, and the court of appeals disregarded the evidence regarding why the city approved the plan. It was uncontroverted that three sets of engineers certified that the revised plans met the city's codes and regulations, and thus would not increase downstream flooding. Further, the court of appeals declined to address the jury's alternate verdict on a claim under the Texas Water Code.

## Outcome

The court reversed the judgment of the court of appeals and remanded.

## LexisNexis® Headnotes

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN1* "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN2* The traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence, or if contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite.

Admiralty & Maritime Law > Maritime Contracts > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

***HN3*** In a ***<u>legal sufficiency</u>*** review, evidence can be disregarded whenever reasonable jurors could do so, an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

***HN4*** If evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > ... > Procedural Matters > Objections & Offers of Proof > Objections

***HN5*** Incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were otherwise, incompetent evidence would always be legally sufficient, because the evidence showing it to be incompetent could never be considered.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

***HN6*** Evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Admissibility > Circumstantial & Direct Evidence

***HN7*** When circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN8* There are several types of conclusive evidence. First, an appellate court conducting a ***legal sufficiency*** review cannot disregard undisputed evidence that allows of only one logical inference. By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence; indeed, uncontroverted issues need not be submitted to a jury at all.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN9* Reviewing ***legal sufficiency*** in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not. Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Undisputed contrary evidence may also become conclusive when a party admits it is true.

Evidence > Inferences & Presumptions > General Overview

*HN10* Undisputed evidence and conclusive evidence are not the same -- undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN11* Proper ***legal-sufficiency*** review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

*HN12* Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > Appeals > Standards of Review > General Overview

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

*HN13* Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN14* Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

*HN15* The jury's decisions regarding credibility must be reasonable. Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. They are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of *legal sufficiency* review.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > Appeals > Standards of Review > General Overview

*HN16* It is the province of the jury to resolve conflicts in the evidence. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > Appeals > Standards of Review > General Overview

Torts > Malpractice & Professional Liability > Healthcare Providers

*HN17* Evidence is not conflicting just because the parties cannot agree to it. But in every circumstance in which reasonable jurors could resolve conflicting evidence either

way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their *legal sufficiency* review.

> Civil Procedure > ... > Jury Trials > Jurors > General Overview
>
> Civil Procedure > Trials > Jury Trials > Province of Court & Jury
>
> Civil Procedure > Appeals > Standards of Review > General Overview
>
> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview
>
> Transportation Law > Private Vehicles > Traffic Regulation > One Way Streets

*HN18* Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their *legal sufficiency* review.

> Civil Procedure > Trials > Jury Trials > Province of Court & Jury
>
> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN19* Whether a court begins by reviewing all the evidence or disregarding part in a *legal-sufficiency* review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement.

> Civil Procedure > Appeals > Record on Appeal
>
> Civil Procedure > Appeals > Standards of Review > General Overview
>
> Evidence > Inferences & Presumptions > Inferences

*HN20* Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it.

> Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review
>
> Civil Procedure > Appeals > Record on Appeal
>
> Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law
>
> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN21* The exclusive and inclusive standards of review must coincide if the Texas Supreme Court is to perform its constitutional duties. Although factual *sufficiency* has been the sole domain of the intermediate appellate courts in Texas since 1891, The supreme court 's jurisdiction has always included *legal sufficiency*, as that is a question of law, not of fact. Construing either standard to require it to do less would be just as unconstitutional as construing either to allow the court to do more.

Civil Procedure > ... > Jury Trials > Jurors > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > *Sufficiency* of Evidence

*HN22* The final test for *legal sufficiency* must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, *legal-sufficiency* review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN23* When a case involves scientific or technical issues requiring expert advice, jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.

**Judges:** JUSTICE BRISTER delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE WAINWRIGHT, and JUSTICE GREEN joined, and in which JUSTICE O'NEILL and JUSTICE MEDINA joined as to Parts I through IV. JUSTICE O'NEILL filed a concurring opinion in which JUSTICE MEDINA joined. JUSTICE JOHNSON did not participate in the decision.

**Opinion by:** Scott Brister

## Opinion

[*807] Must an appellate court reviewing a verdict for *legal sufficiency* start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable **[\*\*2]** evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

## I. Factual and Procedural History

The City of Keller is one of several fast-growing communities on the outskirts of **[\*808]** Fort Worth. [1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the **[\*\*3]** City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide drainage for a 100-year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property, and deed both to the City upon completion. [2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

 **[\*\*4]** In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $ 300,000.

---

[1]   The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

[2]   Evidence at trial and briefs by amici indicate that cities normally acquire title to these easements to ensure they are properly mowed and maintained after the developers' departure.

To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result. [3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside [**5] firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations -- including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention. [4] In its ***legal sufficiency*** review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary." [5] The City challenges [*809] this omission as applying the wrong scope of review.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard). [6] [**7] But we have also stated that a reviewing court must consider "*all* of the evidence" in the light favorable to the verdict (the "inclusive" standard). [**6] [7] Sometimes we have mentioned neither reviewing all evidence nor

---

[3] TEX. CONST. art. I, § 17; *City of Dallas v. Jennings*, 142 S.W.3d 310, 313-14, 47 Tex. Sup. Ct. J. 715 (Tex. 2004).

[4] 86 S.W.3d 693, 715, 717.

[5] *Id.* at 700.

[6] *See*, *e.g.*, *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739, 46 Tex. Sup. Ct. J. 1116 (Tex. 2003) (per curiam); *Bradford v. Vento*, 48 S.W.3d 749, 754, 44 Tex. Sup. Ct. J. 655 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69, 43 Tex. Sup. Ct. J. 972 (Tex. 2000); *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936, 41 Tex. Sup. Ct. J. 811 (Tex. 1998); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450, 40 Tex. Sup. Ct. J. 172 (Tex. 1996); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499, 38 Tex. Sup. Ct. J. 848 (Tex. 1995); *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928, 37 Tex. Sup. Ct. J. 118 (Tex. 1993); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84, 35 Tex. Sup. Ct. J. 881 (Tex. 1992); *Weirich v. Weirich*, 833 S.W.2d 942, 945, 35 Tex. Sup. Ct. J. 952 (Tex. 1992); *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 458, 35 Tex. Sup. Ct. J. 523 (Tex. 1992); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166, 33 Tex. Sup. Ct. J. 742 (Tex. 1990); *Burkard v. ASCO Co.*, 779 S.W.2d 805, 806, 33 Tex. Sup. Ct. J. 80 (Tex. 1989) (per curiam); *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223, 32 Tex. Sup. Ct. J. 108 (Tex. 1988); *City of Gladewater v. Pike*, 727 S.W.2d 514, 518, 30 Tex. Sup. Ct. J. 322 (Tex. 1987); *King v. Bauer*, 688 S.W.2d 845, 846, 28 Tex. Sup. Ct. J. 406 (Tex. 1985); *Tomlinson v. Jones*, 677 S.W.2d 490, 492, 27 Tex. Sup. Ct. J. 445 (Tex. 1984); *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401, 24 Tex. Sup. Ct. J. 482 (Tex. 1981) (per curiam); *Holley v. Adams*, 544 S.W.2d 367, 370, 20 Tex. Sup. Ct. J. 76 (Tex. 1976); *Garza v. Alviar*, 395 S.W.2d 821, 823, 9 Tex. Sup. Ct. J. 76 (Tex. 1965); *Wininger v. Ft. Worth & D.C. Ry. Co.*, 105 Tex. 56, 143 S.W. 1150, 1152 (Tex. 1912).

[7] *See*, *e.g.*, *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519, 46 Tex. Sup. Ct. J. 142 (Tex. 2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86, 41 Tex. Sup. Ct. J. 389 (Tex. 1998); *State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 40, 41 Tex. Sup. Ct. J. 443 (Tex. 1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48, 41 Tex. Sup. Ct. J. 289 (Tex. 1998); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711, 40 Tex. Sup. Ct. J. 846 (Tex. 1997);

disregarding some part of it. [8] [**8]  Finally, we have sometimes expressly mentioned both. [9]

[**9]  Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different. [10] Because this [*810]  important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

## [**10] II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert [11] addressed the standards for reviewing ***legal*** and factual ***sufficiency*** in the most-cited law review article in Texas ***legal*** history. [12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding," [13] the author summarized and attempted to clarify Texas law up to 1960. [14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

*White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262, 26 Tex. Sup. Ct. J. 441 (Tex. 1983); *Burk Royalty v. Walls*, 616 S.W.2d 911, 922, 24 Tex. Sup. Ct. J. 429 (Tex. 1981); *Harbin v. Seale*, 461 S.W.2d 591, 592, 14 Tex. Sup. Ct. J. 128 (Tex. 1970); *De Winne v. Allen*, 154 Tex. 316, 277 S.W.2d 95, 97 (Tex. 1955); *Hall v. Med. Bldg. of Houston*, Tex., 151 Tex. 425, 251 S.W.2d 497, 498 (Tex. 1952).

[8]   *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552, 47 Tex. Sup. Ct. J. 707 (Tex. 2004); *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684, 47 Tex. Sup. Ct. J. 649 (Tex. 2004); *Lozano v. Lozano*, 52 S.W.3d 141, 144, 44 Tex. Sup. Ct. J. 499 (Tex. 2001) (per curiam); *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 247, 43 Tex. Sup. Ct. J. 56 (Tex. 1999); *Latham v. Castillo*, 972 S.W.2d 66, 68, 41 Tex. Sup. Ct. J. 994 (Tex. 1998); *Brown v. Bank of Galveston, Nat'l Ass'n*, 963 S.W.2d 511, 513, 41 Tex. Sup. Ct. J. 437 (Tex. 1998).

[9]   *See*, *e.g.*, *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234, 47 Tex. Sup. Ct. J. 559 (Tex. 2004); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649, 37 Tex. Sup. Ct. J. 860 (Tex. 1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.*, 157 Tex. 351, 303 S.W.2d 359, 363 (Tex. 1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.*, 157 Tex. 367, 298 S.W.2d 79, 81 (Tex. 1956) ("The duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.") (quotation omitted) (emphasis added), *and Cartwright v. Canode*, 106 Tex. 502, 171 S.W. 696, 698 (Tex. 1914) ("We must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict. . . . In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

[10]   *See*, *e.g.*, W. Wendell Hall, *Standards of Review in Texas*, 34 ST. MARY'S L.J. 1, 159-62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts*, 53 SMU L.R. 1497, 1498, 1507-11 (2000); Phil Hardberger, *Juries Under Siege*, 30 ST. MARY'S L.J. 1, 40-41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court*, 75 TEX. L. REV. 1699, 1699-1700, 1704-19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

[11]   Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

[12]   Robert W. Calvert, "*No Evidence*" & "*Insufficient Evidence*" *Points of Error*, 38 TEX. L. REV. 361 (1960).

[13]   *Id.* at 361.

[14]   "Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

**[\*\*11]** According to the article:

> *HN1* ″No evidence″ points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. [15]

We have quoted a similar formulation on many occasions. [16]

**[\*\*12]** Notably, Justice Calvert then proceeded to put the question before us in the proper context:

> It is in deciding ″no evidence″ points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding. [17]

Clearly, *HN2* the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence **[\*811]** (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above). As the following examples show, this has remained the rule since. We do not presume to categorize all **[\*\*13]** circumstances in which contrary evidence must be considered in a *legal sufficiency* review. *HN3* Evidence can be disregarded whenever reasonable jurors could do so, [18] an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

## A. Contextual Evidence

---

[15]  *Id.* at 362-63.

[16]  *See, e.g., King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751, 46 Tex. Sup. Ct. J. 1093 (Tex. 2003); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727, 46 Tex. Sup. Ct. J. 689 (Tex. 2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334, 42 Tex. Sup. Ct. J. 43 (Tex. 1998); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409, 41 Tex. Sup. Ct. J. 683 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 795 n.3, 34 Tex. Sup. Ct. J. 356 (Tex. 1991); *Cecil v. Smith*, 804 S.W.2d 509, 510 n.2, 34 Tex. Sup. Ct. J. 383 (Tex. 1991); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n.9, 33 Tex. Sup. Ct. J. 530 (Tex. 1990).

[17]  Calvert, *supra* note 12, at 364.

[18]  *See In re J.F.C.*, 96 S.W.3d 256, 266, 46 Tex. Sup. Ct. J. 328 (Tex. 2002); *Uniroyal*, 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446, 26 Tex. Sup. Ct. J. 73 (Tex. 1982).

In Justice Calvert's first situation -- a complete absence of evidence of a vital fact -- it is generally irrelevant whether a reviewing court considers contrary evidence. [19] If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context.

 [**14]  For example, publications alleged to be defamatory must be viewed as a whole -- including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. [20] A court reviewing ***legal sufficiency*** cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict. [21]

Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party [**15]  and disregard the remainder, as that would render the latter meaningless. [22] Even writings executed at different times must be considered together if they pertain to the same transaction. [23]

It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for ***legal sufficiency***, ″we consider the context and the relationship between the parties.″ [24] [**16]  Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer [25] may be legally insufficient between [*812]  business parties. [26] In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not. [27]

---

[19]   Calvert, *supra* note 12, at 364 (″If there is an absolute absence of evidence of a vital fact . . . an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.″).

[20]   *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 158-59, 47 Tex. Sup. Ct. J. 1140 (Tex. 2004); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114, 44 Tex. Sup. Ct. J. 244 (Tex. 2000); *Guisti v. Galveston Tribune Co.*, 105 Tex. 497, 150 S.W. 874, 877-78 (1912).

[21]   *Bentley v. Bunton*, 94 S.W.3d 561, 581, 45 Tex. Sup. Ct. J. 1172 (Tex. 2002) (considering remarks in context of series of talk-show programs); *Turner*, 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

[22]   *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292, 47 Tex. Sup. Ct. J. 640 (Tex. 2004).

[23]   *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102, 42 Tex. Sup. Ct. J. 979 (Tex. 1999).

[24]   *Tiller v. McLure*, 121 S.W.3d 709, 714, 46 Tex. Sup. Ct. J. 632 (Tex. 2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 610-11, 45 Tex. Sup. Ct. J. 1245 (Tex. 2002); *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612, 42 Tex. Sup. Ct. J. 907 (Tex. 1999).

[25]   *See George Grubbs Enters., Inc. v. Bien*, 881 S.W.2d 843, 852-53 (Tex. App.--Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of intentional infliction), *rev'd on other grounds*, 900 S.W.2d 337, 338, 38 Tex. Sup. Ct. J. 869 (Tex. 1995).

[26]   *See Tiller*, 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

[27]   *See, e.g., id.* at 713-14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears*, 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. [28] If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite [**17] it by disregarding the middle word alone.

Thus, **HN4** if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

## B. Competency Evidence

It has long been the rule in Texas that**HN5** incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. [29] Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were otherwise, incompetent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be [**18] considered.

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise. [30] Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support a verdict against his employer if the evidence shows that *legal* conclusion to be incompetent. [31]

 [**19] This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient. [32] In [*813] such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion. [33] And if an expert's opinion is based on certain

---

[28] *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684, 685, 47 Tex. Sup. Ct. J. 649 (Tex. 2004) (holding no evidence supported defect as comments from deposition "were read out of context").

[29] *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 n.1, 47 Tex. Sup. Ct. J. 559 (Tex. 2004) (citing *Henry v. Phillips*, 105 Tex. 459, 151 S.W. 533, 538 (Tex. 1912)). This rule was changed for hearsay evidence in 1983. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

[30] *Tex. & P. Ry. Co. v. Ball*, 96 Tex. 622, 75 S.W. 4, 6 (Tex. 1903).

[31] *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 579, 45 Tex. Sup. Ct. J. 828 (Tex. 2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 360, 14 Tex. Sup. Ct. J. 391 (Tex. 1971) (holding truck driver was not in course of employment during social visit to his father).

[32] *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782-83 (Tex. 1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

[33] *See Leitch v. Hornsby*, 935 S.W.2d 114, 119, 40 Tex. Sup. Ct. J. 159 (Tex. 1996).

assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded. [34]

[**20] After we adopted gate-keeping standards for expert testimony, [35] evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well. [36] Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis. [37] Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified. [38]

Thus, *HN6* evidence that might be "some evidence" when considered [**21] in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

## C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla. [39] But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied. [40]

In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists. [41] "When the circumstances are equally consistent with

---

[34] *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499-500, 38 Tex. Sup. Ct. J. 848 (Tex. 1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark v. Allen*, 633 S.W.2d 804, 809, 25 Tex. Sup. Ct. J. 348 (Tex. 1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

[35] *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556, 38 Tex. Sup. Ct. J. 852 (Tex. 1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)).

[36] *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714, 720 (Tex. 1997).

[37] *Id.* at 711, 724-30.

[38] *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254-57, 47 Tex. Sup. Ct. J. 248 (Tex. 2004).

[39] Calvert, *supra* note 12, at 364.

[40] 38 Tex. L. Rev. at 364-65.

[41] *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601, 47 Tex. Sup. Ct. J. 266 (Tex. 2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729, 46 Tex. Sup. Ct. J. 689 (Tex. 2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392, 41 Tex. Sup. Ct. J. 187 (Tex. 1997); *W. Tel. Corp. v. McCann*, 128 Tex. 582, 99 S.W.2d 895, 900 (Tex. 1937); Calvert, *supra* note 12, at 365.

either of two facts, neither fact may be inferred." [42] In such cases, we must "view each piece of [**22] circumstantial [*814] evidence, not in isolation, but in light of all the known circumstances." [43]

Justice Calvert argued there was "no necessity for [**23] the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences. [44] Nevertheless, he recognized that "the opposing inference is present and it does no harm to note its presence." [45]

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite-- that a sloppy shopper recently did both. [46] [**24] Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes. [47]

Thus, *HN7* when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

## D. Conclusive Evidence

Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact. [48] [**25] He argued that this is to some extent not a "true"

---

[42] *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805, 35 Tex. Sup. Ct. J. 225 (Tex. 1991); *see also Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324, 27 Tex. Sup. Ct. J. 166 (Tex. 1984) (citing *Tex. Sling Co. v. Emanuel*, 431 S.W.2d 538, 541, 11 Tex. Sup. Ct. J. 582 (Tex. 1968)).

[43] *Lozano*, 52 S.W.3d at 167.

[44] Calvert, *supra* note 12, at 365.

[45] *Id.*

[46] *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 938, 41 Tex. Sup. Ct. J. 811 (Tex. 1998).

[47] *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729, 46 Tex. Sup. Ct. J. 689 (Tex. 2003) (per curiam); *McCann*, 99 S.W.2d at 900.

[48] Calvert, *supra* note 12, at 363-64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703-10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112, 113, 19 Tex. Sup. Ct. J. 462 (Tex. 1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241, 44 Tex. Sup. Ct. J. 664 (Tex. 2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

no-evidence claim, as proponents may have to show not only that no evidence supports the verdict but that the opposite was proved as a matter of law. [49]

*HN8* There are several types of conclusive evidence. First, an appellate court conducting a ***legal sufficiency*** review cannot "disregard undisputed evidence that allows of only one logical inference." [50] [**26] By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence; [51] indeed, uncontroverted issues [*815] need not be submitted to a jury at all. [52]

*HN9* Reviewing ***legal sufficiency*** in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; [**27] the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-access claim if it is undisputed that access remains along 90 percent of a tract's frontage. [53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary. [54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent. [55]

[**28] Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises

---

[49] Calvert, *supra* note 12, at 363-64. *But see*, *e.g.*, *Cecil v. Smith*, 804 S.W.2d 509, 510 n.2, 34 Tex. Sup. Ct. J. 383 (Tex. 1991) ("Cecil's points that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

[50] *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519-20, 46 Tex. Sup. Ct. J. 142 (Tex. 2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 51 n.1, 40 Tex. Sup. Ct. J. 810 (Tex. 1997)).

[51] *Tex. & N.O.R Co. v. Burden*, 146 Tex. 109, 203 S.W.2d 522, 528, 530 (Tex. 1947); *see also* *Prudential Ins. Co. of Am. v. Krayer*, 366 S.W.2d 779, 783, 6 Tex. Sup. Ct. J. 381 (Tex. 1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

[52] *Sullivan v. Barnett*, 471 S.W.2d 39, 44, 14 Tex. Sup. Ct. J. 416 (Tex. 1971); *Wright v. Vernon Compress Co.*, 156 Tex. 474, 296 S.W.2d 517, 523 (Tex. 1956) ("The trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820, 822 (Tex. 1947) ("Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler*, 132 Tex. 350, 123 S.W.2d 340, 341 (Tex. 1939).

[53] *County of Bexar v. Santikos*, 144 S.W.3d 455, 460-61, 47 Tex. Sup. Ct. J. 1010 (Tex. 2004).

[54] *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 97-98, 47 Tex. Sup. Ct. J. 822 (Tex. 2004).

[55] *State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 40, 41 Tex. Sup. Ct. J. 443 (Tex. 1998).

condition is conclusive evidence he needed no warning about it. [56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her. [57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake. [58]

*164 S.W.3d 607, 48 Tex. Sup. Ct. J. 226*

[**29] It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total, [59] or it may not. [60] Circumstances in which a body is found may conclusively establish suicide, [61] or allow [*816] jurors to infer otherwise. [62] [**30] Evidence is conclusive only if reasonable people could not differ in their conclusions, [63] a matter that depends on the facts of each case.

There is another category of conclusive evidence, in which the evidence *is* disputed. *HN10* Undisputed evidence and conclusive evidence are not the same -- undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock*, we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father. [64] The evidence was directly disputed -- the child's mother testified she had conjugal relations with no one else during the relevant time. [65] [**31]

---

[56] *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709-10, 46 Tex. Sup. Ct. J. 530 (Tex. 2003) (per curiam).

[57] *See Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 930, 39 Tex. Sup. Ct. J. 790 (Tex. 1996).

[58] *King v. Graham*, 126 S.W.3d 75, 78-79, 47 Tex. Sup. Ct. J. 85 (Tex. 2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

[59] *Travelers Ins. Co. v. Seabolt*, 361 S.W.2d 204, 206, 6 Tex. Sup. Ct. J. 44 (Tex. 1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).

[60] *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309-10, 29 Tex. Sup. Ct. J. 282 (Tex. 1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).

[61] *See*, *e.g.*, *Prudential Ins. Co. of Am. v. Krayer*, 366 S.W.2d 779, 783, 6 Tex. Sup. Ct. J. 381 (Tex. 1963).

[62] *See Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 552, 19 Tex. Sup. Ct. J. 280 (Tex. 1976).

[63] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340, 42 Tex. Sup. Ct. J. 43 (Tex. 1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446, 26 Tex. Sup. Ct. J. 73 (Tex. 1982).

[64] 811 S.W.2d 557, 560, 34 Tex. Sup. Ct. J. 733 (Tex. 1991).

[65] *Id.* at 558.

Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary. [66]

Similarly, in *Texas & New Orleans Railroad Co. v. Compton*, we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train. [67] Again, the evidence was hotly disputed -- while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had. [68] Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either. [69]

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which **[**32]** undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "twenty nuns testify that the defendant was with them at the time, far from the scene of the crime … [and] twenty more nuns testify that they saw the informant commit the crime." [70] But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

> If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended something else than the usual meaning which the law imposes upon them, he would still be held . . . . [71]

While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

**[**33]** *HN11* Proper ***legal-sufficiency*** review prevents reviewing courts from substituting **[*817]** their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

## E. Clear-and-Convincing Evidence

---

[66] *Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

[67] 135 Tex. 7, 136 S.W.2d 1113, 1115 (Tex. 1940).

[68] *Id.*

[69] *Id.*

[70] *Clewis v. State*, 922 S.W.2d 126, 133 n.12 (Tex. Crim. App. 1996) (en banc) (citation omitted).

[71] *Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y. 1911).

Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive.

Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia*, appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review. [72] As we recently stated, the standard for ***legal sufficiency*** works in tandem with the standard of review -- "whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated." [73] If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy **[**34]** the higher burdens as well, thus rendering their differences meaningless. [74]

Accordingly, we have held that a ***legal sufficiency*** review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination, [75] **[**35]** defamation, [76] and punitive damages. [77] In such cases, again, evidence contrary to a verdict cannot be disregarded.

## F. Consciousness Evidence

Further, we have had to particularize ***legal-sufficiency*** review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in *Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts." [78] **[**36]** As then Chief Justice Greenhill noted in concurring, speeding and running a red light may not be legally sufficient evidence of gross negligence if one's

---

[72] 443 U.S. 307, 320 n.14, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

[73] *Southwestern Bell Tel. Co. v. Garza*, ___ S.W.3d ___, ___, 48 Tex. Sup. J. 226 (Tex. 2004).

[74] Our sister court reviews the ***legal sufficiency*** of criminal convictions by considering "*all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004); *see also Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2004).

[75] *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[76] *Bentley v. Bunton*, 94 S.W.3d 561, 596, 45 Tex. Sup. Ct. J. 1172 (Tex. 2002); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120, 44 Tex. Sup. Ct. J. 244 (Tex. 2000).

[77] *Garza*, ___ S.W.3d at ___, 48 Tex. Sup. J. 226.

[78] 616 S.W.2d 911, 922, 24 Tex. Sup. Ct. J. 429 (Tex. 1981).

wife and daughter are bleeding to death in the back seat. [79] Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of. [80]

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in **[*818]** such cases requires proof that the insurer denied coverage after it became reasonably clear. [81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear. [82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear. [83]

**[**37]** This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason. [84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently. [85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims. [86]

**[**38]** This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an

---

[79] *Id.* at 926 (Greenhill, C.J., concurring).

[80] *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234-35, 47 Tex. Sup. Ct. J. 559 (Tex. 2004).

[81] *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55-56, 40 Tex. Sup. Ct. J. 810 (Tex. 1997).

[82] *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

[83] *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262-63, 45 Tex. Sup. Ct. J. 659 (Tex. 2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 45, 41 Tex. Sup. Ct. J. 371 (Tex. 1998)(affirming bad-faith verdict after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez*, 133 S.W.3d 320, 330 (Tex. App.--Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason*, 123 S.W.3d 690, 704-06 (Tex. App.--Fort Worth 2003, no pet.) (reversing bad-faith verdict for **_legal_** insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 249-50 (Tex. App.--Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive evidence); *Oram v. State Farm Lloyds*, 977 S.W.2d 163, 167 (Tex. App.--Austin 1998, no pet.) (reversing bad-faith verdict for **_legal_** insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

[84] *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740, 46 Tex. Sup. Ct. J. 1116 (Tex. 2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 452, 40 Tex. Sup. Ct. J. 172 (Tex. 1996) (same).

[85] *See, e.g., Univ. of Houston v. Clark*, 38 S.W.3d 578, 583 (Tex. 2000) (noting good-faith test considers *all* circumstances on which official acted).

[86] *See, e.g., PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 94, 47 Tex. Sup. Ct. J. 822 (Tex. 2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

expert report may foreclose bad faith recovery, [87] it will not do so if the insurer had some reason to doubt the report. [88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

## III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing **[*819]** courts must disregard **[**39]** evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

## A. Credibility Evidence

*HN12* Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. [89] **[**40]** They may choose to believe one witness and disbelieve another. [90] Reviewing courts cannot impose their own opinions to the contrary. [91]

*HN13* Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light

---

[87]  *See*, *e.g.*, *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 194-95, 42 Tex. Sup. Ct. J. 215, 42 Tex. Sup. Ct. J. 610 (Tex. 1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

[88]  *See*, *e.g.*, *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448, 40 Tex. Sup. Ct. J. 794 (Tex. 1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

[89]  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761, 46 Tex. Sup. Ct. J. 1133 (Tex. 2003); *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28, 37 Tex. Sup. Ct. J. 268 (Tex. 1993); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697, 30 Tex. Sup. Ct. J. 96 (Tex. 1986); *Edrington v. Kiger*, 4 Tex. 89, 93 (1849).

[90]  *McGalliard*, 722 S.W.2d at 697; *Silcott v. Oglesby*, 721 S.W.2d 290, 293, 30 Tex. Sup. Ct. J. 114 (Tex. 1986); *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561, 563 (Tex. 1952) (holding it was up to jurors ″to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses″); *Houston, E. & W.T. Ry. Co. v. Runnels*, 92 Tex. 305, 47 S.W. 971, 972 (Tex. 1898).

[91]  *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120, 44 Tex. Sup. Ct. J. 244 (Tex. 2000).

favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it. [92]

 [**41]  For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the latter. [93] [**42]  And we have affirmed a gross negligence verdict based on testimony that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that. [94]

Nor is it necessary to have testimony from both parties before jurors [*820]  may disbelieve either. *HN14* Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. [95] Thus, an architect's uncontradicted testimony that he relied on a 20-year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties. [**43] [96] Nor was an insured's uncontradicted testimony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture. [97] Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone. [98]

---

[92]    *Runnels, 47 S.W. at 972*.

[93]    *Cochran v. Wool Growers Cent. Storage Co.*, 140 Tex. 184, 166 S.W.2d 904, 907 (Tex. 1942) (noting the Court "read the entire statement of facts").

[94]    *Harbin v. Seale*, 461 S.W.2d 591, 594, 14 Tex. Sup. Ct. J. 128 (Tex. 1970); *compare Harbin v. Seale*, 454 S.W.2d 271, 272 (Tex. Civ. App.--Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd*, 461 S.W.2d 591, 14 Tex. Sup. Ct. J. 128 (Tex. 1970).

[95]    *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 653-54, 42 Tex. Sup. Ct. J. 656 (Tex. 1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels, 47 S.W. at 972*; *Cheatham v. Riddle*, 12 Tex. 112, 118 (1845).

[96]    *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 100, 47 Tex. Sup. Ct. J. 822 (Tex. 2004).

[97]    *Anchor Cas. Co. v. Bowers*, 393 S.W.2d 168, 169-70, 8 Tex. Sup. Ct. J. 544 (Tex. 1965).

[98]    *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338, 42 Tex. Sup. Ct. J. 43 (Tex. 1998); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697, 30 Tex. Sup. Ct. J. 96 (Tex. 1986).

Of course, *HN15* "the jury's decisions regarding credibility must be reasonable." [99] **[**44]** Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. [100] And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of *legal sufficiency* review.

## B. Conflicting Evidence

*HN16* It is the province of the jury to resolve conflicts in the evidence. [101] **[**45]** Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict. [102]

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding. [103] We have affirmed a bad-faith verdict for *legal sufficiency* despite "significant evidence" that the insurer acted in **[*821]** good faith. [104] We have found some evidence of lost profits, even though income tax returns showed the contrary. **[**46]** [105] And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident. [106]

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing the evidence in the light favorable to the verdict required us to do so.

---

[99] *Bentley v. Bunton*, 94 S.W.3d 561, 599, 45 Tex. Sup. Ct. J. 1172 (Tex. 2002).

[100] *See* TEX. R. CIV. P. 166a(c); *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 817, 45 Tex. Sup. Ct. J. 863 (Tex. 2002) (finding no evidence that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4*, 19 S.W.3d 322, 325, 43 Tex. Sup. Ct. J. 537 (Tex. 2000); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 574, 41 Tex. Sup. Ct. J. 1394 (Tex. 1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

[101] *See, e.g.*, *Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750, 754, 37 Tex. Sup. Ct. J. 67 (Tex. 1993); *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601, 37 Tex. Sup. Ct. J. 241 (Tex. 1993); *Biggers v. Cont'l Bus Sys., Inc.*, 157 Tex. 351, 303 S.W.2d 359, 365 (Tex. 1957); *Howard Oil Co. v. Davis*, 76 Tex. 630, 13 S.W. 665, 667 (Tex. 1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

[102] *See, e.g.*, *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 592, 42 Tex. Sup. Ct. J. 969 (Tex. 1999); *Caller-Times Publ'g Co. v. Triad Communications, Inc.*, 826 S.W.2d 576, 580, 35 Tex. Sup. Ct. J. 509 (Tex. 1992); *Bendalin v. Delgado*, 406 S.W.2d 897, 899, 10 Tex. Sup. Ct. J. 18 (Tex. 1966).

[103] *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48-49, 41 Tex. Sup. Ct. J. 289 (Tex. 1998).

[104] *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 286, 41 Tex. Sup. Ct. J. 389 (Tex. 1998).

[105] *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262-63, 26 Tex. Sup. Ct. J. 441 (Tex. 1983).

[106] *Hall v. Med. Bldg. of Houston*, 151 Tex. 425, 251 S.W.2d 497, 502 (Tex. 1952).

Of course, it is not always clear whether evidence is conflicting. *HN17* Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case. [107] Similarly, evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement **[**47]** regarding the terms of another. [108]

But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their *__legal sufficiency__* review.

## C. Conflicting Inferences

*HN18* Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes. [109] Even if a defendant admits approaching an intersection from the wrong way on a one-way street, jurors may infer the plaintiff failed to keep a proper lookout, **[**48]** as that is one possible inference from the accident itself. [110] Similarly, jurors may infer that relatives tore down posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them. [111]

Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their *__legal sufficiency__* review.

## IV. Reconciling the Standards

Having noted the dual lines of authority stating the scope of no-evidence review, and the proper application and exceptions to each, **[**49]** we turn to the question of which one is correct. For the reasons **[*822]** discussed below, we believe the answer is both.

## A. Goals: The Standards Must Be The Same

---

[107] *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 542-43, 46 Tex. Sup. Ct. J. 142 (Tex. 2002) (plurality op.).

[108] *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221, 36 Tex. Sup. Ct. J. 259 (Tex. 1992).

[109] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 341-42, 42 Tex. Sup. Ct. J. 43 (Tex. 1998).

[110] *De Winne v. Allen*, 154 Tex. 316, 277 S.W.2d 95, 98-99 (Tex. 1955).

[111] *Lozano v. Lozano*, 52 S.W.3d 141, 144, 44 Tex. Sup. Ct. J. 499 (Tex. 2001) (per curiam); *id. at 162-63* (Hecht, J., concurring and dissenting).

*HN19* Whether a court begins by reviewing all the evidence or disregarding part in a *legal-sufficiency* review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. [112] **[\*\*50]** A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. [113]

Similarly, there is no disagreement about how a reviewing court should view evidence in the process of that review. *HN20* Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. [114] **[\*\*51]** But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it. [115]

Given these premises, it is no coincidence that the two standards should reach the same result -- indeed they *must*. Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

Further, *HN21* the two must coincide if this Court is to perform its constitutional duties. Although factual *sufficiency* has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included *legal sufficiency*, as

---

[112]    *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552, 47 Tex. Sup. Ct. J. 707 (Tex. 2004); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234, 47 Tex. Sup. Ct. J. 559 (Tex. 2004); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601, 47 Tex. Sup. Ct. J. 266 (Tex. 2004); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922, 41 Tex. Sup. Ct. J. 763 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499, 38 Tex. Sup. Ct. J. 848 (Tex. 1995); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25, 37 Tex. Sup. Ct. J. 883 (Tex. 1994); *Orozco v. Sander*, 824 S.W.2d 555, 556, 35 Tex. Sup. Ct. J. 338 (Tex. 1992); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63, 26 Tex. Sup. Ct. J. 383 (Tex. 1983); *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 297, 26 Tex. Sup. Ct. J. 321 (Tex. 1983) (per curiam).

[113]    *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" & "Insufficient Evidence,"* 69 TEX. L.R. 515, 517-20 (1991).

[114]    *Gragg*, 151 S.W.3d at 552; *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519, 46 Tex. Sup. Ct. J. 142 (Tex. 2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 54, 41 Tex. Sup. Ct. J. 930 (Tex. 1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48, 41 Tex. Sup. Ct. J. 289 (Tex. 1998); *Havner*, 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 75, 40 Tex. Sup. Ct. J. 810 (Tex. 1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby*, 778 S.W.2d 67, 68, 33 Tex. Sup. Ct. J. 18 (Tex. 1989) (per curiam); *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922, 24 Tex. Sup. Ct. J. 429 (Tex. 1981); *Harbin v. Seale*, 461 S.W.2d 591, 592, 14 Tex. Sup. Ct. J. 128 (Tex. 1970); *W. Tel. Corp. v. McCann*, 128 Tex. 582, 99 S.W.2d 895, 898 (Tex. 1937).

[115]    *See St. Joseph Hosp.*, 94 S.W.3d at 519-20 (Tex. 2002) (plurality op.); *Giles*, 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.*, 105 Tex. 56, 143 S.W. 1150, 1152 (Tex. 1912) and *Tex. & N.O. Ry. Co. v. Rooks*, 293 S.W. 554, 556-57 (Tex. Comm'n. App. 1927)).

that is a question of law, not of fact. [116] Construing either standard to require us to do less would be just as unconstitutional as construing [**52] either to allow us to do more.

This is not to say judges and lawyers will always agree whether evidence is legally [*823] sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries -- affirming jury verdicts based on evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

## B. Other Motions: The Standards Must Be The Same

Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper [**53] at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for ***legal sufficiency*** should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the nonmovant's case and disregard all contrary evidence. [117] But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict. [**54] [118] And we have sometimes

---

[116] *Southwestern Bell Tel. Co. v. Garza,* ___ S.W.3d ___, ___, 48 Tex. Sup. J. 226 (Tex. 2004) (citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (Tex. 1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (Tex. 1894)).

[117] *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234, 47 Tex. Sup. Ct. J. 559 (Tex. 2004); *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303, 32 Tex. Sup. Ct. J. 115 (Tex. 1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793, 9 Tex. Sup. Ct. J. 66 (Tex. 1965); *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60, 61 (Tex. 1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (Tex. 1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (Tex. 1940).

[118] *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684, 47 Tex. Sup. Ct. J. 649 (Tex. 2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8, 39 Tex. Sup. Ct. J. 386 (Tex. 1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245, 28 Tex. Sup. Ct. J. 153 (Tex. 1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262, 26 Tex. Sup. Ct. J. 441 (Tex. 1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753, 13 Tex. Sup. Ct. J. 227 (Tex. 1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (Tex. 1953); *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (Tex. 1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (Tex. 1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (Tex. 1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (Tex. 1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (Tex. 1941); *Chicago, R.I. & G. Ry. Co. v. Carter,* 261 S.W. 135, 135 (Tex. Com. App. 1924, judgm't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094-95 (Tex. Com. App. 1923, holding approved, judgm't adopted).

stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it. [119]

[**55] By contrast, cases concerning judgments non obstante verdicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them, [120] we have generally reviewed such orders by considering all the evidence in a light favorable to the [*824] verdict that was set aside. [121] [**56] In later years we have sometimes adopted the exclusive standard, [122] but our opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved. [123]

---

[119] *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649, 37 Tex. Sup. Ct. J. 860 (Tex. 1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 483, 27 Tex. Sup. Ct. J. 388 (Tex. 1984); *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295, 26 Tex. Sup. Ct. J. 321 (Tex. 1983); *Jones v. Tarrant Util.* Co., 638 S.W.2d 862, 865, 25 Tex. Sup. Ct. J. 416 (Tex. 1982); *Collora v. Navarro*, 574 S.W.2d 65, 68, 22 Tex. Sup. Ct. J. 120 (Tex. 1978); *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649, 650, 20 Tex. Sup. Ct. J. 84 (Tex. 1976); *Jones v. Nafco Oil & Gas, Inc.*, 380 S.W.2d 570, 574, 7 Tex. Sup. Ct. J. 480 (Tex. 1964).

[120] Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw*, 134 Tex. 500, 137 S.W.2d 7, 13 (Tex. 1940); *Hines v. Parks*, 128 Tex. 289, 96 S.W.2d 970, 971 (Tex. 1936). *Cf. Deal v. Craven*, 277 S.W. 1046, 1047 (Tex. Com. App. 1925, judgm't adopted) (″It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.″).

[121] *Brown v. Bank of Galveston, Nat'l Ass'n*, 963 S.W.2d 511, 513, 41 Tex. Sup. Ct. J. 437 (Tex. 1998) (″We consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it.″); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 931, 26 Tex. Sup. Ct. J. 239 (Tex. 1983) (″In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.″) (emphasis added); *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 728, 25 Tex. Sup. Ct. J. 266 (Tex. 1982) (same); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 777, 17 Tex. Sup. Ct. J. 142 (Tex. 1974) (same); *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 550, 5 Tex. Sup. Ct. J. 475 (Tex. 1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker*, 152 Tex. 503, 260 S.W.2d 600, 603-04 (Tex. 1953) (affirming trial court's implied disregard of one jury answer based on ″consideration of the transcript as a whole″); *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194, 199 (Tex. 1952) (″We must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.″) (emphasis added); *Neyland v. Brown*, 141 Tex. 253, 170 S.W.2d 207, 211 (Tex. 1943) (considering judgment non obstante veredicto ″in the light of the record as a whole″); *Le Master v. Fort Worth Transit Co.*, 138 Tex. 512, 160 S.W.2d 224, 225 (Tex. 1942) (″We must view LeMaster's testimony, *as well as all other testimony in the record*, from a standpoint most favorable to him.″) (emphasis added); *McAfee v. Travis Gas Corp.*, 137 Tex. 314, 153 S.W.2d 442, 445 (Tex. 1941) (″We must regard the evidence contained in this record in its most favorable light for McAfee . . . because of the instructed verdict and judgment non obstante veredicto.″); *see also Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424-29, 47 Tex. Sup. Ct. J. 852 (Tex. 2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

[122] *See Tiller v. McLure*, 121 S.W.3d 709, 713, 46 Tex. Sup. Ct. J. 632 (Tex. 2003) (per curiam); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709, 46 Tex. Sup. Ct. J. 530 (Tex. 2003) (per curiam); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227, 34 Tex. Sup. Ct. J. 157 (Tex. 1990); *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671, 33 Tex. Sup. Ct. J. 314 (Tex. 1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309, 29 Tex. Sup. Ct. J. 282 (Tex. 1986); *Tomlinson v. Jones*, 677 S.W.2d 490, 492, 27 Tex. Sup. Ct. J. 445 (Tex. 1984); *Williams v. Bennett*, 610 S.W.2d 144, 145, 24 Tex. Sup. Ct. J. 110 (Tex. 1980); *Freeman v. Tex. Comp. Ins. Co.*, 603 S.W.2d 186, 191, 23 Tex. Sup. Ct. J. 438 (Tex. 1980); *Dodd v. Tex. Farm Prods. Co.*, 576 S.W.2d 812, 814-15, 22 Tex. Sup. Ct. J. 210 (Tex. 1979); *Campbell v. Northwestern Nat'l Life Ins. Co.*, 573 S.W.2d 496, 497, 22 Tex. Sup. Ct. J. 11 (Tex. 1978); *Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 650, 21 Tex. Sup. Ct. J. 141 (Tex. 1977); *Sobel v. Jenkins*, 477 S.W.2d 863, 865, 15 Tex. Sup. Ct. J. 241 (Tex. 1972); *C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 193, 9 Tex. Sup. Ct. J. 532 (Tex. 1966).

[123] *See Tiller*, 121 S.W.3d at 713 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754, 44 Tex. Sup. Ct. J. 655 (Tex. 2001)); *Miller*, 102 S.W.3d at 709 (same); *Best*, 786 S.W.2d at 671 (citing *King v. Bauer*, 688 S.W.2d 845, 846, 28 Tex. Sup. Ct. J. 406 (Tex. 1985)); *Tomlinson*, 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401, 24 Tex. Sup. Ct. J. 482 (Tex. 1981)); *Campbell*, 573

[**57]  The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard -- a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. [124] Reviewing courts do *not* disregard the evidence supporting the motion; [*825] if they did, all summary judgments would be reversed.

In practice, however, a different scope of review applies when a summary judgment motion is filed without [**58] supporting evidence. [125] In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

## C. Federal Courts: The Standards Are The Same

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer -- the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc*. that the two tests are the same. [126] [**59]

Under *Rule 50* of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." [127] In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

> The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a *Rule 50* motion. Some decisions have stated

---

S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc*., 515 S.W.2d 263, 265, 18 Tex. Sup. Ct. J. 51 (Tex. 1974)); *Campbell, 406 S.W.2d at 193* (citing *Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696, 697-98 (Tex. 1914))*.

[124]   *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798, 47 Tex. Sup. Ct. J. 666 (Tex. 2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215-16, 47 Tex. Sup. Ct. J. 174 (Tex. 2003); *Wal-Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506, 46 Tex. Sup. Ct. J. 21 (Tex. 2002); *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736, 33 Tex. Sup. Ct. J. 697 (Tex. 1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868, 27 Tex. Sup. Ct. J. 369 (Tex. 1984).

[125]   *See* TEX. R. CIV. P. 166a(i).

[126]   530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).

[127]   *FED. R. CIV. P. 50(a)(1)*.

that review is limited to that evidence favorable to the nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.

On closer examination, this conflict seems more semantic than real. Those decisions holding that review under *Rule 50* should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [128]. In *Wilkerson*, we stated that "in passing upon **[**60]** whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party. [129] But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence*, not the evidence that the court should *review*. In the analogous context of summary judgment under *Rule 56*, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a **[*826]** matter of law, the court should review all of the evidence in the record. [130]

**[**61]** We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

## D. Objections: The Standards Are Not The Same

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

First, the courts of appeals often use the two standards in illustrations of the difference between *legal* and factual *sufficiency*, with the exclusive standard tied to the former and the inclusive standard to the latter:

When [reviewing] *legal sufficiency*, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary. . . . When we review factual *sufficiency*, we consider and weigh *all* of the evidence and will set aside the verdict only if it is so against

---

[128] 336 U.S. 53, 93 L. Ed. 497, 69 S. Ct. 413 (1949).

[129] *Id*. at 57.

[130] *Reeves,* 530 U.S. at 149-50 (citations omitted).

the great weight and preponderance of the evidence that it is clearly wrong and unjust. [131]

[**62] But there have always been exceptions to this distinction. [132] As demonstrated in Parts II and III above, it is generally true that the *result* of ***legal-sufficiency*** review is to disregard contrary evidence, but there are exceptions when a reviewing court cannot. It is not surprising that in drawing the general distinction between ***legal*** and factual ***sufficiency***, courts have not complicated that distinction by listing the several exceptions in which the scope of review -- though not the standard of review -- may overlap.

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used. [133] But if that [**63] is true, the opposite should also be the case -- appellate courts are less likely to consider contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

[*827] Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment," [134] we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict -- the same facts may support different conclusions, [135] or may support one part of a verdict but not another. [136] Nor can evidence [**64] supporting a verdict be identified by which party offered it --

---

[131] *Carter v. Steverson & Co.*, 106 S.W.3d 161, 166 (Tex. App.--Houston [1st Dist.] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long*, 144 S.W.3d 64, 67 (Tex. App.--El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 29 (Tex. App.--San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex. App.--Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 113 n.3 (Tex. App.--Beaumont 2001, pet. denied); *Molina v. Moore*, 33 S.W.3d 323, 329 (Tex. App.--Amarillo 2000, no pet.); *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 n.3 (Tex. App.--Austin 2000, pet. denied); *see also In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (Tex. 1951) (per curiam) (holding court of appeals erred in failing to distinguish between ***legal*** and factual ***sufficiency*** review by not weighing all the evidence when conducting the latter).

[132] *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922, 24 Tex. Sup. Ct. J. 429 (Tex. 1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

[133] Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

[134] *State v. Biggar*, 873 S.W.2d 11, 13, 37 Tex. Sup. Ct. J. 612 (Tex. 1994).

[135] *See*, e.g., *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 102, 43 Tex. Sup. Ct. J. 420 (Tex. 2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 45, 41 Tex. Sup. Ct. J. 371 (Tex. 1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

[136] *See*, e.g., *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 327, 37 Tex. Sup. Ct. J. 252 (Tex. 1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

parties depend on admissions and cross-examination during their opponent's case, and minimize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

 [**65] Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice should wear a blindfold, [137] the metaphor was surely never intended to suggest that justice disregards the facts.

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the inclusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

## E. Conclusion: The Standards Are The Same

As both [**66]  the inclusive and exclusive standards for the scope of _**legal-sufficiency**_ review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both -- properly applied -- must arrive at the same result, we see no compelling reason to choose among them.

The key qualifier, of course, is "properly applied." _**HN22**_ The final test for _**legal sufficiency**_ must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, _**legal-sufficiency**_ review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about _**legal sufficiency**_ in particular cases, [*828]  the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also [**67]  inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

> The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the _**legal**_

---

[137]    _See_ Judith Resnik, _Managerial Judges_, 96 HARV. L.R. 374, 382-83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [138] [**68] of "reasonable minds." [139]

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge. [140]

## [**69] V. Application to the Facts

It remains to apply the scope of review to the facts presented.

A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur. [141] The majority pointed to the following proof. First, the

---

[138] Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas*, *46 S.TEX. L. REV. 33, 75 (2004)*; Robert L. Dabney, Jr. *We Were There*, HOUSTON B.J. Nov.-Dec. 1999, at 42, 44.

[139] Calvert, *supra* note 12, at 364.

[140] *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 93 L. Ed. 497, 69 S. Ct. 413 (1949) (Frankfurter, J., concurring).

[141] 86 S.W.3d 693, 709.

Wilsons' expert testified that the revised plan was certain to [*829] create flooding. [142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result. [143] Third, the City "did not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding. [144]

[**70] Of course, the City *did explain* why it approved the new plan -- because three sets of engineers said the omitted ditch was unnecessary -- but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The critical question in this case was the City's state of mind -- the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

Moreover,*HN23* when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so. [145] Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations -- and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true [**71] and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons' expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially [**72] certain of the result in some cases, but not in the context of this

---

[142] [86 S.W.3d at 703, 705](.).

[143] [86 S.W.3d at 705](.).

[144] [86 S.W.3d at 704-05](.).

[145] *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 194-95, 42 Tex. Sup. Ct. J. 215, 42 Tex. Sup. Ct. J. 610 (Tex. 1998); *see also State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448, 40 Tex. Sup. Ct. J. 794 (Tex. 1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is real **[*830]** or imagined -- and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong. [146]

**[**73]** Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the Wilsons had to prove -- not that the City *might* have disbelieved the engineers' reports, but that it *did*. This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result. [147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

**[**74]** We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

---

[146] *Cf. Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 140, 47 Tex. Sup. Ct. J. 955 (Tex. 2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

[147] *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555, 47 Tex. Sup. Ct. J. 707 (Tex. 2004) (emphasis added).

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under *article I, section 17 of the Texas Constitution.* Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.

Scott Brister

Justice

**Concur by:** Harriet O'Neill

**Concur**

JUSTICE O'NEILL, joined by **[**75]** JUSTICE MEDINA, concurring.

The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." ___ S.W.3d at ___. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully **[*831]** articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8-acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian **[**76]** property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $ 300,000. The Court holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so." ___ S.W.3d at ___. Even if this were an appropriate review standard--which it hasn't been until today--I believe the jury had a reasonable basis upon which to

disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding, and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a **[**77]** taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

## I

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." *86 S.W.3d 693, 704*. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." ___ S.W.3d at ___. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence **[**78]** that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second." *86 S.W.3d at* **[*832]** *703*. Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. *Id. at 705.* **[**79]** Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." ___ S.W.3d at ___. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe **[**80]** one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." _McGalliard v. Kuhlmann, 722 S.W.2d 694, 697, 30 Tex. Sup. Ct. J. 96 (Tex. 1986)_ (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." ___ S.W.3d at ___. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. _86 S.W.3d at 706_. But the Wilsons disputed whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. _See id. at 705._ **[**81]**

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. _Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 194-95, 42 Tex. Sup. Ct. J. 215, 42 Tex. Sup. Ct. J. 610 (Tex. 1998)_; _State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448-50, 40 Tex. Sup. Ct. J. 794 (Tex. 1997)_.

In _Castaneda_, a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the **[*833]** jury could have disregarded that evidence. _Castaneda, 988 S.W.2d at 194-95_. In that case, we

performed a traditional *legal sufficiency* analysis and concluded there was no evidence that the defendant acted in bad faith. *Id. at 194*. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case. **[**82]** " *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau*, another bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau, 951 S.W.2d at 448*. The Court conceded that "were we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id. at 450* (citing *TEX. CONST. art. I, § 15*, *art. V, §§ 6*, *10*).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited **[**83]** testimony favorable to the verdict and disbelieved testimony contrary to it." ___ S.W.3d at ___. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See TEX. CONST. art. I, § 15*, *art. V, § 6*; *see also Nicolau, 951 S.W.2d at 450*.

## II

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. *TEX. CONST. art. I, § 17*. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to the City. Municipalities review subdivision plats "to ensure that subdivisions **[**84]** are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith, 687 S.W.2d 300, 302, 28 Tex. Sup. Ct. J. 321 (Tex. 1985)*; *see TEX. LOC. GOV'T CODE § 212.002*. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed

subdivision design from the developers to the municipality. *See, e.g.*, *City of Round Rock, 687 S.W.2d at 302*; *see also Cootey v. Sun Inv., Inc., 68 Haw. 480, 718 P.2d 1086, 1091 (Haw. 1986)* (holding that "the permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with . . . the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer, **[*834]** and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis **[**85]** upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority . . . which resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale, 136 Tex. 29, 146 S.W.2d 731, 736 (Tex. 1941)* (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County, 136 Wn.2d 946, 968 P.2d 871, 879 (Wash. 1998)*; *see also Pepper v. J.J. Welcome Constr. Co., 73 Wn. App. 523, 871 P.2d 601, 606 (Wash. Ct. App. 1994)*. In *Phillips*, the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "if the county or city were **[**86]** liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips, 968 P.2d at 878*. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper, 871 P.2d at 606*. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "the fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id*. The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id*. I am persuaded by the reasoning of the courts in *Phillips* and **[**87]** *Pepper*, and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. *86 S.W.3d at 707*. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allowed the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property." *Id.* As noted above, however, it was the developers' plan--not the City's actions--that allowed the water to flood the Wilson property. Because the City's action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist. v. Gragg, 151 S.W.3d 546, 554, 47 Tex. Sup. Ct. J. 707 (Tex. 2004)* [**88] ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the [*835] "proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale, 146 S.W.2d at 736*. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See TEX. WATER CODE § 11.086(a)*, *(b)* (providing that "no person may divert or impound the natural flow of surface waters in this state . . . in a manner that damages the property of another by the overflow of the water diverted or impounded" and that "[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat--not [**89] the City's approval--caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under *Article I, Section 17 of the Texas Constitution.*

## III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," *TEX. CONST. art. I, § 17*, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur in the Court's judgment.

Harriet O'Neill

Justice

## *Ford Motor Co. v. Ridgway*

Supreme Court of Texas

September 10, 2003, Argued ; February 6, 2004, Delivered

NO. 02-0552

**Reporter**

135 S.W.3d 598; 2004 Tex. LEXIS 74; 47 Tex. Sup. J. 266; CCH Prod. Liab. Rep. P16,878

FORD MOTOR COMPANY, PETITIONER, v. JACK RIDGWAY AND LINDA RIDGWAY, RESPONDENTS

**Subsequent History:** [**1]
Rehearing denied by *Ford Motor Co. v. Ridgway, 2004 Tex. LEXIS 560 (Tex., June 25, 2004)*

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS.
*Ridgway v. Ford Motor Co., 82 S.W.3d 26, 2002 Tex. App. LEXIS 625 (Tex. App. San Antonio, 2002)*

**Disposition:** Reversed the judgment of the court of appeals and rendered judgment that the plaintiffs take nothing..

## Core Terms

defective product, truck, product liability, inferred, Restatement, summary judgment, repairs, manufacturing defect, circumstantial evidence, scintilla of evidence, genuine issue of material fact, res ipsa loquitur, time of sale, causes, pickup

## Case Summary

### Procedural Posture

Plaintiffs, husband and wife, sued defendant automobile manufacturer for injuries the husband sustained when his truck caught on fire. The trial court granted the manufacturer's summary judgment motion, and the Court of Appeals for the Fourth District of Texas affirmed the motion on plaintiffs' negligence claim, but reversed as to the product liability claim. The manufacturer sought review.

### Overview

The husband was injured when the truck that he was driving caught on fire. Plaintiffs did not provide any direct evidence of the cause of the fire, and their circumstantial evidence that a manufacturing defect existed in the truck when it left the manufacturer did not exceed a "scintilla of evidence." The best that plaintiffs' expert could state was that he suspected the electrical system caused the fire. However, because there was no proof that identified a defect in the truck when it left the manufacturer, the expert's affidavit was not sufficient to raise a fact issue. Thus, the state supreme court reversed the judgment of the court of appeals and rendered judgment that the plaintiffs take nothing.

**Outcome**

The decision of the court of appeals was reversed, and the matter was remanded to render judgment that plaintiffs take nothing.

**LexisNexis® Headnotes**

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1* An appellate court reviews the trial court's summary judgment under the standards of *Tex. R. Civ. P. 166a(i)*. The non-movants must produce summary judgment evidence raising a genuine issue of material fact to defeat the summary judgment under that provision. *Tex. R. Civ. P. 166a(i)*. A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. If the plaintiffs fail to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the moving party's proof satisfied the *Rule 166a(c)* burden.

Real Property Law > Torts > Construction Defects

Torts > Products Liability > Types of Defects > Manufacturing Defects

Torts > Products Liability > Theories of Liability > Strict Liability

*HN2* A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. A plaintiff must prove that the product was defective when it

left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries.

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN3* When determining if more than a scintilla of evidence has been produced in response to a *Tex. R. Civ. P. 166a(i)* motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movant. The Supreme Court of Texas has repeatedly held that more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. On the other hand, when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in *legal* effect, is no evidence.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Admissibility > Circumstantial & Direct Evidence

*HN4* Both direct and circumstantial evidence may be used to establish any material fact. To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in *legal* effect no evidence.

**Judges:** CHIEF JUSTICE PHILLIPS delivered the opinion of the Court. JUSTICE HECHT filed a concurring opinion, in which JUSTICE OWEN joined.

**Opinion by:** Thomas R. Phillips

## Opinion

 [*599*]  We must decide whether the evidence offered by plaintiffs in response to the defendant's *Rule 166a(i)* summary judgment motion created a genuine issue of material fact that a manufacturing defect in the defendant's product caused the plaintiff's injuries. Because we hold that the court of appeals erred in holding that the evidence was sufficient, we reverse the judgment of the court of appeals, *82 S.W.3d 26*, and render judgment that the plaintiffs take nothing.

## I

Jack Ridgway sustained serious injuries when his two-year-old Ford F-150 pick-up truck caught fire while he was driving. Ridgway was the truck's third owner. The first owner drove the truck approximately 7,000 miles and installed a spotlight on the front left "A" pillar, which is the front part of the door frame. The second owner drove the truck approximately 47,000 more miles **[\*\*2]** and had the truck repaired four times at the Red McCombs Ford dealership in San Antonio ("Red McCombs"). Each repair attempted to fix a clunking noise that occurred during hard turns. Three of the four repairs also involved the fuel system and attempted to improve the truck's poor gas mileage. The Ridgways drove the truck for only one month before the fire, making no repairs or modifications.

The fire occurred when Ridgway was driving home from work on a paved county road in Bandera County. Driving at or below the speed limit, he looked into the **[\*600]** rear-view mirror and noticed flames curling up around the cab of the truck. Before he could jump out of the truck, Ridgway sustained second-degree burns to 20 percent of his body.

Ridgway and his wife Linda sued Red McCombs and Ford, alleging products liability, breach of express and implied warranties, violations of the *Texas Deceptive Trade Practices Act, and* negligence. After both defendants moved for summary judgment, the Ridgways nonsuited Red McCombs, leaving only their negligence and strict products liability claims against Ford. After adequate time for discovery, Ford moved for summary judgment under *Rule 166a(i)* and alternatively **[\*\*3]** under *Rule 166a(c)*. The trial court granted summary judgment without specifying on which provision it relied. On appeal, a divided court of appeals affirmed the trial court's judgment on plaintiffs' negligence claim but reversed on products liability. We granted Ford's petition for review to determine whether the Ridgways presented more than a scintilla of evidence in support of their claim.

## II

*HN1* We first review the trial court's summary judgment under the standards of *Rule 166a(i)*. The non-movants, here the plaintiffs, must produce summary judgment evidence raising a genuine issue of material fact to defeat the summary judgment under that provision. *TEX. R. CIV. P. 166a(i)*. A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *Morgan v. Anthony, 27 S.W.3d 928, 929, 43 Tex. Sup. Ct. J. 1172 (Tex. 2000)*. If the plaintiffs fail to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether Ford's proof satisfied the *Rule 166a(c)* burden.

*HN2* A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned [**4] output in a manner that renders it unreasonably dangerous. *Torrington Co. v. Stutzman, 46 S.W.3d 829, 844, 44 Tex. Sup. Ct. J. 225 (Tex. 2000)*; *Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 434, 40 Tex. Sup. Ct. J. 658 (Tex. 1997)*. A plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Torrington Co., 46 S.W.3d at 844*.

In an attempt to defeat Ford's motion, the Ridgways presented affidavits from all three of the truck's owners and from Bill Greenlees, an expert who inspected the truck after the accident. The owners explained when and where they purchased the truck, how many miles they drove it, and any modifications or repairs they made. In addition, Ridgway described when he first noticed the fire, how he reacted, and the injuries he sustained. Greenlees explained that his expert opinion was based on his visual inspection of the truck after the accident, a visual comparison of a similar but undamaged truck, a review of Ford service manuals, and a review of the National Highway Traffic Safety Administration's database. Based on the areas of greatest damage to the truck [**5] and an indication of a "hot spot in the left center area of the engine compartment," Greenlees concluded that the fire originated within the engine compartment and opined that "a malfunction of the electrical system in the engine compartment is suspected of having caused this accident." Greenlees, however, declined to eliminate all portions of the fuel system as a possible cause of the accident and conceded that "the actual cause of the fire has not been determine [sic] yet." Although Greenlees suggested that further investigation might yield a more definitive conclusion, particularly [*601] if the vehicle were disassembled, the Ridgways made no motion for further testing and did not complain that the trial court failed to allow adequate time for or sufficient scope of discovery. [1]

*HN3* When determining if more than a scintilla of evidence has been produced in response to [**6] a *Rule 166a(i)* motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movant. *Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 208, 45 Tex. Sup. Ct. J. 470 (Tex. 2002)*. We have repeatedly held that more than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997); *Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499, 38 Tex. Sup. Ct. J. 848 (Tex. 1995)*; *Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25, 37 Tex. Sup. Ct. J. 883 (Tex. 1994)*. On the other hand, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere

---

[1] Greenlees' affidavit stated: "The inspection of the subject Ford was a visual inspection only. No disassembly nor alterations have been performed as of this time." In oral argument, the Ridgways' attorney suggested that Greenlees could not perform destructive testing on the vehicle because it was severely damaged.

surmise or suspicion of its existence, the evidence is no more than a scintilla and, in ***legal*** effect, is no evidence." *Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63, 26 Tex. Sup. Ct. J. 383 (Tex. 1983)*.

***HN4*** Both direct and circumstantial evidence may be used to establish any material fact. *Lozano v. Lozano, 52 S.W.3d 141, 149, 44 Tex. Sup. Ct. J. 499 (Tex. 2001)*; *Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928, 37 Tex. Sup. Ct. J. 118 (Tex. 1993)*. To raise a genuine **[\*\*7]** issue of material fact, however, the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in ***legal*** effect no evidence. *Lozano, 52 S.W.3d at 148*; *Browning-Ferris, Inc., 865 S.W.2d at 928*.

The Ridgways produced no direct evidence of the fire's cause, and their circumstantial evidence that a manufacturing defect existed in the Ford F-150 when it left the manufacturer does not exceed a scintilla. Ridgway's affidavit establishes only that a fire occurred, and Greenlees could say no more than that he "suspects" the electrical system caused the fire. Because Greenlees could not rule out part of the fuel system as a possible cause and because there is no proof that identified a defect in the truck at the time it left the manufacturer, Greenlees' affidavit is not sufficient to raise a fact issue.

The Ridgways argue that this proof is nevertheless sufficient under *section 3 of the Third Restatement of Torts*, which provides:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the **[\*\*8]** incident that harmed the plaintiff:
>
> (a) was of the kind that ordinarily occurs as a result of a product defect; and
>
> (b) was not, in the particular case, solely the result of causes other than the product defect existing at the time of sale or distribution.

*RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 3* (1998). No Texas court has ever cited this section, and we do not decide today whether it reflects the law of this state. Even if *section 3* were the law in Texas, it would generally apply only to new or almost new products. Such products typically have not been modified or repaired, therefore making a product defect the likely cause of an accident. The **[\*602]** drafters of the Restatement realized this limitation and noted: "The inference of defect may not be drawn . . . from the mere fact of a product-related accident. . . . Evidence that the product may have been used improperly or was altered by repair people weakens the inference [that there was a product defect]." *Id.* at reporters' notes to cmt. d (citations omitted). The reporters' notes also provide several examples to illustrate when a product defect cannot be inferred without **[\*\*9]** proof of a specific defect

because of the product's age or the presence of modifications or repairs. *Compare Woodin v. J.C. Penney Co., 427 Pa. Super. 488, 629 A.2d 974, 976-77 (Pa. Super. Ct. 1993)* (recognizing that a product defect cannot be inferred in a freezer cord when it functioned flawlessly for eight years before catching fire), *and Walker v. Gen. Elec. Co., 968 F.2d 116, 120 (1st Cir. 1992)* (holding that the mere fact that a six-year-old toaster oven caught fire does not support an inference that a manufacturing defect exists), *with Dietz v. Waller, 141 Ariz. 107, 685 P.2d 744, 748 (Ariz. 1984)* (stating that a boat that broke in half after only ten hours of use gives rise to an inference of a manufacturing defect). When courts have cited *section 3*, they have also noted this limitation on the Restatement's operation. *See Jarvis v. Ford Motor Co., 283 F.3d 33, 44 (2nd Cir. 2002)* (applying a New York law similar to *section 3* to excuse a plaintiff from proving a specific defect, instead inferring a defect from proof that a six-day-old vehicle did not perform as intended); *Myrlak v. Port Auth., 157 N.J. 84, 723 A.2d 45, 56 (N.J. 1999)* (adopting **[**10]** *section 3* in a case involving a collapsed five-week-old chair). Therefore, we reiterate that because *section 3* is not applicable to the facts of this case, we need not decide if it is an accurate statement of Texas law.

## III

Under the circumstances of this case, the Ridgways' summary judgment proof is no more than a scintilla of evidence that a manufacturing defect was present when the truck left the manufacturer. Therefore, the Ridgways have not met their burden of showing that a genuine issue of material fact exists regarding a manufacturing defect. We accordingly reverse the judgment of the court of appeals and render judgment that the plaintiffs take nothing.

Thomas R. Phillips

Chief Justice

**Concur by:** Nathan L. Hecht

**Concur**

JUSTICE HECHT, joined by JUSTICE OWEN, concurring.

I join in the Court's opinion and write only to explain that while Texas law would allow proof of products liability by circumstantial evidence in certain cases, [1] the black-letter

---

[1]  *See, e.g., General Motors Corp. v. Hopkins,* 548 S.W.2d 344, 20 Tex. Sup. Ct. J. 191 (Tex. 1977), *overruled on other grounds by Turner v. Gen. Motors Corp.,* 584 S.W.2d 844, 22 Tex. Sup. Ct. J. 409 (Tex. 1979) *and Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 27 Tex. Sup. Ct. J. 213 (1984); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 12 Tex. Sup. Ct. J. 358 (Tex. 1969); *see also Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63, 26 Tex. Sup. Ct. J. 383 (Tex. 1983) (citing *Hopkins,* 548 S.W.2d 344, 20 Tex. Sup. Ct. J. 191).

rule of *section 3 of the Restatement (Third) of Torts: Products Liability* does not accurately restate Texas law.

[**11] *Section 3* states:

Circumstantial Evidence Supporting Inference of Product Defect

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of product defect; and

(b) was not, in the particular case, solely the result of causes other than [*603] product defect existing at the time of sale or distribution. [2]

"It may be inferred" cannot mean "it is always proper to infer", as the present case demonstrates. *Section 3(a)* requires only that an injury-causing incident be the kind of thing that ordinarily results from a product defect, not that the incident is the kind of thing that ordinarily does *not* result *unless* there is a defect. A pickup suddenly bursting into flame for no discernible reason is the kind of thing that ordinarily occurs as a result of product defect in the sense that product defects do cause such things. Thus Ridgway has satisfied *section 3(a)*, even though it is also true that fires in vehicles ordinarily occur for many reasons other than [**12] product defect. [3] As for *section 3(b)*, although Ridgway cannot conclusively negate that the fire was caused solely by something other than a defect, Ford cannot point to anything as the sole cause of the fire. Therefore, Ridgway argues, *section 3* entitles him to an inference that his pickup was defective and the further inference that the defect existed when Ford sold the pickup. The Court rejects Ridgway's argument, not because of the text of the rule, but because *comment d to section 3*, the reporter's notes, and cases allowing proof of products liability by circumstantial evidence limit the stated rule. In other words, the *section 3* rule means much less than it appears to say.

[**13] "It may be inferred" really means "it is sometimes proper to infer", but while this reading makes the rule stated in *section 3* accurate, it also makes the rule not very helpful. Few would question the use of circumstantial evidence to prove products liability in appropriate cases. The hard issue is not whether it can be done, but when and how. The comments to *section 3* and the cases cited in support of it illustrate the kinds

---

[2]  RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 3 (1998).

[3]  *See* U.S. FIRE ADMINISTRATION, HIGHWAY VEHICLE FIRES, 2 TOPICAL FIRE RESEARCH SERIES No. 4 (July 2001, revised Mar. 2002) (reporting that highway vehicle fires are due 66% to mechanical or design problems 18% to incendiary or suspicious origins, 8% to misuse, 4% to operational deficiency, and 3% to other design, construction, and installation deficiencies), *available at* http://www.usfa.fema.gov/downloads/pdf/tfrs/v2i4.pdf (last visited Feb. 5, 2004).

of considerations courts have taken into account in deciding whether to allow an inference of pre-sale defect in a product, but these considerations are not reflected the in the black-letter rule itself. One looks to comments to explain the rule; one does not look to comments to find the rule.

Section 3 is modeled on section 328D of the Restatement (Second) of Torts, [4] **[\*\*15]** which states:

> Res Ipsa Loquitur
>
> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
>
> (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
>
> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated **[\*\*14]** by evidence; and
>
> (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff. [5]

 **[\*604]** But the differences in the two provisions are such that section 3 is not an analogue of section 328D but rather a kind of *res ipsa -- lite! Sections 3(a) and (b)* are less strict than the parallel provisions in *sections 328D(1)(a) and (b)*, at least in a case like the present one. It cannot be said that fires in pickups do not ordinarily occur absent a product defect; they ordinarily occur for all sorts of reasons. [6] Nor has Ridgway "eliminated by evidence" the existence of other responsible causes of the fire. The most he can say is that Ford has offered no evidence of another cause. He has not shown that, given the circumstances, another cause was impossible or even improbable. If *section 3* were as strictly worded as *section 328D*, Ridgway's claim would clearly fail.

Texas law of *res ipsa loquitur* is at least as strict as *section 328D*. We require the first condition stated in *section 328D(1)(a)*, and instead of the second condition stated in *section 328D(1)(b)*, we require that the instrumentality causing harm have been under the defendant's management and control. [7] We have explained that

---

[4]  *Proceedings at 72nd Annual Meeting: American Law Institute,* 72 A.L.I. PROC. 179, 231 (1996) (remarks of James A. Henderson, Reporter, introducing RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 3 (Tentative Draft No. 2, 1995)) ("Section 3 is derived quite faithfully from § 328D of the Restatement, Second, of Torts.").

[5]  RESTATEMENT (SECOND) OF TORTS § 328D (1965).

[6]  *See infra* note 3.

[7]  Haddock v. Arnspiger, 793 S.W.2d 948, 950, 33 Tex. Sup. Ct. J. 591 (Tex. 1990) ("*Res ipsa loquitur* is applicable only when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the

the "control" requirement is not a rigid rule that the instrumentality must have always been in the defendant's possession or even that it must have been in the defendant's control at the time of the injury. It is sufficient if the defendant was in control at the time that the negligence inferable from the first factor probably occurred, so that the reasonable probabilities point to the defendant and support a reasonable inference that he was the negligent party. The possibility of other causes does not have to be completely eliminated, but their likelihood must be so reduced that the jury can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door. [8]

The rule of *res* **[**16]** *ipsa loquitur* allows an inference of negligence, absent direct proof, only when injury would ordinarily not have occurred but for negligence, and defendant's negligence is probable.

There is no reason to allow an inference of products liability any more freely than an inference of negligence. An inference of products liability is really two inferences: that the product was defective, and that the defect existed at the time of sale. Applying the principle underlying *res ipsa loquitur,* neither inference can be drawn without evidence that the injury would not ordinarily **[**17]** have occurred absent a product defect and that that defect probably existed when the product was sold. This is not what *section 3* says.

Nathan L. Hecht

Justice

---

instrumentality causing the injury is shown to have been under the management and control of the defendant.") (citing *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 251, 18 Tex. Sup. Ct. J. 113 (Tex. 1974) and *Marathon Oil Co. v. Sterner,* 632 S.W.2d 571, 573, 25 Tex. Sup. Ct. J. 274 (Tex. 1982)).

[8] *Mobil Chem. Co.,* 517 S.W.2d at 251 (citations omitted).

## *Young v. Ward*

Court of Appeals of Texas, Tenth District, Waco

March 6, 1996, delivered ; March 6, 1996, filed

No. 10-95-001-CV

**Reporter**

917 S.W.2d 506; 1996 Tex. App. LEXIS 900

GEOFFREY YOUNG, Appellant v. TRAVIS WARD, Appellee

**Prior History:** **[**1]** From the 13th District Court. Navarro County, Texas. Trial Court # 94-00-03917-CV.

**Disposition:** Reversed and remanded

## Core Terms

one year, employment contract, parties, statute of frauds, retirement, indefinite duration, no writ, terminate, fully performed, oral agreement, ten years, ref'd, summary judgment, conceivably, duration, lifetime

## Case Summary

### Procedural Posture

Appellant sought review of the judgment from the 13 District Court, Navarro County (Texas), which granted appellee's motion for summary judgment in appellant's suit against appellee for enforcement of an oral contract.

### Overview

Appellant sued appellee to enforce an oral contract under which appellee was to pay appellant a monthly pension for the rest of appellant's life. Summary judgment in appellee's favor was entered on the grounds that the oral contract was unenforceable under *Tex. Bus. & Comm. Code Ann. § 26.01(b)(6)*, because it could not be performed within one year from the date of the agreement. Appellant sought the court's review. The court held that *§ 26.01(b)(6)* referred to agreements which could not be performed within one year of their making. But if the occurrence of some other contingent event would terminate the agreement before it had been fully performed, then the possibility

of that terminating event occurring within one year of the agreement's making was sufficient to make *§ 26.01(b)(6)* inapplicable. Here, the contract required appellant to work for a month and a half before becoming entitled to payments. That time period then necessarily expired within one year of the agreement's making. Further, the length of time the payments were to occur could also have been fully performed within one year. Accordingly, *§ 26.01(b)(6)* was not applicable. Judgment reversed and remanded.

## Outcome

Summary judgment in appellee's favor reversed and remanded where the oral contract between appellant and appellee was not required to be in writing to be enforceable where performance of the contract was contingent upon an event which necessarily had to occur within a year of the contract's making, and where the time for performance could have been fully performed within one year.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1* On appeal from the granting of summary judgment, the court must determine whether the evidence establishes as a matter of law that there is no genuine issue of material fact. In deciding whether a genuine issue of material fact exists, the evidence must be viewed in favor of the nonmovant, resolving all doubts and indulging all inferences in his favor. A defendant as a movant must either: 1) disprove at least one element of each of the plaintiff's theories of recovery; or 2) plead and conclusively establish each essential element of an affirmative defense.

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > Performance

Labor & Employment Law > ... > Conditions & Terms > Duration of Employment > Fixed Term

*HN2* *Tex. Bus. & Comm. Code Ann. § 26.01(b)(6)* provides that, to be enforceable, promises or agreements which are not to be performed within one year from the date of making the agreement must be in writing. Agreements which demand performance at or for a specified amount of time are easily determined by the court to fall or not fall under the strictures of *§26.01(b)(6)*. The court simply compares the date of the agreement to the date when the performance under the agreement is to be completed and if there is a year or more in between them then a writing is required to render the agreement enforceable. Agreements where the time at or for performance is not specifically provided but can be readily ascertained from the context of the agreement can also be easily determined to be within or outside *§ 26.01(b)(6)*.

> Contracts Law > Procedural Matters > Statute of Frauds > General Overview
>
> Contracts Law > ... > Statute of Frauds > Requirements > General Overview
>
> Contracts Law > ... > Statute of Frauds > Requirements > Performance
>
> Labor & Employment Law > Employment Relationships > Employment Contracts > Statute of Frauds

*HN3* Without knowing definitely when performance is to be completed, courts are unable to determine with certainty whether the agreement is to be performed within one year from the date of making the agreement. *Tex. Bus. & Comm. Code Ann. § 26.01(b)(6)*. Courts, however, apparently in an effort to avoid the harsh consequences *§ 26.01(b)(6)* can produce, generally hold that, in the absence of a known date when performance will be completed, the statute of frauds as contained in *§ 26.01(b)(6)* does not apply if performance could conceivably be completed within one year of the agreement's making.

> Contracts Law > Procedural Matters > Statute of Frauds > General Overview
>
> Contracts Law > ... > Statute of Frauds > Requirements > General Overview
>
> Contracts Law > ... > Statute of Frauds > Requirements > Performance
>
> Labor & Employment Law > ... > Conditions & Terms > Duration of Employment > General Overview
>
> Labor & Employment Law > Employment Relationships > Employment Contracts > Statute of Frauds

*HN4* Agreements requiring performance for an indefinite duration and which do not depend upon any conditions for their perpetuation are generally held not to require a writing under the statute of frauds, *Tex. Bus. & Comm. Code Ann. § 26.01(b)(6)*, because there is nothing in the agreement itself to show that the agreement could not be performed within a year according to its tenor and the understanding of the parties.

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > Performance

*HN5* Agreements which are to last during the life of one of the parties do not require a writing because the party upon whose life the duration of the contract is measured could die within a year of the agreement's making.

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

Labor & Employment Law > ... > Employment Contracts > Conditions & Terms > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > Express Contracts

*HN6* The mere possibility of an agreement terminating within one year of its making does not, in and of itself, ensure that a writing is not required. If this conceivable possibility of performance is dependent upon some merely fortuitous event, a writing will still be required to enforce the agreement.

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

*HN7* If an agreement can be fully performed within one year of its making, *Tex. Bus. & Comm. Code Ann. § 26.01(b)(6)* does not apply. But if the occurrence of some other contingent event, even if expressly contemplated in the agreement, would simply terminate the agreement before the agreement had been fully performed, then the possibility of that terminating event occurring within one year of the agreement's making is insufficient to take the agreement outside of *§ 26.01(b)(6)*. The event that could conceivably occur within one year of the agreement must be one intended by the parties to result in the full performance of the agreement.

**Counsel:** William B. Short, Jr. & Mark Frels, SHORT, HOW, LOZANO, FRELS & TREDOUX, L.L.P., Dallas, TX.

Frederick M. Loeber, Jr., Dallas. TX.

**Judges:** BOBBY L. CUMMINGS, Justice, BILL VANCE, Justice - concurring

**Opinion by:** BOBBY L. CUMMINGS

## Opinion

[*506] **OPINION**

This is a breach of contract case. At trial, appellant Geoffrey Young sought to enforce an oral contract between him and appellee Travis Ward whereby Ward, Young's former employer, had allegedly agreed to pay Young a pension of $ 2000 per month for the rest of [*507] Young's life. Ward moved for summary judgment on the grounds that the alleged oral contract was unenforceable under the statute of frauds. *TEX. BUS. & COMM. CODE ANN. § 26.01* (Vernon 1987). The trial court granted the motion, prompting Young to bring this appeal. We reverse and remand.

The two parties differ widely in their versions of the events which led to this lawsuit. According to Young, beginning in 1956 and continuing until the end of October 1985, Young worked for Ward as an office manager and bookkeeper. Starting [**2] in or about 1969, he began to feel concerned that Ward had not yet established some provision for his retirement income. He, therefore, brought the subject up to Ward, who assured Young that he had no need to be concerned about a lack of a retirement income and that Ward would provide one for Young when the time came. Nevertheless, despite repeated protests from Young, Ward never attempted to finalize a formal agreement with Young until either late September or early October of 1985 when Young was only a few weeks from his last day of employment. At that time, again according to Young, Ward offered to pay Young $ 2000 per month for the rest of Young's life. Young argues that the consideration for the agreement was that Young would continue to work for Ward until the end of October. The negotiations were oral and the agreement was never reduced to writing.

Ward agrees that Young worked for him from 1956 until the end of October 1985 as an office manager and bookkeeper, but this essentially is where the similarity between his story and Young's ends. According to Ward, his decision to offer Young a pension arose from an effort to keep Young in his employment when Ward was relocating [**3] his offices from Corsicana to Dallas sometime between 1971 and 1973, not from concerns expressed by Young about a lack of a retirement plan. Young did not want to move to Dallas and was reluctant to commute; accordingly, in an effort to persuade him to continue in his employment, Ward offered to provide Young a company car and gas so that Young could make the commute from Corsicana without any financial expense. Furthermore, as an added incentive, Ward decided to offer Young a retirement plan. Ward consulted an insurance agent, Gara Stark, who analyzed certain figures and offered certain suggestions to Ward on what might be feasible Options for him and Young. Ward decided not to accept any of the suggestions from Stark; instead, he orally offered to pay Young $ 2000 per month for eight years once Young retired. According to Ward, Young orally accepted this offer in 1973, but it was never reduced to writing.

The parties agree that Young retired at the end of October 1985 and that Ward paid Young $ 2000 per month for eight years following Young's retirement. Young brought his lawsuit when Ward informed him in or about October 1993 that he would cease making payments to Young the following **[\*\*4]** month.

In his motion for summary judgment, Ward contended the oral agreement between him and Young was unenforceable because it was not to be performed within one year from the date of the making of the agreement, as provided in our state's statute of frauds. *TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6)*. Ward raised two arguments in support of his theory: first, he contended that any contract for lifetime is, *per se,* barred by the statute of frauds; second, he argued that, since the date of the contract's making was in 1973, more than one year would necessarily have had to elapse before the contract could be performed because Young was not due to retire until twelve years later in 1985. The trial court granted summary judgment solely on the former argument; consequently, we can only consider it and not the latter. *State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (1993)*; *McDuff v. Chambers, 895 S.W.2d 492, 497* (Tex. App.--Waco 1995, writ denied).

**HN1** On appeal from the granting of summary judgment, we must determine whether the evidence establishes as a matter of law that there is no genuine issue of material fact. *Rodriguez v. Naylor, 763 S.W.2d 411, 413 (Tex.* **[\*\*5]** *1989)*; *Hamlin v. Gutermuth, 909 S.W.2d 114, 116* (Tex. App.--Houston [14th Dist.] 1995, writ denied). In deciding whether a genuine issue of material fact exists, the evidence must be viewed in **[\*508]** favor of the nonmovant, resolving all doubts and indulging all inferences in his favor. *Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985)*. A defendant as a movant must either: 1) disprove at least one element of each of the plaintiff's theories of recovery; or 2) plead and conclusively establish each essential element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 679 (Tex. 1979)*. Ward in his summary judgment motion raised the affirmative defense of the statute of frauds. The question before us, then, is whether oral lifetime contracts are unenforceable under the statute of frauds. We conclude that they are not.

Construing the facts in the light most favorable to Young, we find that in late September or early October 1985 Ward offered to pay Young $ 2000 per month for the rest of Young's life if Young would continue to work for Ward until the end of October 1985. Young accepted the offer, but the agreement **[\*\*6]** was never reduced to writing.

**HN2** *Section 26.01(b)(6) of the Business and Commerce Code* provides that, to be enforceable, promises or agreements "which [are] not to be performed within one year from the date of making the agreement" must be in writing. *TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6)*. Agreements which demand performance at or for a specified

amount of time are easily determined by the court to fall or not fall under the strictures of *section 26.01(b)(6)*. *Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795, 796 (1961)* (question of whether an agreement falls within the statute of frauds is one of law). The court simply compares the date of the agreement to the date when the performance under the agreement is to be completed and if there is a year or more in between them then a writing is required to render the agreement enforceable. *Gilliam v. Kouchoucos, 161 Tex. 299, 340 S.W.2d 27, 28-29 (1960)* (employment contract for ten years within statute); *Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 533 (Tex. 1948) (employment contract for term of one year and several weeks within statute); *Paschall v. Anderson, 127 Tex. 251, 91 S.W.2d 1050, 1051 (1936)* **[**7]** (same); *Shaheen v. Motion Indus., Inc., 880 S.W.2d 88, 91* (Tex. App.--Corpus Christi 1994, writ denied) (employment contract for nine months not within statute); *International Piping Sys., Ltd. v. M.M. White & Assoc., Inc., 831 S.W.2d 444, 451* (Tex. App.--Houston [14th Dist.] 1992, writ denied) (employment contract for one year performable within one year and therefore not within statute); *Wiley v. Bertelsen, 770 S.W.2d 878, 881-82* (Tex. App.--Texarkana 1989, no writ) (employment agreement for approximately ten years within statute); *M.R.S. Datascope Inc. v. Exchange Data Corp., Inc., 745 S.W.2d 542, 544* (Tex. App.--Houston [1st Dist.] 1988, no writ) (covenant not to compete for three years within statute); *Levine v. Loma Corp., 661 S.W.2d 779, 781-82* (Tex. App.--Fort Worth 1983, no writ) (agreement to employ employee for over one year and then pay him $ 1000 per month for life thereafter within statute).

Agreements where the time at or for performance is not specifically provided but can be readily ascertained from the context of the agreement can also be easily determined to be within or outside *section 26.01(b)(6)*. *Schroeder v. Texas Iron Works,* **[**8]** *Inc., 813 S.W.2d 483 (Tex. 1991)* (employment contract until retirement, which was eight to ten years from date of agreement's making, was within statute); *Niday v. Niday,* 643 S.W.2d 919, 920 (Tex. 1982) (agreement fell within statute where performance under agreement would take at least two years); *Hall v. Hall,* 158 Tex. 95, 308 S.W.2d 12, 15 (1957) (employment contract with no specified duration was within statute where the parties intended it to last for a reasonable time and where the jury determined the parties at the time the agreement was made intended it to be about three years); *Leon Ltd. v. Albuquerque Commons Partnership, 862 S.W.2d 693, 702* (Tex. App.--El Paso 1993, no writ) (writing was required where performance under agency agreement, although for an unspecified term, could not possibly be completed within three years from date of agreement); *Winograd v. Willis, 789 S.W.2d 307, 310-11* (Tex. App.--Houston [14th Dist. 1990, writ denied) (employment contract of unspecified duration determined to be for one year and therefore not within statute where the terms of the agreement indicated that employee **[*509]** was to receive an annual salary); **[**9]** *Benoit v. Polysar Gulf Coast, Inc., 728 S.W.2d 403, 406-07* (Tex. App.--Beaumont 1987, writ ref'd n.r.e.) (employment

contract until retirement for employee several years younger than retirement age within statute); *Gano v. Jamail, 678 S.W.2d 152, 154* (Tex. App.--Houston [14th Dist.] 1984, no writ) (indefinite duration agreement between plaintiff lawyers to share profits from personal injury cases required a writing because the work on the cases could not reasonably be completed within one year from the date the cases were taken); *Molder v. Southwestern Bell Tel. Co., 665 S.W.2d 175, 177* (Tex. App.--Houston [1st Dist.] 1983, writ ref'd n.r.e.) (employment contract until retirement for eighteen year-old employee within statute).

Agreements which fail to specify a definite time when performance is to be completed and agreements from which the time at or for performance cannot be readily ascertained present a different and more difficult problem. *HN3* Without knowing definitely when performance is to be completed, courts are unable to determine with certainty whether the agreement was "to be performed within one year from the date of making the agreement." *TEX. BUS. & COMM.* [\*\*10] CODE ANN. § 26.01(b)(6). Texas courts, however, apparently in an effort to avoid the harsh consequences *section 26.01(b)(6)* can produce, have generally held that, in the absence of a known date when performance will be completed, the statute of frauds does not apply if performance could conceivably be completed within one year of the agreement's making. *Miller v. Riata Cadillac Co., 517 S.W.2d 773, 776 (Tex. 1974)* (where contract to pay employee a bonus after approximately one year could theoretically be performed before the year expired, statute of frauds did not apply); *Young v. Fontenot, 888 S.W.2d 238, 241* (Tex. App.--El Paso 1994, writ denied) (agreement to transfer stocks at an unspecified date in the future was performable within one year and therefore not within statute); *Gerstacker v. Blum Consulting Engineers, Inc., 884 S.W.2d 845, 851* (Tex. App--Dallas 1994, writ denied) (employment contract for no specified duration but for as long as the employee's performance was satisfactory could be performed within one year because performance could conceivably become unsatisfactory within one year); *Prowse v. Schellhase, 838 S.W.2d 787, 790* (Tex. App.--Corpus [\*\*11] Christi 1992, no writ) (agreement to find a buyer for mineral leases was performable within one year and therefore not within statute); *Goodyear Tire & Rubber Co. v. Portilla, 836 S.W.2d 664, 670-71* (Tex. App.--Corpus Christi 1992) (employment contract for as long as employee performed work satisfactorily not within statute), *aff'd,* *879 S.W.2d 47 (Tex. 1994)*; *Day & Zimmermann, Inc. v. Hatridge, 831 S.W.2d 65, 68-69* (Tex. App.--Texarkana 1992, writ denied) (same); *Kennedy v. Hyde, 666 S.W.2d 325, 328* (Tex. App.--Fort Worth) (oral agreement to repay a note for a ten-year period not within statute because parties intended for alternative performance by possible early payment within one year of the agreement), *rev'd on other grounds,* *682 S.W.2d 525 (Tex. 1984)*; JOHN D. CALAMARI AND JOSEPH M. PERILLO, CONTRACTS, § 19-18 (2nd ed. 1977); *contra Wal-Mart Stores, Inc. v. Coward, 829 S.W.2d 340, 342-43* (Tex. App.--Beaumont 1992, writ

denied) (employment contract for as long as employee wanted it and made a "good hand" required a writing).

Furthermore, under similar reasoning, *HN4* agreements requiring performance for an indefinite duration and which do not depend upon [**12] any conditions for their perpetuation are generally held not to require a writing under the statute of frauds because "there is nothing in the agreement itself to show that [the agreement could not] be performed within a year according to its tenor and the understanding of the parties[.]" *Bratcher, 346 S.W.2d at 796* (quoting 49 AM. JUR. *Statute of Frauds* § 27 (1943)). Again, the agreements could conceivably be performed within a year of their making; therefore, a writing is not required to enforce them. *Id.* (statute of frauds did not apply to employment contract of indefinite duration); *Beckstrom v. Gilmore, 886 S.W.2d 845, 846-47* (Tex. App.--Eastland 1994, writ denied) (agreement of indefinite duration by attorney to send demand letters for medical doctor performable within one year and therefore not within statute); *Morgan v. Jack Brown Cleaners, Inc., 764 S.W.2d 825, 827* (Tex. [*510] App.--Austin 1989, writ denied) (on rehearing) (employment contract of indefinite duration not within statute); *Kelley v. Apache Products, Inc., 709 S.W.2d 772, 774* (Tex. App.--Beaumont 1986, writ ref'd n.r.e.) (same); *Robertson v. Pohorelsky, 583 S.W.2d 956, [**13] 958* (Tex. Civ. App.--Waco 1979, writ ref'd n.r.e.) (employment contract of indefinite duration did not require writing because nothing in agreement indicated parties intended employee to work more than one year); *RESTATEMENT (SECOND) OF CONTRACTS § 130 cmt. a* (1981).

Accordingly, *HN5* agreements to last during the life of one of the parties would also not require a writing because the party upon whose life the duration of the contract is measured could die within a year of the agreement's making. In *Wright v. Donaubauer, 137 Tex. 473, 154 S.W.2d 637 (1941)*, the Supreme Court considered whether an oral agreement providing for an alternative means of performing on a ten-year note was within the statute of frauds. The parties orally agreed that the debtor could pay off his $ 2100 debt, payable on the note by $ 100 every six months for ten years, by performing yard work either for the life of the creditor or for the duration of the note, whichever should occur first. *154 S.W.2d at 638*. The parties intended that the note, under either scenario, would be paid in full. *See id.* It is important to distinguish the two agreements at issue in the *Wright* case. The first is the written [**14] agreement represented in the ten-year note. The second is the oral agreement between the parties providing for an alternative means of paying off the note other than the tendering of $ 100 every six months for ten years. Under the oral agreement, the parties intended for two alternative means of performance. The first required ten years of yard work by the debtor; the second required the performance of yard work by the debtor until the death of the creditor. The Supreme Court held that, because the second means of performance could have occurred within one year of the agreement's making, the statute of frauds did not

apply and a writing was not required to enforce it. *154 S.W.2d at 639*; *see Gilliam, 340 S.W.2d at 28*. This rule of law has since been followed in Texas and in virtually every other jurisdiction in the United States. *Lieber v. Mercantile Nat'l Bank at Dallas, 331 S.W.2d 463, 474* (Tex. Civ. App.--Dallas 1960, writ ref'd n.r.e.) (oral prenuptial agreement that husband would will certain monies to his wife not within statute because husband could have died within one year of the agreement's making); *Central Nat'l Bank of San Angelo v. Cox, 96 S.W.2d 746, 748* **[**15]** (Tex. Civ. App.--Austin 1936, writ dism'd) (employment contract until employee should die or become incapacitated performable within one year and therefore not within statute); *accord Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 551-52 (1st Cir. 1989)* (applying Massachusetts law); *Rath v. Selection Research, Inc., 246 Neb. 340, 519 N.W.2d 503, 506 (Neb. 1994)*; *Boothby v. Texon, Inc., 414 Mass. 468, 608 N.E.2d 1028, 1035-36 (Mass. 1993)*; *Falls v. Virginia State Bar, 240 Va. 416, 397 S.E.2d 671, 672 (Va. 1990)*; *Kestenbaum v. Pennzoil Co., 108 N.M. 20, 766 P.2d 280, 283-84 (N.M. 1988)*, *cert. denied, 490 U.S. 1109, 109 S. Ct. 3163, 104 L. Ed. 2d 1026 (1989)*; *Bergquist-Walker Real Estate, Inc. v. William Clairmont, Inc., 333 N.W.2d 414, 418 (N.D. 1983)*; *Kitsos v. Mobile Gas Serv. Corp., 404 So. 2d 40, 42 (Ala. 1981)*; *Kiyose v. Trustees of Indiana Univ., 166 Ind. App. 34, 333 N.E.2d 886, 889 (Ind. 1975)*; *Price v. Mercury Supply Co., Inc., 682 S.W.2d 924, 933 (Tenn. App. 1984)*; *contra Massey v. Houston Baptist Univ., 902 S.W.2d 81, 84* (Tex. App.--Houston [1st Dist.] 1995, writ denied) (promise of lifetime employment, without **[**16]** reference to retirement, required a writing); *Benoit, 728 S.W.2d at 407* (employment contracts for "lifetime employment" require a writing); *Zimmerman v. H.E. Butt Grocery Co., 932 F.2d 469, 472-73* (5th Cir.) (under Texas law agreements for "lifetime employment" require a writing), *cert. denied, 502 U.S. 984, 112 S. Ct. 591, 116 L. Ed. 2d 615 (1991)*; *Quinn v. Workforce 2000, Inc., 887 F. Supp. 131, 136 (E.D. Tex. 1995)* (same); *Rayburn v. Equitable Life Assurance Soc. of the United States, 805 F. Supp. 1401, 1405-06 (S.D. Tex. 1992)* (same).

However, **HN6** the mere possibility of the agreement terminating within one year of its making does not, in and of itself, ensure that a writing is not required. If this conceivable possibility of performance is dependent upon **[*511]** some merely fortuitous event, a writing will still be required to enforce the agreement. *Gilliam, 340 S.W.2d at 28* (ten-year employment contract required writing notwithstanding express provision in the oral agreement that such would terminate upon employee's death); *Chevalier,* 213 S.W.2d at 533 (mere possibility of death did not eliminate requirement of a writing to enforce an **[**17]** employment contract of one year and several weeks); *Collins v. Allied Pharmacy Management, Inc., 871 S.W.2d 929, 934* (Tex. App.--Houston [14th Dist.] 1994, no writ) (employment contract for three years within statute even though under agreement employee could be terminated at any time for cause); *Mann v. NCNB Texas Nat'l Bank, 854 S.W.2d 664, 668* (Tex. App.--Dallas 1992, no writ) (loan agreement with

a three-year repayment term was within Statute notwithstanding remote possibility that debtor would repay the loan within a year from its making); *Webber v. M. W. Kellogg Co., 720 S.W.2d 124, 128* (Tex. App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.) (employment contract until retirement required a writing notwithstanding employer's contractual right to discharge employee at will within first three months of employment). This seemingly technical distinction is one between termination of the contract and performance under the contract. *Gilliam, 340 S.W.2d at 28-9*; *Chevalier*, 213 S.W.2d at 532. *Section 26.01(b)(6)* refers to agreements which cannot be ″performed″ within one year of their making. *TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6)*. Accordingly, *HN7* if an **[**18]** agreement could be fully ″performed″ within one year of its making, *section 26.01(b)(6)* does not apply. *Bratcher, 346 S.W.2d at 796*; *Gilliam, 340 S.W.2d at 28-9*; *Chevalier, 213 S.W.2d at 532*; *Gerstacker, 884 S.W.2d at 851* (employment contract for as long as the employee's performance was satisfactory would be fully completed when employee's performance became unsatisfactory); *Portilla, 836 S.W.2d at 670-71* (same). But if the occurrence of some other contingent event, even if expressly contemplated in the agreement, would simply terminate the agreement before the agreement had been fully performed, then the possibility of that terminating event occurring within one year of the agreement's making is insufficient to take the agreement outside of *section 26.01(b)(6)*. The event that could conceivably occur within one year of the agreement must be one intended by the parties to result in the full performance of the agreement. In the words of the Fifth Circuit, ″If an oral . . . agreement can cease upon some contingency, other than by some fortuitous event or the death of one of the parties, the agreement may be performed within one year, and the statute of frauds does **[**19]** not apply.″ *Pruitt v. Levi Strauss & Co., 932 F.2d 458, 463-64 (5th Cir. 1991)*; *see Gilliam, 340 S.W.2d at 29-30*; *Chevalier, 213 S.W.2d at 532*; *Collins, 871 S.W.2d at 934*; *M.R.S. Datascope, 745 S.W.2d at 544*. We will now apply the facts to the above-stated principles of law.

Here, the summary judgment evidence indicates that the parties agreed in late September or early October 1985 that Ward would pay Young $ 2000 per month for the rest of Young's life if Young would work for Ward until the end of October 1985. We note that there are two stages of performance under this agreement. The first is the month and a half of work Young would have to complete in order to be entitled to payment from Ward. The parties identified a specific and definite period of time by which performance under this first stage would be completed; i.e., no more than a month and a half. This month and a half would necessarily expire within one year of the agreement's making; therefore, the writing requirement of *section 26.01(b)(6)* is not invoked by this stage.

The second stage of performance is the period of time Ward was required to make payments to Young. This period was one of an **[**20]** indefinite duration; i.e., until

Young dies. As an agreement of indefinite duration, we must ask whether it could have been fully performed within one year of its making. Obviously, it could have been. Young could have died at any time after he ceased working for Ward.

We must also ask, however, whether Young's death would have resulted in the agreement being fully performed or fortuitously terminated. The language of the [*512] agreement reveals the parties' intention that the contract would be fully performed once Young died, assuming he successfully performed under the first stage of the agreement, which we note was less than one year. Young's death within a year of the agreement's making would not have simply resulted in the fortuitous termination of the agreement: Young's death was intended by the parties to be the defining event which would determine when the agreement was fully performed. Therefore, because both stages of the agreement, taken together, could have been fully performed within one year of the agreement's making, we conclude that *section 26.01(b)(6)* is not applicable. We, accordingly, sustain Young's first point of error. Due to our disposition of his first [**21] point of error, we need not consider his remaining points. The cause is reversed and remanded for a trial on the merits.

BOBBY L. CUMMINGS

Justice

Before Justice Cummings, and

Justice Vance

Reversed and remanded

Opinion delivered and filed March 6, 1996

## *Pitman v. Lightfoot*

Court of Appeals of Texas, Fourth District, San Antonio

August 7, 1996, Delivered ; August 7, 1996, Filed

Appeal No. 04-93-00480-CV

### Reporter

937 S.W.2d 496; 1996 Tex. App. LEXIS 3531

B.F. PITMAN III; Kim I. MANNING; J. Brian O'CONNOR; Michael H. BERTINO, M.D.; Fred L. BAKER; Lawrence F. HAASS; Rodolfo DAVILA, Trustee of The Rodolfo L. Davila Estate Trust; and Frank DAVILA II, Appellants, v. O. Waymond LIGHTFOOT, Jr.; William R. FIELDS, Jr. and His Estate in Bankruptcy through Intervenor John Patrick LOWE, Trustee, Appellees.

**Subsequent History:** [**1] Released for Publication December 6, 1996.

**Prior History:** Appeal from the 285th District Court of Bexar County. Trial Court No. 91-CI-16926. Honorable Michael P. Peden, Judge Presiding.

**Disposition:** AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

### Core Terms

appellees', control group, stock, trial court, damages, questions, shares, appellants', Savings, parties, issues, ratification, financing, ambiguous, loans, Securities, attorneys', *breach of contract*, pleadings, ratified, securities fraud, discovery rule, conditioned, individually, voting trust, limitations, notice, contractual damages, limitations period, no writ

### Case Summary

### Procedural Posture

Appellant investors of bank holding company stock challenged a judgment from the 285th District Court of Bexar County (Texas), in favor of appellee sellers of the stock, in appellees' action for *breach of contract*, related tort theories, and violations of the Texas Securities Act, *Tex. Rev. Civ. Stat. Ann. art. 581-33*, concerning a purported agreement with appellants to purchase stock from appellees for which payment was not made.

### Overview

The parties had entered into a stock repurchase agreement, an agreement for funding repurchases of shares, and repurchase agreement for the a bank's capital stock. Payment was not made. The trial court granted judgment in favor of appellee sellers in an action against appellant investors for *breach of contract*, breach of trustees' and directors' fiduciary duties, and violations of the Texas

Securities Act, *Tex. Rev. Civ. Stat. Ann. art. 581-33*. On appeal, the court affirmed the part of the judgment based upon **breach of contract** because the "discovery rule" tolled the four-year statute of limitations. The evidence was both legally and factually sufficient to support a finding that appellants promised, though their agent, to buy appellees' stock. The court, however, reversed the judgment regarding the breach of duty and art. 581-33 claims. As to one appellant, no evidence showed that any untrue statements or omissions were made regarding the stock itself. Regarding the other appellant, article 581-33(H) clearly provided an optimum limitations period of five years, which was not observed. The breach of duty claim thus failed as well.

**Outcome**

The court affirmed only that portion of the trial court's judgment that awarded liability and damages for **breach of contract** to appellee sellers of bank holding company stock against appellant investors. The court reversed those parts of the trial court's judgment that awarded liability and damages for breach of trustees' and directors' fiduciary duties, and for violations of the Texas Securities Act, and rendered that appellees **take nothing**.

**LexisNexis® Headnotes**

Civil Procedure > Appeals > Standards of Review

*HN1* When reviewing "matter of law" points, an appellate court employs a two-prong test. The court will first examine the evidence supporting the jury's finding, ignoring all evidence to the contrary. If there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. Only when the contrary proposition is conclusively established by the evidence does the court sustain the point.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Civil Procedure > Discovery & Disclosure > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Procedural Matters > Statute of Limitations > General Overview

*HN2* The discovery rule is a plea in confession and avoidance. A plea in confession and avoidance is one which avows and confesses the truth in the averments of fact in the petition, either expressly or by implication, but then proceeds to allege new matter which tends to deprive the facts admitted of their ordinary legal effect, or to obviate, neutralize, or avoid them. This most closely describes the function of the discovery rule, which asserts that while the statute of limitation may appear to have run, giving rise to that appearance should not control.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Waiver

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Pleadings & Proof

Torts > Procedural Matters > Statute of Limitations > General Overview

*HN3* A party seeking to avail itself of the discovery rule must plead the rule, either in its original petition or in an amended or supplemental petition in response to defendant's assertion of the defense as a matter of avoidance. A defendant who has established that the suit is barred cannot be expected to anticipate the plaintiff's defenses to that bar. A matter in avoidance of the statute of limitations that is not raised affirmatively by the pleadings will, therefore, be waived. The party seeking to benefit from the discovery rule must also bear the burden of proving and securing favorable findings thereon. The party asserting the discovery rule should bear this burden, as it will generally have greater access to the facts necessary to establish that it falls within the rule.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

Torts > Procedural Matters > Statute of Limitations > General Overview

*HN4* The discovery rule does not excuse a party from exercising reasonable diligence in protecting its own interests. The rule expressly mandates the exercise of reasonable diligence to discover facts of negligence or omission. Moreover, the burden is on the party seeking the benefit of the discovery rule to establish its applicability. Whether reasonable diligence was used is generally a question of fact unless the evidence is such that reasonable minds could not differ as to its effect; only then does it become a question of law.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Civil Procedure > Discovery & Disclosure > General Overview

Contracts Law > Breach > *__Breach of Contract__* Actions > General Overview

Contracts Law > Breach > General Overview

Contracts Law > Defenses > Affirmative Defenses > Statute of Limitations

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN5* A *__breach of contract__* action is governed by a four-year statute of limitations. *Tex. Civ. Prac. & Rem. Code Ann. § 16.004* (1986). In applying this

four-year limitations period, a cause of action is generally said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury. An exception to the general rule is known as the discovery rule and this rule is used to determine when the cause of action accrued. The discovery rule tolls the running of the limitations period until the time the injured party discovers or through the use of reasonable care and diligence should have discovered the injury. In a **_breach of contract_** action, limitations begin to run from the time of the breach, or from the time the plaintiff knew or should have known of the breach, whichever is the later.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Civil Procedure > Discovery & Disclosure > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Torts > Procedural Matters > Statute of Limitations > General Overview

**HN6** For a court to apply the discovery rule, the party asserting it must also affirmatively plead the rule.

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN7** The general rule is that pleadings will be construed as favorably as possible

to the pleader. The court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Torts > Procedural Matters > Statute of Limitations > General Overview

**HN8** Reasonably diligent discovery is generally a matter for the jury. This is especially true in a case where the material facts are far from undisputed.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Contracts Law > Breach > **_Breach of Contract_** Actions > General Overview

Contracts Law > Breach > General Overview

Torts > Procedural Matters > Statute of Limitations > General Overview

**HN9** Without application of the discovery rule, a contract cause of action normally

accrues when the contract is breached, not when it was made.

Evidence > ... > Exemptions > Statements by Party Opponents > General Overview

Evidence > Types of Evidence > Judicial Admissions > General Overview

Evidence > Types of Evidence > Judicial Admissions > Pleadings

*HN10* A party's testimonial declarations which are contrary to his position are quasi-admissions. They are merely some evidence, and they are not conclusive upon the admitter. These are to be distinguished from the true judicial admission which is a formal waiver of proof usually found in pleadings or the stipulations of the parties. A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it. The requirements for treating a party's testimonial quasi-admission as a conclusive judicial admission include that the statement be deliberate, clear, and unequivocal and that the hypothesis of mere mistake or slip of the tongue must be eliminated.

Torts > ... > Types of Damages > Judgment Interest > General Overview

*HN11* See *Tex. Rev. Civ. Stat. Ann. art. 5069-1.03* (1987).

Torts > ... > Types of Damages > Judgment Interest > General Overview

*HN12* Where damages are definitely determinable, interest is recoverable as a matter of right from the date of the injury or loss.

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

Civil Procedure > Judgments > Preclusion of Judgments > Law of the Case

*HN13* The "law of the case" doctrine has been defined by the Texas Supreme Court as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. By narrowing the issues in successive stages of the litigation, the law of the case doctrine attempts to achieve uniformity of decision as well as judicial economy and efficiency.

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Judgments > Preclusion of Judgments > Law of the Case

*HN14* The doctrine of the law of the case only applies to questions of law and not to questions of fact. Furthermore, the doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first trial.

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN15* On review of summary judgments, the appellate courts are limited in their considerations of issues and facts. In such a proceeding, the movant is not required to assert every theory upon which he may recover or defend. Thus, when a case comes up for a trial on the merits, the parties may be different, the pleadings may be different, and other causes of action may have been consolidated. Other distinctions may be drawn; for instance, in reviewing the evidence to determine whether there are any fact issues in dispute, the appellate court must review the evidence in the light most favorable to the party opposing the motion for summary judgment. Thus, the context of a summary judgment proceeding is distinguishable from a full trial on the merits.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN16* Proposed questions must be submitted to the jury in "substantially correct wording." *Tex. R. Civ. P. 278*. If the request is not in substantially correct wording, it does not preserve error. *Tex. R. Civ. P. 279*.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Elements of Offense

*HN17* A proper broad form jury question asks an ultimate issue and instructs the jury about the elements of the ground of recovery or defense that the jury must find before giving a "yes" answer to the issue.

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

*HN18* The parol evidence rule is a rule of substantive law which provides that in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written instrument that is facially complete and unambiguous.

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

*HN19* A party may not introduce parol evidence to vary the terms of an unambiguous contract. When a writing is intended as a completed legal transaction, the parol evidence rule excludes other evidence of any prior or contemporaneous expressions of the parties relating to the transaction. Only if the intention of the parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt.

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

Evidence > Admissibility > Statements as Evidence > Parol Evidence

*HN20* When there is no ambiguity, parol evidence is not admissible to create one. When a contract, on its face, can be given a definite, legal meaning, parol evidence is not admissible to render it ambiguous. Only after the trial judge determines that the contract is ambiguous does parol evidence become admissible, and then only to assist the fact finder in determining the subjective intent of the parties at the time they entered into the agreement.

Civil Procedure > Judicial Officers > Judges > General Overview

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Contracts Law > Formation of Contracts > Mistake > General Overview

*HN21* Even in the absence of appropriate pleading by either party, a trial judge may conclude a contract is ambiguous. Indeed, he must do so before the issue can be submitted to the jury: If the trial court has not made a determination on the question of whether a contract is ambiguous before a jury trial commences, it is incumbent on the judge when it first becomes apparent

during trial that at least one of the parties is claiming ambiguity, supported by adequate pleadings, to examine the provisions in question and determine at that time whether or not the contract is or is not ambiguous. This is necessary, among other reasons, so that the court can properly rule on evidentiary objections and submit a substantially correct charge.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN22* If neither party alleges a contract is ambiguous, or if the issue is raised for the first time on appeal, construction of the agreement is a question of law for the appellate court.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN23* Only when a contract contains an ambiguity does its interpretation become a question of fact for the jury.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN24* In construing a contract, the court must give effect to the objective intent of the parties as expressed or apparent in the writing, in light of the surrounding

circumstances. A contract is not ambiguous if, after applying the rules of construction, the provision in question can be given a certain or definite legal meaning or interpretation. On the other hand, the contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. The court recognizes that an instrument is not ambiguous simply because the parties disagree over its interpretation.

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

*HN25* Parol evidence is admissible regarding the intentions of the parties when the writing contained in the document is ambiguous. Moreover, it is admissible to show the agreement was not to become effective save upon certain conditions or contingencies.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > Appeals > Standards of Review > Reversible Errors

*HN26* The admission or exclusion of evidence rests within the sound discretion of the trial court. In other words, the trial court commits error only when it acts in an unreasonable and arbitrary manner, or acts without reference to any guiding principles. Reversible error does not usually occur in connection with rulings on questions of evidence unless the appellant can demonstrate that the whole case turns on the particular evidence that was admitted or excluded. The exclusion of evidence is harmless if it is cumulative of other evidence that was admitted on the same issue.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > Requests for Instructions

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN27* All parties are entitled to have controlling issues, raised by the pleadings and evidence, submitted to the jury. A controlling issue is one which requires a factual determination to render judgment in the case. The issue must also be disputed. Appellants must also show they preserved error to prevail on these points. Several procedural steps are required to preserve error. First, the complaining party must request a question on the issue. The request must be in writing, separated from other requested jury charges, and must be tendered in ″substantially correct″ form. *Tex. R. Civ. P. 278*, *279*. The requested question must also be presented and filed before the charge is read to the jury. Finally, the complaining party must obtain a ruling on the request.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

**HN28** The court reviews a trial court's submission of a theory of recovery or defense by questions or instructions under an abuse of discretion standard, recognizing there is a presumption in favor of the broad-form submission of questions. *Tex. R. Civ. P. 277*. *Rule 277* mandates broad form submission whenever feasible, that is, in any and every instance in which it is capable of being accomplished. The test for an abuse of discretion is whether the trial court's action in refusing to submit the requested definition and instruction was arbitrary or unreasonable. This means the trial court has wide discretion in submitting explanatory instructions and definitions, or in determining what constitutes necessary and proper issues.

Civil Procedure > Trials > Jury Trials > Jury Deliberations

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Criminal Law & Procedure > Appeals > Reversible Error > Juries & Jurors

**HN29** Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and aid the jury in answering the questions in the charge. *Tex. R. Civ. P. 277*, *278*. But, a judgment should not be reversed because of a failure to submit other and various phases or different shades of the same question. Moreover, a trial court errs if it refuses to submit a properly formed question with appropriate instructions, and instead submits separate, granulated issues to the jury.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**HN30** Any complaint concerning the submission of an instruction is waived unless specifically included in the objections. *Tex. R. Civ. P. 274*.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

**HN31** When both legal and factual sufficiency points are raised, the court must first examine the legal sufficiency of the evidence. In considering a "no evidence" or legal sufficiency point, the court considers only the evidence or inferences from the evidence favorable to the decision of the trier of fact and disregards all evidence and inferences to the contrary. If there is any evidence, more than a scintilla, to support the finding, the no evidence challenge will fail.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

**HN32** In considering a factual sufficiency point, the court may not substitute our judgment for that of the trier of fact, but must assess all the evidence and reverse for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence as to be manifestly unjust. Under this analysis, the members of the court are not

the fact finders and do not pass upon the credibility of witnesses or substitute their judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported. In other words, the court is not free to substitute its judgment for the jury's simply because the court may disagree with the verdict.

Business & Corporate Law > ... > Duties & Liabilities > Unlawful Acts of Agents > Fraud & Misrepresentation

Business & Corporate Law > Agency Relationships > Ratification > General Overview

Business & Corporate Law > Agency Relationships > Ratification > Avoidance

Business & Corporate Law > Agency Relationships > Ratification > Express & Implied Ratification

Business & Corporate Law > Agency Relationships > Ratification > Illegal Acts

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Remedies > Ratification

*HN33* Ratification occurs when a principal, though he had no knowledge originally of an unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge. Stated simply, if a person who has fraudulently been made a party to a contract continues to receive the benefits of the contract after he becomes aware of the fraud, or if he otherwise conducts himself in such a manner as to recognize the contract as existing and binding, he thereby affirms the contract and waives his right to a rescission. An express ratification is not necessary; any act based upon a recognition of the contract as existing or any conduct inconsistent with an intention of avoiding it has the effect of waiving the right of rescission.

Business & Corporate Law > Agency Relationships > General Overview

Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > Burdens of Proof

Business & Corporate Law > ... > Duties & Liabilities > Unlawful Acts of Agents > Fraud & Misrepresentation

Business & Corporate Law > Agency Relationships > Ratification > General Overview

Business & Corporate Law > Agency Relationships > Ratification > Illegal Acts

Business & Corporate Law > Agency Relationships > Ratification > Proof

Contracts Law > Remedies > Ratification

*HN34* The critical factor in determining whether a principal has ratified an unauthorized act by his agent is the principal's knowledge of the facts of the prior transaction and his actions in light of such knowledge. Ratification can occur if the party, at the time of his allegedly ratifying acts, has knowledge of all material facts pertaining to the prior fraudulent transaction. The question of ratification of a contract is usually a mixed question of law and fact. Although ratification may be determined as a matter of law if the evidence is uncontroverted or

uncontrovertible, when the act or acts of ratification are controverted, the question of ratification must be left to the trier of fact.

Business & Corporate Law > Agency Relationships > Ratification > General Overview

*HN35* It is fundamental that the critical factors in determining ratification are 1) the principal's subsequent knowledge of the transaction and 2) his actions thereafter, and implied ratification may be proven by silence in the face of knowledge.

Contracts Law > Remedies > General Overview

*HN36* The only way that a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence. If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence.

Contracts Law > Breach > General Overview

Contracts Law > Remedies > General Overview

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

*HN37* To recover for loss of credit, as with any element of contract damage, it must be proved that the injury was the natural, probable, and foreseeable consequence of the ***breach of contract*** or there are no

actual damages. This is not a departure from the general rule of contract damages, but only recognition of an element of damages if proven. Actual damages for loss of credit or injury to credit reputation in an action for ***breach of contract*** may be recovered when there is evidence that loss of credit was a natural, probable, and foreseeable consequence of the defendant's breach.

Business & Corporate Law > General Partnerships > Formation > General Overview

Business & Corporate Law > Unincorporated Associations

*HN38* An unincorporated association is a voluntary group of persons, without a character, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective.

Business & Corporate Law > Agency Relationships > Establishment > General Overview

Contracts Law > Remedies > Ratification

*HN39* Any collective group of individuals may act through a common agent.

Business & Corporate Law > Agency Relationships > General Overview

Business & Corporate Law > General Partnerships > Formation > General Overview

Business & Corporate Law > General Partnerships > Management Duties & Liabilities > General Overview

Business & Corporate Law > Unincorporated Associations

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN40* It may be supposed that an arrangement is entirely inoperative if it purports to be made by a partnership or other unincorporated association with a member of such association. There is no reason why such an agreement should not operate as a valid and enforceable contract between the individual member and the other members of the association that purports to make the agreement. For the purpose of giving a judicial remedy and for other practical purposes, there is nothing to prevent a court from treating the association of individuals as if it were an independent unit. It may well be that an agreement made in this way should be subjected to severe scrutiny in the search for fraud and illegality. Yet the mere fact that the agreement purports to be made between the unincorporated association and one of its members does not in itself prove fraud or illegality.

Business & Corporate Law > Agency Relationships > General Overview

Business & Corporate Law > ... > Authority to Act > Contracts & Conveyances > General Overview

Business & Corporate Law > Agency Relationships > Duties & Liabilities > General Overview

*HN41* An agent's promise necessarily binds his principals to the promised undertaking.

Contracts Law > Third Parties > Joint & Several Contracts

*HN42* In the law of contracts, ***joint and several liability*** usually arises when two or more promisors in the same contract promise the same or different performances to the same promisee. Texas law is no different, obligations of multiple parties to a contract are usually "joint and several."

Civil Procedure > Discovery & Disclosure > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Securities Law > ... > Civil Liability > Blue Sky Fraud > General Overview

Securities Law > Blue Sky Laws > Civil Liability > General Overview

Securities Law > Blue Sky Laws > Offers & Sales

Torts > Procedural Matters > Statute of Limitations > General Overview

*HN43* The limitations period for claims under the Texas Securities Act is found in *Tex. Rev. Civ. Stat. Ann. art. 581-33(H)* (1996), which provides that suit cannot be brought: (1) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (2) more than five years after the purchase; or (3) more than one year after rejecting a rescission offer. However, a claim under the Texas Securities Act may "in no event" be made more than five years after the sale.

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

*HN44* The "merger doctrine" is a corollary to the parol evidence rule in contract cases. Merger refers to the extinguishment of one contract by its absorption into another subsequent contract and is largely a matter of intention of the parties. Merger occurs when the same parties to a prior agreement subsequently enter into a written integrated agreement covering the same subject matter. The question of whether a merger has occurred, or whether an agreement is merely additional to and not contradictory of a written contract, is determined from the intent of the parties. Absent pleading and proof of ambiguity, fraud, or accident, a written instrument presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

*HN45* Although an amended pleading normally supersedes and supplants the original, an original pleading tolls the limitations period for claims asserted in subsequent, amended pleadings as long as the amended pleading does not allege a wholly new, distinct, or different transaction or occurrence. See *Tex. Civ. Prac. & Rem. Code Ann. § 16.068* (1986). The subsequent pleading "relates back" to, and is considered as having been filed at the time of the initial pleading, at least for limitations purposes.

Securities Law > Blue Sky Laws > Civil Liability > General Overview

*HN46* See *Tex. Rev. Civ. Stat. Ann. art. 581-33(B)* (1986).

Securities Law > Blue Sky Laws > Civil Liability > General Overview

*HN47* *Tex. Rev. Civ. Stat. Ann. art. 581-33* (1986) provides remedies of both rescission and damages. Article 581-33(D) provides that on rescission, a plaintiff who was a defrauded seller is to recover the security, or a security of the same class and series, upon tender of the consideration the seller received for the security plus interest thereon at the legal rate from the date the seller received the consideration, less the amount of any income the buyer received on the security. A plaintiff who was a defrauded seller may recover the value of the security at the time of the sale plus the amount of any income the buyer received on the security, less the consideration paid the seller for the security, plus interest on these sums at the legal rate from the date of payment of the seller. Article 581-33(D)(4).

Securities Law > Blue Sky Laws > Civil Liability > General Overview

Securities Law > Blue Sky Laws > Offers & Sales

*HN48* *Tex. Rev. Civ. Stat. Ann. art. 581-33(B)* cmt. (Supp. 1996) states that art. 581-33(B) is to be construed similarly to art. 33(A), which provides remedies for defrauded buyers of securities. Turning to

the statutory definitions, they define "sale," "offer for sale" or "sell" to "include every disposition, or attempt to dispose of a security for value." *Tex. Rev. Civ. Stat. Ann. art. 581-4(E)*. Moreover, one who "offers or sells" a security is not limited to those who pass title. Article 581-4(E) further defines "sell" as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell, either directly or by an agent or salesman. By analogy, the terms "offer to buy" or "buy" should therefore include every acquisition of, or attempt to acquire, a security for value.

Securities Law > Blue Sky Laws > Civil Liability > General Overview

Securities Law > Blue Sky Laws > Offers & Sales

**HN49** Like *Tex. Rev. Civ. Stat. Ann. art. 581-33(B)* (1986), art. 581-33(A)(2) renders a seller liable only if he sells or offers to sell a security by means of an untrue statement or omission.

Energy & Utilities Law > Oil, Gas & Mineral Interests > Conveyances > General Overview

Securities Law > ... > Civil Liability > Blue Sky Fraud > General Overview

Securities Law > Blue Sky Laws > Civil Liability > General Overview

Securities Law > Blue Sky Laws > Offers & Sales

**HN50** Under *Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2)* (1986), in order for the plaintiff or buyer to prevail, he must

introduce evidence that the untrue statements relate to the security purchased and induced the purchase thereof. Thus untrue statements made about a security by a seller to the buyer thereof at a time when the buyer has already purchased the security are not the "means" by which the security was sold. It follows, then, that if a buyer was not induced to purchase a security by an untrue statement made after the purchase, he could not have been misled thereby, and no further statements respecting such security are required to explain the original statement so made under the provisions of the above statute.

Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties

**HN51** The single recovery, or one satisfaction rule, is a rule of general acceptance that an injured party is entitled to one satisfaction for sustained injuries. A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter a judgment. An election is not necessary until after the verdict. But where the prevailing party fails to make that election, the trial court should use the findings affording the greater recovery and render judgment accordingly. If the trial court fails to do so, the appellate court will reform the trial court's judgment to effect such an election.

Civil Procedure > Remedies > Damages > Punitive Damages

Contracts Law > Breach > General Overview

Contracts Law > Contract Interpretation > Fiduciary Responsibilities

Contracts Law > Remedies > General Overview

Contracts Law > ... > Damages > Types of Damages > Punitive Damages

Estate, Gift & Trust Law > ... > Private Trusts Characteristics > Trustees > General Overview

Governments > Fiduciaries

Torts > Remedies > Damages > General Overview

*HN52* Punitive damages are not recoverable for a ***breach of contract*** absent an independent tort with accompanying actual damages.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN53* It is well-settled that to preserve error in a charge, a party must make objections to the court's charge or submit requests for additional questions, instructions, or definitions. The test is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN54* Generally, the granting or denying of a motion for mistrial is reviewed under an abuse of discretion standard. In addition to showing an abuse of discretion, appellants must also show that the trial court's error, if indeed there was error, was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case. Tex. R. App. P. 81(b)(1).

Civil Procedure > ... > Standards of Review > Plain Error > General Overview

*HN55* While some errors are not considered reversible, all errors considered together could present cumulative error requiring reversal. To determine if a cumulation of errors denied the appellants their right to a fair trial and due process of law, all errors in the case will be considered along with the record as a whole to determine if the errors collectively were calculated to cause and probably did cause the rendition of an improper judgment. Tex. R. App. P. 81(b)(1). Before the court may reverse a judgment and order a new trial based on cumulative error, however, it must determine whether the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex. R. App. P. 81(b)(1). Appellants must therefore show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to them.

**Counsel:** FOR APPELLANT: Bruce Robertson, Jr., LAW OFFICES OF BRUCE ROBERTSON, JR., San Antonio, TX. Walter C. Wolff, Jr., Ruth Lown, WOLFF & WOLFF, San Antonio, TX. Kim I. Manning, San Antonio, TX. Paul M. Green, LANG, LADON, GREEN, COGHLAN & FISHER, P.C., San Antonio, TX. Jerry N. Dennard, San Antonio, TX.

FOR APPELLEE: Stewart J. Alexander, San Antonio, TX. Robert D. Reed, LAW OFFICES OF ROBERT D. REED, P.C., San Antonio, TX. Robert W. Wachsmuth, THE KLEBERG LAW FIRM, San Antonio, TX. Thomas H. Crofts, Jr., CROFTS, CALLAWAY & JEFFERSON, P.C., San Antonio, TX. Ron A. Sprague, GENDRY & SPRAGUE, P.C., San Antonio, TX.

**Judges:** Opinion by: Alma L. Lopez, Justice. Sitting: Alma L. Lopez, Justice, Catherine Stone, Justice, Shirley W. Butts, Justice. [1]

**Opinion by:** ALMA [**2] L. LOPEZ

## Opinion

[*500] Appellees, William R. Fields, Jr. and O. Waymond Lightfoot, Jr., filed suit against appellants, Fred L. Baker, Frank Davila II, Rodolfo Davila, Trustee of the Rodolfo Davila Estate Trust (together, the Davilas), Lawrence F. Haass, J. Brian O'Connor, Kim I. Manning, J. Pat O'Connell, Brian O'Connor, B.F. Pitman III, and others, for ***breach of contract*** and other related tort theories. Fields' trustee in bankruptcy, John Patrick Lowe, intervened in the case. Appellees' theories of recovery concern a purported agreement with the appellants to purchase bank holding company stock from the appellees for which payment was not made. After a jury verdict, the trial court granted a judgment in favor of the appellees, from which appellants now bring an appeal raising 104

points of error. We affirm the trial court's judgment in part, and reverse and render in part.

## BACKGROUND

Appellants, appellees, and other individuals were investors in Crown Bancshares, Inc., a bank holding company (Crown Bancshares). Incorporated in June of 1985, Crown Bancshares owned all the stock of Crown Bank, N.A. (Crown Bank). The incorporating officers and directors [**3] were Bernard Austin and appellants, Frank Davila II, Lawrence F. Haass, and Brian O'Connor. The Federal Reserve approved Crown Bank's application in August of 1985, and capital stock in Crown Bancshares was privately offered beginning in October of 1985.

[*501] Beginning in February of 1986, the bank was capitalized through a series of loans to 28 purchasers of Crown Bancshares stock, including appellants and appellees, in the aggregate amount of $ 5,066,310.00, from First State Savings Association (First State). Fields purchased 10,000 shares of Crown Bancshares stock (at $ 10 per share), with $ 5,000.00 in cash and $ 95,000.00 borrowed from First State. With a two percent origination fee, Fields' loan was in the amount of $ 96,900.00. Lightfoot purchased 30,000 shares of Crown Bancshares stock (at $ 10 per share), with $ 15,000.00 in cash and $ 285,000.00 borrowed from First State. With the two percent origination fee, Lightfoot's note to First State was for $ 290,700.00.

---

[1] Justice Shirley W. Butts not participating.

The purchasers pledged their Crown Bancshares stock to First State as security for the loans. These agreements also contained cross-default provisions -- a default by one borrower equaled a default by all [**4] borrowers. [2] In the event of a default, First State could "declare the entire unpaid balance of principal and all earned interest on the Indebtedness immediately due and payable." Each of the borrowers, except Lightfoot and Dr. Richard Rouse, also signed personal guaranty agreements.

A series of agreements were concluded: a voting trust agreement, a stock repurchase agreement, an agreement for funding repurchases of Crown Bancshares, a repurchase agreement concerning the capital stock of Crown Bancshares, and an amendment to the voting trust agreement. Although these agreements were prepared in 1985 -- 1985 is typed on various pages -- they were all apparently signed in February of 1986. These agreements were signed by both the appellants and appellees.

The purpose [**5] of the voting trust agreement was to maintain Crown Bancshares as a closely-held corporation. The organizers of the bank had determined that a voting trust agreement should be signed so that a majority of the subscribers of Crown Bancshares stock could maintain control over the direction and operation of the bank. Through the voting trust agreement, a majority of the shareholders subscribing to the agreement would control the vote at the shareholders' meeting and elect the directors of Crown Bancshares which, in turn, owned and controlled Crown Bank. The stated purpose of the voting trust agreement was to "secure continuity and stability of policy in management, and to establish constructive administration of the business of the Company . . . ." The voting trust agreement signed by the parties referred to them as "subscribers," but the parties often used the term "Control Group" to describe themselves. All of the appellants (except Rodolfo Davila, individually) and appellees were members of the Control Group.

Although it was originally intended that the trustee under the voting trust agreement was to have all the stock of Crown Bancshares issued in his name as trustee, with the trustee [**6] then issuing voting trust certificates to the various shareholders to evidence their stock ownership, the stock of the holding company was not issued that way. No stock was tendered into the voting trust. Instead it was issued separately in the name of each subscriber. First State required that all such stock, upon the closing of the loan to purchase, be physically pledged to First State and that each subscriber sign an "irrevocable stock power" as to the stock and deliver it to First State at the time they signed the other loan documents. The voting trust agreement was signed only by members of the Control Group; neither Crown Bancshares nor First State were parties to the agreement. The subscribers to the voting trust agreement appointed Dwight

---

[2]  Defendants' Exhibit 13, Fred L. Baker's Pledge and Security Agreement, defines "default" as "the failure of DEBTOR or any individual Shareholder of CROWN BANCSHARES, INC. to pay the Indebtedness of any part thereof as it becomes due . . . ."

L. Lieb -- the largest Crown Bancshares stockholder -- as the voting trustee.

The voting trust agreement defined the powers and duties of the voting trustee. The agreement contained a "Grant of Irrevocable Proxy and Power of Attorney," which reads as follows:

> In addition to all other rights and powers granted under this Agreement, during the term hereof each Subscriber by execution of this Agreement irrevocably names, constitutes [**7] [*502] and appoints Trustee (or successor Trustee) his true and lawful attorney and agent with full power of substitution, to vote all shares of stock deposited with Trustee by such Subscriber, subject to the requirements of Section 4 hereof, at any and all regular and special meetings of the Company's shareholders whenever and wherever held during the term of this Agreement, or at any adjournment thereof, and hereby ratifies and confirms all that the said Attorney might do. DURING THE TERM HEREOF, THE PARTIES HERETO AGREE THAT THE PROXY HEREBY GRANTED IS COUPLED WITH AN INTEREST AND IS IRREVOCABLE.

An amendment to the agreement further provided:

> Any Trustee then serving shall have the power and authority to designate agents, and in such connection, to execute and deliver Powers of Attorney designating any person or group of persons to act in his full place and stead, to have and perform any and all powers, duties, acts and discretions as set forth in such written Power of Attorney to the fullest extent permitted by applicable law. Any person dealing with said Trustee shall be entitled to rely upon such Power of Attorney as fully authorizing the exercise of such [**8] powers, acts and discretions as therein set forth.

(Emphasis added).

The Control Group comprised nearly 75 percent ownership of Crown Bancshares. The voting trust subscribers selected the board of directors of Crown Bancshares. The directors of the holding company then elected the directors of Crown Bank who, in turn, selected a slate of officers for the bank. Most, if not all, of these individuals were members of the Control Group.

Sometime after agreeing to participate in the bank's formation, appellees decided to withdraw from the enterprise. During the trial of this case, Lightfoot testified that he first decided to sell his Crown Bancshares stock in the latter part of 1985 or early 1986. According to Lightfoot's testimony, he approached the president of Crown Bancshares, Brian O'Connor, and told him that, due to personal and business difficulties, he could no longer bear the financial cost of purchasing and paying for 30,000 shares of stock. O'Connor asked

Lightfoot to wait because a sale by an incorporating bank director might impede final regulatory approval of the bank.

When Lightfoot again raised the question of a stock repurchase, Lieb, the voting agreement [**9] trustee, said he would call a meeting of the board of directors of Crown Bancshares and convey Lightfoot's need to sell the shares. The first indication of an agreement to repurchase Lightfoot's stock is found in the minutes of a June 9, 1986 Crown Bancshares Board of Directors meeting, which read in part as follows:

> Mr. [J. Brian] O'Connor informed the Board that Director O. Waymond Lightfoot has offered 25,000 shares of Crown Bancshares stock for sale to the holding company as prescribed by the repurchase agreement. The Board waived the corporation's right to purchase the stock and determined that it was in the best interest of the holding company to offer the stock to outside investors. A recommendation was made to the signatories of the Crown Bancshares, Inc. stock repurchase plan to waive their right to purchase the stock and make it available to new investors.

> On June 27th the Board met again. The minutes of the board meeting state that "O'Connor updated the board on the status of the proposed stock sale of O. Waymond Lightfoot. He indicated the shares would soon be ready to be offered for sale."

Fields also decided that he wanted to sell his stock. During March [**10] of 1987, Fields indicated to Lieb that he was prepared to sell his stock in Crown Bancshares for $ 10 a share. The first written indication of an agreement to purchase Fields' shares is found in a April 27, 1987 letter from Fields to Lieb. Fields' letter reads in part as follows:

> This letter confirms our agreement whereby you, or your assignee, purchased 9,000 Crown Bancshares from me on Monday, April 27, 1987, at $ 10.00 per share. As mentioned to you, $ 87,210 principal is outstanding [*503] on the shares purchased by you; interest has been paid through March 31, 1987.

Lieb apparently apprised First State of the Control Group's purchase of Lightfoot's stock on January 15, 1987. Handwritten notes from a meeting with Randy Cadwallader, a First State loan officer, show that "Lightfoot's Crown Bank stock [is] to be transferred over to the Control Group."

On May 19, 1987, Lieb wrote to the Control Group about the agreement to purchase Fields' and Lightfoot's shares. According to Lieb's letter, in June of 1986 the Control Group had agreed to purchase 83.3 percent of Lightfoot's shares and in April 1987, to purchase 90 percent of Field's shares:

Dear Control [**11] Group Member:

The Control Group has purchased certain shares from Waymond Lightfoot and Ray Fields, 25,000 shares and 9,000 shares, respectively. The agreement with Mr. Lightfoot was made in September, 1986, and with Mr. Fields in April, 1987. An explanation of each transaction is enclosed herewith, together with an analysis of the amount owed by each Control Group member.

Lieb's accompanying explanation stated that "the principal balance outstanding on Mr. Lightfoot's stock on 10/01/86 amounted to $ 290,700.00. On that date, the Control Group repurchased 25,000 shares of stock from Mr. Lightfoot at $ 10/sh." As for Fields, the explanation further stated: "The principal balance outstanding on Mr. Field's note on 4/20/87 amounted to $ 96,900.00. On that date, the Control Group repurchased 9,000 shares of stock from Mr. Fields at $ 10 per share." Both Lightfoot and Fields testified that these statements accurately described their agreements with the Control Group. The letter concluded: "Please make your check payable to Dwight L. Lieb, Trustee for the Control Group, and forward same to me at Crown Bank." Lightfoot said this letter accurately represented the agreement [**12] he thought he had with the Control Group.

Lightfoot recalled that he was to be paid by the Control Group, but that it made no difference to him whether appellants performed the agreement either by paying cash or by assuming the indebtedness to First State. He assumed, however, that appellants had chosen to pursue payment by assuming his indebtedness with First State. Lightfoot continued to serve as a director of Crown Bancshares and Crown Bank, and continued to attend board meetings. He said he was aware of the purchase of Fields' stock when he received Lieb's May 19 letter. [3] Appellants recalled these events differently. Baker, for example, denied -- and continues to deny -- that he ever gave Lieb authority to buy Fields' or Lightfoot's stock under the terms of the agreement described in Lieb's May 19, 1987 letter. Baker, like all of the other appellants, testified that in order to buy Fields' or Lightfoot's stock, it would have been necessary to have the stock purchase financed by First State Savings, using the stock as security. But, First State never agreed to refinance Fields' and Lightfoot's stock. Nor did Baker recall ever giving Lieb authority to

---

[3] The jury found the May 19, 1987 document "constituted an agreement whereby the Control Group bought 25,000 of Lightfoot's shares of Crown Bancshares Stock" and 9,000 shares of Fields' Crown Bancshares stock.

purchase Fields' or Lightfoot's [**13] stock.

On April 27, 1987, Fields wrote to Lieb confirming what he called,

"our agreement whereby you, or your assignee, purchased 9,000 Crown Bancshares from me on Monday, April 20, 1987, at $ 10.00 per share. As mentioned to you, $ 87,210 principal is outstanding on the shares purchased by you; interest has been paid through March 31, 1987.

A check for $ 2,790.00, less the interest owed to April 20, 1987, should be forwarded to me . . ."

On August 6, 1987, the Control Group issued a check to Fields for $ 2,700. Fields claimed this figure represented his equity in the 9,000 shares he had sold to the Control Group. Each Control Group member sent Lieb his prorata contribution for 90 percent of the principal and interest due on Fields' note to First State.

[*504] [**14] Meanwhile, Lightfoot continued to receive past-due notices from First State. On June 10, 1987, he received a letter from Pam Pilgrim, a loan processor with First State, which informed him that his loan had been in default since December 20, 1986. The letter added: "I have been informed that you are working with the Control Group in regards to the purchasing of approximately 83% of your crown banc stock. The fact remains, however, that your loan is delinquent and you are responsible for this obligation." Lightfoot recalled asking the Control Group on several occasions why he was receiving these notices and, more specifically, about the progress of the transaction; he testified that he was assured each time that it was just a matter of "paperwork," that it was being "handled," and that they were in control of the situation.

Like Fields, Lightfoot testified that he paid only the interest attributable to his retained shares after the alleged purchase. A handwritten letter received by Lieb in March of 1987 states that "these are the payments I have made against the stock. The sale was originally proposed for June of 1986. The transfer was for $ 250,000 but I am willing to transfer all [**15] of it. My financial commitments have increased dramatically due to other insurance related activities."

The letter is signed "Waymond" and is written on Waymond Lightfoot's personal stationary. Accompanying the letter are four checks from the Harris and Lightfoot Insurance Agency.

Lightfoot and Fields both testified that they were repeatedly assured payments were being made on their

loans. The record contains photocopies of several checks from Lieb, the voting trustee, to First State for principal and interest due on their loans to First State. On September 28, 1987, the Control Group issued a check to First State for $ 6,923.18. This figure represented 90 percent of the principal and interest due on Fields' note as of September, 1987. Fields testified that he paid -- and continued to pay -- the remaining 10 percent, having retained 1,000 of his original 10,000 shares. Although the Control Group never paid Lightfoot's equity, it issued -- through Lieb as Trustee -- a check to First State for $ 7,267.21. This amount represented 83 percent of the principal and interest due on Lightfoot's note in September of 1987. Lightfoot stated that he was never informed the Control Group [**16] had stopped making payments to First State.

On October 20, 1987, Lieb again wrote to the Control Group:

> Enclosed please find a statement for your prorata share of the interest payable to First State for the shares purchased by the Control Group from Waymond Lightfoot and Ray Fields. First State is very anxious to receive payment by Friday, October 23, 1987, and your

check by return mail, payable to Dwight L. Lieb, Trustee for Control Group, sent to the bank will be appreciated.

At an October 1987 meeting, the Control Group [4] discussed the status of this matter as well as delinquent loans of minority (non-Control Group) stockholders. The minutes also indicate that "First State had never prepared documents necessary to refinance the shares of Waymond Lightfoot and Ray Fields which the members of the Control Group agreed to purchase in 1986." The Control Group directed that a $ 50,000.00 letter of credit be obtained and provided to First State to cover delinquent principal and interest on all notes held by First State and to bring cash contributions of all Control Group members current. [**17]

On October 27, 1987, the Control Group's attorney, Neil Boldrick, Jr., wrote to First State that several "adjustments" to the original $ 5.2 million notes were necessary, e.g., "restructuring of the Lightfoot and Fields Notes and complete financing for new investors of the Gamboa, Flume, Japhet and O'Connor Notes."

In December of 1987, Dennis Jones, an assistant vice president with First State, advised Neil Boldrick that "as all parties are well aware, certain of

---

[4] According to the minutes of the meeting, the following shareholders were present: Dwight Lieb, Frank Davila II, B.F. Pitman III, Kim Manning, Michael Bertino, Richard Rouse, J. Brian O'Connor.

the loans are presently in default, and have been in default for a [*505] period of time beyond thirty (30) days . . . ." Jones also advised Boldrick that "First State Savings is willing to accommodate your clients." Jones' letter added that "if, after reasonable efforts on the part of your clients, they are unable to bring the loan current, then, upon transfer of the stock or a letter instructing us to transfer the stock to Dwight Lieb, Trustee, and payment of all past-due interest, we will reinstate the applicable loan." The letter further advised Boldrick that First State held a letter of credit and certificates of deposit that could be used to pay past due interest if the Control Group so desired. Jones later [**18] testified that First State never provided financing for loans to purchase Fields' or Lightfoot's stock and that his letter to Boldrick never specifically addressed the question. Rather, it addressed the problem of the Control Groups' delinquent loans and what was necessary to reinstate them.

On February 12, 1988, Lightfoot received another letter from First State informing him that the note for $ 290,700.00 "executed by O. Waymond Lightfoot and payable to First State Savings" was now in default. The letter demanded payment for $ 28,534.28 in past due interest on or before February 25, 1988.

On February 22, 1988, the Control Group met at the home of Frank Davila II. The apparent subject of the meeting was a memorandum written by Frank Davila II and addressed to the "File" which questioned whether the Control Group had ever agreed to purchase Fields' and Lightfoot's stock. Davila observed that "an effective transaction concerning the sale or transfer of the stock would involve, among other things, the approval of First State Savings to finance the purchase of the said stock"; and that "Dennis Jones of First State Savings told Fred Baker and myself that at no time had there been [**19] an agreement by First State Savings to finance such a purchase." Davila concluded by noting that:

> The ultimate disposition of said shares of stock will probably result in any case in the fact that the Control Group and its members are going to be saddled with obligations which were not fully foreseen at the time that the written documents were executed. I feel very strongly, however, that there should not be ratification of a transaction which has not in fact occurred, and that the legal owners of the shares of stock in question should be the persons involved in the foreclosure and/or other proceedings

which have or might be initiated by First State Savings.

This is my opinion, and perhaps I am the only person holding to this opinion, but I believe that each member present should take a yes or no position as to whether the transaction took place, and whether the Control Group and its non-delinquent members should be involved in any of the steps preceding the actual takeover of the stock by First State Savings.

Fields testified that Lieb interrupted a heated discussion between Frank Davila II and Fields by reassuring Fields that the Control Group had indeed [**20] purchased Fields' stock. Although Fields said he took that as a reassurance he was going to get paid, he continued to get notices from First State Savings reflecting 100 percent liability on the loan, as though he still owned 10,000 and not 1,000 shares. As before, however, Fields continued to pay 10 percent of the outstanding loan balance.

Fields recalled writing two separate checks for 10 percent of the interest due -- one in June and another in September. He sent them directly to Fred Baker. Both payments were accompanied by a letter to Baker. Both letters specified the amount tendered and identified that amount

as ten percent of the current interest payment due. The letters further noted that the interest on the balance of the note ″should be paid by the Control Group pursuant to their purchase of my stock in April, 1987.″ Baker testified that he did not recall Lightfoot ever writing letters about either his stock or his down payment. As before, Fields asked for a copy of the minutes of the March, 1988 Control Group meeting and reminded Baker the account with First State was past-due:

I am again requesting a copy of the minutes of this years [sic] meeting wherein [**21] it was again confirmed that the Control [*506] Group purchased, in April 1987, 9,000 of my 10,000 shares of stock in Crown Bank.

Please note on the enclosed statement of account from First State Savings that the Control Group still owes the amount shown as delinquent on the statement of account. I have been current on my share of the account since my purchase of the stock.

It is again requested that the records at First State Savings be brought up to date accordingly and that I be notified that this action has been taken.

Fields said he never received a copy of those minutes, taken by Pitman,

until he saw them in discovery prior to the trial of this case.

During February of 1988, Don Krause, an attorney for the Control Group, began negotiations with First State to refinance the $ 5.2 million capitalization loan. Refinancing was discussed during a March 7, 1988 meeting of the Control Group, which also confirmed Lieb's resignation as trustee. He was replaced by Fred L. Baker and Frank Davila II as co-trustees. [5] The Control Group also voted to renegotiate the entire First State $ 5.2 million loan on better terms. The minutes state that: [**22]

> Dwight Lieb delivered to Fred Baker a check in the amount of $ 24,266.44, such check representing the interest due on his loan to First State Savings, such interest calculated through 2-29-88. This payment is to be used only if the other members of the Control Group pay their pro-rata share of the amounts that are delinquent at First State Savings, and a restructuring of the debt at First State Savings is accomplished.

> Upon a motion made by B.F. Pitman and seconded by Ray Fields, Frank Davila and Fred Baker were appointed to work with Don Krause in the attempt to restructure the indebtedness at First State Savings. The motion passed unanimously.

The check for $ 24,266.44, along with additional cash contributions from other Control Group members, was supposed to bring the delinquent or defaulted loans current, thereby inducing First State to restructure the loans on better terms. First State had made clear it would not do anything [**23] until the delinquent loans were made current -- hence, the contributions. Baker continued to hold this money until February of 1990, at which point he said it became clear a restructuring of the loans could not be accomplished.

The Control Group never succeeded in restructuring their loans with First State. Don Krause testified that he tried his best to induce First State to restructure the loans but they never agreed to do so. Baker testified that in addition to Krause's efforts, he repeatedly talked to representatives of First State to try not only to get them to restructure all the loans on better terms, but also to make loans to finance the purchase of Fields' and Lightfoot's stock. Again, however, First State never did so. Baker, like Lieb, and Dennis Jones, a vice president in charge of regulatory compliance with First

---

[5] Lieb filed for bankruptcy in April of 1989.

State Savings, considered refinancing the loans and financing the purchase of appellees' stock as separate issues.

Whether First State representatives ever intended to finance a stock purchase, the evidence certainly shows that Control Group members, including Baker, believed that First State was going to finance the purchase of appellees' stock. This belief [**24] was apparently based, at least in part, on statements made by representatives of First State who were in management when the original purchase money loans were made, but who were no longer with First State when discussions were later held to renegotiate the total indebtedness and finance the appellees' purchase.

There is also evidence that First State Savings was having financial problems long before the Federal Deposit Insurance Corporation (FDIC) took control of it in March of 1989. Beginning in April of 1987, First State was under on-site supervision of state, and later federal, banking regulators; there is testimony to the effect that their approval would have been required for any restructuring of loans or stock purchase financing.

On March 16, 1988, the Control Group met again and with Fields, Lightfoot, Frank Davila II and O'Connell abstaining, voted to [*507] confirm and ratify the purchase of Fields' and Lightfoot's stock. The handwritten minutes from the March 16, 1988 meeting -- taken by Pitman -- record that a "motion to confirm that the stock purchase is a valued transaction" was made, seconded and passed. [6] There is no mention of any financing conditions. [**25]

On March 25, 1988, Crown Bancshares filed its "Annual Report of Bank Holding Companies" for the 1987 fiscal year -- the "FR Y-6" form -- with the Federal Reserve. The FR Y-6 contained a list of the members of the Control Group and their individual percentages of ownership in Crown Bancshares. The report stated that Fields owned 1,000 shares and Lightfoot owned 5,250 shares. The report mentions no stock sale or financing conditions.

The FDIC [**26] took control of First State Savings on March 2, 1989. On June 26, 1989, Fields received his first official delinquency notice from the now federally-controlled First State Savings. In July, the FDIC again demanded payment from Fields for

[6] Although Control Group meetings were, in theory, closely structured, with set, ordered agendas, Fred Baker recalled that Control Group meetings often involved free-wheeling discussions and "were very difficult to chair and manage." Baker said he did not recall whether there was an affirmative vote to confirm the purchase of Fields' and Lightfoot's shares; however, he also admitted that he never asked to amend the minutes. Baker denied ever voting for a resolution confirming the purchase of Fields' and Lightfoot's stock in accordance with the terms of Lieb's letter.

his full share of the initial capitalization loan, which represented 10,000 shares of Crown Bancshares stock.

In August of that year, Baker met with Donald Backer of the FDIC, in a final attempt to either restructure the notes with First State or refinance Fields' and Lightfoot's notes. Backer, however, maintained that he intended to deal with the Control Group borrowers on an individual basis. Baker reminded him that "if he was going to do that, then the transaction between the members of the Control Group and Mr. Fields and Mr. Lightfoot needed to be taken into consideration as he dealt with each individual." No agreement to refinance was reached.

On February 6, 1990, Co-Trustees Baker and Frank Davila II wrote to the Control Group that "it has become obvious that each of us will end up dealing with First State on an individual basis." With this letter, Baker and Frank Davila II returned money the Control Group had contributed to the [**27] Trust in March of 1988 for renegotiation of their delinquent loans with First State. Fields received $ 451.97; Lightfoot received $ 2,410.28. Both Fields and Lightfoot recalled accepting and cashing their checks. Baker later testified that he returned "dollar-for-dollar" what had been contributed. He said he did not think he had the authority from the other Control Group members to turn all of the money over to either Fields or Lightfoot to pay for the stock purchase.

After receiving the letter and check, Fields, on February 10, 1990, wrote to Baker expressing his concern "that nothing has been accomplished to date regarding the transfer of the 9,000 shares of Crown Bancshares common stock purchased from me by Control Group members in April, 1987."

In October of 1990, Crown Bancshares' board of directors voted to liquidate and dissolve the bank. The resolution appointed Bernard Austin as the Liquidating Director and Trustee and provided that Crown Bancshares would distribute the remainder of its bank account to its shareholders on a prorata basis. Fields recalled receiving a liquidation distribution based on only 1,000 shares of stock.

In November of 1990, Austin sent the shareholders [**28] of Crown Bancshares, Inc. their purported prorata shares of the liquidation distribution -- approximately $ 0.1254013 for each share held. On November 25, 1990, Austin wrote to Neil Boldrick that in connection with the liquidation, he was enclosing two cashier's checks for the firm's escrow account. One of the checks, registered in Fields' name, was for $ 1,128.61 and represented 9,000

shares of stock. The other check, registered in Lightfoot's name, was in the amount of $ 3,135.03 and represented 25,000 shares. The letter added that "the [*508] 9,000 shares and 25,000 shares listed above represent shares apparently purchased from Mr. Fields and Mr. Lightfoot by the Crown Bancshares, Inc. Voting Trust ('Control Group') but which shares have never been presented to the corporation for registration."

On June 26, 1991, Fields filed a voluntary petition under Chapter Seven of the U.S. Bankruptcy Code. Both Fields and Lightfoot were subsequently sued by the RTC for the full amounts of their First State notes.

Lightfoot testified that he realized for the first time that he would not be paid for his stock on October 10, 1991. On that day he attended a meeting with Fields, his lawyers, [**29] and various members of the Control Group. Lightfoot recalled there were "some extremely heated discussions and denials as to any responsibility for the debt and/or the purchase of Ray Fields' stock." Fields said that until February 6, 1990, he believed the appellants were in the process of performing the agreement.

Fields and Lightfoot filed this lawsuit on November 25, 1991 against Crown Bancshares, Inc., F. Bernard Austin, Fred L. Baker, Michael H. Bertino, M.D., Frank Cross, Frank Davila II, Rodolfo Davila, Israel Fogiel, Lawrence F. Haass, Roger Maley, Kim I. Manning, J. Pat O'Connell, J. Brian O'Connor, B.F. Pitman III, and Richard G. Rouse, M.D. The plaintiffs originally asserted causes of action for ***breach of contract***, misrepresentation, fraud, breach of fiduciary duty (both as to the directors and trustees of Crown Bancshares), negligence, tortious interference with contract, and violations of article 581-33(B) of the Texas Securities Act. The appellees' second amended petition (filed on December 14, 1992) dropped claims against F. Bernard Austin but added the Rodolfo L. Davila Estate Trust [7] as a defendant. The amended petition also dropped claims for tortious interference [**30] with contract, but added negligent misrepresentation and several additional theories of liability against the trustees and directors of Crown Bancshares. The appellees claimed that the directors, liquidating director, trustee, and co-trustees of Crown Bancshares failed to establish a "trust fund" for the benefit of Fields, Lightfoot and other creditors. They argued that the corporate entity of Crown Bancshares should be disregarded because it was the "alter

---

[7] Rodolfo Davila testified that the Rodolfo Davila Estate Trust was set up by his father to oversee the estate after his death.

ego″ of the Control Group and because it was used as a ″sham to perpetrate a fraud.″ The appellees further argued that the defendants' **_breach of contract_** resulted in a ″loss of credit and/or injury to credit reputation of Fields and Lightfoot.″ At the conclusion of the evidence, the trial court submitted four of the appellees' causes of action to the jury: (1) **_breach of contract_**; (2) breach of trustees' (Fred L. Baker and Frank Davila II) fiduciary duties; (3) breach of directors' (Fred L. Baker, Michael H. Bertino, Frank Davila II, Lawrence F. Haass, Kim I. Manning, J. Pat O'Connell, J. Pat O'Connor, B.F. Pitman) fiduciary duties; and (4) violations of the Texas Securities Act. After the jury found for the appellees on these issues, **[**31]** the trial court rendered judgment against the appellants on April 12, 1993. A default judgment was entered against Crown Bancshares. Defendant, Richard G. Rouse, received a summary judgment prior to trial. The case against him was severed, resulting in a separate appeal. In Fields and Lightfoot v. Rouse, No. 04-93-00067-CV (Tex. App.--San Antonio, December 15, 1993, writ denied) (unpublished), we affirmed the summary judgment in Dr. Rouse's favor.

The trial of this case lasted nearly three weeks and leaves a substantial record in its wake. Compounding the problem is the fact that appellants have brought 104 points of error scattered among four separate briefs. Fred Baker, for example, raises 35 points of error. B. F. Pitman, J. Brian O'Connor, Michael H. Bertino, and Kim I. Manning (hereafter Pitman) raise 29 points of error. Rodolfo Davila, Trustee of the Rodolfo L. Davila Estate **[**32]** Trust, and Frank Davila II, his brother (together, the Davilas), raise 23 points of error. Lawrence F. Haass raises 17 points of error. Each appellant's brief, in turn, **[*509]** adopts the points of error and arguments contained in the other three. In addressing these arguments we have tried, whenever possible, to combine the relevant points of error and address them collectively. Whenever possible, we have also avoided addressing the appellants' points by their individual number, discussing them instead according to the issues they raise.

## DISCUSSION

### *Statute of Limitations*

All of the appellants raise ″matter of law″ points attacking the trial court's decision to submit the discovery rule in questions 20 and 21 of the jury charge. In answering questions 20 and 21, the jury found that Fields and Lightfoot either discovered or, in the exercise of reasonable diligence, should have discovered on February 6, 1990 that appellants would not perform the agreement. Appellants argue that the trial court

erred in awarding judgment for Fields and Lightfoot under a ***breach of contract*** theory because, as a matter of law, the cause of action is barred by the four-year statute [**33] of limitations. We disagree.

This lawsuit was filed on November 25, 1991. The original petition named as defendants all of the appellants except the Rodolfo L. Davila Estate Trust, which was joined as a defendant when the appellees filed their second amended petition on December 14, 1992. As we have already noted, however, Lieb's letter to the Control Group regarding the Control Group's repurchase of the appellees' stock is dated May 19, 1987. Lieb's letter also references two earlier dates: September of 1986 for Lightfoot and April, 1987 for Fields. The appellees' second amended petition claims that under the alleged stock purchase agreement, the effective date of the transfer, for purposes of calculating principal, interest, and equity, was October 1, 1986 for Lightfoot and April 20, 1987, for Fields. However, all of these dates are well beyond the four-year limitations period for ***breach of contract*** claims. *See* [TEX. CIV. PRAC. & REM. CODE ANN. § 16.004](#) (Vernon 1986). Unless the appellees' ***breach of contract*** claim somehow accrued or was tolled beyond November 25, 1987 -- four years before this lawsuit was filed

-it is barred by limitations. Fields and Lightfoot therefore offer [**34] three arguments designed to avoid the limitations period: (1) their claims against the appellants did not accrue until the appellants had a "reasonable time" to pay the money they owed; (2) the appellants acknowledged the debt; and (3) the "discovery rule" tolled the limitations period. This last argument will be the focus of our discussion.

*HN1* When reviewing "matter of law" points, an appellate court employs a two-prong test. The court will first examine the evidence supporting the jury's finding, ignoring all evidence to the contrary. [*Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989)*](#); *see also* W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, [24 ST. MARY'S L.J. 1135 (1993)](#). If there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. [*Sterner, 767 S.W.2d at 690*](#). Only when the contrary proposition is conclusively established by the evidence do we sustain the point. [*Meyerland Community Improvement Ass'n v. Temple, 700 S.W.2d 263, 267 (Tex. App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.)*](#).

In *Woods v. William Mercer, Inc.*, 769 S.W.2d [**35] 515 (Tex. 1988),

the court explained the nature and origin of the discovery rule:

> **HN2** We hold that the discovery rule is a plea in confession and avoidance. A plea in confession and avoidance is one which avows and confesses the truth in the averments of fact in the petition, either expressly or by implication, but then proceeds to allege new matter which tends to deprive the facts admitted of their ordinary legal effect, or to obviate, neutralize, or avoid them. This most closely describes the function of the discovery rule, which asserts that while the statute of limitation may appear to have run, giving rise to that appearance should not control.

> **HN3** A party seeking to avail itself of the discovery rule must therefore plead the rule, either in its original petition or in an amended or supplemental petition in response to defendant's assertion of the defense [*510] as a matter of avoidance. A defendant who has established that the suit is barred cannot be expected to anticipate the plaintiff's defenses to that bar. A matter in avoidance of the statute of limitations that is not raised affirmatively by the pleadings will, therefore, be waived.

> The party seeking [**36] to benefit from the discovery rule must also bear the burden of proving and securing favorable findings thereon. The party asserting the discovery rule should bear this burden, as it will generally have greater access to the facts necessary to establish that it falls within the rule.

*Id. at 517-18* (citations omitted). **HN4** The discovery rule does not excuse a party from exercising reasonable diligence in protecting its own interests. *Johnson v. Abbey, 737 S.W.2d 68, 70 (Tex. App.--Houston [14th Dist.] 1987, no writ)*. The rule expressly mandates the exercise of reasonable diligence to discover facts of negligence or omission. *Black v. Wills, 758 S.W.2d 809, 815 (Tex. App.--Dallas 1988, no writ)*. Moreover, the burden is on the party seeking the benefit of the discovery rule to establish its applicability. *Woods, 769 S.W.2d at 518*. Whether reasonable diligence was used is generally a question of fact unless the evidence is such that reasonable minds could not differ as to its effect; only then does it become a question of law. *Enterprise-Laredo Associates v. Hachar's, Inc.*, 839 S.W.2d 822, 837 (Tex. App.--San Antonio 1992), *writ denied per*

*curiam*, 843 [**37] S.W.2d 476 (Tex. 1992).

HN5 A ***breach of contract*** action is governed by a four-year statute of limitations. *TEX. CIV. PRAC. & REM. CODE ANN. § 16.004* (Vernon 1986). In applying this four-year limitations period,

> a cause of action is generally said to accrue "when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990)*. An exception to the general rule is known as the discovery rule and this rule is used to determine when the cause of action accrued. The discovery rule tolls the running of the limitations period until the time the injured party discovers or through the use of reasonable care and diligence should have discovered the injury. *In a **breach of contract** action, limitations begin to run from the time of the breach, or from the time the plaintiff knew or should have known of the breach, whichever is the later*. *El Paso Associates, Ltd. v. J.R. Thurman & Co., 786 S.W.2d 17, 20 (Tex. App.--El Paso 1990, no writ)*.

*Id.* at 837 (emphasis added); *see also El Paso Associates, Ltd. v. J.R.*

*Thurman & Co., 786 S.W.2d at 20* (cause of action for breach [**38] of contact "commences to run from the time of the ***breach of contract***, or from the time when the plaintiff had knowledge of the breach, whichever is the later, unless his lack of knowledge resulted from his lack of diligence or from negligence").

HN6 For a court to apply the discovery rule, the party asserting it must also affirmatively plead the rule. *Woods, 769 S.W.2d at 517-18*. Appellants argue that the discovery rule does not toll the statute of limitations in this case because Fields and Lightfoot failed to plead the discovery rule. After reviewing the appellees' amended and original pleadings, however, we believe Fields and Lightfoot pled sufficient facts to make the discovery rule an issue in this case.

Although appellees' original and amended pleadings do not specifically mention discovery or concealment, their second amended petition alleges that Lightfoot made no earlier demand for payment for the purchase of his shares because "he did not know and could not have known that the Control Group would not perform the agreement." As for Fields, the clear import of the appellees' pleadings is that he did not know and could not have known the Control Group's intent until Baker [**39] and Frank Davila II returned the third-call contributions

and wrote that "it has become obvious that each of us will end up dealing with FIRST STATE on an individual basis." Also, the appellees specifically pled that they "justifiably relied" on the Control Group's representation that the appellants "would consummate the purchase of their respective shares of stock."

*HN7* The general rule is that pleadings will be construed as favorably as possible to the pleader. *Gonzalez v. City of Harlingen, 814 S.W.2d 109, 112* [*511] (Tex. App.--Corpus Christi 1991, writ denied). "The court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated." *Gulf, Colorado & Santa Fe Ry. Co. v. Bliss, 368 S.W.2d 594, 599 (Tex. 1963)*. Having reviewed the appellees' pleadings and the record, we believe Fields and Lightfoot pled sufficient facts to make the discovery rule an issue in this case. We also note that appellants failed to file any special exceptions to the appellees' original or amended pleadings; hence, they [**40] waived any pleading defects. *See J.K. & Susie L. Wadley Research Inst. v. Beeson, 835 S.W.2d 689, 695 (Tex. App.--Dallas 1992, writ denied)*; *see also* TEX. R. APP. P. 90.

Having determined that the discovery rule applies in this case, the issue then becomes whether there is sufficient evidence to support the jury's finding. As we have already noted, both Fields and Lightfoot testified that appellants could perform the agreement by paying cash or by assuming their indebtedness with First State Savings. Thereafter, Lightfoot paid the interest attributable to his retained shares; appellants paid the interest attributable to the sold shares. The trustees assured Lightfoot on several occasions that completion of the assumption was merely a matter of paperwork. Lightfoot said he believed that the appellants were attempting in good faith to work out the assumption, but that nobody at First State apprised him of any problem. Against this background, Lightfoot testified that he realized appellants were not going to perform the agreement after a meeting with Fields and his counsel on October 10, 1991.

Fields likewise testified that First State accepted his interest payments attributed [**41] to the retained shares and that appellants' ongoing assumption effort "was exactly what they said they would do." Until February 6, 1990, Fields said he believed, by virtue of the parties' reallocated contributions toward the First State loan and appellants' ongoing assumption efforts, that

appellants were in the process of performing the agreement.

The jury found that appellees, in the exercise of reasonable diligence, should have discovered on February 6, 1990 that appellants would not perform the agreement. [8] The jury charged Lightfoot with notice on that date despite his testimony as to a later date. *HN8* Even so, reasonably diligent discovery is generally a matter for the jury. *Enterprise-Laredo*, 839 S.W.2d at 838. This is especially true in a case like this one, where the material facts are far from undisputed. Giving due deference to the jury's role in determining the weight and credibility of the witnesses' testimony, we believe there is sufficient evidence to support the jury's finding that February 6, 1990 was the date Fields and Lightfoot either discovered or should have discovered that the Control Group would not perform the agreement. Since there is sufficient evidence [**42] supporting the jury's finding, we need not consider the second element of *Sterner. 767 S.W.2d at 690*.

### Judicial Admission

We reach this conclusion despite the appellants' argument that both Fields and Lightfoot judicially admitted their actions accrued at a time when they would have been barred by limitations. Appellants are correct in noting that Fields and Lightfoot repeatedly testified they were entitled to payment beginning in April of 1987 with respect to Fields, and in September or October of 1986 as to Lightfoot. But, while Fields and Lightfoot both testified they were entitled to payment at the time of the contract, they also pinpointed the date when they realized the appellants were not going to perform the agreement. Lightfoot testified that he realized this for the first time [**43] on October 10, 1991; Fields testified that he reached this conclusion on February 6, 1990. We have already noted that the limitations period on a claim for ***breach of contract*** begins to run "from the time of the breach, or from the time the plaintiff knew or should have known [*512] of the breach, whichever is the later." *Enterprise-Laredo*, 839 S.W.2d at 837. *HN9* Without application of the discovery rule, a contract cause of action normally accrues when the contract is breached, not when it was made. *Tel-Phonic Services, Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1143 (5th Cir. 1992)*. The most that can be said of Fields' and Lightfoot's testimony regarding their entitlement to payment is that it raises a question as to when they

---

[8] February 6, 1990 was the day co-trustees Baker and Frank Davila II served notice to the other members of the Control Group that "each of us will end up dealing with First State on an individual basis."

really knew matters had gone awry. One could argue that if the appellees knew they were entitled to their money beginning in late 1986 or early 1987, they must have known long before February of 1990 that the appellants were not going to honor the agreement. This is, however, an evidentiary issue for the trier of fact, not a question of law for an appellate court; it was for the jury to determine the date appellees knew or should have known that the [**44] appellants were not going to honor their agreement. Moreover, the appellees' testimonial declarations more closely resemble "quasi-admissions," not conclusive judicial admissions:

> HN10 A party's testimonial declarations which are contrary to his position are quasi-admissions. They are merely some evidence, and they are not conclusive upon the admitter . . . . These are to be distinguished from the true judicial admission which is a formal waiver of proof usually found in pleadings or the stipulations of the parties. A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it . . . .

*Hennigan v. I.P. Petroleum Co., Inc., 858 S.W.2d 371, 372 (Tex. 1993)* (quoting *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980))*. "The requirements for treating a party's testimonial quasi-admission as a conclusive judicial admission include that the statement be 'deliberate, clear, and unequivocal' and that 'the hypothesis of mere mistake or slip of the tongue must be eliminated.'" *Id. at 372* (quoting *Griffin v. Superior* [**45] *Ins. Co., 161 Tex. 195, 338 S.W.2d 415, 419 (1960))*. Given the record in this case, we cannot say either Fields or Lightfoot judicially admitted that their claims for **breach of contract** were barred by limitations.

Nor do we attribute any significance to the fact that the plaintiffs' second amended petition pleads for a recovery of prejudgment interest beginning on October 1, 1986 for Lightfoot and April 20, 1987 for Fields. Article 5069-1.03 provides in part:

> HN11 When no specific rate of interest is agreed upon by the parties, interest at the
>
> rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

*TEX. REV. CIV. STAT. ANN. art. 5069-1.03* (Vernon 1987). **HN12** The Texas Supreme Court has stated that "where damages are definitely determinable, interest is recoverable as a matter of right from the date of the injury or loss." *Imperial Sugar Co., Inc. v. Torrans, 604 S.W.2d 73, 74 (Tex. 1980)* (per curiam). We therefore agree with appellees that there is nothing inconsistent about pleading for the commencement of interest, **[**46]** on the one hand, and a reasonable post-contract period of time in which appellants could timely perform the agreement, on the other.

### Law of the Case

Nor are we persuaded by the appellants' argument that our prior opinion in *Fields and Lightfoot v. Rouse*, No. 04-93-00067-CV (Tex. App.--San Antonio, December 15, 1993, writ denied) (unpublished), controls the outcome of this appeal. In our prior decision, which affirmed a summary judgment in favor of Dr. Richard G. Rouse, we held that all of the appellees' claims against Dr. Rouse were barred by the four-year statute of limitations for ***breach of contract*** claims. Appellants argue that our prior decision in *Fields and Lightfoot v. Rouse* controls the outcome of this case insofar as appellees' ***breach of contract*** claim is concerned. Again, however, we disagree.

**HN13** The "law of the case" doctrine has been defined by the Texas Supreme Court as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent **[*513]** stages." *Hudson v. Wakefield, 711 S.W.2d 628, 630 (Tex. 1986)*. By narrowing the issues in successive stages of the litigation, **[**47]** the law of the case doctrine attempts to achieve uniformity of decision as well as judicial economy and efficiency. *Dessommes v. Dessommes, 543 S.W.2d 165, 169 (Tex. Civ. App.--Texarkana 1976, writ ref'd n.r.e.)*. The doctrine is based on public policy and is aimed at putting an end to litigation. *See Barrows v. Ezer, 624 S.W.2d 613, 617 (Tex. App.--Houston [14th Dist.] 1981, no writ)*; *Elliott v. Moffett, 165 S.W.2d 911 (Tex. Civ. App.--Texarkana 1942, writ ref'd w.o.m.)*.

**HN14** The doctrine of the law of the case only applies to questions of law and not to questions of fact. *Hudson, 711 S.W.2d at 630*. Furthermore, the doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first trial. *Barrows, 624 S.W.2d at 617*. In *Hudson*, the court also drew a distinction between a summary judgment and an appeal following a full trial on the merits:

A critical factor in our determination of this case is that in the first appeal we reviewed a summary judgment. *HN15* On review of summary judgments, the appellate courts are limited in their considerations of issues and facts. **[**48]** In such a proceeding, the movant is not required to assert every theory upon which he may recover or defend. Thus, when a case comes up for a trial on the merits, the parties may be different, the pleadings may be different, and other causes of action may have been consolidated. *See Governing Bd. v. Pannill, 659 S.W.2d 670, 680-81 (Tex.App.--Beaumont 1983, writ ref'd n.r.e.)*. Other distinctions may be drawn; for instance, in reviewing the evidence to determine whether there are any fact issues in dispute, the appellate court must review the evidence in the light most favorable to the party opposing the motion for summary judgment. *Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 562 (1962)*. Thus, the context of a summary judgment proceeding is distinguishable from a full trial on the merits.

*Id. at 630-31*. *See also Med Center Bank v. Fleetwood, 854 S.W.2d 278,*

*283 (Tex. App.--Austin 1993, writ denied)*. The court in *Pannill* also recognized that an "appeal after a full and lengthy trial on the merits with a jury acting as the finder of facts, differs in a very material sense from a prior limited appeal" following a summary judgment. *Pannill,* **[**49]** *659 S.W.2d at 681*. The distinction recognized in *Hudson* and *Pannill* also applies here, since our prior opinion was issued on review of a summary judgment in favor of Dr. Rouse. The present appeal followed a jury trial which lasted nearly three weeks and leaves behind a voluminous record. As a result, the facts were developed to a point far beyond the summary judgment record that we reviewed in *Rouse*. And as we have already noted, the jury found that Fields and Lightfoot either discovered or should have discovered on February 6, 1990 that the appellants would not perform the agreement. Were we sitting as the jurors in this case we might well have resolved the issue differently. However, it was for the jury, not this court, to weigh the evidence and determine the weight and credibility of the witnesses' testimony. There is certainly sufficient evidence to support the jury's answer. Given the present circumstances, we simply cannot agree that our opinion in *Rouse* should control the legal issues in this appeal.

### Requested Limitations Issues

Appellants also argue that the trial court erred when it refused to submit their requested limitations issues. [**50] They claim the jury should have been asked when payment was due, not when Fields and Lightfoot "knew or should have known" that the appellants would not perform the agreement. Once again, we disagree.

There were four proposed limitations issues which were refused by the trial court. Two of these issues were submitted by the Davilas; the other two by Baker. As to Fields and Lightfoot, however, they were identical: (1) "On what date was the indebtedness claimed by O. Waymond Lightfoot, Jr. due to him under the terms of the agreement, if any?"; and (2) "On what date was [*514] the indebtedness claimed by William R. Fields, Jr. due to him under the terms of the agreement, if any?"

Appellants also argue that the trial court erred in submitting questions 20 and 21 because they are not "ultimate issues." Building on their previous argument, appellants again claim the appellees' causes of action began to run at the time when they were entitled to their money. Given the appellees' testimony, this would have been on October 1, 1986 for Lightfoot and April 20, 1987 for Fields. According to appellants, it follows that a question regarding the date appellees knew, or should have

known, that [**51] the Control Group would not perform the agreement is "irrelevant." Again, we disagree.

*HN16* Proposed questions must be submitted to the jury in "substantially correct wording." *TEX. R. CIV. P. 278*. If the request is not in substantially correct wording, it does not preserve error. *TEX. R. CIV. P. 279*; *Keetch v. Kroger Co., 845 S.W.2d 262, 266 (Tex. 1992)*. In this case, the appellants' proposed limitations questions were not tendered in "substantially correct" wording. For example, their tendered questions assumed that the contract specified when payment would be due -- it did not. Appellants apparently presume that the limitations period for **breach of contract** claims is measured only from the time payment is due -- it is not. Nor can appellees' testimony regarding when they were entitled to their money be transformed into conclusive judicial admissions, given the strict standards which govern judicial admissions. To be within the realm of substantial correctness, the appellants' tendered limitations questions should have included a reasonable time inquiry -- once again, they did not. Since the appellants failed to comply with *Rule 279*, their limitations points concerning the charge [**52] are not subject to appellate review. There was no abuse of discretion.

As to whether questions 20 and 21 raised "ultimate issues," we note that the trial court has broad discretion when constructing the jury charge. **HN17** "A proper broad form jury question asks an ultimate issue and instructs the jury about the elements of the ground of recovery or defense that the jury must find before giving a 'yes' answer to the issue." *Rampel v. Wascher, 845 S.W.2d 918, 924 (Tex. App.--San Antonio 1992, writ denied)*. We hold that the charge in this case aided the jury and did not misstate the law. Appellants' points are overruled.

### Breach of Contract

Fields and Lightfoot pleaded that Lieb's May 19, 1987 letter evidenced a contract binding on the appellants for the purchase of the appellees' stock. This claim was submitted to the jury in questions one and two of the court's charge. In answering these questions, the jury agreed that Lieb's May 19, 1987 "writings" "constituted an agreement whereby the Control Group" purchased Fields' and Lightfoot's stock. The questions were preceded by an "Instruction on Agreement," which charged the jury as follows:

> In deciding whether [**53] the parties agreed that Lightfoot and Fields would not be paid unless First State Savings actually funded and restructured the Control Group's loans, you may

consider what the parties said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

In addition to arguing that the appellees' contract claim is barred by limitations, appellants assail the **breach of contract** theory on a number of other grounds: (1) the trial court should have admitted evidence that the agreement was conditioned on First State "actually funding" the stock purchase; (2) the trial court should have asked the jury whether the agreement was "conditioned" on financing; (3) the jury's finding that the Control Group ratified its purchase of the appellees' stock is not supported by legally or factually sufficient evidence; (4) the trial court should have asked the jury whether each of the appellants individually ratified the agreement; (5) the appellees' contractual damages are not supported by legally or factually sufficient evidence; (6) the trial court should have submitted questions asking the jury [**54] whether each member of the Control Group individually agreed to purchase the appellees' stock and whether the agreement [*515] was based upon prorata liability; and (7) the trial court should not have held them jointly and severally liable for the appellees' contractual damages.

### *Exclusion of Evidence*

Prominent among appellants' complaints is their contention the trial court erred in not submitting to the jury their theory concerning the non-occurrence of an alleged condition precedent, i.e., the agreement was conditioned on First State "actually funding" the stock purchase. This argument takes two forms: (1) that the trial court erred in failing to admit evidence that the agreement was conditioned on First State actually funding or restructuring the Control Group's loans; and (2) that the trial court should have submitted a separate question regarding conditional purchase in the court's charge. We will begin with the first argument, which concerns the parol evidence rule and the trial court's ruling on the appellees' motion in limine.

On February 22, 1993, shortly before trial, the appellees filed a motion in limine. Although there is no written order, the record [**55] indicates that the trial court sustained paragraph eight of the motion, which asked the court to prohibit the appellants or their counsel from suggesting to the jury,

> that there were conditions, conditions precedent or terms of their agreement to purchase Appellees' shares of Crown Bancshares stock which are not expressed in the written

memoranda, letters and records of Crown and the Control Group, because such writings constitute the written agreements between the parties; and Appellants cannot vary the terms by parol evidence and have no pleadings to support introduction of such testimony.

Appellants introduced evidence through a bill of exception pertaining to the alleged condition precedent. Baker and Frank Davila II testified by bill of exception that the agreement made by the members of the Control Group was subject to the condition that First State Savings would provide refinancing. The appellants' bill included excerpts from the depositions of Frank Cross and Dwight Lieb, both of whom similarly testified that refinancing by First State Savings was part of the agreement.

The bill also included testimony from Frank Davila II regarding plaintiffs' exhibits 16 [**56] and 59. Exhibit 16 was the notice from Frank Davila II to members of the Control Group informing them of a meeting to be held on June 16, 1986 to consider repurchase of the appellees' stock. Exhibit 59 was Frank Davila II's February 22, 1988 memorandum which questioned the validity of the sale and reiterated that any purchase was based on financing from First

State. Both documents had been admitted at the beginning of trial without limitation, but during Frank Davila II's direct examination, the trial judge would not permit him to read aloud the first paragraph of exhibit 59, which stated that "an effective transaction concerning the sale or transfer of the stock would involve, among other things, the approval of First State Savings to finance the purchase of said stock." This was presumably in keeping with the court's ruling on the motion in limine. During the bill of exception, Frank Davila II read from both the excluded portion of exhibit 59 and the first paragraph of exhibit 16, which stated "the control group purchase would be conditioned on the approval of First State Savings to finance the purchase."

Lightfoot testified under direct examination during the appellants' bill [**57] of exception that the original proposal presented to the Control Group was that he would be paid $ 10 per share for 25,000 shares; that the Control Group agreed to purchase his shares at that price based upon the "approval" or "permission" of First State Savings to refinance the debt. Lightfoot also admitted that his original petition contained the statement that "the purchase [of Lightfoot's shares] was conditioned on the Control Group's acquisition of financing from FIRST STATE." The appellants' record included a copy of Lightfoot's original petition, which the trial court had excluded from evidence.

HN18 The parol evidence rule is a rule of substantive law which provides that in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written instrument [*516] that is facially complete and unambiguous. *Martin v. Ford, 853 S.W.2d 680, 681 (Tex. App.--Texarkana 1993, writ denied)*; see also JOHN D. CALAMARI AND JOSEPH M. PERILLO, CONTRACTS § 3-2, at 135-36 (3rd ed. 1987) ("The parol evidence rule has been stated in many ways but the basic notion is that a writing intended by the parties to be a final [**58] embodiment of their agreement may not be contradicted by certain kinds of evidence.").

HN19 A party may not introduce parol evidence to vary the terms of an unambiguous contract. *Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941)*; *Markert v. Williams, 874 S.W.2d 353, 355 (Tex. App.--Houston [1st Dist.] 1994, writ denied)*. When a writing is intended as a completed legal transaction, the parol evidence rule excludes other evidence of any prior or contemporaneous expressions of the parties relating to the transaction. *Markert, 874 S.W.2d at 355*; *Massey v. Massey, 807 S.W.2d 391, 405*

*(Tex. App.--Houston [1st Dist.] 1991)*, writ denied, *867 S.W.2d 766 (Tex. 1993)*. Only if the intention of the parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt. *Markert, 874 S.W.2d at 355*.

*HN20* When there is no ambiguity, parol evidence is not admissible to create one. *Markert, 874 S.W.2d at 355*; *Entzminger v. Provident Life & Accident Ins. Co., 652 S.W.2d 533, 537 (Tex. App.--Houston [1st Dist.] 1983, no writ)*; see also *Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex.* [**59] *1981)* (When a contract, on its face, can be given a definite, legal meaning, parol evidence is not admissible to render it ambiguous). Only after the trial judge determines that the contract is ambiguous does parol evidence become admissible, and then only to assist the fact finder in determining the subjective intent of the parties at the time they entered into the agreement. *Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983)*.

*HN21* Even in the absence of appropriate pleading by either party, a trial judge may conclude a contract is ambiguous. *Sage Street Associates v. Northdale Const. Co., 863 S.W.2d 438, 445 (Tex. 1993)*. Indeed, he must do so before the issue can be submitted to the jury:

> If the trial court has not made a determination on the question of whether a contract is ambiguous before a jury trial commences, it is incumbent on the judge when it first becomes apparent during trial that at least one of the parties is claiming ambiguity, supported by adequate pleadings, to examine the provisions in question and determine at that time whether or not the contract is or is not ambiguous. This is necessary, among other reasons, so that the court can properly rule on evidentiary [**60] objections and submit a substantially correct charge.

*West Texas Gathering Co. v. Exxon Corp., 837 S.W.2d 764, 770 (Tex. App.--El Paso 1992)*, rev'd on other grounds, *868 S.W.2d 299 (Tex. 1993)*. *HN22* If neither party alleges a contract is ambiguous, or if the issue is raised for the first time on appeal, construction of the agreement is a question of law for the appellate court. *See Praeger v. Wilson, 721 S.W.2d 597, 600 (Tex. App.--Fort Worth 1986, writ ref'd n.r.e.)*; see also *Community Dev. Serv. v. Replacement Parts Mfg., Inc., 679 S.W.2d 721, 724 (Tex. App.--Houston [1st Dist.] 1984, no writ)*; *Sale v. Contran Corp., 486 S.W.2d 161, 165 (Tex. Civ. App.--Dallas 1972, writ ref'd n.r.e.)*.

Although never using the word "ambiguity" in their pleadings, the appellants and appellees obviously disagreed over whether there was a contract, and if so, whether it was subject to certain conditions. Baker and the Davilas alleged in their amended answers that "there was no valid agreement between Appellants and/or the Control Group and Appellees because there was no meeting of the minds of the parties as to such agreement." Pitman, Bertino, O'Connor, and Manning all [**61] denied that Lieb, Baker or Frank Davila II -- the voting trustees -- ever had the authority to negotiate an agreement with the appellees, or that they ratified such an agreement, but added that if there were an agreement, it was subject to certain conditions precedent, e.g., First State Savings agreeing to the proposed transfer of stock, allowing a prorata assumption of the appellees' debts, and, in turn, releasing the appellees from their indebtedness. Haass adopted the amended answers filed by Fred Baker [*517] and the Davilas, which contained these same allegations.

There is no indication in the record that the trial court ever expressly found the contract was ambiguous, and apparently, none of the parties ever asked him to do so. The trial judge must have concluded, at least initially, that Lieb's letter was unambiguous, since it excluded the appellants' condition evidence. In constructing the jury charge, however, the trial judge asked the jury questions designed to ascertain whether there was an agreement, i.e., whether Lieb's May 19, 1987 "writings" "constituted an agreement whereby the Control Group" purchased Fields' and Lightfoot's stock. If the document was indeed [**62] unambiguous, the court should never have submitted such issues to the jury. **HN23** Only when a contract contains an ambiguity does its interpretation become a question of fact for the jury. *Reilly v. Rangers Management, Inc., 727 S.W.2d 527, 529 (Tex. 1987)*. While the trial judge never expressly found the agreement was ambiguous, such a determination was necessary before it could submit questions one and two. *See Exxon Corp. v. West Texas Gathering Co., 868 S.W.2d 299, 302 (Tex. 1993)* ("If the court had not considered the contract ambiguous, the court could only have interpreted it as a matter of law."); *see also Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (By submitting issues to the jury designed to ascertain the parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous."). As a result, the issue is whether the trial court erred in concluding the document was ambiguous, and if not, whether the appellants' parol evidence should have been admitted.

*HN24* In construing a contract, the court must give effect to the objective intent of the parties as expressed or apparent in the writing, in light of the surrounding [**63] circumstances. *Praeger, 721 S.W.2d at 600-01*. A contract is not ambiguous if, after applying the rules of construction, the provision in question can be given a certain or definite legal meaning or interpretation. *Coker, 650 S.W.2d at 393*; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951). On the other hand, the contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker, 650 S.W.2d at 393*. We recognize that an instrument is not ambiguous simply because the parties disagree over its interpretation. *Markert, 874 S.W.2d at 355*; *Praeger, 721 S.W.2d at 600*. After carefully reviewing the record, we do not believe the trial judge erred in concluding the agreement was ambiguous or in submitting the issue to the jury.

Turning to the second issue, we note that *HN25* parol evidence is admissible regarding the intentions of the parties when the writing contained in the document is ambiguous. *Trinity Univ. Ins. Co. v. Ponsford Bros., 423 S.W.2d 571, 574-75 (Tex. 1968)*. Moreover, it is admissible to show the agreement was not to become effective save upon certain conditions [**64] or contingencies. *Baker v. Baker*, 143 Tex. 191, 183 S.W.2d 724, 728 (Tex. 1944); *Litton v. Hanley, 823 S.W.2d 428, 430 (Tex. App.--Texarkana 1992, no writ)*. Since the trial court concluded the agreement was ambiguous, and since our review of the record and the law requires no contrary determination, the appellants' parol evidence should have been admitted to aid the jury in determining the intentions of the parties.

Our analysis, however, does not end there. We must also conduct a harm analysis to determine if this error requires reversal. *See* TEX. R. APP. P. 81(b)(1). In addition to showing that the trial court committed error, appellants must also show that the error was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989)*; *Bridges v. City of Richardson, 163 Tex. 292, 354 S.W.2d 366, 368 (Tex. 1962)*; *New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp., 872 S.W.2d 303, 310 (Tex. App.--Austin 1994, no writ)*; *see also* TEX. R. APP. P. 81(b). *HN26* The admission or exclusion of evidence rests within the sound discretion of the trial [**65] court. *Center, Inc., 872 S.W.2d at 310*; *Tracy v. Annie's Attic, Inc., 840 S.W.2d 527, 531 (Tex. App.--Tyler 1992, writ denied)*;

*Luvual v. Henke & Pillot*, 366 S.W.2d 831, 838 (Tex. Civ. App.--Houston [1st Dist.] 1963, writ ref'd n.r.e.). In other words, the trial court **[*518]** commits error only when it acts in an unreasonable and arbitrary manner, or acts without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied*, *476 U.S. 1159, 90 L. Ed. 2d 721, 106 S. Ct. 2279 (1986)*. Reversible error does not usually occur in connection with rulings on questions of evidence unless the appellant can demonstrate that the whole case turns on the particular evidence that was admitted or excluded. *Litton v. Hanley, 823 S.W.2d 428, 430 (Tex. App.--Houston [1st Dist.] 1992, no writ)*. The exclusion of evidence is harmless if it is cumulative of other evidence that was admitted on the same issue. *See Gee, 765 S.W.2d at 396* ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error."); *see also* TEX. R. CIV. EVID. 403.

Appellants **[**66]** argue that exclusion of their condition evidence was harmful error, because it was material not only to the issue of whether there was an agreement, but to all of the appellees' tort claims as well as their actual and exemplary damages. Unable to elicit testimony from witnesses, produce documentary evidence, or argue to the jury what the terms of the agreement were, and consequently, explain why they did not follow through with the deal, appellants claim their case was hopelessly prejudiced by the trial court's decision to exclude their condition precedent testimony. We disagree.

Our review of the record shows that various Control Group members testified without objection that it was their intention to purchase the appellees' stock only if First State would finance the purchase. Although never using the word "condition," Baker, Lieb, Pitman, O'Connor, Bertino, Manning, and Haass all testified before the jury that they were prepared to buy their prorata shares of Fields' and Lightfoot's stock if First State agreed to refinance the purchase. Moreover, the issue of financing conditions was raised during closing arguments. Counsel for Baker and the Davilas urged the jury to answer "no" **[**67]** to questions one and two because the financing condition had not been satisfied. Thus, not only did the jury hear a wealth of evidence on the appellants' condition theory, but the issue was included in the court's preliminary "Instruction on Agreement" and argued to the jury. Appellants never objected to this instruction. As for plaintiffs' exhibits 16 and 59, the Frank Davila II memoranda, although appellants

claim they were never offered to the jury "in their entirety," the record shows both documents were admitted without reservation at the beginning of trial, and were in the jury room during deliberations. The fact Frank Davila II was not permitted to read from or testify regarding specific paragraphs is not cause for concern, when one considers the other condition evidence that was before the jury. Because other evidence admitted throughout the trial and emphasized during closing arguments conveyed substantially the same information to the jury that was found in appellants' bill of exception, even if the trial court erred in excluding this testimony, the error was harmless. The appellants' points are overruled.

### Conditional Purchase

Appellants also argue that [**68] the trial court erred in refusing to ask the jury whether the agreement was conditioned on financing by First State. To prevail on these points, however, appellants must show they were entitled to a jury question on the issue. *HN27* All parties are entitled to have controlling issues, raised by the pleadings and evidence, submitted to the jury. *Brown v. Goldstein, 685 S.W.2d 640, 641 (Tex. 1985)*. A controlling issue is one which requires a factual determination to render judgment in the case. *Employers Casualty Co. v. Block,*

*744 S.W.2d 940, 944 (Tex. 1988)* (op. on reh'g). The issue must also be disputed. *Id.*

Appellants must also show they preserved error to prevail on these points. Several procedural steps are required to preserve error. First, the complaining party must request a question on the issue. *Lyles v. Texas Employers' Ins. Ass'n, 405 S.W.2d 725, 727 (Tex. Civ. App.--Waco 1966, writ ref'd n.r.e.)*. The request must be in writing, separated from other requested jury charges, and must be tendered in "substantially correct" form. *TEX. R. CIV. P. 278*, *279*; *Woods v. Crane Carrier Co., Inc., 693 S.W.2d 377, 379* [*519] *(Tex. 1985)*. The requested question must [**69] also be presented and filed before the charge is read to the jury. *M.L.C. Loan Corp. v. P.K. Foods, Inc., 541 S.W.2d 902, 905 (Tex. Civ. App.--Beaumont 1976, no writ)*. Finally, the complaining party must obtain a ruling on the request. *TEX. R. CIV. P. 276*; *Greenstein, Logan & Co. v. Burgess Mktg., 744 S.W.2d 170, 181 (Tex. App.--Waco 1987, writ denied)*.

Counsel for Baker, Haass, Bertino, Pitman, O'Connor and the Davilas all objected to questions one and two, but only the Davilas tendered "condition" questions. The Davilas' first question asked whether there "was any authority given to Lieb by the Davila Defendants to purchase Fields' stock limited to purchasing

such stock on condition of First State actually accomplishing the financing?″ The second question asked: ″Did the Davila Defendants agree to by [sic] Fields' stock without a condition of First State actually accomplishing the financing?″ The third asked: ″Did the Davilas agree to buy Crown Bancshares, Inc. from Lightfoot without a condition of First State actually accomplishing the financing?″ All three questions were refused by the trial court. The record shows that appellants filed written requests for a special [**70] charge on the issue of condition, separated from their other requested questions, definitions, and instructions, before the charge was submitted to the jury. Therefore, they complied with the first procedural step in error preservation. Because the trial judge endorsed these requests ″refused″ and signed his name officially, appellants fulfilled this final error preservation requirement.

*HN28* We review a trial court's submission of a theory of recovery or defense by questions or instructions under an abuse of discretion standard, recognizing there is a presumption in favor of the broad-form submission of questions. *TEX. R. CIV. P. 277*; *Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990)*; *Mobil Chem. Co. v. Bell, 517 S.W.2d 245, 256 (Tex. 1974)*. ″*Rule 277*

mandates broad form submission 'whenever feasible,' that is, in any and every instance in which it is capable of being accomplished.″ *E.B., 802 S.W.2d at 649*. The test for an abuse of discretion is whether the trial court's action in refusing to submit the requested definition and instruction was arbitrary or unreasonable. *Downer*, 701 S.W.2d at 241-42. This means the trial court has wide discretion [**71] in submitting explanatory instructions and definitions, *Wisenbarger v. Gonzales Warm Springs Rehabilitational Hosp., Inc., 789 S.W.2d 688, 692 (Tex. App.--Corpus Christi 1990, writ denied)*, or in determining what constitutes necessary and proper issues. *Scott v. Ingle Bros. Pacific, Inc., 489 S.W.2d 554, 557 (Tex. 1972)*.

*HN29* Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and aid the jury in answering the questions in the charge. *See TEX. R. CIV. P. 277*, *278*; *see also Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992)*; *Texas Dep't of Transp. v. Ramming, 861 S.W.2d 460, 463 (Tex. App.--Houston [14th Dist.] 1993, writ denied)* (trial court's discretion ″is subject to the requirement that the questions submitted must control the disposition of the case, be raised by the pleadings and evidence, and properly submit the disputed issues

for the jury's deliberation."). But, "[a] judgment should not be reversed because of a failure to submit other and various phases or different shades of the same question." *Sheldon L. Pollack Corp. v. Falcon Industries, Inc., 794 S.W.2d 380, 383 (Tex. App.--Corpus* [**72] Christi 1990, writ denied). Moreover, a trial court errs if it refuses to submit a properly formed question with appropriate instructions, and instead submits separate, granulated issues to the jury. *H.E. Butt Grocery Co. v. Warner, 845 S.W.2d 258, 260 (Tex. 1992)*.

In *Island Recreational Development Corp. v. Republic of Texas Savings Association, 710 S.W.2d 551 (Tex. 1986)*, the developer and owner of a condominium brought a lawsuit against a bank alleging **breach of contract** for failure to permanently fund first mortgages of condominium units under the terms of a commitment letter. *Id. at 553*. The trial court submitted a broad-form issue to the jury asking whether they found the "plaintiffs performed their obligations under the commitment letter in question." *Id. at 554*. There were no instructions accompanying this issue, nor did the parties ask for them. [*520] *Id.* The Texas Supreme Court held that trial courts are permitted, and even urged, to submit the controlling issues of a case in broad terms so as to simplify the jury's chore. *Id. at 555*. The *Island*

Court further held, and *Rule 277* specifically provides, that the trial court should [**73] submit appropriate accompanying instructions to enable the jury to render a verdict. *Id. See also Glendon Investments, Inc. v. Brooks, 748 S.W.2d 465, 469 (Tex. App.--Houston [1st Dist.] 1988, writ denied)*; *American Cyanamid Co. v. Frankson, 732 S.W.2d 648, 658 (Tex. App.--Corpus Christi 1987, writ ref'd n.r.e.)*.

In the present case, as in *Island*, Fields' and Lightfoot's contractual claim was submitted to the jury in broad form. Although appellants claim the trial court should have submitted several additional questions inquiring about specific aspects of the contract -- whether the agreement was conditioned; whether the appellants individually ratified it -- the controlling issue in the case, and the one which authorized recovery for the appellees, was whether Lieb's May 19, 1987 letter constituted an agreement whereby the Control Group bought certain shares of Fields' and Lightfoot's stock. This was the issue the trial court submitted to the jury; the remaining issues, e.g., condition and ratification, were addressed in the court's accompanying instructions and, therefore, were encompassed within the broad-form question. We therefore hold that the trial court did

[**74] not abuse its discretion in refusing appellants' tendered questions and in choosing to submit the contractual claims in broad form. Accordingly, appellants' points of error are overruled.

*Agency*

In connection with the liability issues, the court gave the jury an "Instruction on Authority" which preceded all of the liability questions:

> A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

> Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another person to perform an act, that other party is also authorized to do whatever else is proper, usual and necessary to perform the act expressly authorized.

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of such authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct [**75] of another may be considered in determining whether apparent authority exists.

During closing arguments, appellants urged the jury to absolve them of liability because they gave Lieb no authority to purchase the appellees' stock. In resolving the liability issues against the appellants, however, the jury impliedly found the requisite agency connection.

Appellants raised no trial objection to the court's agency instruction, and their briefs scarcely even mention the issue. In a reply brief, Baker argues the trial court should not have rendered judgment based upon a theory of agency because the trial court's rulings construing Lieb's May 19, 1987 letter as the written memorial of the agreement between the parties and its prohibition of the appellants' condition evidence harmed appellants. Moreover, Baker again claims the trial court erred in refusing the appellants' condition evidence because this evidence would have explained "Lieb's restricted authority."

Conspicuously absent from the appellants' argument is any indication of whether, or how, they preserved error on this point. *HN30* Any complaint concerning the submission of an instruction is

waived unless specifically included [**76] in the objections. *See TEX. R. CIV. P. 274*. This appellants failed to do. Although they tendered several proposed instructions on agency, appellants never once challenged the court's agency instruction, [*521] nor do they raise the issue now. [9] By failing to even raise the issue in their appellate briefs, appellants waived any complaint on appeal regarding an implied finding of agency. [**77]

But even if error was preserved, we believe there is sufficient evidence for the jury to have reasonably inferred the existence of an actual or apparent agency relationship between Trustee Lieb and the other members of the Control Group regarding the purchase of Fields' and Lightfoot's stock. Whether an agency relationship exists is usually a question of fact, and circumstantial evidence may be used to establish the agency and the extent of the agent's authority. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.*, 917 S.W.2d 29, 48 (Tex. App.--Amarillo 1995, n.w.h.); *Bhalli v. Methodist Hosp., 896 S.W.2d 207, 210 (Tex. App.--Houston [1st Dist.] 1995, writ denied)*; *Foundation Reserve Ins. Co. v. Wesson, 447 S.W.2d 436, 438 (Tex. Civ. App.--Dallas 1969, writ ref'd)*. An agency relationship becomes a question of law only when the facts are agreed or undisputed. *Ross v. Texas One Partnership, 796 S.W.2d 206, 209 (Tex. App.--Dallas 1990)*, *writ denied per curiam*, 806 S.W.2d 222 (Tex. 1991). This is certainly not such a case.

### The Voting Trust Agreement

Perhaps the most compelling evidence of an agency relationship between Lieb and [**78] the members of the Control Group is the voting trust agreement. In entering this agreement, the appellants agreed among themselves, in the interest of "continuity and stability of policy," to unite their vote in Trustee Lieb and to be bound by their own vote regarding matters entrusted to him. This agreement constitutes evidence, albeit circumstantial, from which the jury could have found a broader agency relationship between Lieb and the other members of the Control Group.

### Other Circumstantial Evidence

There is also evidence of an actual or apparent agency relationship through the Control Group's official vote and the appellants' subsequent conduct. Among the relevant

---

[9] Counsel for the Davilas alluded to the issue of agency when he was objecting to questions one and two of the court's charge. After reminding the trial judge that questions one and two asked the jury to determine whether Lieb was an agent for the Control Group, counsel added: "We have submitted requested instructions on the -- on agency, and this is a necessary element of whether Mr. Lieb was an agent and could enter into the agreement. And we have submitted an instruction on that agency theory which we've raised by the pleadings and has been shown by the evidence or raised by the evidence, and the court has denied that." On appeal, however, appellants do not challenge the trial court's denial of their agency instructions.

circumstances the jury could have considered is the fact that, after receipt of Lieb's May 19, 1987 letter, each appellant appears to have conducted himself in accordance with the described transaction. There is evidence in this record from which the jury could have found that each appellant had knowledge of the transaction, recognized its existence, and retained the beneficial right to increase his holdings commensurate with the purchase. Not only did the Control Group vote its explicit ratification, **[**79]** but each appellant contributed several times to the Control Group's fund for paying the First State debt that corresponded to the stock purchase. Given these circumstances, we believe there is sufficient evidence to support the jury's implied finding that Lieb was the agent of the Control Group. *See City of San Antonio v. Aguilar, 670 S.W.2d 681, 683 (Tex. App.--San Antonio 1984, writ dism'd)* (implied authority exists when appearances indicate that "in some manner the agent was authorized to do what he did").

### *Ratification*

In addition to the agency instruction, the court also charged the jury on ratification. In answering this question, the jury found that the Control Group ratified their purchase of Fields' and Lightfoot's stock. [10]

Appellants **[*522]** raise two related arguments regarding the court's ratification instruction and the jury's findings: (1) they claim the court's submission of the issue was erroneous because appellants were entitled to separate questions as to whether each of them, individually, ratified the Lieb agreement; and (2) they argue that even if the ratification issue was properly submitted, the evidence is both legally and factually **[**80]** insufficient to support the jury's response. After reviewing the record, however, we disagree.

Do you find the Control Group ratified their purchase of Fields' stock?

[Answer "Yes" or "No"]

ANSWER: Yes

Question four provided:

Do you find the Control Group ratified their purchase of Lightfoot's stock?

[Answer "Yes" or "No"]

ANSWER: Yes

These questions were preceded by an instruction on ratification:

A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.

Implied ratification occurs when a party, though he may have been

---

[10] Question three reads as follows:

unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

HN31 When, as in [**81] this case, both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981)*. In considering a "no evidence" or legal sufficiency point, we consider only the evidence or inferences from the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l. Bank*, 760 S.W.2d 240, 242 (Tex. 1988); *Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*. If there is any evidence -- more than a scintilla -- to support the finding, the no evidence challenge will fail. *Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987)*; *In re King's Estate, 150 Tex. 662, 224 S.W.2d 660, 661 (1951)*.

HN32 In considering a factual sufficiency point, we may not substitute our judgment for that of the trier of fact, but must assess all the evidence and reverse for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986)*; [**82] *Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)*. Under this analysis, we are not the fact finders and we do not pass upon the credibility of witnesses or substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported. *Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App.--Dallas 1986, writ ref'd n.r.e.)*. In other words, we are not free to substitute our judgment for the jury's simply because we may disagree with the verdict. *Herbert v. Herbert, 754 S.W.2d 141, 142 (Tex. 1988)*.

HN33 Ratification occurs when a principal, though he had no knowledge originally of an unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge. *Land Title Co. of Dallas v. F. M. Stigler, Inc., 609 S.W.2d 754, 757 (Tex. 1980)*. Stated simply, if a person who has fraudulently been made a party to a contract continues to receive the benefits of the contract after he becomes aware of the fraud, or if he otherwise conducts himself in such a manner as to recognize the contract as existing and binding, he thereby affirms the contract and waives his right to a rescission. *Daniel* [**83]

*v. Goesl, 161 Tex. 490, 341 S.W.2d 892, 895 (1960)*; *Rosenbaum v. Texas Bldg. & Mortgage Co., 140 Tex. 325, 167 S.W.2d 506, 508 (1943)*; *Spangler v. Jones, 797 S.W.2d 125, 131 (Tex. App.--Dallas 1990, writ denied)*. An express ratification is not necessary; any act based upon a recognition of the contract as existing or any conduct inconsistent with an intention of avoiding it has the effect of waiving the right of rescission. *Rosenbaum, 167 S.W.2d at 508*. **HN34** The critical factor in determining whether a principal has ratified an unauthorized act by his agent is the principal's knowledge of the facts of the prior transaction and his actions in light of such knowledge. *Land Title Co. v. F. M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex. 1975)*. Ratification can occur if the party, at the time of his allegedly ratifying acts, has knowledge of all material facts pertaining to the prior fraudulent transaction. *Rourke v. Garza, 530 S.W.2d 794, 805 (Tex. 1975)*; *Vessels v. Anschutz Corp., 823 S.W.2d 762, 764* **[*523]** *(Tex. App.--Texarkana 1992, writ denied)*. The question of ratification of a contract is usually a mixed question of law and fact. *Sawyer v. Pierce* **[**84]** *, 580 S.W.2d 117, 123 (Tex. Civ. App.--Corpus Christi 1979, writ ref'd n.r.e.)*. Although ratification may be determined as a matter of law if the evidence is uncontroverted or uncontrovertible, when the act or acts of ratification are controverted,

the question of ratification must be left to the trier of fact. *Id.*

Appellants argue that Plaintiff's Exhibit 66 -- the handwritten minutes of the Control Group's March 16, 1988 meeting -- do not show who voted for the resolution to confirm the purchase of Fields' and Lightfoot's stock. Rather, these minutes, which were kept by Pitman, merely indicate that the "motion to confirm that the stock purchase is a valid transaction made 2nded & [sic] passed." Baker, like the other appellants, testified that if the minutes meant the agreement was being ratified without any condition, he did not vote for it. And Baker, like the other appellants, testified by bill of exception that the agreement was always conditioned on First State accomplishing financing.

Be that as it may, however, the record is replete with evidence from which the jury could have concluded the Control Group ratified the purchase of Fields' and Lightfoot's shares. **HN35** "It **[**85]** is fundamental that the critical factors in determining ratification are 1) the principal's subsequent knowledge of the transaction and 2) his actions thereafter, and implied ratification may be proven by silence in the face of knowledge." *See Banc Texas Allen Parkway v. Allied American Bank, 694 S.W.2d 179, 182 (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.)* (emphasis added);

*see also Spangler, 797 S.W.2d at 131* (conduct recognizing agreement as binding is sufficient). There is evidence that each appellant had knowledge of the transaction, conducted himself in recognition of its existence, and retained the beneficial right to increase his holdings commensurate with a stock purchase. Indeed, not only did the Control Group vote its explicit ratification of the stock purchase, but each appellant contributed several times to the Control Group's fund to pay the First State debt that corresponded to the purchase. Given this record, there is simply no merit to the appellants' contentions that the trial court erred when it refused to submit separate authority and ratification questions for each defendant. In entering the voting trust agreement, the appellants agreed [**86] among themselves, in the interest of "continuity and stability of policy," to unite their vote in Trustee Lieb and to be bound by their own vote in matters entrusted to him. Moreover, each appellant's contribution to partial performance is additional evidence from which the jury could have concluded they acknowledged Lieb's authority and ratified the stock purchase agreement with Fields and Lightfoot. Finally, the trial court's Control Group questions are all-or-nothing propositions; the jury

could not have answered as it did without a finding applicable to every member of the Control Group. Thus, even if Lieb did not have the authority to negotiate a stock purchase agreement with the appellees, the jury's finding that the Control Group ratified the purchase of the appellees' shares supports the trial court's judgment. We therefore hold that the trial court did not err in refusing to submit separate ratification questions, and the jury's finding that the Control Group ratified the purchase of the appellees' shares is supported by legally and factually sufficient evidence.

### Damages for Breach of Contract

Appellants also attack the legal and factual sufficiency of [**87] the evidence supporting the appellees' contractual damages -- questions five and six of the court's charge. [11] Urging [*524] an evidentiary sufficiency challenge as to various elements of Fields' and Lightfoot's contractual damages, appellants argue the entire answer should be disregarded. The Davilas, for example, claim two elements of Fields' contractual damages lack any support in the evidence: (b) reasonable and necessary costs incurred by Fields, and (e) the value of any property, income or business interests lost as a natural, probable and foreseeable consequence of the

---

[11] The questions and the jury's answers are as follows:

Control Group's failure to comply. Baker argues that "there is no evidence that as a natural, probable and foreseeable consequence of group's [sic] purported failure to comply with the agreement that Fields lost the value of any property, income or business interests," an apparent reference to element (e) of question number six. As for Lightfoot, appellants claim there is no evidence of damage to Lightfoot's credit reputation and the "reasonable and necessary costs incurred."

What sum of money, if any, if paid in cash, would fairly and reasonably compensate Lightfoot for his damages, if any, that resulted from the Control Group's failure to comply with their agreement to purchase 25,000 of his shares?

Consider the following elements of damages, if any, and none other:

a. The agreed purchase price;

b. The reasonable and necessary costs incurred by Lightfoot;

c. Reasonable and necessary expenses incurred in defense of the suit brought on Lightfoot's loan at First State Savings;

d. Damage to credit reputation that was a natural, probable and foreseeable consequence of the Control Group's failure to comply.

Do not include any amount for interest on past damages, if any.

Answer in dollars and cents for damages, if any, that --

Were sustained in the past:

ANSWER: $ 253,000

In reasonable probability will be sustained in the future:

ANSWER: $ 0

A similar question was posed with respect to Fields:

What sum of money, if any, if paid in cash, would fairly and reasonably compensate Fields for his damages, if any, that resulted from the Control Group's failure to comply with their agreement to purchase 9,000 of his shares?

Consider the following elements of damages, if any, and none other:

a. The agreed purchase price;

b. The reasonable and necessary costs incurred by Lightfoot;

c. Reasonable and necessary expenses incurred in defense of the suit brought on Lightfoot's loan at First State Savings;

d. Damage to credit reputation that was a natural, probable and foreseeable consequence of the Control Group's failure to comply.

Do not include any amount for interest on past damages, if any.

Answer in dollars and cents for damages, if any, that --

Were sustained in the past:

ANSWER: $ 290,000

In reasonable probability will be sustained in the future:

ANSWER: $ 0

These questions were preceded by the following instruction:

You are instructed that if you answer questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment.

 [**88] Our review of the appellees' contractual damages is complicated by the fact that the issues were submitted to the jury in broad form, i.e., called for a one-sum answer after consideration of several different elements. "When a damages issue is submitted in broad-form, an appellate court cannot ascertain what amount of the damages award is attributable to each element." *Greater Houston Transp. Co., Inc. v. Zrubeck, 850 S.W.2d 579, 589, n. 11 (Tex. App.--Corpus Christi 1993, writ denied)*.

*HN36* The only way that a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence. If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence.

*Id.* Appellants have clearly failed to meet this burden.

Appellants cannot defeat a damages question that is submitted in broad-form by attacking only individual elements. We note, for example, that the Davilas fail to challenge three elements of Fields' damages: (a) the agreed purchase price; (c) reasonable and necessary costs incurred in defense [**89] of the suit brought on Fields' loan at First State Savings; and, more importantly, (d) damage to credit reputation that was a natural and probable and foreseeable consequence of the Control Group's failure to comply. Baker fails to challenge the evidence in support of element (d) -- damage to Fields' credit reputation. [12] [*525] Appellants also overlook several elements of Lightfoot's damages: agreed purchase price, reasonable and necessary costs, reasonable and necessary legal expenses. By challenging some elements of Fields'

---

[12] The brief filed by Pitman adopts the arguments contained in Baker's brief, and Haass does not raise the issue.

and Lightfoot's contractual damages but not others, appellants run the risk of losing their sufficiency challenge if there is at least one element of Fields' and Lightfoot's contractual damages that is supported by legally and factually sufficient evidence. See *Zrubeck, 850 S.W.2d at 589*.

### Fields' Damages

In addition to testimony concerning the unpaid [**90] balance on the agreement with Lieb to sell his shares of stock in Crown Bank, Fields also testified that he has been sued by the RTC for the full amount of the unpaid principal on his promissory note to First State, or $ 93,993.00, with $ 42,551.59 in accrued interest as of April 3, 1992, together with interest accrued since that date, for a total amount due under the guarantee agreement of $ 193,800.00. The RTC's petition also included a demand for $ 2,500.00 in attorneys' fees, and an additional $ 5,000.00 for each appellate level to which an appeal is taken.

Much of Fields' damages testimony concerned "lost investment" or "lost income" opportunities, and damage to his credit reputation. He testified that, beginning in 1985, he became involved with several other investors including another member of the Control Group, Dr. Bertino, in a series of highly complex medically-related business transactions. Although the corporate structure changed several times, at the core of these transactions were two companies called Rehabtex, Inc. and Rehabtex Services, Inc., which were formed to develop a series of outpatient physical rehabilitation centers in Texas. Rehabtex and Rehabtex Services [**91] sold a series of limited partnerships concerning outpatient physical therapy rehabilitation to individuals in the medical field. Rehabtex was supposed to be the general partner; the limited partners would be referring physicians. Rehabtex Services would provide the billing, collection, budgeting, accounting, and administrative support. Rehabtex and Rehabtex Services were, in turn, owned by several other corporate entities, among them Orion Medical Group (OMG) and Rehabco, Inc., a Pennsylvania corporation owned by an investor named Rick Actman. Like Dr. Bertino, Fields owned a percentage of the Orion Medical Group, Rehabtex, and several other closely related corporate entities. Fields, however, said he was forced to sell his interest in all of these outside ventures by August of 1989, because he could not come up with his share of a $ 15,000.00 tax debt -- $ 6,400.00 -- that Orion Medical Group owed the IRS. Fields stated that he had tried to borrow $ 2,500.00 from a San Antonio bank to meet his share of the obligation, but was unable to do so. In any

event, the minutes of the August 9, 1989 meeting of the board of directors of the Orion Medical Group (O.M.G.) -- Michael H. Bertino, [**92] William R. Fields, and Charles V. Heath -- show that Dr. Bertino agreed to pay the tax obligation. In return, Fields sold his OMG stock to Dr. Bertino, receiving $ 17,000.00 for his equity in the company. Fields resigned from OMG and all affiliated companies and corporations; he remained on the board of directors of Rehabtex, Inc., but retained no voting rights. Fields claimed he had no ownership interest in any of these ventures after the August, 1989 board meeting.

Fields blamed his financial losses on a poor credit rating, claiming his continuing indebtedness with First State, which was listed on his credit report, hampered his ability to borrow money. Fields introduced a copy of his credit report, dated July of 1989, which showed that he owed First State Savings $ 94,000.00 with a delinquency of $ 14,000.00.

Fields also testified regarding the future profitability of his outside interests. He testified that Orion Medical Group was the general partner in a limited partnership which had an interest in the San Antonio Imaging Center -- including the right to 50 percent of the net profits and 20 percent of the radiology fees. According to Fields, this center was [*526] generating

[**93] over $ 400,000.00 in revenues by April of 1988 as a result of physician referrals. Fields, a stock broker by training, estimated these outside business interests would have been worth approximately $ 590,800.00 by the time of the trial had he not been forced to sell them. More specifically, he claimed his net interest in Rehabtex would have been worth approximately $ 200,000.00 by the time of trial, had he not been forced to sell it. To arrive at the larger figure, however, Fields essentially claimed that if this sum had been invested in a series of other ventures, for example, a company called Sunport Medical, it would have run the $ 200,000.00 into $ 590,000.00.

Dr. Carl Hubbard, the appellees' expert witness on damages, estimated that if Fields had still owned these outside business interests at the time of trial -- three years after their sale -they would have been worth $ 204,481.70. Hubbard testified at length regarding these highly complex business transactions. However, Hubbard's testimony concerned only Fields' resulting or consequential damages; the damages that resulted from the sale of Fields' stock and the failure of the appellants to pay the alleged purchase price. He [**94] said he was not asked to make such calculations regarding the sale of Lightfoot's stock.

In *Mead v. Johnson Group, Inc., 615 S.W.2d 685 (Tex. 1981)*, the Texas Supreme Court explained:

The 1980 Supplement to Corbin on Contracts states "there is no good reason why damage to credit rating should not be compensable in contract." 2 Corbin, Contracts § 1007 (Kaufman Supp. 1980). Recognition that loss of credit may be a foreseeable result of **breach of contract** is in line with the realities of today's economy. **HN37** To recover for loss of credit, as with any element of contract damage, it must be proved that the injury was the natural, probable, and foreseeable consequence of the **breach of contract** or there are no actual damages. *See Hadley v. Baxendale, supra*, at *354; Restatement (Second) of Contracts* § 365 (Tent. Draft 1979). This is not a departure from the general rule of contract damages, but only recognition of an element of damages if proven. *We hold that actual damages for loss of credit or injury to credit reputation in an action for* **breach of contract** *may be recovered when there is evidence that loss of credit was a natural, probable, and foreseeable consequence* [**95] *of the defendant's breach*.

*Id. at 368* (emphasis added). Given the broad form submission of Fields' contractual damages and the uncontested evidence regarding lost income and damage to his credit reputation, we hold that the evidence is legally and factually sufficient to support Fields' damages award.

### Lightfoot's Damages

Although there is no testimony regarding damage to Lightfoot's credit reputation, he claimed he had been sued by the RTC for over $ 436,000.00, and that he had paid an attorney $ 3,000.00 to defend him in that lawsuit. In addition, there was testimony concerning the agreement with Lieb to sell his shares of stock in Crown Bank. This is only $ 3,000.00 less than the amount which the jury awarded Lightfoot -- $ 253,000.00. Lightfoot's testimony as to the $ 3,000.00 in attorneys' fees supports the remainder of the jury's award. We therefore hold there is both legally and factually sufficient evidence in this record to support the jury's award of $ 253,000.00 in contractual damages for Lightfoot. Appellants' points are overruled.

### Individual Purchase

Appellants argue the trial court should have submitted a question to the [**96] jury asking whether each member of the Control Group individually agreed to purchase the

appellees' stock. The questions tendered by Baker and the Davilas would have asked the jury whether "Dwight Lieb, as agent for each of the following named control group members and with each member's authority to do so, agreed to purchase O. Waymond Lightfoot Jr.'s 25,000 shares of Crown Bancshares stock?" The jury would have been asked to answer yes or no for each member of the Control Group, including Fields. The trial court refused these questions as well as identical questions pertaining to Fields.

[*527] Appellants base their argument on the contention that the Control Group is an unincorporated association. They cite the general rule that unincorporated associations [13] are not liable on their contracts, which are regarded as the liability of the individuals who sign them. *Hutchins v. Grace Tabernacle United Pentecostal Church, 804 S.W.2d 598, 599 (Tex. App.--Houston [1st Dist.] 1991, no writ)*; *see also Cox v. Thee Evergreen Church, 836 S.W.2d 167, 169 (Tex. 1992)*. In *Hutchins*, the only case cited by appellants on this issue, the court noted that the members of an unincorporated [**97] association were not bound by unauthorized acts or unratified representations of an individual member. *Id.* However, the court also noted that members of an association

become liable on a contract made in their name if they assent to or ratify it. *Id.*

As we have already noted, the appellees' case against the Control Group was based on a theory of agency and ratification -- even if Lieb did not have the authority to negotiate a stock repurchase agreement with Fields and Lightfoot, the Control Group ratified the agreement. Since appellants waived any complaint regarding the jury's agency findings, and the agency and ratification findings are supported by legally and factually sufficient evidence, whether the Control Group is a legal entity is immaterial. *HN39* Any collective [**98] group of individuals may act through a common agent. *See RESTATEMENT (SECOND) OF AGENCY § 20 Comment f.* ("A number of persons . . . may act jointly in the authorization of an agent. In such case, the agent may have power to subject them to joint liability to third persons . . ."). The fact that Fields and Lightfoot were both members of the Control Group makes the resulting contractual arrangement somewhat unusual, but it does not invalidate the agreement.

*HN40* It may be supposed, for example, that an arrangement is entirely inoperative if it purports to be

---

[13] *HN38* "An unincorporated association is a voluntary group of persons, without a character, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." BLACK'S LAW DICTIONARY, 1531-32 (6th ed. 1990).

made by a partnership or other unincorporated association with a member of such association. There is no reason why such an agreement should not operate as a valid and enforceable contract between the individual member and the other members of the association that purports to make the agreement. For the purpose of giving a judicial remedy and for other practical purposes, there is nothing to prevent a court from treating the association of individuals as if it were an independent unit. . . . It may well be that an agreement made in this way should be subjected to severe scrutiny in the search for fraud and illegality. Yet the [**99] mere fact that the agreement purports to be made between the unincorporated association and one of its members does not in itself prove fraud or illegality.

1 CORBIN ON CONTRACTS § 3.1 (Rev. ed. 1993). In fact, since appellants jointly appointed Lieb, his only real authority was to act for their joint account. *See* RESTATEMENT (SECOND) OF AGENCY § 41(1) ("Unless otherwise indicated, authority given by two or more principals jointly includes only authority to act for their joint account."). *HN41* An

agent's promise necessarily binds his principals to the promised undertaking. *See Ames v. Great Southern Bank, 672 S.W.2d 447, 450 (Tex. 1984)*. Through their agent, Lieb, all of the appellants made the same promise to the appellees. *See RESTATEMENT (SECOND) OF CONTRACTS § 288 Comment c* ("It has been said that when two or more persons undertake a contractual obligation they are presumed to undertake it jointly and that 'words of severance' are necessary to overcome the presumption."). We therefore hold the trial court did not err in refusing to ask the jury whether appellants individually agreed to purchase the appellees' stock. Appellants' points are overruled.

### *Prorata* [**100] *Liability*

Appellants also claim the trial court should have asked the jury whether the agreement, and, consequently, the Control Group's purchase, was based on prorata liability. Baker and the Davilas submitted proposed questions, which were refused by the trial court, asking whether the agreement to buy Fields' and Lightfoot's shares was "limited [*528] to buying such control group member's pro rata portion of such stock."

Citing no authority or discussing any law to support their contentions, appellants claim that Lieb's letter and its attachments "unequivocally"

show that the responsibility of the Control Group members was based on their individual stock ownership in Crown Bancshares. They also refer us to evidence, including testimony from the appellees, which indicates the stock purchases were based on the appellants' proportionate ownership in the bank. Appellants argue that if this evidence did not establish their prorata liability as a matter of law, it required the trial court to submit the issue to the jury. Again, however, we disagree.

HN42 In the law of contracts, *joint and several liability* usually arises when two or more promisors in the same contract promise [**101] the same or different performances to the same promisee. *See RESTATEMENT (SECOND) OF CONTRACTS §§ 288, 289* (1981); *see also* CORBIN ON CONTRACTS § 928 (West Pub. Co. 1951) ("Each Joint Promisor is Bound For the Whole Performance Promised."). Texas law is no different -- obligations of multiple parties to a contract are usually "joint and several." *See Marynick v. Bockelmann, 773 S.W.2d 665, 668 (Tex. App.--Dallas 1989)*, *rev'd on other grounds*, *788 S.W.2d 569 (Tex. 1990)*; *Guynn v. Corpus Christi Bank & Trust, 620 S.W.2d 188, 190 (Tex. Civ. App.--Corpus Christi 1981, writ ref'd n.r.e.)*. In answering questions one and two of the court's charge,

the jury found the Control Group agreed to purchase the appellees' stock. Appellants do not challenge the legal or factual sufficiency of the evidence supporting these findings. They raised the issue of limitations, which we have already overruled. Since there is legally and factually sufficient evidence that the Control Group promised, though their agent, Lieb, to buy the appellees' stock, it makes no difference whether their duty was "joint and several." Consequently, the trial court did not err in refusing to ask the jury [**102] whether the agreement was based on prorata liability. The appellants' points are overruled.

## Joint and Several Liability

Appellants also claim the trial court erred in awarding contractual damages jointly and severally. Building on their previous argument, appellants claim the trial judge erred in awarding appellees the full amount of the contractual damages found by the jury because, as a matter of law, appellants were liable for only their prorata share. Once again, however, appellants cite no authority or discuss any law to support their contentions. We have already explained that the trial court did not err in refusing to ask the jury whether the agreement was based on prorata liability, and we need not discuss the issue again. Appellants' points are overruled.

## Texas Securities Act

As for the appellees' claims under *TEX. REV. CIV. STAT. ANN. art. 581-33* (Vernon Supp. 1996), the Texas Securities Act, appellants raise two arguments: (1) they argue the claim itself is barred under the limitations period contained in article 581-33(H)(2); and (2) they claim the evidence is both legally and factually insufficient to support the jury's answers [**103] to questions 15 and 16 of the court's charge, which concerned liability and damages for securities fraud. Both of these arguments have merit.

### Statute of Limitations

*HN43* The limitations period for claims under the Texas Securities Act is found in article 581-33(H), which provides that suit cannot be brought: (1) ″more than three years after discovery of the untruth or omission,″ or after discovery should have been made by the exercise of reasonable diligence; or (2) ″more than five years after the purchase;″ or (3) more than one year after rejecting a rescission offer. *TEX. REV. CIV. STAT. ANN. art. 581-33(H)(2)* (Vernon Supp. 1996). However, a claim under the Texas Securities Act may ″in no event″ be made more than five years after the sale. *Williams v. Khalaf, 802 S.W.2d 651, 655 n. 3 (Tex. 1990)*; *see also TEX. REV. CIV. STAT. ANN. art. 581-33(H)* cmt. (Vernon Supp. 1996).

The question then becomes whether, for purposes of limitations, we consider the sale [*529] of Fields' and Lightfoot's stock to have occurred on May 19, 1987, the date of Lieb's letter to the Control Group, or the earlier dates referenced in Lieb's letter and accompanying writing -October [**104] 1, 1986 for Lightfoot; April 20, 1987 for Fields. Given that the appellees' original petition was filed on November 25, 1991, if we calculate the five-year limitations period from September or October of 1986, Lightfoot's securities fraud claims are barred. Fields' claim, however, would not be barred if we used the April, 1987 date referenced in Lieb's letter to the Control Group. Furthermore, if we consider the sale to have occurred on May 19, 1987, the date of Lieb's letter, neither claim is barred by limitations. Not surprisingly, appellees therefore argue that under the law of merger, May 19, 1987 becomes the effective date of the sale, rather than the earlier oral agreements referenced in Lieb's letter.

*HN44* The ″merger doctrine″ is a corollary to the parol evidence rule in contract cases. Merger refers to the extinguishment of one contract by its absorption into another subsequent contract and is largely a matter of intention of the parties. *Leon, Ltd. v. Albuquerque Commons Partnership, 862 S.W.2d 693, 701*

*(Tex. App.--El Paso 1993, no writ)*; *Smith v. Smith, 794 S.W.2d 823, 827 (Tex. App.--Dallas 1990, no writ)*. Merger occurs when the same parties to a prior agreement [**105] subsequently enter into a written integrated agreement covering the same subject matter. *Leon, Ltd., 862 S.W.2d at 700*; *Boy Scouts of America v. Responsive Terminal Systems, Inc., 790 S.W.2d 738, 744 (Tex. App.--Dallas 1990, writ denied)*. The question of whether a merger has occurred, or whether an agreement is merely additional to and not contradictory of a written contract, is determined from the intent of the parties. *See Smith, 794 S.W.2d at 827-28*; *Smith v. U.S. Nat'l Bank of Galveston, 767 S.W.2d 820, 823 (Tex. App.--Texarkana 1989, writ denied)*. Absent pleading and proof of ambiguity, fraud, or accident, a written instrument presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument. *Boy Scouts of America, 790 S.W.2d at 745*. Appellants' argument overlooks two important points. First, we have already held that the issue of ambiguity was raised in the appellants' pleadings, and the trial judge did not err in concluding the May 19, 1987 document was ambiguous or in submitting the issue to the jury. Insofar as the parol evidence rule and the doctrine of merger are concerned, this means [**106] we cannot disregard the earlier dates referenced in Lieb's letter. Second, and more importantly, article 581-33(H) clearly provides an optimum limitations period of five years for securities fraud claims, and this limitations period is measured from the date of the "purchase or sale," not the date of the agreement. *See Williams v. Khalaf, 802 S.W.2d at 655 n. 3*; *see also TEX. REV. CIV. STAT. ANN. art. 581-33(H)* cmt. (Vernon Supp. 1996). In this case, Lieb's letter and the accompanying documents pinpoint the dates of the sale: October 1, 1986 for Lightfoot, and April 20, 1987 for Fields. Furthermore, this is consistent with the appellees' own testimony: Fields and Lightfoot repeatedly testified they were entitled to payment for their stock beginning in April of 1987 with respect to Fields, and in September or October of 1986 as to Lightfoot. Since the appellees' original petition was not filed until November of 1991, Lightfoot's claims under the Texas Securities Act are barred by the five-year limitations period. [14] We therefore sustain the appellants' applicable points of error insofar as they pertain to Lightfoot's securities fraud claim; we overrule them as to Fields'

---

[14] There is a discrepancy between Lieb's letter and the accompanying documents regarding the date when Lightfoot's stock was sold. The letter states that the sale occurred in September of 1986, while the accompanying documents indicate that the stock sale occurred

[**107] claim. [15] We will address appellants' remaining arguments only as they apply to Fields.

One final question concerns the status of appellant, Rodolfo Davila, as trustee of [*530] his deceased father's estate. The appellees' original petition named only Frank Davila II and Rodolfo Davila, individually, as appellants. The "Rodolfo L. Davila Estate Trust" was not joined as a defendant until December 14, 1992, when the appellees [**108] filed their second amended petition. The Davilas therefore argue that the trustee and the trust cannot be liable to either appellee under the five-year limitations period contained in the securities statute, because they were joined as appellants more than five years after Lieb's letter to the Control Group. Again, however, we disagree.

HN45 Although an amended pleading normally supersedes and supplants the original, an original pleading tolls the limitations period for claims asserted in subsequent, amended pleadings as long as the amended pleading does not allege a wholly "new, distinct, or different transaction or occurrence." *See TEX. CIV. PRAC. & REM. CODE ANN. § 16.068* (Vernon 1986). The subsequent pleading "relates back" to, and is considered as having been filed at the time of the initial pleading, at least for limitations purposes. *See Stevenson v. Koutzarov, 795 S.W.2d 313, 319 (Tex. App.--Houston [1st Dist.] 1990, writ denied)*; *Meisler v. Republic of Texas Savings Ass'n, 758 S.W.2d 878, 881-882 (Tex. App.--Houston [1st Dist.] 1988, no writ)*. This rule applies to claims under the Texas Securities Act. *See Nicholas v. Crocker, 687 S.W.2d 365, 368 (Tex.* [**109] *App.--Tyler 1984, writ ref'd n.r.e.)* (Appellees' first amended petition under Texas Securities Act was not subject to plea of limitations, where original petition, based on fraud, was not subject to plea of limitations and amended petition was not based on new, distinct or different transaction or occurrence). A review of the appellees' original petition and their subsequent amended petitions, leaves no doubt that the same evidence supports all of their causes of action, the measure of damages is the same, and that the allegations are subject to the same defenses. We therefore conclude that Fields' securities fraud claims against the "Rodolfo L. Davila Estate Trust" are not barred by limitations.

***Liability and Damages for***

---

on October 1, 1986. In either event, however, Lightfoot's claims are barred by the five-year limitations period contained in article 581-33(H).

[15] These points include Baker's twenty-eighth, twenty ninth, and thirtieth points of error; the Davilas' eighth point; Pitman's twenty-third point; and Haass' third point.

## Securities Fraud

Appellants raise three arguments regarding appellees' securities fraud claims: (1) the appellees cannot recover damages under the Texas Securities Act, but may only obtain rescission since they still own the securities; (2) there is neither legally nor factually sufficient evidence that any member of the Control Group made untrue statements or omissions regarding the securities purchased; and (3) the trial court should have submitted [**110] each individual's liability separately. The second issue is what concerns us here.

Fields and Lightfoot sought damages for misrepresentations pursuant to the Texas Securities Act. *TEX. REV. CIV. STAT. ANN. art. 581-1, et seq.* (Vernon 1964 & Supp. 1996). Article 581-33(B) of the Act provides:

> **HN46** A person who offers to buy or buys a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) *by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading*, is liable to the person selling the security to him, who may sue either at law or in equity for rescission

or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

(Emphasis added).

**HN47** The statute provides remedies of both rescission and damages. Part D of article [**111] 581-33 provides that on rescission, a plaintiff who was a defrauded seller is to recover the security (or a security of the same class and series) upon tender of the consideration the seller received for the security plus interest thereon at the legal rate from the date the seller received the consideration, less the amount of any income the buyer received on the security. *Id. at 581-33(D)*(2). A plaintiff who was a defrauded seller may recover the value of the security at the time of the sale [*531] plus the amount of any income the buyer received on the security, less the consideration paid the seller for the security, plus interest on these sums at the legal rate from the date of

payment of the seller. *Id. at 581-33(D)*(4). [16] [**112]

The act does not define "offers to buy or buys." **HN48** However, the commentary to article 33(B) states that the provision is to be construed similarly to article 33(A), which provides remedies for defrauded buyers of securities. *See TEX. REV. CIV. STAT. ANN. art. 581-33(B)* cmt. (Vernon Supp. 1996) ("The phrase 'offers to buy or buys' is to be construed like the corresponding phrase for sales in §§ 33(A)(1) and 33(A)(2)."). Turning to the statutory definitions, we note that they define "sale," "offer for sale" or "sell" to "include every disposition, or attempt to dispose of a security for value." *Id. at 581-4(E)*. Moreover, one who "offers or sells" a security is not limited to those who pass title. *See Pinter v. Dahl, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988)*. The act further defines "sell" as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell, either directly or by an agent or salesman. *TEX. REV. CIV. STAT. ANN. art. 581-4(E)* (Vernon Supp. 1996). By analogy, the terms "offer to buy" or "buy" should therefore include every acquisition of, or attempt to acquire, a security for value. This would include the [**113] transaction in the present case.

**HN49** Like article 33(B), article 33(A)(2) renders a seller liable only if he sells or offers to sell a security *by means of* an untrue statement or omission. One court of appeals has held that the wording of subsection (A)(2) requires the defrauded buyer to prove that the untrue statements related to the security and induced the purchase. In other words, the plaintiff must show the untrue statements were made before the sale occurred. *See Nicholas, 687 S.W.2d at 368*. In *Nicholas*, the court held that a buyer of an interest in oil and gas wells failed to establish a violation of article 581-33(A)(2) because he did not show the seller's representations were made before the sale. **HN50** The court construed the article 581-33(A)(2),

> to mean that in order for the plaintiff/buyer to prevail, he must introduce evidence that the untrue statements relate to the security purchased and induced the purchase thereof. Thus untrue statements made about a security by a seller to the buyer thereof at a time when the buyer has already purchased the security are not

---

[16] Two other provisions are worth noting. Part F imposes *joint and several liability* on anyone who "directly or indirectly controls a seller, buyer, or issuer of a security" and on anyone who "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id. at 531-33(F)*(1)(2). Part M provides that "the rights and remedies provided by this Act are in addition to any other rights (including exemplary or punitive damages) or remedies that may exist at law or in equity." *Id. at 581-33(M)*.

the "means" by which the security was sold. It follows, then, that if a buyer was not induced [**114] to purchase a security by an untrue statement made after the purchase, he could not have been misled thereby, and no further statements respecting such security are required to explain the original statement so made under the provisions of the above statute.

*Id. at 368*. *See also Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1418 (5th Cir. 1993)* (Citing *Nicholas v. Crocker*, and noting that "Article 581-33A(2) has been construed to mean that the alleged misrepresentation must relate to the security and 'induce the purchase thereof.'"). Given the statutory directive that article 33(B) and 33(A) "are intended to be construed similarly," *see TEX. REV. CIV. STAT. ANN. art. 33(B)* cmt. (Vernon Supp. 1996), these rules apply equally well to our analysis of Fields' and Lightfoot's claims. We therefore conclude, like the *Nicholas* court, that under article 33(B) of the Texas Securities Act, the alleged untruth or material omission must have related to the security and "induced the purchase thereof."

In the present case, the only allegations regarding statutory securities fraud are found in paragraph ten of the appellees' amended petition: [**115]

[*532] The Control Group agreed (and if not, fraudulently offered and misrepresented to FIELDS and LIGHTFOOT) to purchase Fields' and Lightfoot's shares of CROWN stock for Ten Dollars ($ 10.00) per share. FIELDS and LIGHTFOOT relied on that agreement and representation. Each member of the Control Group, CROWN, and each Trustee, directly or indirectly, with intent to deceive or disregard or reckless disregard for the truth, aided in the misrepresentations regarding the purchase. Further, CROWN and each Trustee who directly or indirectly controlled the Control Group, were aware of the agreements to purchase, and failed to ensure that the purchase price be paid. Because the purchase was not consummated as represented, the acts and failures to act by CROWN, the Control Group, and the Trustees directly and proximately caused damages to FIELDS and LIGHTFOOT.

Appellees claim there is more than enough evidence to support the jury's findings. They argue, for example, there is evidence from

which the jury could have concluded, or at least inferred, that the Control Group failed to disclose their intent not to pay Fields and Lightfoot unless they could secure an overall restructuring [**116] of the entire $ 5.2 million loan for their own benefit. Unfortunately, however, they provide no citations to the record in support of these assertions.

In this case, there is simply no evidence there were any untrue statements or omissions regarding the stock itself. We recognize that a person who offers to buy or buys a security by means of any untrue statement of a material fact may be liable to the person selling the security who does not know of the untruth. Similarly, liability may be imposed on a buyer who fails to state a material fact that is necessary to prevent other statements from being misleading in light of the circumstances under which they were made. *See* WILLIAM V. DORSANEO III, *TEXAS LITIGATION GUIDE §  171.03[1][d]* (1995). In the present case, however, the evidence does not show a violation of the Texas Securities Act, but simply a **_breach of contract_**. The evidence alluded to by the appellees concerns how they were to be paid for the stock and the fact they were continually told after the sale that it would go through --

not evidence of an untrue statement or material omission relating to the stock itself at the time of purchase. Simply offering to purchase [**117] stock and then failing to pay for it does amount to an untruth or material omission, nor can omissions which occur only after the sale be the "means" by which a purchaser "offers to buy or buys" the security. To hold otherwise would transform every **_breach of contract_** involving a sale of securities into a statutory violation, a result certainly not intended by the Texas Legislature when it drafted article 33(B). We therefore hold, as a matter of law, that Fields has not established a violation of article 33(B) of the Texas Securities Act. Accordingly, we sustain the appellants' relevant points of error insofar as they attack the legal sufficiency of the jury's answers to questions fifteen and sixteen of the court's charge -- liability and damages for statutory securities fraud. [17] We reverse that portion of the court's judgment and render judgment that Fields **_take nothing_**. [**118]

### Rescission

Since we have already determined that Lightfoot's securities fraud claims are barred by limitations, and that Fields' cause of action fails as a matter of law, we need not address

---

[17] These include Baker's twenty-third through twenty-sixth points; the Davilas' seventeenth point; Pitman's seventeenth point; and Haass' fifteenth point.

the rescission argument raised by the appellants.

## *Damages*

Appellants raise several arguments regarding the damages awarded by the trial court. Prominent among these complaints is their contention that the trial court erred in cumulating the jury's actual damages findings in questions five, six, ten, thirteen, sixteen and then awarding the total sum to the appellees.

The trial court rendered judgment against appellants on April 12, 1993. Unless otherwise indicated, the following awards were against all of the appellants, jointly and severally, except Rodolfo Davila individually:

[*533]

| | LIGHTFOOT | FIELDS |
|---|---|---|
| ***Breach of Contract*** | $ 253,000.00 | $290,000.00 |
| Prejudgment interest (10%) [18] | $ 131,698.63 | $150,958.90 |

[**119]

| | LIGHTFOOT | FIELDS |
|---|---|---|
| Attorneys' fees | $ 153,879.45 | $176,383.56 |
| Trustees' Breach of Fiduciary Duties [19] | -0- | $200,000.00 |
| Prejudgment interest (10%) | -0- | $104,109.58 |
| Attorneys' fees | -0- | $121,643.00 |
| Directors' Breach of Fiduciary Duties [20] | $ 3,000.00 | $ 42,551.59 |
| Prejudgment interest (10%) | -0- | $ 22,150.15 |
| Attorneys' fees | $1,200.00 | $ 22,880.70 |
| Exemplary Damages for Directors Breach of Fiduciary Duties | | |
| Fred L. Baker | -0- | $ 1,750.00 |
| Michael H. Bertino | -0- | $ 1,500.00 |
| Frank Davila II | -0- | $ 5.00 |
| Lawrence F. Haass | -0- | $ 250.00 |
| Kim I. Manning | -0- | $ 250.00 |
| J. Pat O'Connell | -0- | $ 1,000.00 |
| J. Brain O'Connor | -0- | $ 500.00 |
| B.F. Pitman III | -0- | $ 1,750.00 |
| Texas Securities Act | $253,000.00 | $ 332,551.59 |
| Prejudgment interest (10%) | $131,698.63 | $ 173,109.04 |
| Attorneys' fees | 153,879.45 | $ 202,264.25 |

[**120] Appellants raised the issue of double recovery of damages in their motions for new trial and for judgment notwithstanding the verdict. Both then and

---

[18] The awards of prejudgment simple interest were calculated from January 20, 1988 until the date of judgment.

[19] This award is against defendants Fred L. Baker and Frank Davila II, jointly and severally.

[20] This award is against defendants, Fred L. Baker, Michael H. Bertino, Frank Davila II, Lawrence F. Haass, Kim I. Manning, J. Pat O'Connell, J. Brian O'Connor, and B.F. Pitman III, jointly and severally.

now, they base their arguments on two closely related principles of law: (1) that an injured party is entitled to only one satisfaction for his loss, *Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1 (Tex. 1991)*; and (2) when an injury consists only of economic loss to the subject of a contract, the action sounds in contract alone. *Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986)*. It is the first rule which we address here.

### *Cumulation of Damages; Double Recovery*

*HN51* The single recovery, or one satisfaction rule, is a rule of general acceptance that an injured party is entitled to one satisfaction for sustained injuries. *Stewart Title, 822 S.W.2d at 7*. A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter a judgment. *Star Houston, Inc. v. Shevack, 886 S.W.2d 414, 422 (Tex. App.--Houston [1st Dist.] 1994)*, *writ denied per curiam*, *907 S.W.2d 452 (1995)*; **[\*\*121]** *American Baler Co. v. SRS Systems, Inc.*, 748 S.W.2d 243, 246 (Tex. App.--Houston [1st Dist.] 1988, writ denied); *Thate v. Texas & Pacific Ry. Co., 595 S.W.2d 591, 595 (Tex. Civ. App.--Dallas 1980, writ dism'd)*. An election is not necessary until after the verdict. *International Piping Systems, Ltd. v. M.M. White & Assoc., Inc., 831 S.W.2d 444, 452 (Tex. App.--Houston [14th Dist.] 1992, writ denied)*. But where the

prevailing party fails to make that election, the trial court should use the findings affording the **[\*534]** greater recovery and render judgment accordingly. *Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 367 (Tex. 1987)*; *see also* *Southern County Mutual Ins. Co. v. First Bank & Trust of Groves, 750 S.W.2d 170, 173-74 (Tex. 1988)* (noting that bank's pleadings set forth alternative grounds of recovery, and that appeals court reversibly erred in rendering a judgment based on both grounds of recovery pled). If the trial court fails to do so, the appellate court will reform the trial court's judgment to effect such an election. *Star Houston, 886 S.W.2d at 422*; *Koutzarov, 795 S.W.2d at 322*; *American Baler Co.*, 748 S.W.2d at **[\*\*122]** *246, 250*.

In support of their argument that they should recover for all theories under which the jury awarded damages, appellees cite *Birchfield v. Texarkana Memorial Hospital, 747 S.W.2d 361 (Tex. 1987)*. In *Birchfield*, the plaintiffs sued a hospital alleging gross negligence and DTPA [21] violations. Although the jury was asked only a single question on actual damages, it awarded both exemplary damages under the gross negligence claim and treble damages under the DTPA claim. *Id. at 367*. The court held that "in the absence of separate and distinct findings of actual damages on both the acts of negligence and the deceptive acts or practices, an award of exemplary damages and statutory damages would be necessarily

---

[21] Damages under the DTPA are cumulative, and simultaneous recovery with another legal theory is generally allowed. *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 937 (Tex. App.--Houston [14th Dist.] 1994, writ denied). But, to obtain such a cumulative recovery, separate findings of actual damages for each act complained of are required. *Birchfield, 747 S.W.2d at 361, 367*.

predicated upon the same finding of actual damages and would amount to a double recovery of punitive damages." *Id.* Fields and Lightfoot argue that because they obtained separate jury findings of actual damages on each cause of action, they were entitled to recover on each cause of action. *Birchfield*, however, simply does not support this conclusion. The case addresses only the issue of when statutory and exemplary damages are both available in DTPA cases. **[**123]** It does not hold that jury findings on multiple theories of recovery automatically support duplicate awards of actual damages. As we have already noted, although a party may assert any and all causes of action it may have against another, it is limited to only one recovery of damages. *See Jones v. Rainey, 168 S.W.2d 507, 509-10 (Tex. Civ. App.--Texarkana 1942, writ ref'd n.r.e.).*

A review of the jury's findings leaves no doubt that the damages awarded by the trial court were cumulative. Beginning with the contractual damages awarded to Fields in question six, $ 290,000.00, we note again that the only evidence which could support **[**124]** this finding is the unpaid balance on his First State note, $ 90,000.00, plus $ 200,000.00 for the loss of outside business interests, as calculated by his expert witness, Dr. Hubbard. As for Lightfoot, the only support in the record for the $ 253,000.00 which the jury awarded him in question number five is the unpaid balance on his First State note, $ 250,000.00, plus $ 3,000.00 which he paid as attorneys' fees to defend the lawsuit brought by the RTC.

The damages for the trustees' and directors' breach of fiduciary duties are strikingly similar to the contractual damages. The trustees' breach of fiduciary damages were zero for Lightfoot and $ 200,000.00 for Fields. Coincidentally, however, this $ 200,000.00 figure is exactly what Fields testified to as the damages for loss of his outside business interests. The damages for the directors' breach of fiduciary duties were $ 3,000.00 for Lightfoot and $ 42,551.59 for Fields. As we have already noted, however, Lightfoot testified that he paid $ 3,000.00 in attorneys' fees to defend the lawsuit brought by the RTC. Similarly, Fields testified that the interest calculated by the RTC in the original purchase of his stock was $ 42,551.59.

**[**125]** The jury's answers to the securities fraud questions are even more intriguing. Lightfoot's damages, $ 253,000.00, correspond precisely to the contractual damages that he received in the jury's answer to question number five. If one adds Fields' contractual damages, $ 290,000.00, and his damages for the directors' breach of fiduciary duties, $ 42,551.49, the total is $ 332,551.59. This is precisely what the jury awarded him in its answer **[*535]** to question number six for statutory securities fraud.

A review of the appellees' pleadings only reinforces our conclusion that their damages are based on the same acts or omissions. The appellees' second amended petition prefaces Fields' and Lightfoot's actual damages with the statement they are based on "the acts of ***breach of contract***,

misrepresentation, negligent misrepresentation, fraud, breach of fiduciary duty, negligence, gross negligence, and securities fraud." What follows, however, is a discussion that looks suspiciously contractual in nature -- purchase price of the stock; principal and interest due; and, in the case of Fields, loss of business interests because of the appellants' failure to discharge his note at First State. **[**126]** Except for the punitive damages, which the jury awarded only in small amounts, there are no damages peculiar to tort claims of any kind. Indeed, each element mentioned is of a type one would normally expect to see in a lawsuit for *__breach of contract__*. The essence of all these claims is the failure of the appellants to pay for Fields' and Lightfoot's stock under the contract.

Our review of the pleadings and the record leaves no doubt that the appellees' claims for *__breach of contract__*, breach of trustees' and directors' fiduciary duties, and statutory securities fraud are all based on the same acts or omissions. We therefore sustain the appellants' points of error regarding cumulation of actual damages. [22] Because we have already concluded that the appellees' securities fraud claims fail as a matter of law, and as between the remaining claims, the damages awarded by the jury for the *__breach of contract__* are clearly greater, we hold that appellees are entitled to recover only the damages for *__breach of contract__*. Thus, we reverse that portion of the trial court's judgment which awarded Fields and Lightfoot actual and exemplary damages for breach of fiduciary duty, and render judgment that **[**127]** Fields and Lightfoot *__take nothing__* for this claim. Our application of the double recovery rule also eliminates the exemplary damages which the jury awarded Fields in its answer to the second part of question fourteen. *HN52* Punitive damages are not recoverable for a *__breach of contract__* absent an independent tort with accompanying actual damages. *Texas Nat'l Bank v. Karnes, 717 S.W.2d 901, 903 (Tex. 1986)* (per curiam). Because of our holding, we do not address the appellants' points regarding either breach of trustees' or directors' fiduciary duties -- questions seven through fourteen of the court's charge. [23] These points are denied as moot.

## [**128] *Attorneys' Fees*

Appellants also argue that the trial court erred in awarding judgment to the appellees for attorneys fees because, as a matter of law, attorneys' fees are not recoverable for any of the appellees' causes of action except *__breach of contract__*. We have already concluded that the appellees' claims for breach of fiduciary duty and securities fraud cannot stand close scrutiny. This leaves only the attorneys' fees for *__breach of contract__*, which the appellants argue

---

[22] This includes Baker's thirty-second and thirty-third points; the Davilas' ninth point of error, Pitman's twenty-sixth point; and Haass' sixth point.

[23] This includes points ten through twenty-two, twenty-eight through thirty, in Baker's brief; points five through seven, fourteen through sixteen, in the brief filed by the Davilas; points ten and eleven, thirteen through sixteen, and twenty-four, in the brief filed by Pitman; and point fourteen in Haass' brief.

should have been awarded on a prorata basis rather than imposed jointly and severally. Appellants, however, failed to object to questions eighteen and nineteen of the court's charge, which asked the jury to assess a "reasonable fee for the necessary services" of the appellees' attorneys, stated as a percentage of recovery." The jury's answer, forty percent, therefore stands unless there is some indication in the record that appellants preserved the issue by objection.

Our review of the record finds they made no such objection. The only objection to questions eighteen and nineteen was as follows: "On the attorney's fees, there is no evidence that the fee charged for the necessary services was reasonable. [**129] Counsel did not give any testimony on whether that was a [*536] reasonable fee or not . . ." There was no mention of prorating attorneys' fees, nor did appellants submit a question or instruction in that regard. *HN53* It is well-settled that to preserve error in the charge, a party must make objections to the court's charge or submit requests for additional questions, instructions, or definitions. The test is whether the party made the trial court "aware of the complaint, timely and plainly," and obtained a ruling. *State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). Because appellants failed to do this, we overrule their points of error. We now address their remaining arguments.

***Prejudgment Interest***

Appellant, Lawrence Haass, claims the trial court erred in awarding prejudgment interest to appellees "on any of the theories of recovery advanced." Our resolution of the appellees' breach of fiduciary duty and securities fraud claims leaves prejudgment interest for ***breach of contract*** as the only remaining issue.

In his appellate brief, Haass' point is grouped with three other points of error which attack attorneys' fees, exemplary [**130] damages, and the trial court's decision to cumulate damages -- issues we have already discussed. There is no argument or authority regarding attorneys' fees, save for the cryptic statement that "appellees were awarded pre-judgment interest and attorneys' fees on each respective theory," an apparent reference to cumulation of damages. Haass' brief purports to adopt pages 21 - 28 of the brief filed by the Davilas, and pages 47 and 48 of Baker's brief. However, the Davilas do not discuss prejudgment interest for ***breach of contract***, except to remind us the ***breach of contract*** claim is barred by limitations -- an issue we have already resolved. Baker says only that prejudgment interest, like attorneys' fees, should have been prorated. Once again, however, he fails to tell us how or why it should have been prorated, and his brief offers no argument or authority on the subject. If in fact, the trial court erred in awarding prejudgment interest for ***breach of contract***, appellees' only remaining claim, appellants have not even told us how the trial court erred, much less whether the error "was reasonably calculated to cause and probably

did cause rendition of an improper judgment in the case." **[\*\*131]** TEX. R. APP. P. 81(b)(1). Their points, therefore, are overruled.

### *Default Judgment Against Crown Bancshares*

Appellants also argue that the trial court erred in awarding a default judgment against Crown Bancshares, the holding company. After the close of the evidence, the appellees' counsel moved for a judgment by default or, in the alternative, an instructed verdict against Crown Bancshares. Crown Bancshares had filed an answer in the case but made no appearance in the trial. The court reserved ruling until after the verdict, at which time it granted the default. We note, however, that Crown Bancshares, Inc. has not perfected an appeal from the trial court's judgment, only individual members of the Control Group have done so. Therefore, their points are overruled.

### *Jury Deliberations; Motion for Mistrial*

Appellants also argue that the trial court erred in overruling their motions for mistrial based on improper jury communication. Shortly after the jury received the court's exhibits, the charge, and retired to deliberate, it asked the trial court whether there was an exhibit list that could be used as a reference to locate certain exhibits. The only **[\*\*132]** exhibit list in existence was appellees' exhibit number 128, a list which contained all of the appellees' exhibits that were offered at trial, along with a description of each item.

The list also contained handwritten comments in the margins which indicated whether the exhibits had been admitted or denied, and a series of initials which seem to indicate during whose testimony they were admitted, e.g., "LF," "RF," or "FB."

The trial judge granted the jury's request. The appellees prepared a revised exhibit list which contained only the exhibits which had been admitted at trial, along with a brief description of each item. The appellees submitted their list to the bailiff the following morning. The appellants had apparently **[\*537]** been given an opportunity to submit their own exhibit list, but were late in doing so.

The bailiff provided the appellees' exhibit list to the jury upon receipt. The appellants telephoned the court clerk and advised the court they would be late in submitting their exhibit list. At that time, they were informed that the appellees' list had already been given to the jury. The trial judge, who was not in chambers, was contacted and instructed the bailiff **[\*\*133]** to withdraw the appellees' exhibit list.

The appellants moved for mistrial. The bailiff testified that he thought he had complied with the court's instruction and that the appellees' exhibit list was in the jury room for approximately fifteen minutes before it was removed. The appellants argued that the appellees' descriptions of the exhibits contained editorial comments about the exhibits and their evidentiary significance which harmed

the appellants' case. [24] They noted that the appellees' list omitted exhibit sixteen, the letter where Frank Davila II had given notice of the June, 1986 Control Group meeting, a document which was admitted into evidence. The trial court denied the motion for mistrial.

 [**134] Appellants argue that the exhibit list harmed their case because it "contained editorial comments concerning appellees' opinions as to the effect of the exhibits," and because the appellants were never given an opportunity to inspect the list before it was given the jury. Appellees maintain the trial court did not abuse its discretion in denying the appellants' motion for mistrial because there is no evidence of an improper jury communication, or that the brief presence of the exhibit list in the jury room was "reasonably calculated to cause and probably did cause rendition of an improper" verdict. We agree.

*HN54* Generally, the granting or denying of a motion for mistrial is reviewed under an abuse of discretion standard. *See Ussery v. Gray, 804 S.W.2d 232, 237 (Tex. App.--Fort Worth 1991, no writ)* (disqualification of attorney); *Mendoza v. Ranger Ins. Co., 753 S.W.2d 779, 781 (Tex. App.--Fort Worth 1988, writ denied)* (jury selection). In addition to showing an abuse of discretion, appellants must also show that the trial court's error, if indeed there was error, "was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." [**135] *See* TEX. R. APP. P. 81(b)(1). In this case, however, neither showing has been made. The points are overruled.

## Cumulative Error

In one of their final points, appellants argue that the combined or cumulative effect of the trial court's alleged errors deprived them of a fair trial and due process of law. *HN55* While some errors are not considered reversible, all errors considered together could present cumulative error requiring reversal. *Fibreboard Corp. v. Pool*, 813 S.W.2d at 695; *Klein v. Sporting Goods, Inc., 772 S.W.2d 173, 179 (Tex. App.--Houston [14th Dist.] 1989, no writ)*. "To determine if a cumulation of errors denied the appellants their right to a fair trial and due process of law, all errors in the case will be considered along with the record as a whole to determine if the errors collectively were calculated to cause and probably did cause the rendition of an improper judgment." *Fibreboard*, 813 S.W.2d at 696; TEX. R. APP. P. 81(b)(1). Before we may reverse a judgment and order a new trial based on cumulative error, however, we must determine whether the error committed by the trial court was reasonably calculated to cause and probably did cause [**136] the rendition of an improper judgment. *Fibreboard*, 813 S.W.2d at 695-96; TEX.

---

[24]  For example, they took issue with the title: "Fields and Lightfoot v. Crown Bank Control Group." They also complained of the appellees' descriptions of exhibits 17 ("O'Connor correspondence to Crown Board of Directors re: Lightfoot shares will soon be ready for sale"), 27 ("Lieb informs Control Group of purchase of Lightfoot and Fields shares"), 45 ("First State Savings (Dennis Jones) letter to Boldrick offers to restructure loans upon: 1) transfer of the stock or a letter instructing First State Savings to transfer stock to Lieb; and 2) payment of all past due interest"), and 84 ("Bertino takes over Fields' stock in Orion Medical Group").

R. APP. P. 81(b)(1). Appellants must therefore show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to them. [*538] *See Fibreboard*, 813 S.W.2d at 695. This they cannot do.

Although appellants attack specific rulings of the trial court, e.g., the motion in limine, they do not assert that, but for the cumulative effect of these errors, the jury would probably have rendered a verdict in their favor. Nor do we believe appellants have met their burden in this regard. We have considered all their allegations of error and we specifically find that the errors committed by the trial court do not constitute cumulative error. As another court noted, albeit under different circumstances: ″there are few errorless trials, especially those of the length of this proceeding.″ *Id. at 696*. We have carefully reviewed the record and each of appellants' 104 points of error, and we do not find cumulative error that would have probably caused the jury to render a verdict in favor of the appellants. Because we do not find any cumulative error [**137] that probably caused the jury to render an improper verdict, appellants' points are overruled.

### Notice Under the Texas Trust Code

The Davilas also argue that the trial court erred in rendering judgment against the Rodolfo L. Davila Estate Trust because there is neither factually nor legally sufficient evidence that appellees gave notice to the beneficiaries of the trust under § 115.015 of the Texas Trust Code.

The purpose of § 115.015 is to assure trust beneficiaries that ″their interest will be protected, [and] that a potential conflict of interest will not threaten the adequacy of their interests' representation.″ *Nacol v. McNutt, 797 S.W.2d 153, 154 (Tex. App.--Houston [14th Dist.] 1990, writ denied)*. ″The trustee is required to provide a list of beneficiaries within eleven days of the request for such list. A plaintiff satisfies the notice requirements of this section when he notifies those persons on the list provided by the trustee within the time prescribed by the statute.″ *Corum Management Co., Inc. v. Aguayo Enterprises, Inc., 755 S.W.2d 895, 900-901 (Tex. App.--San Antonio 1988, writ denied)*.

The appellees' original petition and first amended [**138] petition named only ″Rudy″ Davila and Frank Davila II, individually, as appellants, but the second amended original petition, filed on December 14, 1992, added the Rodolfo L. Davila Estate Trust as a defendant. This amended petition announced that,

> notice is hereby given that the Trustee, Rodolfo Davila, provide Appellees a list of all beneficiaries and their addresses within (10) days of the receipt of this AMENDED PETITION. However, to the extent that the Trustee's production of a list of beneficiaries is not forthcoming or is not timely provided to Appellees; Appellees request that the Court enter an order setting a deadline, which is more than (30) days prior to the date of judgment,

by which notice must be given to the beneficiaries.

There is no indication in the record whether the trial court ever entered such an order. The Davilas' answer informed the trial court that "the appellees have failed to give proper notice to the beneficiaries of the Rodolfo L. Davila Estate Trust as is required under the Texas Trust Code." In an amended motion for new trial and/or to "modify, correct and reform the judgment" the Davilas again claimed "there was no evidence that the [**139] appellees and/or intervenor [trustee of Fields' bankruptcy estate] gave notice to the beneficiaries of the Rodolfo L. Davila Estate Trust that is required by the Texas Trust Code."

Apart from these tantalizing bits of information, however, we have no further indication from the parties whether notice to the trust beneficiaries was required, ordered, or even given. There is no mention of the evidence, arguments, or authorities that were presented to the trial court regarding the judgment that was rendered. We also note that although appellees claim they "provided notice to the beneficiaries identified by the trustee by certified mail, which was received by all identified beneficiaries," their brief provides no citations to the record that would support this assertion. Even so, the burden is on appellants, not the appellees, to show error that "was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." *See* TEX. R. APP. P. 81(b)(1). The Davilas have failed to [*539] meet this burden. Their point, therefore, is overruled.

### Cross Claims and Counterclaims for Contribution and Indemnity

The Davilas also argue that [**140] the trial court erred because it failed to grant judgment for them based on their cross-claims and counterclaims for indemnity and contribution. Again, we disagree.

The Davilas, like the other appellants, filed cross-claims against their fellow appellants and counterclaims against the appellees. The basis for the Davilas' cross-claim was that if any defendant was adjudged liable to the appellees on the contract claim and/or the tort claims, they would be entitled to contribution from those co-defendants who were also held responsible.

The basis for the counterclaims filed by the Davilas and the other appellants apparently concerns the appellees' status as members of the Control Group. As Control Group members, the appellees were responsible, albeit at reduced ownership, for the purchase of each other's stock. Since they have not paid their respective shares of the purchase price for each other's stock, they are, according to appellants, liable along with them.

As a practical matter, however, the appellees did not sell the stock to themselves and should not, therefore, be liable to themselves for any part of the appellants' liability. More to the point, no appellant introduced [**141] evidence or requested jury questions on contribution or indemnity issues. No appellant argued at

trial that the appellees' damages should be reduced or in some way impacted by indemnity or contribution. It was the appellants' burden to request jury issues in substantially correct wording and to secure a ruling on them by the trial court. *TEX. R. CIV. P. 278*, *279*; *General Resources Organization, Inc. v. Deadman, 907 S.W.2d 22, 33 (Tex. App.--San Antonio 1995)*, *writ denied*, No. 95-973- CV, 1996 WL 242513 (1996). They failed to do either. As a result, any counterclaims or cross-claims for contribution and indemnity, whatever their basis, were waived. The points are overruled.

### Haass' Motion for Directed Verdict & Judgment NOV

Haass also argues that the trial court erred in denying his motion for directed verdict and for a judgment notwithstanding the verdict. His appellate brief attacks the legal and factual basis for three of the appellees' claims -- breach of fiduciary duty, ***breach of contract***, and statutory securities fraud. However, since we have already examined the appellees' claims for ***breach of contract*** and securities fraud, and since a discussion of the **[**142]** breach of fiduciary duty claim is unnecessary in view of our application of the double recovery rule, we deny these points of error as moot.

### Conclusion

In summary, we affirm only that portion of the trial court's judgment which awards liability and damages for ***breach of contract***. Lightfoot is therefore entitled to $ 253,000.00 damages for ***breach of contract***, $ 131,698.63 for prejudgment interest, and $ 153,879.45 in attorneys' fees, together with 10 percent postjudgment interest. Fields will receive $ 290,000.00 damages for ***breach of contract***, $ 150,958.90 for prejudgment interest, and $ 176,383.56 for attorneys' fees, plus ten percent postjudgment interest. These sums are recoverable against all of the appellants, jointly and severally, except Rodolfo Davila individually. However, we reverse those parts of the trial court's judgment which award liability and damages for breach of trustees' and directors' fiduciary duties, and for violations of the Texas Securities Act. We render judgment that Fields and Lightfoot ***take nothing*** for these claims.

Alma L. Lopez,

Justice

## *SBC Operations, Inc. v. Business Equation, Inc.*

Court of Appeals of Texas, Fourth District, San Antonio

December 19, 2001, Delivered ; December 19, 2001, Filed

No. 04-00-00698-CV

### Reporter

75 S.W.3d 462; 2001 Tex. App. LEXIS 8358

SBC OPERATIONS, INC. f/k/a Southwestern Bell Communications, Inc. and Southwestern Bell Telephone Company, Appellants v. THE BUSINESS EQUATION, INC., A California Corporation, Appellee

**Subsequent History:** [**1] Petition for Review Granted June 13, 2002. Petition for Review Denied November 21, 2002. Petition for review denied by, 08/29/2002 Motion for rehearing on petition for review denied by, 11/21/2002

**Prior History:** From the 131st Judicial District Court, Bexar County, Texas. Trial Court No. 98-CI-13442. Honorable John D. Gabriel, Judge Presiding.

**Disposition:** Reversed and rendered.

### Core Terms

launch, lost profits, customers, telemarketing, calculations, assumptions, marketing, projections, mailing, terminal, reliable, services, estimates, royalties, vendors, unreliable, trial court, damages, expenses, statute of frauds, business plan, no evidence, three year, enrollment, costs, rates, awarding damages, one year, admissibility, econometric

### Case Summary

### Procedural Posture

Plaintiff advertising company sued defendants, telephone companies, for fraud and breach of contract. Following a jury trial in the 131st Judicial District Court, Bexar County, Texas, judgment was entered in favor of the advertising company. The telephone companies appealed.

### Overview

The jury found that the telephone companies breached an oral agreement with the advertiser, and awarded damages. On appeal, the telephone companies argued that the statute of frauds barred such a recovery, and the court of appeals agreed. The advertiser agreed to take over the certain functions for the full launch of a discount program. In the November 1997 business strategy presentation, the full launch of the program would begin in April of 1998 and continue through the end of 1999, a period in excess of one year. Consequently, the contract fell with the

statute of frauds and, absent a sufficient writing was unenforceable. The telephone companies contended there was legally and factually insufficient evidence to support the jury's award of lost profits and terminal value. The court of appeals agreed and concluded that the no-evidence challenge was dispositive of all remaining issues on appeal. The expert evidence offered was not sufficient to show lost profits either because of flaws in the experts' assumptions, misuse of actual data from a test program or lack of facts, figures, and data from historical profitability.

## Outcome

The court of appeals reversed the decision of the trial court and rendered judgment for the telephone companies.

## LexisNexis® Headnotes

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

*HN1* The statute of frauds provides that certain promises and agreements are not enforceable unless they are in writing. *Tex. Bus. & Com. Code Ann. § 26.01(a)* (Vernon 1987).

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > Performance

*HN2* An agreement that is not to be performed within one year from the date of its making must be in writing to be enforceable. Id. If a contract explicitly calls for performance over a period longer than one year, the mere theoretical possibility of termination of the contract within one year because of death or another fortuitous event does not take the contract out of the statute of frauds.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN3* In reviewing a no-evidence challenge, the appellate court considers only the evidence in the light most favorable to the finding, and disregards all evidence and inferences to the contrary. If there is a scintilla of evidence to support the finding, the finding will be upheld.

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

*HN4* Loss of profits damages need only be proven with reasonable certainty, and the rule regarding such proof is intended to be flexible so as to accommodate the various circumstances in which claims for lost profits arise. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > General Overview

*HN5* The ″reasonable certainty″ test to determine lost profits has clear parameters. Profits that are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others that make a business venture risky in prospect preclude recovery of lost profits in retrospect.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > General Overview

*HN6* Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery.

**Counsel:** FOR APPELLANT: Daniel W. Lanfear, Hubert W. Green, The Kleberg Law Firm, P.C. San Antonio, TX. Jacqueline N. Strch, Sharon E. Callaway, Crofts & Callaway, P.C. San Antonio, TX.

FOR APPELLEE: Renee Fortnach McElhaney, Rosemarie Kanusky, W. Wendell Hall, Fulbright & Jaworski, L.L.P., San Antonio, TX. Paul Bartlett, Jr., Law Office of Paul N. Bartlett, Jr., San Antonio, TX. Richard J. Karam, Law Offices of Richard J. Karam, San Antonio, TX.

**Judges:** Opinion by: Tom Rickhoff, Justice. Dissenting opinion by: Phil Hardberger, Chief Justice. Sitting: Phil Hardberger, Chief Justice, Tom Rickhoff, Justice, Sarah B. Duncan, Justice.

**Opinion by:** Tom Rickhoff

## Opinion

 **[*464]** SBC Operations, Inc. (″SBC″) and Southwestern Bell Telephone Company (″SBTC″) appeal a judgment rendered on a jury verdict. The jury found SBC liable to The Business Equation, Inc. (″BEI″) for fraud and breach of contract. SBC and SBTC present twelve issues challenging the jury's liability and damage findings. We conclude the evidence is legally insufficient to support the award of lost profits and terminal value, and the oral contract between the parties is barred by the statute of frauds. Therefore, we reverse the judgment and render a take-nothing judgment in favor of SBC and SBTC.

### BACKGROUND

In January 1997, John Allshouse presented the idea of a member services program to SBC. Allshouse and his partner Clark ″Dub″ Doyal ultimately formed A&D Alliance Resources, Inc. (″ADAR″). The member services program was **[**2]** designed to offer discounts on various goods and services from participating vendors to SBC small and medium size business customers. The program was later given the name BizLink.

As ADAR worked to locate vendors to join the program, ADAR discovered that BEI

was engaged in a similar program on a much smaller scale. Judy Wallace and Joyce Axtell were the primary officers of BEI. BEI had contracts in place with vendors that ADAR thought would be good vendors to include in BizLink. On April 10, 1997, ADAR and BEI entered into a [*465] letter agreement "to authorize [ADAR] to use agreed upon contracts with vendors/partners to provide these services for a member services program for [a] client of [ADAR]." On April 15, 1997, BEI entered into a non-disclosure agreement with SBC. At that time, BEI first learned that the program was to be offered to SBC's customers. The non-disclosure did not commit either party to a specific arrangement but was intended to facilitate the free-flow of information during the planning and negotiating phases.

As the parties were working on business plans for BizLink, SBC was undertaking to acquire Pacific Bell ("PacBell"). In July 1997, SBC discussed BizLink [**3] with PacBell's marketing team to determine if BizLink should be offered to PacBell business customers. On July 10, 1997, the parties met with several of the participating vendors to discuss BizLink.

The planning documents envisioned that a direct mailing advertising BizLink would be sent to all the small and medium size business customers of SBC and PacBell. The customers would not be charged to join BizLink. The vendors would pay royalties based on the amount of sales to SBC and PacBell customers. The royalties would be divided as follows: SBC - 60%; ADAR - 20%; and BEI - 20%. The goal of the BizLink program was customer retention; however, the financial projections showed that BizLink would break-even in 1999 based on an early 1997 beginning date.

A formal Member Services Agreement ("MSA") was entered into between SBC and ADAR on August 28, 1997. Although BEI had wanted to be a party to the MSA, it was not made a party to the final agreement. An appendix of the MSA describes the services ADAR agreed to provide. ADAR is defined as the Seller in the MSA. The appendix states that BEI was approved as a subcontractor. On September 15, 1997, ADAR and BEI entered into a separate contract, [**4] setting forth their agreement with respect to the services each was to provide with respect to the BizLink program. The MSA was incorporated by reference into the agreement between ADAR and BEI.

In November 1997, a meeting was held to alleviate the vendors' concerns regarding the delay in beginning the program. A revised business plan was discussed with a test launch followed by a full launch of BizLink to all SBC/PacBell customers. The plans included a goal of a 10% enrollment rate; *i.e.*, if the direct mailing was sent to 100,000, the goal was that 1,000 customers would enroll. In 1998, the goals of BizLink were changed, and SBC management wanted the program to break-even in 1998.

The launch of BizLink involved a three-city mailing in February 1998: 40,000 mailings

in Houston, Texas; 14,934 mailings in Wichita, Kansas; and 25,481 mailings in Austin, Texas. As the responses were being measured, it appeared that the 10% goal would not be met. As a result, additional marketing efforts were undertaken, including a reminder post-card to the same 80,415 customers, another 8,900 mailings to new business customers in a five-state area, inbound telemarketing by SBC (offering BizLink [**5] to customers calling for different reasons), outbound telemarketing by SBC (calling and offering BizLink to customers), an advertisement in a magazine SBC provided to customers, and bill inserts. On March 20, 1998, the company SBC paid to perform the direct mailing, RMG, stopped measuring the response level. Based on the responses they measured, only 2.12% of the customers receiving the direct mail enrolled in BizLink.

SBC sent ADAR a formal letter terminating the MSA on May 6, 1998. BEI [*466] sued SBC for breach of contract and fraud. A jury found SBC liable and awarded BEI $ 3.6 million for breach of the MSA, $ 94,000 for breach of an oral call center agreement, $ 4.6 million for fraud, $ 4.75 million in exemplary damages, [1] and $ 1.02 million in attorneys' fees, with additional attorneys' fees contingent on appeal. BEI elected to recover the damages for the fraud claim. SBC and SBTC timely filed this appeal.

[**6] **LIABILITY FOR BREACH OF THE ORAL CALL CENTER CONTRACT**

In April of 1998, SBC and BEI were modifying the BizLink business plans to find ways to cut expenses and to break-even quicker. At a meeting, BEI orally agreed to take over the inbound call center for $ 10,000, plus an additional $ 10,500 per month. BEI operated the call center from April 1998 through August 1999.

The jury found that SBC breached its oral agreement with BEI, and awarded $ 94,000 in damages. On appeal, SBC and SBTC argue that the statute of frauds bars such a recovery, and we agree.

*HN1* The statute of frauds provides that certain promises and agreements are not enforceable unless they are in writing. *TEX. BUS. & COM. CODE ANN. § 26.01(a)* (Vernon 1987). *HN2* An agreement that is not to be performed within one year from the date of its making must be in writing to be enforceable. *Id*. If a contract explicitly calls for performance over a period longer than one year, the mere theoretical possibility of termination of the contract within one year because of death or another fortuitous event does not take the contract out of the statute of frauds. *Young v. Ward, 917 S.W.2d 506, 511* [**7] (Tex. App.--Waco 1996, no writ).

In this case, BEI agreed to take over the call center functions for the full launch of BizLink. In the November 1997 business

---

[1] The jury awarded BEI $ 2.85 million in exemplary damages against SBC and $ 1.9 million in exemplary damages against SBTC.

strategy presentation, the full launch would begin in April of 1998 and continue through the end of 1999, a period in excess of one year. The possibility that SBC could terminate BizLink within one year does not take the contract out of the statute of frauds. *Id*.

## SUFFICIENCY OF THE EVIDENCE - LOST PROFITS AND TERMINAL VALUE

SBC and SBTC contend there is legally and factually insufficient evidence to support the jury's award of lost profits and terminal value. We conclude that the no-evidence challenge is dispositive of all remaining issues on appeal. *HN3* In reviewing the no-evidence challenge, we consider only the evidence in the light most favorable to the finding on lost profits and terminal value, and we disregard all evidence and inferences to the contrary. *See* *Vickery v. Vickery, 999 S.W.2d 342, 375-76 (Tex. 1999)*. If there is a scintilla of evidence to support the finding, the finding will be upheld. *See id*.

### A. The Lost Profits "Reasonable Certainty" Test

*HN4* Loss of profits damages **[\*\*8]** need only be proven with reasonable certainty, and the rule regarding such proof is intended to be flexible so as to accommodate the various circumstances in which claims for lost profits arise. *Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994)*; *America's Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 629* (Tex. App.-- **[\*467]** San Antonio

1996, writ denied). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Szczepanik, 883 S.W.2d at 649*; *Samaras, 929 S.W.2d at 629*. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Szczepanik, 883 S.W.2d at 649*.

*HN5* The "reasonable certainty" test has clear parameters. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994)*. Profits that are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the **[\*\*9]** success of a new and unproven enterprise, cannot be recovered. *Id*. Factors like these and others that make a business venture risky in prospect preclude recovery of lost profits in retrospect. *Id*.

*HN6* Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new *Samaras, 929 S.W.2d at 629*. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery. *Samaras, 929 S.W.2d at 629*.

BEI called three experts to the stand. James Perdiew testified regarding the anticipated revenues and expenses for the

BizLink program during the three-year term of the MSA; Dr. Harvey Sundel was retained to project the revenues and costs associated with the BizLink program over three years; and David Marshall testified regarding the terminal value of the BizLink program.

## B. PERDIEW'S EXPERT OPINION

Perdiew created an econometric model of BizLink to determine the profits BizLink would have earned had SBC completed the full incremental [**10] launch. The model contains variables based upon SBC's representations, including a complete launch to two million SBC and PacBell customers, outbound and inbound telemarketing, and a three-year term. Among Perdiew's variables were the response and purchase rates, based on his experience or vendor information.

Perdiew's model has twenty ″drivers″ or assumptions that underlie his calculations, including: (1) a 10% response rate; (2) an estimated cost of $ 800 per thousand direct mail pieces that was only charged to the program in years two and three because SBC bore the cost in year one; (3) a 15% downward adjustment for the loss of SBC as the program sponsor after year one; (4) a 20% upward adjustment in year two and three due to improvements made in the marketing effort through experience; and (5) a separate response and activation rate for each vendor based on Perdiew's experience and SBC's estimates.

Perdiew's model also included cost variables. He attributed no marketing costs to ADAR or BEI for year one, because he understood SBC would bear that cost in the first year. In years two and three, he attributed 100% of the marketing cost to ADAR and BEI, because SBC would not sponsor [**11] the program after year one. He did not deduct general and administrative expenses for the three-year projection. He did not apportion 60% of the royalties due SBC in the first year or divide the royalties between ADAR and BEI in any of the three years for which he gave estimates.

Perdiew opined that the net value of the BizLink program for the full three years [*468] would be $ 14,153,470, based on $ 3,862,945 in year one; $ 3,642,031 in year two; and $ 6,648,494 in year three.

Although Perdiew has vast experience in direct marketing, we conclude that his testimony was not reliable because he did not factor in actual data from the test launch; thus, his testimony provides no evidence of lost profits.

## C. SUNDEL'S EXPERT OPINION

Sundel was retained to project the revenues and costs associated with BizLink over three years. Sundel explained his testimony differed from Perdiew's because Perdiew's assumptions included projections based on Perdiew's experience while his projections were based on the information obtained through the test launch of BizLink. Sundel was critical of the results reported from the test launch because the results were only measured for forty-eight days. He [**12] used the number of activators and the

average royalty per purchase reported from the test launch. Sundel applied these numbers to a full roll-out of the program to all SBC and PacBell customers, with the timing based on the launch strategy described in the business plan. He explained that he adjusted some of the figures for use in later mailings because of the number of non-deliverables and subsequent mailing lists would not include those non-deliverables. Sundel did not adjust his results for any anticipated growth, although he expected growth. Sundel included telemarketing because telemarketing was undertaken in the test launch and the modified business plan included telemarketing. Based on Sundel's experience in telemarketing, he estimated the enrollment rate that would be achieved by using telemarketing to new connects or new customers. He explained that the cost of the direct mailing was charged to SBC, while the cost of the telemarketing was charged to BEI and ADAR. Sundel included an attrition rate percentage in his calculations. Sundel testified that he based the purchase rate percentage each month on SBC's projected 65%, but he reduced the estimated percentage to a more conservative **[**13]** 50% based on his experience.

Sundel provided two calculations. One calculation included a $ 3.50 royalty that was based on SBC's forecast after the media test. The second calculation included a $ 6.61 royalty that was computed by dividing the dollar amount of the actual purchases following the test launch by the dollar amount of the royalties for the same period.

Sundel testified that the information regarding operating expenses was provided by BEI and ADAR and certain items he provided based on his experience. Sundel included general and administrative expenses and an expense to inform customers that SBC would no longer be associated with BizLink after the full launch. He also included a cost for purchasing new business lists.

Based on the $ 6.61 royalty, Sundel calculated that the present day value of the total net profit over the three year period was $ 22,971,315. Based on the $ 3.50 royalty, Sundel calculated that the present day value of the total net profit over the three year period was $ 9,546,445.

Despite the mathematical precision with which Sundel calculated BEI's lost profits, we conclude there is little, if any, factual basis for the assumptions underlying many of **[**14]** his figures. Sundel's estimates were not based on the realities of how well-or how poorly-the program performed during the media test but rather on assumptions, based on his experience, about the success of the program's potential expansion.

**[*469]** Sundel's projection of future revenue and expenses was based on assumptions that the program would continue to attract new enrollees, who would make increased purchases under the program. Unfortunately, these assumptions had no basis in fact. Certainly the

approximately eight thousand enrollees from a mailing of close to 160,000 did not justify these assumptions. Further, only 203 purchases resulted from all the mailings and additional contacts through the service centers. Although the purchase rate was 2.50%, Sundel's assumptions included a 50% purchase rate, based on his experience.

Although the concept of an affinity program such as BizLink is not new and the *possibility* of BizLink's success was ably demonstrated by Sundel, the *fact* of its success, based on the media test, was very much in doubt. Because Sundel's conclusions about BEI's lost profits were based on his assumptions, there is no evidence of objective facts, figures, and [**15] data from historical profitability; thus, Sundel's testimony provides no evidence of lost profits.

## D. Terminal Value

David Marshall testified regarding the terminal value of the BizLink program. Marshall took Sundel's lost profits projection for the third year of the BizLink program, less taxes, multiplied this number by three, and arrived at his value of BizLink's future income. Because we have determined that Sundel's projections constitute no evidence of lost profits, we conclude that Marshall's testimony is not sufficiently reliable for purposes of admissibility. Thus, there is no evidence of BizLink's terminal value.

## FRAUD AND BREACH OF MSA CLAIMS

The jury found that SBC breached the MSA and committed fraud against BEI, and awarded damages. On appeal, SBC and SBTC challenge both the liability findings and the damage award.

The jury was instructed to consider only lost profits and terminal value in their calculation of the amount of damages owed for breach of the MSA and fraud. Having found no evidence to support BEI's lost profits or BizLinks' terminal value, we need not detail the lack of evidentiary support for the amount of damages awarded by the jury, [**16] and we do not address SBC and SBTC's challenge to the liability findings.

## CONCLUSION

We reverse the judgment in favor of BEI and render a take-nothing judgment in favor of SBC and SBTC.

Tom Rickhoff, Justice

**Dissent by:** PHIL HARDBERGER

**Dissent**

## DISSENTING OPINION

This case tests the abuse of discretion standard for the trial court acting as the "gatekeeper" for expert testimony. The trial court took all the appropriate steps that a "gatekeeper" is supposed to take and, in my opinion, decided the admissibility question with ample evidence to make the court's decision a reasonable one. I do not think there was an abuse of

discretion, but my learned colleagues disagree, so I must respectfully dissent. I dissent to all of the majority opinion with the sole exception of the majority's conclusion that the oral call center contract was barred by the statute of frauds. I agree it was.

The majority concludes that the evidence is legally insufficient to support the jury's damage award. The basis of the majority's conclusion is the majority's determination that the testimony of James Perdiew and Dr. Harvey Sundel was unreliable. **[*470]** Perdiew and Dr. Sundel testified regarding the projected **[**17]** net profit of the BizLink program had it been fully launched as represented by SBC. Because a third expert, David Marshall, used the net profit projections provided by Dr. Sundel in calculating the terminal value of the BizLink program, the majority also rejects Marshall's testimony as unreliable. I respectfully dissent because the trial court did not abuse its discretion in determining that the testimony of Perdiew and Dr. Sundel was sufficiently reliable and, therefore, was admissible.

A. Standard of Review

A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Helena Chemical Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001)*. The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Id*. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Id*.

In *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, six nonexclusive factors were identified to determine whether an expert's testimony is **[**18]** reliable. *923 S.W.2d 549, 557 (Tex. 1995)*. However, the Texas Supreme Court has recognized that the *Robinson* factors will not apply to all experts' testimony. *See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726-27 (Tex. 1998)*. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Helena, 47 S.W.3d at 499*.

B. James Perdiew

James Perdiew was called as an expert to testify regarding the anticipated revenues and expenses for the BizLink program during the three-year term of the MSA. Perdiew testified that he has been involved in direct marketing for thirty years. For six years, Perdiew had worked in market planning and analysis, advertising and sales promotion at a large department store chain. Perdiew then worked eleven years as a national account executive for a company that provided consultative direct marketing services for a variety of direct marketing firms around the United States. In 1982, Perdiew started his own firm that provides consultative direct marketing services to various clients. **[**19]** Perdiew had worked on programs offering a package of

benefits or services to small businesses similar to the BizLink program. As part of his services, Perdiew worked to develop projections by building econometric models, which are "mathematical depictions of a business" that "try to take into account all of the key things that affect a business so that from a mathematical and financial point of view, [we] can evaluate the affect [sic] of changes and so we can project what happens over time." Perdiew stated that he uses a 90 percent level of confidence in his calculations. Perdiew testified that his methodology is called "standard procedures" in the direct marketing business.

SBC and SBTC assert numerous specific reasons to support their contention that Perdiew's opinion was unreliable. The following summarizes the assertions and the reason I believe the record does not support the assertions.

(1) Perdiew is a marketing expert and, therefore, is not qualified to testify as a damages expert.

The evidence showed that Perdiew has thirty years of direct marketing experience and routinely develops econometric models in the course of his business. Accordingly, Perdiew was qualified [**20] to give his testimony.

 [*471] (2) Perdiew used response rates that were based on predictions as opposed to actual results.

Perdiew explained that the reason he did not use the response rate reported by RMG was due to the early cut-off of results. Perdiew explained that the results were only counted for forty-eight days; therefore, the actual reported response rate was not a proper measure.

(3) Perdiew used higher response rates for certain vendors based on his experience, and Perdiew's estimation of enrollment rate and growth rate were unreliable.

The higher response rates were based both on Perdiew's experience and SBC's estimates. Just as "observations of enough bees in various circumstances to show a pattern would be enough to support [a beekeeper's] opinion," *Gammill, 972 S.W.2d 713*, the measuring of response rates to various vendors in numerous direct marketing programs provides a basis for Perdiew to use his experience in providing a response rate taking into consideration SBC's estimates. Furthermore, Perdiew's estimation of enrollment rate and growth rate were based on his vast experience in direct marketing programs.

(4) Perdiew should not have included [**21] telemarketing efforts in his calculation.

Perdiew stated that telemarketing was used in reality, telemarketing was included in the business plan, and "part of [Perdiew's] role [was] to project how the BizLink business would have performed if allowed to go forward using the best practices in direct marketing. That would have included telemarketing." This is a sufficient explanation of Perdiew's reason for including telemarketing.

(5) Perdiew failed to allocate the lost profits between SBC, BEI, and ADAR, failed to include general and administrative costs, and failed to consider the financial condition of BEI and ADAR.

Perdiew explained that the allocation of the lost profits was not within the scope of his assignment. Perdiew was assigned to evaluate the BizLink program. Perdiew did not evaluate ADAR, BEI or SBC. If BEI or ADAR had a negative net worth, Perdiew explained that "it would have no bearing on the vitality of the BizLink program's royalties." Finally, Perdiew explained that "G&A is allocated to specific programs," and "the allocations are arbitrary and judgmental within each individual corporation. The direct costs involved with operating a program or a part of a [**22] business are necessary to evaluate the feasibility of the business."

Considering Perdiew's testimony as a whole, the trial court did not abuse its discretion in admitting Perdiew's testimony because it was sufficiently reliable. Perdiew's econometric model requires certain assumptions to be made. Perdiew explained those assumptions and the basis for them. In those instances in which the assumptions differed from actual results, Perdiew explained why the data from the test launch was unreliable.

C. Dr. Harvey H. Sundel

Dr. Harvey Sundel has a bachelor's and master's degree in marketing. He also has a Ph.D in business administration with an emphasis in marketing. Dr. Sundel has taught marketing and been involved in marketing research for over 30 years. Dr. Sundel has his own consulting firm which does market research. Dr. Sundel has performed services for numerous industries including telecommunications. Dr. Sundel's telecommunications clients include [*472] AT&T, U.S. West, Nextel Communications, and Southwestern Bell. Dr. Sundel's firm performs approximately 200 projects a year. Approximately 20% of the projects Sundel performs require projections.

SBC and SBTC assert numerous [**23] specific criticisms of Dr. Sundel's testimony. The following summarizes the assertions and the reason I believe the record does not support the assertions.

(1) Dr. Sundel has no qualifications in either cost accounting or in performing a damage calculation.

The evidence showed that Dr. Sundel has marketing degrees and wide experience in conducting marketing research, including making projections regarding a project's revenues and expenses.

(2) Dr. Sundel's calculations included rates that "bore no resemblance to actual experience."

Dr. Sundel explained the basis for each figure included in the calculation. The figures were based on either actual results adjusted for information learned in the test launch that would be applied in the full roll-out or Dr. Sundel's experience applied to SBC's planned projections.

(3) Dr. Sundel included telemarketing after SBC was out of the program.

Dr. Sundel stated that telemarketing was used during the test launch and BEI informed him BEI intended to continue telemarketing efforts.

(4) Dr. Sundel did not include an adjustment for the advent of the internet.

Nothing in the record would support the need for including such an adjustment.

 [**24] (5) Dr. Sundel accepted the expense amounts provided by BEI.

SBC and SBTC provide no record citations to evidence indicating that those numbers are unreliable.

(6) Dr. Sundel's model did not divide the royalties between SBC, BEI, and ADAR.

Dr. Sundel was reviewing the revenues and costs for the BizLink Program, not determining what each of the participating companies would receive as a result.

Considering Dr. Sundel's testimony as a whole, the trial court did not abuse its discretion in admitting Dr. Sundel's testimony because it was sufficiently reliable. Although Dr. Sundel's calculations required certain assumptions to be made, Dr. Sundel explained those assumptions and the basis for them. In those instances in which the assumptions differed from actual results, Dr. Sundel explained why the data from the test launch was unreliable or adjusted.

D. Conclusion

The majority's primary criticism of Perdiew is that he "did not factor in actual data from the test launch," and the majority's primary criticism of Dr. Sundel is that his conclusions "were based on his assumptions" which had "no basis in fact." However, Perdiew explained his "standard procedures" methodology [**25] which is used in the direct marketing business, and he further explained the concept of the econometric model he used. In addition, Dr. Sundel explained that he used the data from the media test that was reliable. Both Perdiew and Dr. Sundel only made assumptions when the media test data was unreliable because SBC cut off the collection of data before the data could reliably measure the response to the BizLink program. In view of the prior focus group study demonstrating that customers needed time in order to be convinced that the BizLink program did not come with a "catch," SBC was aware that the data would not reliably measure the response to the BizLink program if the results were prematurely cut [*473] off. Therefore, Perdiew and Dr. Sundel properly refused to base their calculations on SBC's reported data because opinions drawn from unreliable foundational data are likewise unreliable. See *Helena, 47 S.W.3d at 499*. Both Perdiew and Dr. Sundel demonstrated that their opinions comported with applicable professional standards and had a reliable basis in the knowledge and experience of their marketing discipline. *See id*.

Because the trial court did not abuse its discretion [**26] in admitting the testimony of Perdiew and Dr. Sundel, their testimony was more than a scintilla of evidence to

support the jury's damage award. I would affirm the jury's verdict with the exception of the damages awarded for the breach of the oral call center contract.

PHIL HARDBERGER,

CHIEF JUSTICE

◆ Positive

As of: February 20, 2015 2:17 PM EST

# *Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*

Court of Appeals of Texas, Fifth District, Dallas

November 20, 2013, Opinion Filed

No. 05-12-00492-CV

## Reporter

418 S.W.3d 172; 2013 Tex. App. LEXIS 14226; 2013 WL 6097965

BERRYMAN'S SOUTH FORK, INC. AND RICHARD BERRYMAN, Appellants v. J. BAXTER BRINKMANN INTERNATIONAL CORPORATION, THE BRINKMANN CORPORATION AND J. BAXTER BRINKMANN, Appellees

**Subsequent History:** Petition for review denied by *Berryman's S. Fork v. J. Baxter Brinkmann Int'l Corp., 2014 Tex. LEXIS 333 (Tex., Apr. 25, 2014)*

**Prior History:** [**1] On Appeal from the 192nd Judicial District Court, Dallas County, Texas. Trial Court Cause No. 08-05771.

## Core Terms

appellees, trial court, appellants', damages, attorneys', statute of frauds, summary judgment, expenses, termination, pet, reimburse, declaration, declaratory judgment, costs, Oil, plaintiffs', parties, one year, appellant contention, appellants assert, record shows, summary judgment motion, breach of contract, modification, breach of contract claim, defendants', segregated, renewal, trial court's judgment, granting summary judgment

## Case Summary

### Overview

HOLDINGS: [1]-Appellees did not meet their summary judgment burden as to their breach of contract claim, for purposes of *Tex. R. Civ. P. 166a(c)*; [2]-The court has found no authority for the position that a modification not capable of being performed within one year falls outside the statute of frauds if it constitutes an immaterial change to the original contract, for purposes of *Tex. Bus. & Com. Code Ann. § 26.01(b)(6)*; [3]-The court thus could not agree that the materiality of a modification had any bearing on the application of the statute of frauds in this case; [4]-Appellants' argument as to part performance contained no other analysis and they did not meet their burden to raise a fact issue as to partial performance, and thus the requirements of the statute of frauds applied to the alleged agreement to reimburse expenses.

### Outcome

Judgment reversed in part, rendered in part, and otherwise affirmed.

Jamie Graham

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Appealability

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1* The appellate court reviews a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. The appellate court reviews the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. The appellate court must take evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. When summary judgment is sought and granted on multiple grounds, the appellate court will affirm if any of the grounds is meritorious. Further, with the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, issues not expressly presented to the trial court by written motion, answer, or other response shall not be considered on appeal as grounds for reversal. *Tex. R. Civ. P. 166a(c)*.

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Absence of Essential Element

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Scintilla Rule

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN2* A party seeking a no-evidence motion for summary judgment must assert that no evidence exists as to one or more of the essential elements of the nonmovant's claim on which the nonmovant would have the burden of proof. *Tex. R. Civ. P. 166a(i)*. The burden then shifts to the nonmovant to produce more than a scintilla of summary judgment evidence that raises a genuine issue of material fact as to each essential element identified in the motion. *Tex. R. Civ. P. 166a(i)*. More than a scintilla of evidence exists if the evidence would allow reasonable and fair-minded people to reach the verdict under review.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN3* In a traditional summary judgment, the party moving for summary judgment has the burden to establish that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*. When reviewing a traditional summary judgment granted in favor of the defendant, the appellate court determines whether the defendant conclusively disproved at least one element of the plaintiff's claim or conclusively proved every element of an affirmative defense. A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. If the movant satisfies its burden, the burden shifts to the nonmovant to preclude summary judgment by presenting evidence that raises a genuine issue of material fact.

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Contracts Law > Breach > Breach of Contract Actions > Elements of Contract Claims

Evidence > Relevance > Relevant Evidence

*HN4* A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. Where damages evidence does not relate to the amount of damages sustained under the proper measure of damages, that evidence is both irrelevant and legally insufficient to support a judgment.

Civil Procedure > Appeals > Summary Judgment Review > Appealability

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > ... > Procedural Matters > Objections & Offers of Proof > Objections

*HN5* A party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. Further, an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment is an exception to the general rule that issues not expressly presented to the trial court by written motion, answer, or other response shall not be considered on appeal as grounds for reversal. *Tex. R. Civ. P. 166a(c)*.

Contracts Law > Remedies > Specific Performance

Contracts Law > Types of Contracts > Personal Service Agreements

*HN6* A contract for personal services is not specifically enforceable.

Contracts Law > Standards of Performance > General Overview

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

Contracts Law > Remedies > Specific Performance

*HN7* Except in cases where specific performance is proper, a non-repudiating party cannot afterwards go on, and thereby increase the damages, and then recover such damages from the other party.

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

Contracts Law > Defenses > Volunteers

*HN8* The court has found no authority to support the assertion that the voluntary payment rule is a sub-defense of a general equitable estoppel defense.

Civil Procedure > Appeals > Summary Judgment Review > Appealability

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN9* The appellate court reviews a trial court's ruling that sustains an objection to summary judgment evidence for an abuse of discretion. When an appellee urges several objections to a particular piece of evidence and, on appeal, the appellant complains of its exclusion on only one of those bases, the appellant has waived that issue for appeal because he has not challenged all possible grounds for the trial court's ruling that sustained the objection.

Evidence > ... > Exemptions > Statements by Party Opponents > General Overview

*HN10* *Tex. R. Evid. 801(e)(2)(D)* provides a hearsay exception for a statement by a party's agent or servant concerning a matter within the scope of agency or employment made during the existence of the relationship. *Rule 801(e)(2)(D)* provides a hearsay exception for certain statements by a party's agent or servant.

Contracts Law > ... > Statute of Frauds > Requirements > Signatures

Contracts Law > ... > Statute of Frauds > Requirements > Writings

Evidence > Burdens of Proof > Allocation

*HN11* Under the statute of frauds, certain contracts are not enforceable unless they are in writing and signed by the person against whom enforcement of the contract is sought. *Tex. Bus. & Com. Code Ann. § 26.01(a)* (2009). The party pleading the statute of frauds bears the burden of establishing its applicability.

Contracts Law > ... > Statute of Frauds > Exceptions > General Overview

Contracts Law > ... > Statute of Frauds > Requirements > Signatures

Contracts Law > ... > Statute of Frauds > Requirements > Writings

*HN12* The statute of frauds applies to an agreement which is not to be performed within one year from the date of the making of the agreement. *Tex. Bus. & Com. Code Ann. § 26.01(b)(6)*. When a promise or agreement, either by its terms or by the nature of the required acts,

cannot be completed within one year, it falls within the statute of frauds and is unenforceable unless it is in writing and signed by the person to be charged. *Tex. Bus. & Com. Code Ann. § 26.01(a)*, *(b)(6)*. If the agreement is capable of being performed within one year, it is not within the statute of frauds. The question of whether an agreement falls within the statute of frauds is one of law. However, whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact.

> Contracts Law > ... > Statute of Frauds >
>  Exceptions > General Overview

> Contracts Law > ... > Statute of Frauds >
>  Requirements > Writings

**HN13** In deciding whether an agreement is capable of being performed within one year, the court compares the date of the agreement to the date when the performance under the agreement is to be completed. If there is a year or more between those two reference points, a writing is required to render the agreement enforceable. When the date performance will be completed cannot be readily ascertained, the law provides that if performance could conceivably be completed within one year of the agreement's making, a writing is not required to enforce it. If a contract can, from the terms of the agreement, be performed within one year it is not within the Statute of Frauds.

> Contracts Law > ... > Statute of Frauds >
>  Exceptions > Partial Performance

**HN14** Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. The partial performance must be unequivocally referable to the agreement and corroborative of the fact that a contract actually was made. The performance a party relies on to remove a parol agreement from the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced. Without such precision, the acts of performance do not tend to prove the existence of the parol agreement sought to be enforced.

> Contracts Law > ... > Statute of Frauds >
>  Exceptions > General Overview

**HN15** The court has found no authority to support the position that a modification not capable of being performed within one year falls outside the statute of frauds if it constitutes an immaterial change to the original contract. *Tex. Bus. & Com. Code Ann. § 26.01(b)(6)*.

> Civil Procedure > Judgments > Summary
>  Judgment > Evidentiary Considerations

**HN16** A party submitting summary judgment evidence must specifically identify the supporting proof on file that it seeks to have considered by the trial court.

> Civil Procedure > ... > Declaratory
>  Judgments > State Declaratory Judgments >
>   Scope of Declaratory Judgments

*HN17* See *Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a)*.

Civil Procedure > ... > Declaratory Judgments > State Declaratory Judgments > Appellate Review

*HN18* The appellate court reviews declaratory judgments under the same standards as other judgments. *Tex. Civ. Prac. & Rem. Code Ann. § 37.010*. The appellate court looks to the procedure used to resolve the issue at trial to determine the standard of review on appeal.

Civil Procedure > ... > Declaratory Judgments > State Declaratory Judgments > Scope of Declaratory Judgments

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Contract Conditions & Provisions > General Overview

*HN19* Texas law does not allow recovery of attorneys' fees unless authorized by statute or contract. A person may recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for an oral or written contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)*. To qualify for fees under *§ 38.001(8)*, a litigant must prevail on a breach of contract claim and recover damages. Additionally, under *Tex. Civ. Prac. & Rem. Code Ann. § 37.009*, the trial court in a declaratory judgment proceeding may award reasonable and necessary attorney's fees

as are equitable and just. *Tex. Civ. Prac. & Rem. Code Ann. § 37.009*.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > General Overview

Evidence > Burdens of Proof > Allocation

*HN20* If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. It is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. This standard does not require more precise proof for attorneys' fees than for any other claims or expense. To meet a party's burden to segregate its attorneys' fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > General Overview

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Evidence > ... > Procedural Matters > Objections & Offers of Proof > Objections

*HN21* If no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived.

Civil Procedure > ... > Declaratory Judgments > State Declaratory Judgments > Appellate Review

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Civil Procedure > Appeals > Remands

*HN22* After a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just. Therefore, when the appellate court reverses a declaratory judgment and the trial court awarded attorneys' fees to the party who prevailed at trial, the appellate court may remand the attorneys' fee award for reconsideration in light of our disposition on appeal. The appellate court is not required to do so, however.

Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest

*HN23* Under *Tex. R. Civ. P. 559*, the successful party in the suit shall recover his costs, except in cases where it is otherwise expressly provided. *Tex. R. Civ. P. 559*. Further, *Tex. Fin. Code Ann. § 304.003(a)* (2006) provides in part that a money judgment of a court of this state, including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment interest at the rate determined under this section. *Tex. Fin. Code Ann. § 304.003(a)* (2006). Postjudgment interest accrues on entire amount of final judgment, including court costs and prejudgment interest, from date of judgment until paid.

Civil Procedure > Pleading & Practice > Pleadings > General Overview

Civil Procedure > Judgments > Entry of Judgments > General Overview

*HN24* *Tex. R. Civ. P. 301* provides that a judgment of trial court shall conform to the pleadings.

**Counsel:** For Appellants: F. Leighton Durham, Dallas, TX; Kirk L. Pittard, Dallas, TX; Christy Denison Wollin, Dallas, TX; Peter M. Kelly, Dallas, TX; Sean Reed Cox, Dallas, TX; Barbara Thompson Hale, Dallas, TX; Thad D. Spalding, Kelly, Durham & Pittard, LLP, Dallas, TX.

For Appellees: Michael G. Brown, Figari Davenport, LLP, Dallas, TX; Amber Grand, Figari & Davenport, LLP, Dallas, TX.

**Judges:** Before Justices FitzGerald, Lang, and Myers. DOUGLAS S. LANG.

**Opinion by:** DOUGLAS S. LANG

## Opinion

[*178] This case arises from a written contract (the "Agreement") under which appellee J. Baxter Brinkmann International Corporation ("JBBI") employed appellant Berryman's South Fork, Inc. ("BSF") for the purpose of "engaging the full-time services" of appellant Richard Berryman ("Berryman") as a "sales and marketing representative." Appellees JBBI and The Brinkmann Corporation ("TBC") filed this lawsuit against appellants asserting claims for, in part, declaratory judgment, breach of contract, and money had and received.

Appellants (1) counterclaimed against JBBI for, in part, breach of an alleged contract to pay Berryman's expenses and (2) asserted claims against J. Baxter Brinkmann, individually, ("Brinkmann") as a third party defendant.[1] Appellees filed a motion for (1) traditional summary judgment in their favor on the claims asserted by JBBI and TBC and appellants' counterclaims and (2) no-evidence summary judgment in their favor on appellants' counterclaims. The trial court signed a final judgment in which [**2] it (1) sustained appellees' objections to an affidavit of Berryman filed by appellants as summary judgment evidence, (2) granted appellees' motion for summary judgment, (3) made declarations respecting the Agreement, and (4) awarded appellees damages, attorneys' fees, interest, and costs of court.

In eleven issues on appeal, appellants contend the trial court erred because (1) the evidence raises fact issues as to the parties' claims; (2) the declaratory relief requested by JBBI and TBC was "redundant with" their breach of contract claim and therefore was "barred as a matter of law"; (3) appellees "failed to conclusively prove the reasonableness and necessity of the claimed [attorneys'] fees by not segregating fees"; (4) Brinkmann, individually, did not recover on any cause of action and therefore should not have been awarded damages, attorneys' fees, interest, or costs of court; and (5) the sustaining of appellees' objections to

Berryman's affidavit constituted an abuse of discretion.

For the reasons below, on this voluminous summary judgment record, we reverse the trial court's [**3] judgment in part, render judgment in part, and otherwise affirm the trial court's judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The Agreement was executed on July 2, [*179] 2001.[2] It stated in part that JBBI "desires to employ the services of [Berryman], through [BSF], for the benefit of [JBBI] and its affiliated companies." Additionally, the Agreement provided in part

2. Compensation

In exchange for the services to be rendered hereunder by [Berryman], [JBBI] shall pay, or cause to be paid, the sum of one million dollars per year in equal monthly installments. . . .

3. Term

This Agreement is for a term of five years starting August 1, 2001 and is to be renewed annually thereafter unless either parties [sic] gives notice in writing 90 days prior to the end of any anniversary date. Notwithstanding the five year fixed term, [JBBI] may terminate this

---

[1] In this opinion, unless otherwise specified, "appellees" refers to, collectively, JBBI, TBC, and Brinkmann.

[2] As described above, the parties to the Agreement were JBBI and BSF. Additionally, Berryman, individually, [**4] guaranteed the obligations of BSF.

Agreement and have no further payment obligation if [Berryman] is unable to perform full-time services due to death or disability or has failed to carry out the duties of a senior sales and marketing representative in accord with general industry standards.

Approximately seven years after the Agreement was executed, an attorney for appellants sent JBBI a letter dated May 20, 2008. In that letter, appellants' attorney stated that as a result of actions taken by JBBI, "including, but not limited to, making defamatory statements" to JBBI employees and others, JBBI had "substantially undermined [Berryman's] ability to perform his job duties and responsibilities" and therefore had "constructively terminated [Berryman] and breached the implied covenant of good faith and fair dealing with respect to the Agreement." Further, appellants' attorney (1) stated JBBI had "failed and refused" to reimburse Berryman for approximately $160,000 in expenses that JBBI was "obligated to pay" pursuant to "Mr. Berryman's contract" with JBBI and (2) requested that JBBI contact him to "negotiate a fair and equitable severance for Mr. Berryman."

On May 23, 2008, JBBI and TBC ("plaintiffs") filed this lawsuit against BSF and Berryman ("defendants"). In their original petition, plaintiffs asserted a claim for "declaratory judgment relief." Specifically, plaintiffs requested in part that the trial court declare (1) "whether [d]efendants [**5] have carried on its or their required duties under the terms of the [Agreement]"; (2) that plaintiffs have not violated the terms of their "agreements or obligations, if any," to defendants; and (3) "other declaratory relief as necessary to terminate the controversy and remove uncertainty relating to the [plaintiffs'] alleged remaining rights and obligations to [d]efendants, if any." Further, plaintiffs requested "reasonable and necessary attorneys' fees incurred herein and on any appeal."

In a letter to defendants dated August 29, 2008, counsel for JBBI stated (1) defendants had failed to perform as obligated under the Agreement "for some months now" and (2) JBBI "hereby terminates the Agreement as permitted in Section 3 and as otherwise allowed by law." Subsequent to that letter, plaintiffs filed supplements to their original petition in which they added claims for breach of contract and "money had and received/unjust [*180] enrichment." In their breach of contract claim, plaintiffs alleged in part that defendants "failed and refused and continue to fail and refuse to fulfill their obligations under the [Agreement]," thus entitling plaintiffs to damages and attorneys' fees. In their claim [**6] for "money had and received/unjust enrichment," plaintiffs asserted in part that "during the May 2008 through August 2008 time period," defendants "received monies they were not entitled to keep and to which they have been unjustly enriched." Pursuant to that claim, plaintiffs sought to recover approximately $334,000 received by defendants during that time period,

including (1) "$291,666.66 paid during a time period [defendants] performed no work for [plaintiffs]" and (2) approximately $42,000 in "Airplane Allowance payments" made to defendants pursuant to a "separate verbal agreement" that plaintiffs would "provide [d]efendants an upfront allowance for expenses (up to $12,000 per month) [d]efendants incurred related to the operation of an aircraft to be used to assist [d]efendants in performing their duties owed to [p]laintiffs" (the "Airplane Allowance").

Defendants filed a general denial answer and asserted several affirmative defenses, including "equitable estoppel." Additionally, defendants asserted (1) a counterclaim against JBBI for "breach of contract relating to reimbursement of expenses," in which defendants contended they were owed $157,600.83 in "expenses not paid" by JBBI; [**7] and (2) claims for business disparagement, defamation, and exemplary damages against Brinkmann as a third-party defendant.

JBBI and Brinkmann filed separate general denial answers to defendants' counterclaims. Additionally, JBBI asserted several affirmative defenses, including the statute of frauds. Further, in Brinkmann's prayer for relief in his answer, he requested, in part, that he recover costs of court.

On December 12, 2011, plaintiffs and Brinkmann filed a motion for (1) traditional summary judgment on plaintiffs' breach of contract, money had and received, and declaratory judgment claims and defendants' counterclaims and (2) no-evidence summary judgment on defendants' counterclaims. In their motion, plaintiffs stated in part (1) "[b]ased on [d]efendants' breach of contract, [p]laintiffs are entitled to elect as their remedy the recovery of the largest damage amount suffered due to [d]efendants' breach, such amount being the $291,666,67 paid from May through August 2008, plus attorney's fees totaling $160,948.00"; (2) to "prevent unjust enrichment," defendants must return to plaintiffs "overpayments" of "$291.666.67 for work not performed"[3] and "$41,999.96 in Airplane Allowance [**8] payments"; (3) defendants "ceased performing under the Agreement in at least May of 2008, and thereby materially breached same"; (4) "[t]he Agreement was terminable from [May of 2008] forward by [p]laintiffs, and no further obligations are due under the Agreement following its lawful termination in August 2008"; (5) "[n]otwithstanding [p]laintiffs' proper termination of Agreement for cause, the Agreement actually expired on August 1, 2008"; and (6) JBBI did not breach the Agreement or "any ancillary agreement to pay business expenses."

The appendix filed in support of the summary judgment motion included, in part (1) excerpts from depositions of Berryman and Brinkmann; (2) an affidavit of Brinkmann; (3) copies of the Agreement and correspondence described above; and

---

[3] Plaintiffs stated in their brief in support of their motion for summary judgment that they "will only be entitled to collect and will only seek the $291,666.67 once."

(4) an affidavit of plaintiffs' counsel respecting attorneys' fees.

Berryman stated in part in his deposition that (1) his job responsibilities pursuant to the Agreement included preparing for and attending meetings with retailers' [*181] representatives to solicit [**9] orders for JBBI's products, communicating "almost on a daily basis" with Brinkmann, and participating in the "finalization" process respecting retailers' orders; (2) during two separate meetings in 2006 and 2008, Brinkmann complained in front of retailers' representatives that Berryman "didn't work" and buyers did not want to do business with Berryman; (3) Berryman was still able to perform his duties after Brinkmann's negative comments were made; (4) in approximately April 2008, JBBI hired Mike Bush; (5) at the time Bush was hired, Bush told Berryman that Berryman was "being replaced" by Bush; (6) Berryman was not replaced by Bush; (7) there is no written agreement for reimbursement of expenses; (8) at approximately the same time the Agreement was executed in 2001, Berryman and Brinkmann entered into an oral agreement that Berryman's business expenses would be reimbursed by JBBI; (9) after May 20, 2008, Berryman did not return Brinkmann's calls, with one exception in which he told Brinkmann his attorney had advised him not to speak with Brinkmann; did not participate in "finalization" negotiations; and did not attend any meetings; and (10) from May 2008 to August 2008, Berryman continued [**10] to receive and accept checks from Brinkmann.

Brinkmann testified in part in his deposition and affidavit (1) although reimbursement of Berryman's expenses was not part of "the deal," he reimbursed Berryman for various expenses starting in 2001 and continuing until at least 2006; (2) defendants ceased performing their required duties under the Agreement "as early as the first half of May 2008"; (3) after defendants ceased performing under the Agreement, JBBI "hoped [d]efendants would resume performance" and paid BSF $41,999.96 in airplane allowance payments and an additional sum of more than $291,666.67; and (4) BSF and Berryman have not returned those amounts to plaintiffs.

Finally, counsel for plaintiffs testified in part in his affidavit (1) at least 85%, or $127,073, of the attorneys' fees and paralegal fees incurred by plaintiffs so far "are recoverable against the [d]efendants in this lawsuit"; (2) "it is reasonable to conclude that [plaintiffs'] counsel's activities cannot all be segregated by task and as such are dependent on the same or similar sets of facts and circumstances, are part of many of the same tasks, and are therefore so intertwined that they cannot be so separated [**11] or segregated"; (3) a fair estimate of additional attorneys' fees likely be incurred by plaintiffs through the hearing on plaintiffs' motion for summary judgment to advance plaintiffs' "affirmative claims" against defendants is at least $33,875; and (4) in the event of appeal of

plaintiffs' "affirmative claims," plaintiffs will likely incur at least an additional $35,000 in fees in defense of an appeal to the Dallas Court of Appeals, $20,000 in fees in briefing an appeal to the Texas Supreme Court, and $15,000 in fees if the Texas Supreme Court grants a hearing on such appeal.

In their amended response to plaintiff's motion for summary judgment, defendants argued in part (1) the agreement to pay expenses was an enforceable "oral modification" and/or "implied in fact modification" of the "original contract" entered into between the parties on July 2, 2001; (2) Berryman was justified in discontinuing performance under "the written contract and oral modification of the contract" in May 2008 because he was relieved of performance by plaintiffs' "material breach," i.e. plaintiffs' "slanderous statements," hiring of Bush, and failure to pay Berryman's expenses; (3) equitable relief is not [**12] warranted because Berryman received and accepted the sums paid to him as part of the damages he is entitled to receive as a [*182] result of plaintiffs' "material breach" of the "contract between the parties"; and (4) the statute of frauds does not apply to the oral agreement to reimburse expenses because "each of the claims was capable of being performed within one year" and, alternatively, "part performance by the parties" takes the oral agreement outside the statute of frauds. Attachments to defendants' response included an affidavit of Berryman and an "Expense Report Tracking Log" that showed $157,600.83 in "outstanding" expenses incurred by Berryman from 2006 to 2008.

Plaintiffs filed (1) "objections to and motion to strike defendants' 'evidence' in support of their amended response" and (2) supplemental objections to defendants' summary judgment evidence. Therein, plaintiffs contended Berryman's affidavit (1) contains irrelevant testimony; (2) lacks necessary attachments; (3) is a "sham affidavit" as to specified statements of Berryman in paragraphs 9, 12, 15, 16, 19, 22, 24, and 28; (4) "fails to set forth actual facts based upon Berryman's personal knowledge"; and (5) "cites Berryman's [**13] conclusory personal beliefs based upon conjecture and hearsay." Specifically, in an objection to Berryman's affidavit "as a whole," plaintiffs stated in part

> Berryman amended his [affidavit] to assert that he possessed personal knowledge of all of "the facts set forth" in the [affidavit], based upon (1) his conversations with [Brinkmann], (2) conversations with unidentified employees of JBBI, (3) the unattached "business records" of JBBI . . . and (4) the unattached "business records" of [BSF]. Berryman cannot rely on hearsay to demonstrate his "personal knowledge."

(citation to record omitted).

Additionally, plaintiffs filed a reply to defendants' response to the motion for summary judgment. Plaintiffs asserted in part (1) defendants' election to continue

performance after plaintiffs' alleged nonpayment of expenses starting in 2006 precluded any excuse for defendants' terminating performance; (2) defendants' response did not raise a legal claim or fact issue respecting defendants' contentions that plaintiffs "prevented [d]efendants from being able to perform under the [Agreement]" or "'constructively terminated' [d]efendants"; (3) defendants have no damages for breach because plaintiffs [**14] "paid the entire value" of the Agreement; (4) the oral agreement alleged by defendants respecting payment of expenses was not performable within one year and therefore is precluded by the statute of frauds and, alternatively, "lacks definitive contract terms"; and (5) while defendants' response "appears to argue" that application of the statute of frauds is precluded by "partial performance," defendants provide "only a footnote citation without analysis" respecting that argument.

In the final judgment described above,[4] the trial court (1) defined "movants" as JBBI, TBC, and Brinkmann, collectively, and (2) ordered that "summary judgment is granted in favor of Movants on their breach of contract, money had and received, and declaratory judgment claims." Further, the trial court ordered therein that "Movants shall recover from Defendants, jointly and severally," (1) "actual damages in the amount of $333,666.63," which "includes $291,666.67 for contract payments made by Plaintiffs to Defendants when work was not being performed by Defendants, and $41,999.96 in Airplane Allowance payments made by Plaintiffs to [*183] Defendants when work was not being performed by Defendants"; (2) "their reasonable [**15] and necessary attorneys' fees as a result of the above-mentioned breach of contract and declaratory judgment claims in the amount of $160,948.00"; (3) "$49,117.95 in pre-judgment interest on the aforesaid amount (excluding attorney's fees)"; (4) additional attorneys' fees in the event of appeal "as set forth in the Movants' uncontested attorneys' fees affidavit"; and (5) "all costs of court incurred and filed with the Court in this action." Additionally, the trial court ordered that "the total amount of this Judgment, $543,732.58, plus costs of court, will bear post-judgment interest at the rate of 5%, compounded annually." Finally, the trial court made declarations respecting plaintiffs' declaratory judgment claim.[5]

Defendants filed a timely motion for new trial, which was overruled by operation of law. This appeal timely followed.

---

[4] The record shows a hearing on appellees' motion for summary judgment was scheduled. However, the record contains no reporter's record of such hearing.

[5] Specifically, the trial court stated in the final judgment

[T]he court holds the following as a matter of undisputed fact and law as it related to Movants' declaratory judgment claim:

a. Defendants ceased performing under the Agreement in, at least, May of 2008 when Berryman refused to fulfill his duties and obligations for [**16] Plaintiffs. This constituted a material breach of the Agreement. The Agreement was at a minimum terminable from that point forward by Plaintiffs, and after making every reasonable effort to

## II. SUMMARY JUDGMENT

### A. Standard of Review

**HN1** We [**17]** review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009)*; *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005)*; *Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985)*. We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Timpte Indus., Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009)*. We must take evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *City of Keller v. Wilson, 168 S.W.3d 802, 824 (Tex. 2005)*; *Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 800 (Tex. 1994)*; *Nixon, 690 S.W.2d at 549*; *In re Estate of Berry, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.)*. ″When summary judgment is sought and granted on multiple grounds, we will affirm if any of the grounds is meritorious.″ *Zimmerhanzel v. Green, 346 S.W.3d 721, 724 (Tex. App.—El Paso 2011, pet. denied)*. [**18]** Further, with the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, [*184]** ″[i]ssues not expressly presented to the trial court by written motion, answer, or other response shall not be considered on appeal as grounds for reversal.″ *Tex. R. Civ. P. 166a(c)*; *see McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 343 (Tex. 1993)*; *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 676-77 (Tex. 1979)*.

**HN2** A party seeking a no-evidence motion for summary judgment must assert that no evidence exists as to one or more of the essential elements of the nonmovant's claim on which the nonmovant would have the burden of proof. See *Tex. R. Civ. P. 166a(i)*. The burden then shifts to the nonmovant to produce more than a scintilla of summary judgment evidence that raises a genuine issue of material fact as to each essential element identified in the motion.

---

communicate with Berryman, Plaintiffs lawfully terminated the Agreement in August 2008. Thus, no further obligations are owed or due to Defendants under the Agreement.

b. Notwithstanding Plaintiffs' lawful termination of the Agreement, the Agreement expired on August 1, 2008. The Agreement provides for automatic renewal upon the anniversary date of the contract only if neither party provides written notice to the other party to the contrary. Here, Defendants' Agreement Termination Letter was received by Plaintiffs in May of 2008, and the Agreement expired by its own terms on August 1, 2008 as a result.

c. The Agreement is defined by the four corners of the document, and the alleged oral contracts for expense reimbursement and Airplane allowance are not a part of the Agreement.

d. JBBI did not, constructively or otherwise, breach the Agreement.

*Id*.; *Timpte Indus., Inc., 286 S.W.3d at 310*. More than a scintilla of evidence exists if the evidence would allow reasonable and fair-minded people to reach the verdict under review. *See City of Keller, 168 S.W.3d at 827*.

*HN3* In a traditional summary judgment, the party **[**19]** moving for summary judgment has the burden to establish that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*; *Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215-16 (Tex. 2003)*; *Nixon, 690 S.W.2d at 548-49*. When reviewing a traditional summary judgment granted in favor of the defendant, we determine whether the defendant conclusively disproved at least one element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Kalmus v. Oliver, 390 S.W.3d 586, 588 (Tex. App.—Dallas 2012, no pet.)* (citing *Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997))*. A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Id. at 588-89*. If the movant satisfies its burden, the burden shifts to the nonmovant to preclude summary judgment by presenting evidence that raises a genuine issue of material fact. *See Affordable Motor Co., Inc. v. LNA, LLC, 351 S.W.3d 515, 519 (Tex. App.—Dallas 2011, pet. denied)*.

## B. Analysis

1. Breach of Contract Claim Asserted by JBBI and TBC

We begin with appellants' second issue, in which they **[**20]** contend "the trial court erred in granting summary judgment on [a]ppellees' claim for breach of contract because it applied an incorrect measure of damages and there was no evidence of recoverable damages." According to appellants, "the evidence of damages was legally insufficient because the evidence represented overpayments that occurred for approximately three months after the alleged breach and thus caused the trial court to utilize an improper measure of damages (an incorrect time period)." Additionally, appellants assert in their reply brief in this Court that "[appellees'] only damage evidence relates to amounts that are not recoverable, rendering their evidence legally insufficient."

Appellees respond (1) appellants "failed to object or otherwise raise to the trial court any allegation that the measure of damages provided by [a]ppellees was somehow improper" and therefore waived the alleged error, (2) appellants "ignore [a]ppellees' right to elect to continue to perform under the Agreement" and "sue for damages as they accrue when the time for performance under the contract is due," and (3) "[a]ppellants' arguments that [a]ppellees could not 'create or increase' their damages **[**21]** are actually arguing a failure to mitigate," an affirmative defense that appellants did not plead.

**[*185]** *HN4* "A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance

by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Petras v. Criswell, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.)*; *see Barnett v. Coppell N. Tex. Court, Ltd., 123 S.W.3d 804, 815 (Tex. App.—Dallas 2003, pet. denied)*. "Where damages evidence does not relate to the amount of damages sustained under the proper measure of damages, that evidence is both irrelevant and legally insufficient to support a judgment." *De Escabedo v. Haygood, 283 S.W.3d 3, 6 (Tex. App.—Tyler 2009)*, aff'd sub nom., *356 S.W.3d 390 (Tex. 2011)*.

The record does not show appellants objected to the evidence respecting the measure of damages or otherwise raised that issue in the trial court. However, **HN5** "a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility." *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 233 (Tex. 2004)*. **[**22]** Further, an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment is an exception to the general rule that "[i]ssues not expressly presented to the trial court by written motion, answer, or other response shall not be considered on appeal as grounds for reversal." *TEX. R. CIV. P. 166a(c)*; *see McConnell, 858 S.W.2d at 343*; *Clear Creek Basin Auth., 589 S.W.2d at 676-77*. Therefore, we conclude appellants did not waive error pertaining to the legal sufficiency of the evidence respecting breach of contract damages.

In support of their assertion that the proper measure of damages was applied in this case, appellees state "when one party repudiates a contract, the other party may then elect to 'treat the repudiation as inoperative and sue for damages as they accrue when the time for performance under the contract is due.'" (quoting *America's Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 626 (Tex. App.—San Antonio 1996, writ denied))*. Appellees contend they (1) "elected to continue the Agreement in force in an effort to have [a]ppellants resume performance and therefore continued to make payments" and (2) "are entitled to recover **[**23]** the $291,666.67 paid during the time of [a]ppellants' non-performance under the Agreement."

Appellants cite the following statement of law in support of their position: "A party, while in the performance of a contract, when served with notice of its repudiation by the other party, cannot proceed with the performance of the contract except it be one of which specific performance may be enforced and increase the damages to which he would otherwise be entitled." *Osage Oil & Ref. Co. v. Lee Farm Oil Co., 230 S.W. 518, 522 (Tex. Civ. App.—Amarillo 1921, writ ref'd)*. According to appellants, (1) the Agreement was a contract for services and therefore was not subject to specific performance and (2) appellees were not entitled to recover "overpayments that occurred for approximately three months after the alleged breach."

During oral argument before this Court, appellees contended (1) the rule quoted

above from *Osage Oil* "has not been followed by a single court" and (2) current case law allows a non-repudiating party to choose to treat the contract as continuing regardless of whether specific performance is available. In support of those arguments, appellees cited three cases. *See Bumb v. Intercomp Tech., L.L.C., 64 S.W.3d 123 (Tex. App.—Houston [14th Dist.] 2001, no pet.)*; [**24] *Avasthi & Assocs., Inc. v.* [*186] *Dronamraju, No. 01-11-00786-CV, 2012 Tex. App. LEXIS 10511, 2012 WL 6644873 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, pet. denied)* (mem. op.); *C.K. Oil Props., Inc. v. Hrubetz Operating Co.*, No. 11-99-00066-CV, 2002 WL 32344609 (Tex. App.—Eastland Apr. 25, 2002, no pet.) (not designated for publication).

In *C.K. Oil*, Hrubetz Operating Company ("HOPCO") contracted to operate certain gas and oil leases. *C.K. Oil*, 2002 WL 32344609, at *1. Subsequently, a working interest in the leases was conveyed to C.K. Oil Properties, Inc. ("C.K."). *Id*. C.K. informed HOPCO that HOPCO was terminated as operator and advised HOPCO that C.K. would not reimburse HOPCO for any operating expenses incurred after November 10, 1997. *Id*. HOPCO continued to operate the leases. *Id*. Additionally, HOPCO filed suit against C.K. to specifically enforce the terms of its contract and sought damages from C.K. as a result of the attempted termination. *Id*. at *2. Those damages included expenses for operating the leases from the date of the purported termination through the date of trial. *Id*. C.K. counterclaimed for trespass,

asserting HOPCO was liable to C.K. in tort for refusing to accept C.K.'s breach of the contract. [**25] *Id*. The trial court granted a motion by C.K. for partial summary judgment denying specific performance and the remaining issues were tried before a jury. *Id*. The jury found in favor of HOPCO and awarded HOPCO damages that included its expenses incurred in operating the leases after the date of the purported termination. *Id*. On appeal, C.K. argued in part that pursuant to the rule stated in *Osage Oil*, HOPCO was (1) required to accept C.K.'s repudiation and (2) not entitled to recover any damages for expenses incurred in operating the lease after the date of the purported termination. *Id*. at *8, *14. The Eleventh District Court of Appeals in Eastland disagreed with C.K. *Id*. The court stated that the "damage rule" announced in *Osage Oil* "does not apply to affirmative claims for relief which a repudiating party asserts against the non-breaching party for failing to accept the breach." *Id*. at *8. Therefore, the court concluded, HOPCO was "not required to accept C.K.'s repudiation." *Id*. Further, in considering HOPCO's claim for damages, the court stated in part, "For the same reasons that we have rejected the ruling in *Osage Oil* as serving as a basis for [C.K.'s] counterclaims sounding in [**26] tort, we do not find *Osage Oil* to be controlling on the issue of HOPCO's damages." *Id*. at *14. The court concluded, "Because the ruling in *Osage Oil* directly conflicts with the non-breaching party's option of treating the repudiation as inoperative, we decline to apply *Osage Oil* to the facts of this case." *Id*.

Unlike the case before us, *C.K. Oil* involved not only a non-repudiating party claiming damages, but also a repudiating party seeking to use the rule in *Osage Oil* to profit from its own breach. *See id.* at *8. We cannot agree with appellees that the *C.K. Oil* court's conclusion that Osage Oil was not controlling on the facts of that case supports appellees' position that *Osage Oil* is inapplicable in the case before us.

*Bumb* involved an employee, John W. Bumb, whose employment contract provided that either he or his employer, InterComp Technologies, L.L.C. ("InterComp"), could terminate their relationship at will by giving ninety days' notice. *Bumb, 64 S.W.3d at 124*. On August 4, 1995, InterComp notified Bumb that his employment was terminated effective November 3, 1995. *Id.* On September 25, 1995, InterComp allegedly told Bumb that it would no longer pay his salary or reimburse him [**27] for expenses. *Id.* However, Bumb continued [*187] to perform his duties until November 3, 1995. *Id.* On October 12, 1995, Bumb downloaded copies of InterComp software in violation of his employment contract. *Id.* Almost four years later, Bumb filed suit against InterComp for unpaid salary and expenses. *Id.* Intercomp moved for summary judgment, alleging it was excused from further performance under the contract when Bumb breached the contract by downloading software. *Id.* In response, Bumb claimed InterComp breached the contract first by orally repudiating the contract on September 25, 1995, and by

failing to pay his salary and expenses on October 1, 1995. *Id.* The trial court granted InterComp's motion for summary judgment. *Id. at 125*. The Fourteenth District Court of Appeals in Houston affirmed, stating "an anticipatory repudiation gives the nonrepudiating party the option to treat the repudiation as a breach, or ignore it and await the agreed upon time of performance." *Id.* The court reasoned that "by waiting to sue until after InterComp's performance was due, Bumb was obligated to continue performing under the contract, and any breach on his own part prior to the November 3, 1995 termination [**28] date excused InterComp from further performance." *Id.* Therefore, the court concluded, Bumb's October 12, 1995 breach barred his suit for any breaches by InterComp thereafter. *Id.* As to breaches by InterComp prior to October 12, 1995, the court observed that the contract provided Bumb's monthly salary was payable "in arrears." *Id.* Thus, payment for Bumb's services during October was not due until November 1, 1995, a date after Bumb's October 12, 1995 breach of contract. *Id.* Further, as to Bumb's claim for expenses, the court observed that the contract required "appropriate support" before expenses would be reimbursed. *Id.* The court stated there was no proof the required support had been provided to Intercomp until a date after Bumb's October 12, 1995 breach. *Id.*

Appellees assert *Bumb* demonstrates that the rule of *Osage Oil* is not currently the law in cases involving contracts for services. However, the court in *Bumb* did

not specifically address the issue of whether, when a contract is repudiated, the non-repudiating party can "increase the damages to which he would otherwise be entitled" by continuing to perform. *See Osage Oil, 230 S.W. at 522*. We cannot agree with appellees that Bumb [**29] supports their position that *Osage Oil* is inapplicable to the case before us.

Finally, in *Avasthi*, Sharma Dronamraju contracted with a petroleum consulting company, Avasthi & Associates, Inc. ("A & A"), to provide geological services for a specific project. *Avasthi, 2012 Tex. App. LEXIS 10511, 2012 WL 6644873 at *1*. The contract contained detailed reporting and billing requirements. *Id*. It was undisputed that Dronamraju "never timely complied" with those requirements during the ten-month time period that he worked for A & A. *2012 Tex. App. LEXIS 10511, [WL] at *2*. Despite such noncompliance, A & A paid Dronamraju on numerous occasions and continued to request him to perform work on the project. *2012 Tex. App. LEXIS 10511, [WL] at *3-4*. After the project was completed, A & A informed Dronamraju that certain bills for his time "had been submitted too late" and would not be paid by A & A. *2012 Tex. App. LEXIS 10511, [WL] at *3*. Dronamraju filed suit against A & A for breach of contract, seeking payment of his unpaid bills. *Id*. The jury found in favor of Dronamraju. *2012 Tex. App. LEXIS 10511, [WL] at *4*. On appeal, A & A argued that as a matter of law, it was excused from performing under the contract, i.e. paying Dronamraju, because of Dronamraju's prior material breach of the same contract, i.e. the failure to timely bill. *2012 Tex. App. LEXIS 10511, [WL] at *6*. [**30] The First District Court of Appeals in Houston disagreed. *2012 Tex. App. LEXIS 10511, [WL] at *7*. The court concluded that by seeking to continue [*188] benefiting from the contract by requesting Dronamraju continue performing work, "A & A waived its ability to treat Dronamraju's breach as a justification for non-performance." *2012 Tex. App. LEXIS 10511, [WL] at *8*. Unlike the case before us, *Avasthi* did not involve a non-repudiating party seeking to recover damages for breach of contract after continuing performance. *See id*. Therefore, that case is inapposite as to whether *Osage Oil* applies to such a fact situation.

As described above, the Agreement stated JBBI was employing BSF "for the purpose of engaging the full-time services of [Berryman]." *HN6* A contract for personal services is not specifically enforceable. *See Gage v. Wimberley, 476 S.W.2d 724, 731 (Tex. Civ. App.—Tyler 1972, writ ref'd n.r.e.)*; *Chain v. Pye, 429 S.W.2d 630, 635 (Tex. Civ. App.—Beaumont 1968, writ ref'd n.r.e.)*. Further, appellees assert in their brief on appeal that "[a]s early as the first half of May of 2008, [a]ppellants altogether ceased performance under the Agreement." The record shows that at that point, the $291,666.67 claimed by appellees as breach of contract damages [**31] had not been paid to appellants. Appellees assert they continued to pay appellants in May, June, July, and August of 2008, even though appellants "never resumed performance under the Agreement." Thus, the record

shows that absent the continuation of payments by appellees, they would not "otherwise be entitled" to the $291,666.67 they claim as breach of contract damages. *See Osage Oil, 230 S.W. at 522*. On this record, we conclude those sums are not recoverable as breach of contract damages. *See id.; see also Tower Contracting Co., Inc. v. Flores, 294 S.W.2d 266, 273 (Tex. Civ. App.—Galveston 1956), aff'd as modified, 157 Tex. 297, 302 S.W.2d 396 (Tex. 1957)* **HN7** (except in cases where specific performance is proper, non-repudiating party "cannot afterwards go on, and thereby increase the damages, and then recover such damages from the other party"). The record shows no evidence of other breach of contract damages claimed by appellees. Consequently, we conclude appellees did not meet their summary judgment burden as to their breach of contract claim. *See Petras, 248 S.W.3d at 477; Barnett, 123 S.W.3d at 815; see also Tex. R. Civ. P. 166a(c)*.

We decide in favor of appellants on their second issue.[6]

2. Money Had and Received

In their third issue, appellants contend "the trial court erred in granting summary judgment on [a]ppellees' claims for money had and received because recovery is barred by the voluntary payment doctrine." Appellees respond in part that this argument fails because appellants did not plead voluntary payment as an affirmative defense and "did not cite evidence to or raise the issue of voluntary payment" in their summary judgment response in the trial court. In their reply brief in this Court, appellants assert in part (1) "[t]he voluntary payment doctrine is an equitable estoppel-based defense," (2) appellants "pled equitable estoppel" in their answer, and (3) "[b]ecause **[**33]** [plaintiffs] failed to specially except to [defendants'] affirmative defenses, asserting a general equitable estoppel defense was sufficient to plead the sub-defense of voluntary payment."

**[*189]** "Money had and received is a category of general assumpsit to restore money where equity and good conscience require refund." *MGA Ins. Co. v. Charles R. Chesnutt, P.C., 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.); accord Edwards v. Mid-Continent Office Distribs., L.P., 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied)*. "A cause of action for money had and received is not premised on wrongdoing, but 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" *MGA Ins. Co., 358 S.W.3d at 813* (quoting *Amoco Prod. Co. v. Smith, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ))*. "In short, it is an equitable doctrine applied to prevent unjust enrichment." *Id.* "To prove a claim for money had and received, a

---

[6] In their **[**32]** first issue, appellants contend "the trial court erred in granting summary judgment on [a]ppellees' claim for breach of contract because [a]ppellees failed to conclusively prove causation." In light of our disposition of appellants' second issue, we need not reach appellants' first issue. *See Tex. R. App. P. 47.1*.

plaintiff must show that a defendant holds money which in equity and good conscience belongs to him.″ *Id*.

Under the voluntary payment rule, ″'[m]oney voluntarily paid on a claim of right, with full knowledge of [**34] all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'″ *BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 763, 768 (Tex. 2005)* (quoting *Pennell v. United Ins. Co., 150 Tex. 541, 243 S.W.2d 572, 576 (Tex. 1951))*. ″The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense.″ *Id*.; *see Miga v. Jensen, 299 S.W.3d 98, 103 (Tex. 2009)* (voluntary payment rule is ″a defense to a restitution claim″).

The record shows appellants did not assert the voluntary payment rule as a defense or address voluntary payment in their summary judgment response. *See BMG Direct Mktg., Inc., 178 S.W.3d at 768*; *TEX. R. CIV. P. 166a(c)*. Further, appellants cite no authority, and *HN8* we have found none, to support their assertion that the voluntary payment rule is a ″sub-defense″ of a ″general equitable estoppel defense.″ *Cf. Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507,*

*515-16 (Tex. 1998)* (″[T]he doctrine [**35] of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.″). We conclude appellants' third issue presents nothing for this Court's review. *See TEX. R. CIV. P. 166a(c)*.

We decide against appellants on their third issue.[7]

### 3. Objections to Berryman's Affidavit

Next, we address appellants' ninth issue, in which they assert the trial court ″erred in sustaining [a]ppellees' objections to [a]ppellants' summary judgment evidence.″ Specifically, appellants assert the trial court abused its discretion by [**36] sustaining appellees' objections to Berryman's affidavit respecting ″improper conclusions and opinions,″ irrelevant testimony, hearsay testimony, and lack of required attachments.

[*190] Appellees respond in part that ″[a]ppellants waived any alleged error by failing to address independent and alternative grounds to exclude evidence.″ Specifically, appellees assert in part that appellants ″nowhere address″ appellees' (1) supplemental objection ″to the entirety of Berryman's affidavit for failing to be

---

[7] The record shows that in their motion for summary judgment, appellees requested damages of $333,666.63 in connection with plaintiffs' claim for money had and received. Further, the trial court's judgment does not show the damages awarded therein are based on a particular claim. Therefore, the record shows plaintiffs' claim for money had and received, alone, supports the full amount of damages awarded in the judgment.

based on personal knowledge" and (2) "objections to paragraphs 9, 12, 15, 16, 19, 22, 24, and 28 of Berryman's affidavit as being a sham affidavit that directly contradicted his deposition testimony."

*HN9* We review a trial court's ruling that sustains an objection to summary judgment evidence for an abuse of discretion. *Cantu v. Horany, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.)*; *Bradford Partners II, L.P. v. Fahning, 231 S.W.3d 513, 521 (Tex. App.—Dallas 2007, no pet.)*. "[W]hen an appellee urges several objections to a particular piece of evidence and, on appeal, the appellant complains of its exclusion on only one of those bases, the appellant has waived that issue for appeal because he **[**37]** has not challenged all possible grounds for the trial court's ruling that sustained the objection." *Cantu, 195 S.W.3d at 871*; *see Bradford Partners, 231 S.W.3d at 521*; *Goodenberger v. Ellis, 343 S.W.3d 536, 540 (Tex. App.—Dallas 2011, pet. denied)*.

As described above, appellants filed an initial brief and a reply brief in this Court. In those briefs, appellants do not address appellees' objections that portions of Berryman's affidavit constituted a "sham affidavit." Therefore, we conclude appellants have presented no challenge in this Court to the trial court's sustaining of appellees' "sham affidavit" objections respecting paragraphs 9, 12, 15, 16, 19, 22, 24, and 28 of Berryman's affidavit. *See Cantu, 195 S.W.3d at 871*; *Bradford Partners, 231 S.W.3d at 521*.

As to appellees' objection "to the entirety of Berryman's affidavit for failing to be based on personal knowledge," appellants contend in their reply brief in this Court that they "properly addressed [appellees'] personal knowledge arguments, and therefore, did not waive their right to argue against them on appeal." According to appellants, in their initial appellate brief, they (1) "cite to [Berryman's] testimony that he was present **[**38]** during his conversations with [Brinkmann] and certain JBBI employees, and therefore demonstrated he had the personal knowledge regarding what statements were made during those conversations"; (2) "dedicated an entire section of their brief to explaining how the statements of Brinkmann and his employees were not hearsay because the statements constitute admissions by a party opponent"; and (3) explained "how [appellees'] own internal business records were the source of [Berryman's] personal knowledge."

First, appellants' citations in their initial appellate brief that purportedly show Berryman's "personal knowledge" as to his conversations with Brinkmann and JBBI employees appear in a section of appellants' brief addressing objections to "conclusory statements" of Berryman. The issue of whether Berryman's "personal knowledge" was based on hearsay was not addressed with respect to those statements.

Second, in the portion of appellants' initial appellate brief addressing appellees' hearsay objections, appellants assert appellees are "incorrect" that Berryman's

affidavit contained hearsay. Then, appellants contend, "For one, contrary to [appellees'] arguments, the statements of people in [**39] [appellees'] accounting department that certain submitted reimbursements had been approved (CR at 712) fall under the hearsay exception for admissions [*191] of a party opponent." In support of that contention, appellants cite *Texas Rule of Evidence 801(e)(2)(D)*. *See* **HN10** *TEX. R. EVID. 801(e)(2)(D)* (providing hearsay exception for statement by party's agent or servant concerning matter within scope of agency or employment made during existence of relationship). The page of the record specifically cited by appellants, page 712, is a page of Berryman's affidavit that contains paragraphs 26 and 27 and portions of paragraphs 25 and 28. The only statement on that page pertaining to appellees' "accounting department" reads as follows: "Part of my claim for breach of contract based on unreimbursed expenses occurred in 2006 and 2007 as well as 2008. I was assured that these reimbursements had been approved by the accounting department and would be forwarded to me." While *rule 801(e)(2)(D)* provides a hearsay exception for certain statements by a "party's agent or servant," the page of Berryman's affidavit cited by appellants does not state who "assured" Berryman the reimbursements in question had been [**40] approved.[8] *See Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 908 (Tex. 2004)* (proponent of hearsay has burden to show testimony fits within exception). Appellants do not otherwise cite any "statements of Brinkmann and his employees" that they contend "constitute admissions by a party opponent."

Finally, in the third portion of appellants' initial brief to which they direct this Court, appellants specifically address appellees' objection that Berryman's affidavit should be struck because Berryman did not attach required documents pursuant to *Texas Rule of Civil Procedure 166a(f)*. *See TEX. R. CIV. P. 166a(f)* (providing in part that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto"). Appellants cite the following statement of Berryman in his affidavit:

> I am personally aware of my own actions [**41] since 2001, and the damages claimed by [d]efendants in this action. In addition, I have personal knowledge of the facts set forth below based on my direct conversations with [Brinkmann]; employees of [JBBI]; the business records of [JBBI] . . . ; and the business records of [BSF].

Then, appellants argue that because Berryman "simply identified a source from which his personal knowledge was developed" and "does not refer to documents in this paragraph," he "was not required to attach documents." Appellants do not address hearsay in that argument.

---

8    The record shows paragraph 24 of Berryman's affidavit also addressed approval of reimbursements. However, (1) appellants do not cite to paragraph 24 in their appellate argument respecting hearsay and (2) Berryman's statements in paragraph 24 were among those objected to pursuant to the "sham affidavit" objections described above.

Because the trial court could have granted appellees' objections to Berryman's affidavit on grounds not challenged by appellants, we conclude appellants have waived their complaint that the trial court erred by sustaining appellees' objections to their summary judgment evidence. *See Goodenberger, 343 S.W.3d at 540* (citing *Cantu, 195 S.W.3d at 871*).

We decide appellants' ninth issue against them.

4. Appellants' Breach of Contract Counterclaim

Now, we address together appellants' tenth and eleventh issues, in which they assert error by the trial court in granting summary judgment on their counterclaim for "breach of the agreement to reimburse expenses." **[**42]** Specifically, in their tenth issue, **[*192]** appellants assert the evidence "raises material questions of fact as to the existence, terms, and breach" of the agreement to reimburse expenses. In their eleventh issue, appellants contend in part that material fact questions exist pertaining to the applicability of the statute of frauds, including whether the agreement to reimburse expenses (1) was an immaterial change to the Agreement, (2) "modified only the one year renewals of the Agreement," (3) "was independent of the Agreement," and (4) is enforceable under the doctrine of partial performance.

Appellees respond that "the statute of frauds bars appellants' expense reimbursement breach of contract claim." Further, appellees argue partial performance does not bar application of the statute of frauds in this case because appellants waived that defense.

*HN11* Under the statute of frauds, certain contracts are not enforceable unless they are in writing and signed by the person against whom enforcement of the contract is sought. *See Tex. Bus. & Com. Code Ann. § 26.01(a)* (West 2009); *S & I Mgmt., Inc. v. Sungju Choi, 331 S.W.3d 849, 854 (Tex. App.—Dallas 2011, no pet.)*. The party pleading the statute of **[**43]** frauds bears the burden of establishing its applicability. *See Kalmus, 390 S.W.3d at 589*.

*HN12* The statute of frauds applies to, *inter alia*, "an agreement which is not to be performed within one year from the date of the making of the agreement." *Tex. Bus. & Com. Code Ann. § 26.01(b)(6)*. When a promise or agreement, either by its terms or by the nature of the required acts, cannot be completed within one year, it falls within the statute of frauds and is unenforceable unless it is in writing and signed by the person to be charged. *See id. § 26.01(a)*, *(b)(6)*; *Kalmus, 390 S.W.3d at 589*. If the agreement is capable of being performed within one year, it is not within the statute of frauds. *Kalmus, 390 S.W.3d at 589* (citing *Gerstacker v. Blum Consulting Eng'rs, Inc., 884 S.W.2d 845, 849 (Tex. App.—Dallas 1994, writ denied))*. The question of whether an agreement falls within the statute of frauds is one of law. *See Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795, 796 (Tex. 1961)*; *Biko v. Siemens Corp., 246 S.W.3d 148, 159 (Tex. App.—Dallas 2007, pet. denied)*. However, whether the circumstances of a particular

case fall within an exception to the statute of frauds is generally a question of fact. *See* *Kalmus, 390 S.W.3d at 589*; [**44] *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 705 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

*HN13* In deciding whether an agreement is capable of being performed within one year, we compare the date of the agreement to the date when the performance under the agreement is to be completed. *Kalmus, 390 S.W.3d at 590*. If there is a year or more between those two reference points, a writing is required to render the agreement enforceable. *Id*. When the date performance will be completed cannot be readily ascertained, the law provides that if performance could conceivably be completed within one year of the agreement's making, a writing is not required to enforce it. *Id*.; *see also* *Miller v. Riata Cadillac Co., 517 S.W.2d 773, 775 (Tex. 1974)* (″If a contract can, from the terms of the agreement, be performed within one year it is not within the Statute of Frauds.″).

*HN14* Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. *Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 439 (Tex. App.—* [*193] *Dallas 2002, pet. denied)*. [**45] The partial performance must be unequivocally referable to the agreement and corroborative of the fact that a contract actually was made. *Id*.; *Holloway v.*

*Dekkers, 380 S.W.3d 315, 324 (Tex. App.—Dallas 2012, no pet.)*. The performance a party relies on to remove a parol agreement from the statute of frauds ″must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced.″ *Breezevale, 82 S.W.3d at 439-40*. Without such precision, the acts of performance do not tend to prove the existence of the parol agreement sought to be enforced. *Id. at 440*.

First, we address appellants' argument in their eleventh issue that the alleged agreement to reimburse expenses ″modified only the one year renewals of the Agreement″ and therefore was not barred by the statute of frauds. Appellants contend ″[e]ven if the statute of frauds initially applied to the expense reimbursement agreement as a modification of the 2001 Agreement, an agreement to reimburse expenses can be implied regarding the one year renewals of the 2001 Agreement that would not be barred by the statute of frauds.″ According to appellants, (1) ″[o]nce the initial term of the 2001 Agreement [**46] expired, and it automatically renewed on an annual basis, it was no longer covered by the statute of frauds because it was capable of being performed within a year″ and (2) ″[l]ikewise, the modification of the 2001 Agreement to allow for expense reimbursement would not be covered by the Statute of Frauds.″ In support of their argument, appellants cite *Garcia v. Karam, 154 Tex. 240, 276 S.W.2d 255, 257 (Tex. 1955)*, for the statement that ″[i]f neither

the portion of the written contract affected by the subsequent modification nor the matter encompassed by the modification itself is required by the Statute of Frauds to be in writing, then the oral modification will not render the contract unenforceable." Additionally, appellants cite *Miller* for the statement that "contracts that can be performed within one year are not within the Statute of Frauds." *Miller, 517 S.W.2d at 775*.

*Garcia* involved a purchaser's action for a seller's alleged breach of a written contract for the sale of realty. *Garcia, 276 S.W.2d at 256*; *see also* Tex. Bus. & Com. Code Ann. *§ 26.01 (b)(4)* (providing contract for sale of real estate is within statute of frauds). The contract provided that $20,000 of the purchase price was to [**47] be paid by merchandise. *Garcia, 276 S.W.2d at 256*. Subsequent to executing the written contract, the parties orally agreed that the seller would accept the merchandise without the necessity of taking inventory. *Id*. The purchaser later filed and prevailed in a suit to enforce the contract as modified by the oral agreement. *Id*. On appeal to the supreme court, the seller contended the oral modification of the contract was prohibited by the statute of frauds because it amounted to a "complete change" of the terms of the contract between the parties and was an attempt to "substitute an entirely new consideration" for the one required by the writing. *Id*. The supreme court reasoned, "Had the [plaintiff] contracted in writing for the sale of his merchandise for '$20,000.00, at invoice', and subsequently agreed orally with the [defendant] to

convey without an inventory, the Statute of Frauds would have been wholly inapplicable." *Id. at 257*. The court stated that the oral modification did not change the "subject matter of the contract," but "only the method of performing it." *Id*. Therefore, the court concluded, the subsequent oral modification of the written contract was valid. *Id*.

In *Miller*, [**48] Kenneth F. Miller was employed by Riata Cadillac Co. as a used car manager pursuant to an oral contract. [*194] *Miller, 517 S.W.2d at 774*. Miller was terminated after approximately three and one-half years and filed suit against Riata to enforce the alleged terms of the oral contract. *Id*. Riata argued the contract was an unenforceable contract within the statute of frauds. *Id*. On appeal, the supreme court concluded in part that because it was undisputed that the contract was an "indefinite term employment contract," it was considered performable in one year and therefore was not within the statute of frauds. *Id. at 776*.

Unlike the case before us, neither *Garcia* nor *Miller* involved a contract with an initial term longer than one year followed by automatic annual renewals. Further, neither case discussed application of the statute of frauds to such a contract. Therefore, we do not find those cases instructive. Appellants cite no other authority, and we have found none, to support their position that "[o]nce the initial term of the 2001 Agreement expired, . . . it was no longer covered by the statute of frauds because it was capable of being performed within a year." *Cf. Hampton v.*

*Lum, 544 S.W.2d 839, 841 (Tex. Civ. App.—Texarkana 1976, no writ)* [**49] (construing lease as "demise for twenty-four months" where lease provided for one-year period that automatically renewed for another year in the absence of notice).

As described above, the record shows the Agreement stated it was for "a term of five years starting August 1, 2001 and is to be renewed annually thereafter unless either parties [sic] gives notice in writing 90 days prior to the end of any anniversary date." Additionally, the record shows (1) Berryman testified in part in his deposition that at approximately the same time the Agreement was executed in 2001, he and JBBI entered into an oral agreement that Berryman's business expenses would be reimbursed by JBBI and (2) Brinkmann testified JBBI reimbursed Berryman for various expenses starting in 2001 and continuing until at least 2006. We cannot agree with appellants that there is evidence in the record that the alleged modification of the 2001 Agreement to allow for expense reimbursement was capable of being performed within one year.

Second, we address appellants' assertion in their eleventh issue that the statute of frauds does not bar the modification in question because it was "an immaterial change to the Agreement." [**50] According to appellants, the statute of frauds is applicable to the modification in this case only if "the modification materially effects the obligations of the underlying agreement." In support of that position, appellants cite a case involving an oral modification to reduce a real estate brokerage commission in a contract to sell real estate. *See Am. Garment Props., Inc. v. CB Richard Ellis-El Paso, L.L.C., 155 S.W.3d 431, 437 (Tex. App.—El Paso 2004, no pet.)*. However, we concluded above that the alleged modification of the 2001 Agreement to allow for expense reimbursement was not capable of being performed within one year. Appellants cite no authority, and **HN15** we have found none, to support the position that a modification not capable of being performed within one year falls outside the statute of frauds if it constitutes an "immaterial change" to the original contract. *See Tex. Bus. & Com. Code Ann. § 26.01(b)(6)*. We cannot agree with appellants that the materiality of the modification in question has any bearing on the application of the statute of frauds in this case.

Third, appellants contend in their eleventh issue that "[e]ven if the statute of frauds applies to modifications [**51] of the 2001 Agreement, the expense reimbursement agreement alternatively should be viewed [*195] not as a direct modification of the 2001 Agreement, but rather as independent of the 2001 Agreement." According to appellants, because there is no time period fixed for performing the "independent" expense reimbursement agreement, "it must be treated as capable of being performed within a year." Therefore, appellants assert, "if the expense reimbursement agreement is independent of the 2001 Agreement, the

statute of frauds would not bar its enforcement."

Appellees contend appellants pleaded and argued in the trial court that "there was an oral *modification* of the written Agreement." (emphasis original). According to appellees, appellants did not assert in the trial court that "the expense reimbursement agreement was a stand alone agreement" and therefore appellants cannot make that contention for the first time on appeal. Further, appellees argue, "even if such an agreement existed, it could not have been performed within one year because it would necessarily correlate to the five (5) year term of the Agreement."

The record shows appellants asserted in their amended response to the motion for summary [**52] judgment that the agreement to pay expenses was an "oral modification" of the Agreement and/or an "implied in fact modification." Appellants did not argue in the trial court that "the expense reimbursement agreement is independent of the 2001 Agreement." Consequently, that argument presents nothing for this Court's review. *See* TEX. R. CIV. P. 166a(c); *McConnell, 858 S.W.2d at 343*; *Clear Creek Basin Auth., 589 S.W.2d at 676-77*.

Fourth, we address appellants' argument that the partial performance exception to the statute of frauds applies in this case. The record shows that in their amended response to appellees' motion for summary judgment in the trial court, appellants asserted "part performance by the parties

takes the Agreement outside the statute of frauds." In a footnote to that statement, appellants cited the portion of *Breezevale* that states the law described above respecting partial performance. *See 82 S.W.3d at 439*. Appellants' argument as to "part performance" in the trial court contained no other statements, analysis, or citations to authority or to the record.

*HN16* "[A] party submitting summary judgment evidence 'must specifically identify the supporting proof on file that it seeks [**53] to have considered by the trial court.'" *Bich Ngoc Nguyen v. Allstate Ins. Co., 404 S.W.3d 770, 776 (Tex. App.—Dallas 2013, pet. denied)* (quoting *Arredondo v. Rodriguez, 198 S.W.3d 236, 238 (Tex. App.—San Antonio 2006, no pet.))*. On this record, we conclude the trial court did not err by concluding appellants did not satisfy their burden to raise a fact issue as to partial performance. *See id. at 777*; *see also MGA Ins. Co., 358 S.W.3d at 815*; *TEX. R. CIV. P. 166a(i)*.

Based on the preceding analysis, we conclude the trial court did not err by concluding the requirements of the statute of frauds apply to the alleged agreement to reimburse expenses. *TEX. BUS. & COM. CODE ANN. § 26.01(a)*, *(b)(6)*. We decide against appellants on their eleventh issue.

In their tenth issue, appellants assert that even if the trial court properly excluded Berryman's affidavit, the remaining evidence in the record "raises material questions of fact as to the existence, terms, and breach" of the agreement to reimburse expenses. In a footnote to their appellate

argument on this issue, appellants contend appellees "err in assuming that the expense reimbursement agreement must have been in writing." However, we concluded [**54] above that the trial court did not [*196] err by concluding the expense reimbursement agreement was within the statute of frauds. *See id.* Because the record does not show the expense reimbursement agreement was in writing and signed by the party to be charged, that agreement is unenforceable. *Id.* Consequently, the evidence described by appellants has no bearing on whether the trial court erred in granting summary judgment respecting the agreement to reimburse expenses.

We decide appellants' tenth issue against them.

5. Declaratory Judgment

Chapter 37 of the Texas Civil Practice and Remedies Code is titled "Declaratory Judgments." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001-37.011 (West 2008). *Section 37.004* of that chapter provides in part

> HN17 A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

*Id.* § 37.004(a).

HN18 We review [**55] declaratory judgments under the same standards as other judgments. *Id.* § 37.010; *Lidawi v. Progressive Cnty. Mut. Ins. Co., 112 S.W.3d 725, 730 (Tex. App.—Houston [14th Dist.] 2003, no pet.).* We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Lidawi, 112 S.W.3d at 730.* Thus, in the case before us, we review the propriety of the trial court's declaratory judgment under the same standards we apply to a summary judgment. *Id.*

a. Redundancy

In their fourth issue, appellants assert "the trial court erred in granting summary judgment on [a]ppellees' declaratory judgment claim because declaratory relief was redundant with [a]ppellees' breach of contract claim and therefore barred as a matter of law." Appellees respond in part that "[a]ppellants did not object or otherwise argue to the trial court that declaratory relief was 'merely redundant or duplicative' of [a]ppellees' other claims" and "cannot do so for the first time on appeal." Appellants argue in their reply brief in this Court that their complaint respecting the redundancy of the declaratory judgment claim was not "waived" by their failure to object at the trial level because (1) [**56] "[a] failure to object is not waiver when error is apparent from the face of the record" and (2) "it is apparent from the face of the record that [plaintiffs'] breach of contract and declaratory judgment claims involve the

same issues and resolution of one adds nothing to the other."

In support of their argument that their failure to object did not constitute "waiver," appellants cite *Coastal Transport Co., Inc.* See [136 S.W.3d at 233](#). However, unlike the case before us, that case involved a no-evidence challenge asserted for the first time on appeal. The supreme court concluded in that case that when such a challenge is "restricted to the face of the record (for example, when expert testimony is speculative or conclusory on its face)," a party "may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility." In the case before us, appellants do not explain, and the record does not show, how their complaint respecting redundancy is a challenge to the legal sufficiency of the evidence.

[*197] On this record, we conclude appellants' fourth issue presents nothing for this Court's review. *See* [TEX. R. CIV. P. 166a(c)](#); *cf.* [*Narisi v. Legend Diversified Inv., 715 S.W.2d 49, 51-52 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)*](#) [**57] (rejecting argument that declaratory judgment counterclaim was redundant where issue was not raised until after judgment was signed); *City of Dallas/DISD v. US W. Fin. Servs., Inc.*, No. 05-92-01106-CV, 1993 WL 147262, at *5 (Tex. App.—Dallas Apr. 27, 1993, no writ) (not designated for publication) (declining

to consider complaint that declaratory judgment claim was "duplicative" as grounds for reversal of summary judgment because such issue was not raised in trial court).

We decide against appellants on their fourth issue.

b. Fact Questions Respecting Trial Court's Declarations

In their fifth and sixth issues, appellants contend the trial court erred in granting summary judgment on appellees' declaratory judgment claim because fact questions exist (1) "as to the trial court's declarations" and (2) "concerning whether [a]ppellees' conduct excused further performance by [a]ppellants."[9]

First, we consider appellants' assertion in their sixth issue that "any breach by [appellants] was excused by [appellees'] conduct." In support of their argument, appellants cite the general rule that "performance is excused when a party to a contract prevents the other from performing." *See* [*O'Shea v. Int'l Bus. Mach. Corp., 578 S.W.2d 844, 846 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.)*](#). Appellants contend that "[u]nder this general rule, actions of [appellees] that undermined or interfered with [appellants'] ability to sell or market products excused any alleged breach of such duties because such actions prevented performance."

---

9 Additionally, appellants assert in part in their sixth issue that summary judgment on appellees' breach of contract claim was precluded by fact issues respecting whether appellants' performance was excused. However, we concluded in our analysis pertaining to issue two above that the trial court erred by granting [**58] summary judgment in favor of appellees on their breach of contract claim. Therefore, we need not address the portion of appellants' sixth issue pertaining to appellees' breach of contract claim.

Additionally, appellants cite *O'Shea* in support of their position that "[a]ny question of fact as to whether [appellees] interfered with [appellants'] performance would preclude summary judgment."

Appellees respond in part that appellants "cite [**59] no authority for the proposition that 'undermining' or 'interfering' are the equivalent of preventing performance." Further, appellees argue the trial court "properly disposed of appellants' attempt to excuse their breach as a matter of law" because "[a]ppellees presented to the trial court undisputed evidence that [a]ppellants were at all times able to perform despite the actions [a]ppellants want to complain about."

The court in *O'Shea* did not address the question of whether evidence that a party "interfered" with performance constitutes evidence that performance was prevented. *See* 578 S.W.2d at 846. Appellants cite no other authority, and we have found none, in support of their position that "[a]ny question of fact as to whether [appellees] interfered with [appellants'] performance would preclude summary judgment." In support of their argument that the evidence raises a fact question as to whether appellants' performance of the Agreement was "prevented," appellants cite portions of (1) Berryman's affidavit and (2) the depositions of Berryman and [*198] Brinkmann. We concluded above that the trial court did not err by sustaining appellees' objection to Berryman's affidavit. Therefore, we [**60] do not consider that affidavit in our analysis. The

excerpts from Berryman's deposition cited by appellants include Berryman's testimony that (1) during two separate meetings in 2006 and 2008, Brinkmann stated in front of retailers' representatives that Berryman "didn't work" and buyers did not want to do business with Berryman; (2) in approximately April 2008, JBBI hired Mike Bush; and (3) at the time Bush was hired, Bush told Berryman that Berryman was "being replaced" by Bush. Additionally, appellants cite deposition testimony of Brinkmann respecting the hiring of Bush.

The record shows Berryman testified in his deposition that he was still able to perform his duties under the Agreement after the negative comments made by Brinkmann in 2006 and 2008. Therefore, we cannot conclude those comments prevented Berryman's performance. In their reply brief in this Court, appellants assert that even if the "defamatory statements" of Brinkmann did not prevent performance, appellees "wholly frustrated [appellants'] ability to perform" because they "effectively eliminated [Berryman's] position" by hiring Bush and "wresting away [Berryman's] authority to act on his accounts." However, the deposition [**61] testimony cited by appellants does not show Berryman's performance was prevented by the hiring of Bush. Further, Berryman testified in his deposition that he was not replaced by Bush. On this record, we cannot conclude the evidence raises a fact question as to whether appellants' performance of the Agreement was "excused."

We decide against appellants on their sixth issue.

As to the trial court's four declarations in the judgment, all are challenged by appellants. However, in light of our conclusions above, appellants' arguments respecting the trial court's declaration ″c″ need not be addressed.[10] Consequently, we address only appellants' challenges respecting the following declarations:

a. Defendants ceased performing under the Agreement in, at least, May of 2008 when Berryman refused to fulfill his duties and obligations for Plaintiffs. This constituted a material breach of the Agreement. The Agreement was at a minimum terminable from that point forward by Plaintiffs, and after making every reasonable effort to communicate with Berryman, Plaintiffs lawfully terminated the Agreement in August 2008. Thus, no further obligations are owed or due to Defendants under the Agreement.

b. Notwithstanding [**62] Plaintiffs' lawful termination of the Agreement, the Agreement expired on August 1, 2008. The Agreement provides for automatic renewal upon the anniversary date of the contract only if neither party provides written notice to the other party to the contrary. Here, Defendants' Agreement Termination Letter was received by Plaintiffs in May of 2008, and the Agreement expired by its own terms on August 1, 2008 as a result.

. . . .

[*199] d. JBBI did not, constructively or otherwise, breach the Agreement.

With respect to declaration ″a,″ appellants argue they ″presented evidence that the 2001 Agreement had [**63] already been constructively terminated by [appellees'] conduct that undermined and interfered with [appellants'] performance of the contract.″ According to appellants, ″[t]his evidence raised a fact question as to whether [appellees] breached the agreement, which should have prevented the trial court from entering summary judgment and making the above declaration.″

Appellees respond in part that appellants' argument respecting ″constructive termination″ is waived because appellants ″do not cite or analyze any cases in alleged support of their contention that constructive termination principles apply in non-employment contract cases or, if such did apply, connecting evidence to elements of constructive termination to demonstrate

---

10  Specifically, appellants contend the trial court's declaration ″c″ was issued in error because ″[t]he existence of fact questions surrounding the partial performance doctrine and the modification of the 2001 Agreement's one year extensions prevented [appellees] from conclusively proving that the oral agreements [to reimburse expenses] were not part of the 2001 Agreement.″ We concluded in the analysis above pertaining to issue eleven that the trial court did not err by concluding no fact questions existed as to partial performance and ″modification of the 2001 Agreement's one year extensions.″

the existence of a fact issue." Additionally, appellees contend "[t]he evidence is uncontroverted that working conditions did not force [a]ppellants to stop performing, and that [a]ppellants did not 'resign' or stop performance when the alleged offending incidents occurred, such being requirements of a constructive discharge claim in the employment context."

In their reply brief in this Court, appellants contend appellees' allegations of "waiver" fail for two [**64] reasons. First, appellants assert appellees "misunderstand the point" of appellants' argument. Specifically, appellants assert "[t]he 'constructive termination' language was loosely used to argue that [appellees] breached before [appellants'] alleged breach, and therefore, the further performance by [appellants] was excused." Appellants contend they "presented summary judgment evidence that [appellees] breached before [May 2008] by engaging in conduct that undermined and interfered with [appellants'] performance of the contract." In support of that assertion, appellants cite the same evidence cited by them in their argument pertaining to prevention of performance in their sixth issue above. To the extent appellants assert an argument distinct from their argument pertaining to their sixth issue, appellants do not provide analysis or authority for such argument. Therefore, such argument presents nothing for this Court's review. *See* _Tex. R. App. P. 38.1(i)._ Second, appellants assert in their reply brief that "there is no merit to

[appellees'] contention that 'constructive termination' is a concept limited to application in the employment context." According to appellants, "constructive [**65] termination is a concept that is recognized in many types of relationships." In support of that assertion, appellants cite cases that purportedly relate to constructive termination in the contexts of franchise agreements, licensing agreements, and leases. However, appellants do not address the elements of constructive termination in their briefs in this Court or explain how appellees' alleged conduct in question constituted constructive termination. Consequently, we conclude appellants' argument respecting constructive termination presents nothing for this Court's review.[11] *See* _Tex. R. App. P. 38.1(i)._ As to declaration "d," appellants contend that declaration was issued in error because appellants "presented evidence that raised a fact question as to [appellees'] breach of the 2001 Agreement by undermining and interfering with [appellants'] performance." In support of that argument, appellants cite to their analysis pertaining [*200] to their sixth issue and the evidence cited therein. However, again, to the extent appellants assert an argument distinct [**66] from their argument pertaining to their sixth issue, appellants do not provide analysis or authority for such argument and therefore present nothing for this Court's review. *See* _Tex. R. App. P. 38.1(i)._ As to the trial court's declaration "b," appellants contend they presented evidence

---

[11] In oral argument before this Court, counsel for appellants asserted the Agreement was terminated according to its terms on August 29, 2008.

that raises fact questions as to the termination of the Agreement. Specifically, appellants assert

> [T]he evidence shows that the termination provision requires 90 days' notice for any termination. Otherwise the 2001 Agreement automatically renews. It is undisputed that 90 days' notice was not provided by either party. Thus, under the express terms of the 2001 Agreement no termination occurred. At the very least, a fact question exists that should have prevented the trial court from making this declaration.

(citations to record omitted).

Appellees respond in part that because appellants "cite and analyze no cases for their position that the Agreement did not expire in August 2008 as determined," that argument is waived. Additionally, appellees assert (1) "[a]ppellants' Termination Letter sent 72 days prior to renewal when coupled with [a]ppellants' failure to resume performance of the Agreement precluded [**67] automatic renewal as [a]ppellees under such circumstances are not obligated to require [a]ppellants to comply with the Agreement's notice provision"; (2) [a]ppellants' breach precluded the Agreement's renewal"; and (3) "[n]o fact questions could exist on this point in any event" because "[t]he meaning of contract language is a question of law for the court." In support of their argument, appellees cite cases pertaining to waiver of contract provisions and cessation of performance due to breach. *See Long Trusts v. Griffin, 222 S.W.3d 412, 415-16 (Tex. 2006); Guzman v. Ugly Duckling Car Sales of Tex., L.L.P., 63 S.W.3d 522, 528 (Tex. App.—San Antonio 2001, pet. denied)*; *Roma Indep. Sch. Dist. v. Ewing Constr. Co., No. 04-12-00035-CV, 2012 Tex. App. LEXIS 5968, 2012 WL 3025927, at *2 (Tex. App.—San Antonio July 25, 2012, no pet.)* (mem. op.); *Atkinson v. Saddlewood Partners, I, Ltd., No. 04-98-00681-CV, 1999 Tex. App. LEXIS 4284, 1999 WL 371285, at *4 (Tex. App.—San Antonio June 9, 1999, pet. denied)* (not designated for publication).

In their reply brief in this Court, appellants contend in part that "[n]o case law is necessary" to resolve this issue in their favor because "it is apparent on the face of the record that no evidence supports [**68] the trial court's declaration that 'the Agreement expired by its own terms on August 1, 2008.'"

Because appellants' argument is based on the language of the Agreement, we cannot agree with appellees that appellants waived this argument by not citing case law. Further, the cases cited by appellees in support of their argument do not involve compliance with a contract provision respecting notice that precludes automatic renewal of the contract. Therefore, we do not find those cases instructive.

The record shows paragraph three of the Agreement stated in part, "This Agreement is for a term of five years starting August

1, 2001 and is to be renewed annually thereafter unless either parties [sic] gives notice in writing 90 days prior to the end of any anniversary date." Berryman's letter alleging he had been "constructively terminated" was dated May 20, 2008, which the parties do not dispute is less than ninety days prior to August 1, 2008. Thus, while the trial court's statement that "Defendants' Agreement Termination Letter was received by [*201] Plaintiffs in May of 2008" is not incorrect, we cannot agree that "the Agreement expired by its own terms on August 1, 2008 as a result." We conclude [**69] no evidence supports the trial court's declaration "b."

We decide in favor of appellants on the portion of their fifth issue respecting the trial court's declaration "b." Appellants' fifth issue is otherwise decided against them. We reverse declaration "b" of the trial court's judgment and render judgment denying summary judgment as to that declaration.

However, the record shows (1) the summary judgment in question was sought and granted on multiple grounds and (2) declaration "b" is immaterial to summary judgment as prayed for by appellees on the ground of money had and received and declarations "a," "c," and "d." Therefore, the trial court's error respecting declaration "b" does not necessitate reversal of the entirety of the trial court's summary judgment. *See Zimmerhanzel, 346 S.W.3d at 724*; *see also Tex. R. App. P. 44.1*.

## 6. Attorneys' Fees

In their seventh issue, appellants assert in part "the trial court erred in awarding [a]ppellees attorneys' fees when [a]ppellees failed to conclusively prove the reasonableness and necessity of the claimed fees by not segregating fees incurred for work on causes of action for which such fees are permitted, from causes of action for which such fees [**70] are barred."[12] According to appellants, (1) "because [appellees'] cause of action for breach of contract fails, the trial court's award of attorneys' fees cannot be based on that action," (2) "[i]t is undisputed that [appellees] presented no evidence segregating the fees incurred in pursuing their claims," and (3) no attempt was made to segregate attorneys' fees incurred in pursuing third-party claims asserted by Brinkmann, individually, that were later nonsuited.

Appellees contend appellants "waived any complaint" respecting segregation of attorneys' fees because they "did not object to [a]ppellees' attorneys' fees evidence or provide controverting evidence." Further, appellees argue, counsel for appellees testified to the trial court "in great detail" in his affidavit, "including segregating 15 percent of the attorney's fees incurred."

*HN19* Texas law does not [**71] allow recovery of attorneys' fees unless authorized by statute or contract. *See, e.g., Tony Gullo Motors I, L.P. v. Chapa, 212*

---

12 Additionally, appellants contend in their seventh issue that "[a]ppellees' redundant declaratory judgment action was used simply to pave a way to attorney fees." As described above, appellants' arguments respecting the redundancy of the declaratory judgment action were not raised below and present nothing for this Court's review.

*S.W.3d 299, 310 (Tex. 2006)*. A person may recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for an oral or written contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)*; *see Ashford Partners, Ltd. v. ECO Res., Inc., 401 S.W.3d 35, 40 (Tex. 2012)* ("[T]o qualify for fees under *[section 38.001(8)]*, a litigant must prevail on a breach of contract claim and recover damages."). Additionally, under *section 37.009 of the civil practice and remedies code*, the trial court in a declaratory judgment proceeding may award "reasonable and necessary attorney's fees as are equitable and just." *Tex. Civ. Prac. & Rem. Code Ann. § 37.009*; *see also Jarvis v. Rocanville Corp., 298 S.W.3d 305, 317 (Tex. App.—Dallas 2009, pet. denied)*.

*HN20* If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. **[*202]** *Tony Gullo Motors, 212 S.W.3d at 313*. "[I]t is only when discrete legal services advance both a recoverable and **[**72]** unrecoverable claim that they are so intertwined that they need not be segregated." *Id. at 313-14*. This standard does not require more precise proof for attorneys' fees than for any other claims or expense. *Id. at 314*. "[T]o meet a party's burden to segregate its attorneys' fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable." *RM Crowe Prop. Servs.*

*Co., L.P. v. Strategic Energy, L.L.C., 348 S.W.3d 444, 453 (Tex. App.—Dallas 2011, no pet.)*; *see CA Partners v. Spears, 274 S.W.3d 51, 82 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)*.

We concluded above that the trial court erred by granting summary judgment on plaintiffs' breach of contract claim. Therefore, attorneys' fees based on that cause of action cannot be recovered. *See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)*. However, as described above, appellants' issues pertaining to declarations "a," "c," and "d" in the final judgment are decided against them in this appeal. Therefore, a basis for recovery of attorneys' fees remains. *See Tex. Civ. Prac. &Rem. Code Ann. § 37.009*.

The record shows that **[**73]** in an affidavit in the appendix to appellees' motion for summary judgment, counsel for appellees testified in part (1) at least 85%, or $127,073, of the attorneys' fees and paralegal fees incurred by plaintiffs so far "are recoverable against the [d]efendants in this lawsuit"; (2) "it is reasonable to conclude that [plaintiffs'] counsel's activities cannot all be segregated by task and as such are dependent on the same or similar sets of facts and circumstances, are part of many of the same tasks, and are therefore so intertwined that they cannot be so separated or segregated" (3) a fair estimate of additional attorneys' fees likely be incurred by plaintiffs through the hearing on plaintiffs' motion for summary judgment to advance plaintiffs' "affirmative claims" against defendants is at least

$33,875; and (4) in the event of appeal respecting plaintiffs' "affirmative claims," plaintiffs will likely incur at least an additional $35,000 in fees in defense of an appeal to the Dallas Court of Appeals, $20,000 in fees in briefing an appeal to the Texas Supreme Court, and $15,000 in fees if the Texas Supreme Court grants a hearing on such appeal. Appellants did not object to this evidence **[**74]** or provide controverting evidence respecting segregation of attorneys' fees. On this record, we conclude appellees met their burden as to segregation of attorneys' fees. *See Tony Gullo Motors, 212 S.W.3d at 313-14*; *RM Crowe Prop. Servs. Co., L.P., 348 S.W.3d at 453*; *see also Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 389 (Tex. 1997)* **HN21** ("if no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived").

We decide against appellants on their seventh issue.[13]

**[*203]**   7. Damages, Attorneys' Fees, Costs, and Interest Awarded to Brinkmann

Lastly, in their eighth issue, appellants contend "the trial court erred in entering judgment in favor of [Brinkmann], individually, when he did not recover on any cause of action." Appellants assert that at the time the final judgment was entered, Brinkmann "was not a party to the affirmative causes of action on which judgment was entered." According to appellants, "[t]he trial court's judgment must be reversed because it awarded damages, attorneys' fees, costs and interest to an individual who was not a party to any cause of action on which those amounts were awarded."

Appellees "agree that the final judgment **[**76]** should be modified so Brinkmann individually is removed from the award of damages or fees because he never requested that relief." Specifically, appellees contend in a footnote in their appellate brief

The Final Judgment provides for recovery of damages and fees to "Movants" collectively, which was a defined term that included both Plaintiffs/Appellees as well as Third Party Defendant/Brinkmann individually. Brinkmann was not a party to the Agreement, or any alleged oral agreements with Appellants and did not assert breach of Agreement or declaratory judgment claims in any pleading or as a part of Appellees' and Brinkmann's summary judgment

---

[13]   This Court has stated that **HN22** "after a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just." *SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc., 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.).* "Therefore, when we reverse a declaratory judgment and the trial court awarded attorneys' fees to the party who prevailed at trial, we may remand the attorneys' fee award for reconsideration in light of our disposition on appeal." *Id.* "We are not required to do so, however." *Id.*; *see City of Temple v. Taylor, 268 S.W.3d 852, 858 (Tex. App.—Austin 2008, pet. denied).* In the case before us, the outcome **[**75]** in the trial court as to the declaratory judgment is not substantially affected by our conclusions above. Therefore, we conclude reconsideration of attorneys' fees is not warranted in this case. *See Advanced Polymer Sciences, Inc., 128 S.W.3d at 324*; *Taylor, 268 S.W.3d at 858*; *cf. Funes v. Villatoro, 352 S.W.3d 200, 217 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)* (where reversal of portion of declaratory relief "substantially affects" trial court's judgment, remand as to attorneys' fees is warranted).

motion. Appellants' third party claims of defamation and business disparagement asserted against Appellees and Brinkmann were dismissed by the trial court and not raised on appeal. Brinkmann non-suited his affirmative claims against Appellants.

(citations to record omitted).[14] However, appellees assert, "[a]ppellants' desire to reverse the entire judgment due to this correctable inadvertent drafting error is not authorized or required." According to appellees, "[a]ppellants' request beyond deleting the award of damages and fees to Brinkmann individually [\*\*77] should be denied."

*HN23* Under *rule 559 of the Texas Rules of Civil Procedure*, "[t]he successful party in the suit shall recover his costs, except in cases where it is otherwise expressly provided." *See* TEX. R. CIV. P. 559. Further, *section 304.003(a) of the Texas Finance Code* provides in part that "[a] money judgment of a court of this state . . . , including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment interest at the rate determined under this section." TEX. FIN. CODE ANN. § 304.003(a) (West 2006); *see Dallas Cnty., Tex. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 50 (Tex. App.—Dallas 2012, pet. denied)

(postjudgment interest accrues on entire amount of final judgment, including court costs and prejudgment interest, from date of judgment until paid).

The record shows that at the time the final judgment in this case [\*\*78] was signed, Brinkmann was a third-party defendant as to appellants' claims for business disparagement, [\*204] defamation, and exemplary damages and had requested costs of court respecting those claims in his answer in the trial court. The trial court granted summary judgment against appellants on those claims and those claims were dismissed and not raised on appeal. However, the record also shows (1) Brinkmann was not a party to the affirmative causes of action on which judgment was rendered, i.e. breach of contract, money had and received, and declaratory judgment and (2) the trial court's awards of damages, attorneys' fees, and prejudgment interest pertain to those claims. Accordingly, we conclude all recoveries in favor of Brinkmann except costs of court and interest on such costs cannot stand.[15] *See* **HN24** TEX. R. CIV. P. 301 (judgment of trial court shall conform to pleadings).

We reverse the portions of the trial court's judgment (1) granting summary judgment in favor of Brinkmann on the claims asserted by JBBI and TBC for breach of

---

[14] With respect to the "affirmative claims" of Brinkmann described by appellees, the record shows that after Brinkmann was named as a third-party defendant, he asserted several claims not relevant to this appeal against appellants in the trial court, then nonsuited those claims prior to the time the trial court's judgment was rendered.

[15] The trial court's judgment provided in part that "Movants shall recover from Defendants, jointly and severally, all costs of court incurred and filed with the Court in this action." The record does not show the parties raised or addressed apportionment of costs in the trial court, nor is apportionment of costs raised [\*\*79] or addressed on appeal.

contract, money had and received, and declaratory judgment and (2) awarding Brinkmann damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. Additionally, we render judgment omitting Brinkmann from (1) the portion of the summary judgment respecting the claims asserted by JBBI and TBC for breach of contract, money had and received, and declaratory judgment and (2) the award of damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. *See Tex. R. App. P. 43.2(c)* (providing appellate court may reverse trial court's judgment in part and render judgment trial court should have rendered). Appellants' eighth issue is otherwise decided against them.

## III. CONCLUSION

We decide in favor of appellants on their second issue and portions of their fifth and eighth issues. We need not reach appellants' first issue. Appellants' remaining issues are decided against them.

We reverse the trial court's judgment, in part, **[**80]** as to (1) declaration ″b″; (2) summary judgment on the breach of contract claim asserted by JBBI and TBC; (3) summary judgment in favor of Brinkmann on the claims asserted by JBBI and TBC for money had and received and declaratory judgment; and (4) the award to Brinkmann of damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. We render judgment (1) denying summary

judgment as to declaration ″b″ and the breach of contract claim asserted by JBBI and TBC and (2) modifying the judgment to omit Brinkmann from the parties granted summary judgment on the affirmative claims asserted by JBBI and TBC and from the trial court's award of damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. The trial court's judgment is otherwise affirmed.

/s/ Douglas Lang

DOUGLAS S. LANG

JUSTICE

## JUDGMENT

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's judgment, in part, as to (1) declaration ″b″; (2) summary judgment on the breach of contract claim asserted by appellees J. Baxter Brinkmann International Corporation and The Brinkmann Corporation; (3) summary judgment in **[**81]** favor of appellee J. Baxter Brinkmann on the claims asserted by J. Baxter Brinkmann International Corporation and The Brinkmann Corporation for money had and received and declaratory judgment; and (4) the award to J. Baxter Brinkmann of damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. We **RENDER** judgment (1) denying summary judgment as to declaration ″b″ and the breach of contract claim asserted by J. Baxter Brinkmann

International Corporation and The Brinkmann Corporation and (2) modifying the judgment to omit J. Baxter Brinkmann from the parties granted summary judgment on the affirmative claims asserted by J. Baxter Brinkmann International Corporation and The Brinkmann Corporation and from the trial court's award of damages, attorneys' fees, prejudgment interest, and postjudgment interest on items other than costs of court. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear their own costs of this appeal. Further, it is **ORDERED** that appellees J. Baxter Brinkmann International Corporation, The Brinkmann Corporation, and J. Baxter Brinkmann recover the full amounts to which they [**82] are entitled under the trial court's judgment from appellants Berryman's South Fork, Inc. and Richard Berryman and from any supersedeas bond or cash deposit in lieu of supersedeas bond. After the judgment and appellants' costs of this appeal have been paid, the clerk of the trial court is **DIRECTED** to release the balance, if any, of any cash deposit in lieu of supersedeas bond to the person who made the deposit.

Judgment entered this 20th day of November, 2013.

/Douglas S. Lang/

DOUGLAS S. LANG

JUSTICE